# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## Charlotte Division

| | |
|---|---|
| A1 KITCHEN & BATH FRANCHISING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>PROVERBS 163 VENTURES, INC., JOEL SENGER, AMY SENGER, and SENGER CUSTOM HOMES, LLC,<br><br>Defendants. | Case No. 3:25-cv-261 |

## COMPLAINT

This is an action for declaratory judgment, breach of contract, trademark infringement, and unfair competition related to Franchise Agreements between Plaintiff A1 Kitchen & Bath Franchising, LLC ("A1" or "Franchisor") and Defendant Proverbs 163 Ventures, Inc. ("Proverbs" or "Franchisee") in which Proverbs was licensed the right to use the "THE DESIGNERY KITCHENS BATHS CLOSETS®," "THE DESIGNERY™," and other related trademarks and service marks for the operation of a franchised business in the Cincinnati, Ohio market area. Defendants Joel Senger and Amy Senger (with Proverbs, collectively referred to as "Franchisee Defendants") personally guaranteed Proverbs' obligations under the Franchise Agreements.

Franchisee Defendants have breached the Franchise Agreements by failing to pay monthly royalty and advertising fees and by violating the in-term covenant not to compete provision, which prohibits Franchisee Defendants from having any interest in a competitive business, among other breaches. As a result of these breaches, A1 properly terminated the Franchise Agreements effective March 28, 2025, and requested Franchisee Defendants comply with their post-termination obligations. As of this date, Franchisee Defendants have failed to deidentify their formerly

franchised business, failed to cease all use of A1's Proprietary Marks and Confidential Information, and are unlawfully operating a competitive business. Accordingly, as set forth below, A1 now seeks damages and injunctive and declaratory relief.

## The Parties

### A. Plaintiff

1.      Plaintiff A1 Kitchen & Bath Franchising, LLC ("A1" or "Franchisor") is a North Carolina limited liability company with its principal place of business located at 107 Parr Drive, in Huntersville, North Carolina. A1 is an entity with a legal existence in good standing in its state of incorporation and has the capacity to sue.

2.      A1 is engaged in the business of franchising independent businesses to operate design and installation services for kitchen, bath, and closet projects in new construction and renovation of both residential and commercial buildings using Franchisor's Proprietary Marks and "THE DESIGNERY™" System.

### B. Defendants

3.      Defendant Proverbs 163 Ventures, Inc. ("Proverbs" or "Franchisee") is a Kentucky corporation with its principal place of business located at 241 North Colony Drive in Edgewood, Kentucky 41017.

4.      On October 20, 2023, Defendant Joel Senger entered two Franchise Agreements with A1 for the operation of a THE DESIGNERY™ franchise in the Cincinnati, Ohio market area. True and correct copies of the Franchise Agreements are attached to this Complaint as Exhibit 1 (hereinafter the "Franchise Agreements"). Pursuant to an Assignment and Assumption Agreement dated April 4, 2024, Defendant Proverbs assumed from Defendant Joel Senger the Franchise Agreements.  A true and correct copy of the Assignment and Assumption Agreement is attached

to this Complaint as Exhibit 2.

5.      Defendant Joel Senger is a natural person and a citizen and resident of the commonwealth of Kentucky. Mr. Senger is the President and CEO of Proverbs and personally guaranteed the obligations of Proverbs pursuant to a guaranty executed in connection with the Assignment and Assumption Agreement. *See* Exhibit B to Assignment and Assumption Agreement.

6.      Defendant Amy Senger is a natural person and a citizen and resident of the commonwealth of Kentucky. Ms. Senger personally guaranteed the obligations of Proverbs pursuant to a guaranty executed in connection with the Assignment and Assumption Agreement. *See* Exhibit B to Assignment and Assumption Agreement.

7.      Defendant Senger Custom Homes LLC is a Kentucky limited liability company with its principal place of business located at 241 North Colony Drive in Edgewood, Kentucky 41017.

## Jurisdiction

8.      This Court has subject matter jurisdiction pursuant to sections 34(a) and 39 of the Lanham Act, 15 U.S.C. §§ 1116(a) and 1121 and 28 U.S.C. §§ 1331, 1338, and 1367.

9.      This Court has *in personam* jurisdiction over Franchisee Defendants because they irrevocably submitted to jurisdiction in the Franchise Agreements from which this dispute arises, by "expressly agree[ing] to the jurisdiction and venue of any court of general jurisdiction in Mecklenburg County, North Carolina and the jurisdiction and venue of the United States District Court for the Western District of North Carolina." (Franchise Agreements § 5). In addition, Franchisee Defendants conduct or conducted business in this District, and a substantial part of the events giving rise to this dispute occurred in this District.

10.     Defendant Senger Custom Homes LLC is, upon information and belief, owned and controlled by Joel and Amy Senger and operates as the alter ego of the Sengers such that they are one in the same, thereby subjecting it to the jurisdiction of this Court to the same extent as the Sengers.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims herein occurred in the District. In addition, under Section 5 of the Franchise Agreements and Section 5 of the Personal Guaranty, Franchisee Defendants agreed to submit to the venue of this Court.

## Background Facts

### A.      The A1 System and The Designery Marks

12.     A1 has developed a proprietary system for the establishment of a series of standards, specifications, marketing, training, and operations for the successful management of franchised businesses that offer design and installation services for kitchen, bath, and closet projects for new construction and renovation of both residential and commercial buildings under "THE DESIGNERY™" name and proprietary marks (the "System"). Through the execution of franchise agreements, A1 authorizes others to use the System, including valuable know-how, information, trade secrets, methods, proprietary standards, and certain proprietary products developed by Franchisor (the "Approved Products"). There are more than twenty-five DESIGNERY franchised businesses located throughout the United States.

13.     A1 authorizes franchisees to use "THE DESIGNERY™," "THE DESIGNERY KITCHENS BATHS CLOSETS®," and other related proprietary tradenames, trademarks, service marks, logos and other indicia of origin (the "Proprietary Marks" or "Marks").

14.     A1 owns federal registrations for the mark "THE DESIGNERY KITCHENS

-4-

BATHS CLOSETS®" (Registration No. 7604876 on the principal register) and "THE DESIGNERY PROS" (Registration No. 7656023 on the supplemental register). A1 has also established significant common law rights in the Proprietary Marks throughout the entire United States, including in the Cincinnati Metro area.

15.     The Proprietary Marks are valid and have been widely advertised and promoted by A1. A1 has continuously used the Proprietary Marks in commerce throughout the United States to identify the System and those who are authorized to operate under the System since at least April 15, 2022. As a result of extensive advertising and promotion of the products, services and System associated with the Marks, the public has come to know and recognize the Marks and associate them exclusively with the products and services offered by THE DESIGNERY™ franchisees. A1 has established substantial and valuable goodwill in the Proprietary Marks, which have become valuable assets to A1.

16.     The goodwill and reputation associated with the Proprietary Marks are harmed or subject to being harmed when a franchisee operates a DESIGNERY™ franchise contrary to the standards and requirements established by the franchise agreement.

**Franchisee Defendants' Obligations Under the Franchise Agreement**

17.     Pursuant to the Franchise Agreements, Franchisee Defendants agreed to operate a THE DESIGNERY™ franchise, for a period of ten years, commencing on October 20, 2023, using Franchisor's Proprietary Marks and System in two adjacent territories in the Cincinnati, Ohio market area.

**A.      Fees to Franchisor**

18.     Under the terms of the Franchise Agreements, Franchisee Defendants agreed to pay certain fees to A1 in exchange for a license to use THE DESIGNERY™ Proprietary Marks and

PPAB 12246447v1

System.

19.     Pursuant to Section 3.2 of the Franchise Agreements, Franchisee Defendants agreed to pay A1 a monthly royalty fee, calculated on the tenth business day of each month for the prior month equal to the greater of: (i) a percentage of the prior month's gross revenue (between 5% and 7% depending on revenue); or (ii) a minimum monthly royalty fee, which is $250 per month for months 4-12 of operation and $550 per month in the second year of operation, for each Franchise Agreement (the "Royalty Fee"). (Franchise Agreements §§ 3.2, 3.2.1, 3.2.2).

20.     Pursuant to Section 3.7 of the Franchise Agreements, Franchisee Defendants also agreed to pay a technology fee, which was $599 per month for both Franchise Agreements, associated with using and maintaining the reservation system, intranet, mobile applications, required computer hardware and software, hosting services and solutions, and any other technology used in the operation of the franchised business (the "Technology Fee"). (Franchise Agreements § 3.7).

21.     Franchisee Defendants agreed that the above fees would be paid automatically through an electronic funds transfer on the tenth day of each month. Specifically, pursuant to Section 3.4 of the Franchise Agreements, Franchisee Defendants agreed to "pay all fees and other amounts due to Franchisor . . . under this Agreement through an electronic funds transfer program (the "EFT Program"), under which Franchisor automatically deducts all payments owed to Franchisor under this Agreement" and Franchisee Defendants were obligated to provide a Withdrawal Authorization Form to permit A1 to withdraw funds. (Franchise Agreements § 3.4).

22.     In addition to paying the fees above, Franchisee Defendants agreed to expend on a monthly basis the greater of: (i) three percent (3%) of Gross Revenue; or (ii) three thousand dollars ($3,000) for the first Franchise Agreement and one thousand five hundred dollars ($1,500) for each

additional contiguous Franchise Agreement (for a total of $4500 per month) on local advertising (the "Local Advertising Requirement"). Franchisee Defendants were required to provide A1 with monthly expense statements evidencing compliance with the Local Advertising Requirement. (Franchise Agreements § 3.6; Multi-Unit Addendum to Franchise Agreements ¶ 4).

23.     If any of the above fee payments were past due, Franchisee Defendants agreed to pay immediately upon demand and recognized A1 was entitled to a $100 per week late fee in addition to one and one-half percent per month interest on the past due amount from the date it was due until the date it is paid. (Franchise Agreements § 3.9).

**B.     Right to Use of Marks**

24.     Franchisee Defendants also agreed to "only use the Proprietary Marks which Franchisor designates," and to "use them only in the manner Franchisor authorizes and permits." (Franchise Agreements § 4.1.1).

25.     Franchisee Defendants were only permitted to use the Proprietary Marks for the operation of their franchised business and in connection with sales and marketing for the franchised business as permitted under the terms of the Franchise Agreement. (Franchise Agreements § 4.1.2).

26.     Indeed, Franchisee Defendants agreed their "right to use the Proprietary Marks is limited to such uses as are authorized under th[e] [Franchise Agreements], and any unauthorized use thereof shall constitute an infringement of Franchisor's rights." (Franchise Agreements § 4.1.5).

**C.     Receipt of Trade Secret and Confidential Information**

27.     Further, Franchisee Defendants acknowledged that during the term of the Agreement, Franchisee Defendants "will receive information which Franchisor considers its trade

PPAB 12246447v1

secret and confidential information" and Franchisee Defendants "may not, during the term of this Agreement or thereafter, communicate, divulge or use for the benefit of any other person or entity, any Confidential Information." (Franchise Agreements § 5.1).

28.     "Confidential Information" is defined without limitation to include:

[A]ny and all proprietary and trade secret information relating to the operation of a Franchised Business, such as: (i) all financial, operational, technical and marketing information; (ii) Operations Manual; (iii) Franchisor's System policies or procedures, and franchising materials, brochures, marketing plans, forecasts, and related information; (iv) cost data; (v) pricing information; (vi) business plans; (vii) financial records and results of Franchisor's operations and other persons or entities operating a Franchised Business; (viii) photographs, devices, samples, models and illustrations; (ix) software developed by or for Franchisor; (x) customer and/or client lists and any information relating to Franchisor's customers or the customers of other System franchisees; (xi) prospect customer/client lists; (xii) patent, trademark, service mark and copyright applications; (xiii) information relating to inventions, discoveries, software, and any other research and development information; (xiv) methods of conducting the business developed by Franchisor or other franchisees, and any forms, memoranda, outlines, protocol, presentations, proposals, software, or other documents or information related to such methods; (xv) any information of a customer not generally known or available to the public; (xvi) any Trade Secrets (defined in Section 5.3), or of a customer of Franchisor, or of any other franchisee; and (xvii) any information about or originating from any Franchisee which, if it was information of Franchisor, is expressly deemed Confidential Information pursuant to the foregoing (collectively, "Confidential Information").

(Franchise Agreements § 5.2).

29.     Section 5.3 of the Franchise Agreements defines "trade secrets" to include, among other things, any components of the System, product marketing and promotional techniques, confidential business information technical or non- technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, and lists of actual or potential customers or suppliers that "derive economic value." (Franchise Agreements § 5.3).

PPAB 12246447v1

#### D. In-Term and Post-Term Noncompete Obligations

30.     Franchisee Defendants agreed that they would not compete during or after the term of the Franchise Agreements.

31.     Specifically, pursuant to Section 17.1 of the Franchise Agreements, Franchisee Defendants agreed that during the term of the Agreement they would not, directly or indirectly:

> Own, maintain, engage in, be employed as an officer, director, or principal of, lend money to, extend credit to, or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers the Approved Products and/or Approved Services or any other products and/or services authorized or offered for sale by System franchisees (a "Competitive Business") within the Designated Territory or the Designated Territory of any other System franchisee . . .

(Franchise Agreements § 17.1.1).

32.     Franchisee Defendants also agreed that they would not "[s]olicit any current, former or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System, or other franchisees for any competitive purpose." (Franchise Agreements § 17.1.3).

33.     Franchisee Defendants also agreed that for a period of two years after termination of the Franchise Agreements or any Holdover Period, they would not, directly or indirectly:

> Own, maintain, engage in, be employed as an officer, director, principal of, lend money to, extend credit to, or have any interest in any Competitive Business: (a) within the Designated Territory; (b) within a twenty-five (25)-mile radius of the Designated Territory of any other Franchised Business; or (c) within a twenty-five (25)-mile radius of any System business operated by Franchisor or its affiliate . . .

(Franchise Agreements § 17.2.1).

34.     Franchisee Defendants also agreed to not solicit any current, former or prospective customer for a period of two years after the termination of the Franchise Agreements or any Holdover Period. (Franchise Agreements § 17.2.3).

35.     Franchisee Defendants further agreed the covenants contained in Section 17 "are

necessary to protect the goodwill . . . of the System" and the covenants "are necessary to protect the Franchisor's procedures and know-how transmitted during the term of this Agreement." (Franchise Agreements § 17.3).

36.     As a result, Franchisee Defendants agreed "that in the event of the actual or threatened breach of this Section 17, Franchisor's harm will be irreparable." (Franchise Agreements § 17.3).

37.     Franchisee Defendants agreed "that each has previously worked or been gainfully employed in other careers and that the provisions of Section 17 in no way prevent any such person from earning a living." (Franchise Agreements § 17.3).

38.     Franchisee Defendants also agreed that the two-year limitations period would be "tolled during any default under this Section." (Franchise Agreements § 17.3).

**E.     Franchisor's Right to Terminate**

39.     Franchisee Defendants agreed that A1 has the right to terminate the Franchise Agreements upon notice and without providing Franchisee Defendants an opportunity to cure for any of the following defaults:

   i.    If Franchisee Defendants materially impair the goodwill associated with the System or Proprietary Marks and fail to cease and correct such activities or conduct within twenty-four hours of notice of a breach (Franchise Agreements § 15.2.3);

   ii.   If Franchisee Defendants violate any provision pertaining to the Proprietary Marks or Confidential Information or misuse the Proprietary Marks or Confidential Information (Franchise Agreements § 15.2.8);

   iii.  If Franchisee Defendants violate the in-term restrictive covenant contained

in Section 17.1, or any other restrictive covenants in the Franchise Agreements (Franchise Agreements § 15.2.11); or

    iv.    If Franchisee Defendants indicate a desire or intent to discontinue the Franchised Business in accordance with the terms of the Franchise Agreements for seven (7) days or more without Franchisor's prior written consent (Franchise Agreements § 15.2.14).

40.    Franchisee Defendants also agreed that A1 has the right to terminate the Franchise Agreements with fifteen (15) days' notice to cure if Franchisee Defendants fail to pay A1 "as and when due any sums owed to" A1. (Franchise Agreements § 15.3.1.)

41.    Moreover, Franchisee Defendants agreed that A1 has the right to terminate the Franchise Agreements with thirty (30) days' notice to cure, if Franchisee Defendants failed to "perform or comply with any other term or condition of this Agreement." (Franchise Agreements § 15.4).

**F.    Obligations Upon Termination**

42.    In the event of termination, among other things, Franchisee Defendants agreed that they must:

    i.    Immediately cease all operations under the Franchise Agreements (Franchise Agreements § 16.1.1);

    ii.    Immediately pay A1 all unpaid fees (Franchise Agreements § 16.1.2);

    iii.    Immediately discontinue use of the Proprietary Marks (Franchise Agreements § 16.1.3);

    iv.    Immediately "return all Proprietary Materials and Confidential information, including, without limitation, all customer lists and data, within ten (10)

calendar days, and immediately and permanently cease use of such information and materials" (Franchise Agreements § 16.1.4);

v.    Immediately cease using all telephone numbers and social media pages associated with their franchised business and direct the telephone company to transfer the telephone numbers to A1 and transfer social media usernames and passwords to A1 (Franchise Agreements § 16.1.5);

vi.    Vacate the franchised business (Franchise Agreements § 16.1.6);

vii.    Immediately surrender all printed materials, signs, advertising materials and other items containing the Proprietary Marks and all items which are part of the trade dress of the System with ten (10) calendar days (Franchise Agreements § 16.1.7);

viii.    Immediately cease holding the business out as a THE DESIGNERY™ franchisee (Franchise Agreements § 16.1.8);

ix.    Immediately cease to communicate with all customers of the franchised business (Franchise Agreements § 16.1.9);

x.    Permit A1 to inspect the franchisee's financial records, books, and other accounting records within 1 month of the effective date of termination (Franchise Agreements § 16.1.11);

xi.    Comply with the post-termination covenant to not compete (Franchise Agreements § 16.1.12); and

xii.    Reimburse Franchisor in connection with any costs Franchisor incurs in enforcing the post-termination obligations (Franchise Agreements § 16.1.17).

-12-

### G. Personal Guaranty

43. In conjunction with Proverbs' execution of the Assignment and Assumption Agreement, in which it assumed all obligations under the Franchise Agreements from Joel Senger, Joel and Amy Senger each executed a Personal Guaranty in which they agreed "to be firmly bound by all of the terms, provisions and conditions" of the Franchise Agreements. (*See* Exhibit B to Assignment and Assumption Agreement, Art. I).

44. In the Assignment and Assumption Agreement, Proverbs agreed to release A1 of and from all manner of claims related to the assignment of the Franchise Agreements. Similarly, Joel Senger agreed to release A1 of and from all manner of claims. (Assignment and Assumption Agreement ¶¶ 7-8).

### H. Franchisor's Remedies in the Event of Default or Breach

45. Franchisee Defendants agreed that in the event of breach or default of any monetary or non-monetary obligations under the Franchise Agreements, and A1 engages an attorney to enforce its rights "whether or not formal judicial proceedings are initiated," Franchisee Defendants "must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs." (Franchise Agreements § 22.8).

46. Franchisee Defendants also agreed to promptly pay to Franchisor all damages, costs, and expenses, including reasonable attorneys' fees, incurred as a result of any default that results in termination. (Franchise Agreements § 16.4).

PPAB 12246447v1

47. Franchisee Defendants further agreed that their failure to comply with the terms of their Franchise Agreements is likely to cause irreparable damage to Franchisor, and damages at law would be an inadequate remedy. Therefore, Franchisee Defendants agreed that Franchisor may seek injunctive relief or specific performance (with recovery of reasonable attorneys' fees and costs incurred in obtaining such relief) to remedy certain breaches, including violations of the covenants not to compete, the post-termination obligations, and the intellectual property rights contained in the Franchise Agreements. (Franchise Agreements § 18.8).

## Franchisee Defendants' Breaches of the Franchise Agreements

48. In recent months, Franchisee Defendants have repeatedly defaulted on their obligations under the Franchise Agreements.

49. On January 6, 2025, Franchisee Defendants sent A1 a revocation of the Withdrawal Authorization under the EFT Program despite the obligation to permit A1 to automatically electronically withdraw funds pursuant to Section 3.4 of the Franchise Agreements. Franchisee Defendants did not provide a replacement Withdrawal Authorization.

50. Further, Franchisee Defendants failed to pay Royalty Fees and Technology Fees to A1 as required under the Franchise Agreements. As of March 28, 2025, Franchisee Defendants owed at least $4,497.00 in past due Royalty and Technology Fees, plus interest and late fees.

51. Franchisee Defendants also failed to submit monthly expense statements evidencing their compliance with the Local Advertising Requirement in Section 3.6 of the Franchise Agreements. Upon information and belief, they have failed to comply with their minimum advertising expenditure requirements.

52. On February 6, 2025, A1 sent a Notice of Default letter to Franchisee Defendants advising them of their defaults related to the EFT Program, obligations to pay Royalty and

Technology Fees, and obligations to report compliance with the Local Advertising Requirements. A true and correct copy of the Notice of Default is attached as Exhibit 3 to this Complaint.

53.     The Notice of Default alerted Franchisee Defendants to their obligation to cure their defaults within fifteen (15) days.

54.     Franchisee Defendants failed to timely cure their defaults, and the defaults remained uncured as of March 28, 2025.

55.     Around this time, A1 learned that Franchisee Defendants abandoned their Franchised Business and established and registered a competing business, Defendant Senger Custom Homes LLC, in Kentucky and Ohio.

56.     A1 discovered that Defendants attempted to establish relationships between Senger Custom Homes and A1's preferred vendors for the purchase of Approved Products.

57.     In addition, a recent investigation revealed that Defendants collectively are offering competing home design, installation, and renovation services in their Designated Territory through Defendant Senger Custom Homes. Defendants diverted a potential customer who visited their THE DESIGNERY™ showroom to Defendant Senger Custom Homes for design and renovation services for a pantry project, falsely claiming that the requested pantry redesign could not be done by THE DESIGNERY™ even though this is exactly the type of work THE DESIGNERY™ businesses offer. Defendants made disparaging comments about A1 to the customer, including telling the customer that working with the Franchisor had been "impossible," and claiming that certain of A1's marketing statements are "misleading."

58.     This constitutes a violation of the in-term noncompete obligations and other obligations under the Franchise Agreements.

59.     As a result, and pursuant to the applicable provisions of the Franchise Agreements,

-15-

on March 28, 2025, A1 sent Franchisee Defendants a Notice of Default and Termination terminating the Franchise Agreements and demanding that they comply with their post-termination obligations. A true and correct copy of the Notice of Default and Termination is attached as Exhibit 4 to this Complaint.

60.     To date, Franchisee Defendants have not paid the past due amounts owed to A1, and have not complied with their post-termination obligations. Instead, Defendants continue operating their competing business and continue their unauthorized use of A1's Confidential Information, Proprietary Marks and System. Defendants' actions have caused and continue to cause monetary damage and irreparable harm to A1, including harm to A1's reputation and goodwill.

### COUNT I
### (Breach of Contract—In-Term Obligations)
### Franchisee Defendants

61.     The allegations of the foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

62.     The Franchise Agreements, Assignment and Assumption Agreement, and Personal Guaranty are lawful and binding contracts between A1 and the Franchisee Defendants.

63.     Franchisee Defendants' failure to pay A1 Royalty Fees and Technology Fees constitutes a material breach of the obligations set forth in Sections 3.2 and 3.7 of the Franchise Agreements and Personal Guaranty.

64.     Franchisee Defendants' failure to comply with the Local Advertising Requirements set forth in Section 3.6 of the Franchise Agreements constitutes a material breach of the Franchise Agreements and Personal Guaranty.

65.     Franchisee Defendants' failure to provide proper banking information and

authorization under the EFT Program constitutes a material breach of the obligations set forth in Section 3.4 of the Franchise Agreements and Personal Guaranty.

66.     Further, Defendants' engagement in a directly competitive business, Senger Custom Homes, and solicitation of franchise customers to their competing business violates Franchisee Defendants' in-term covenant not to compete set forth in Section 17.1 and constitutes a material breach of the Franchise Agreements and Personal Guaranty.

67.     A1 has performed its obligations under the Franchise Agreements and Personal Guaranty.

68.     As a result of Defendants' actions, A1 has suffered and is continuing to suffer irreparable injury, and has incurred and is continuing to incur monetary damage in an amount that has yet to be determined but is in excess of $230,000, plus costs, disbursements, interest, and attorneys' fees.

## COUNT II
### (Breach of Contract—Post-Termination Obligations)
### Franchisee Defendants

69.     The allegations of the foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

70.     The Franchise Agreements, Assignment and Assumption Agreement, and Personal Guaranty are lawful and binding contracts between A1 and the Franchisee Defendants.

71.     Defendants have failed to comply with the post-termination obligations set forth in the Franchise Agreements, including by operating a competing business and continuing to use A1's Confidential Information and Proprietary Marks, materials, and System. This conduct constitutes materials breaches of the Franchise Agreements and Personal Guaranty.

72.     A1 has no adequate remedy at law to protect its substantial business and proprietary

-17-

rights at issue in this lawsuit. The damages from Defendants' failure to comply with the post-termination obligations in the Franchise Agreements are considerable and continuing and thus not capable of ascertainment at this time.

73.     A1 is entitled to preliminary and permanent injunctive relief enforcing all post-termination obligations of the Franchise Agreements, preventing Defendants from using A1's Marks and Confidential Information, and preventing Defendants from operating a competing business in violation of the post-termination noncompete provisions.

74.     As a direct and proximate result of Defendants' actions, A1 has suffered and is continuing to suffer irreparable injury and has incurred and is continuing to incur monetary damages, for breaches of the post-termination obligations, in an amount that has yet to be determined but is in excess of $230,000, plus costs, disbursements, interest, and attorneys' fees.

**COUNT III**
**(Civil Conspiracy)**
**All Defendants**

75.     The allegations of the foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

76.     As guarantors and operators of the THE DESIGNERY™ franchised business, Defendants were aware of the existence and terms of the Franchise Agreements, including the terms relating to confidentiality and post-termination obligations.

77.     With full knowledge of the post-termination and other obligations contained in the Franchise Agreements, Defendants agreed to develop a plan and scheme to transfer or assign the business, customers, and goodwill generated by the THE DESIGNERY™ franchised business for the specific purpose and intent to divert business and customers to Senger Custom Homes while attempting to evade their post-termination obligations.

78.     The purpose and objective of Defendants' conduct was to make customers cease doing business with the THE DESIGNERY™ franchised business and transfer those customers to Senger Custom Homes while at the same time avoiding the post-termination obligations under the Franchise Agreements.

79.     Defendants created, planned, and implemented their conspiracy to deprive A1 of the financial benefits of Defendants' Franchise Agreements and the opportunity to retain the goodwill developed under the Proprietary Marks in the Designated Territory, and to attempt to avoid post-termination contractual obligations under the terms of the Franchise Agreements.

80.     Defendants' actions, as alleged above, were undertaken in secret, pursuant to a conspiracy to damage A1's goodwill and deprive A1 of the benefits and other protections under the Franchise Agreements.

81.     As a result of Defendants' actions, A1 has suffered and is continuing to suffer irreparable injury and has incurred and is continuing to incur in the form of lost revenue, damage to its goodwill, damage to other franchisees, damage to its business reputation, and damage from the loss of opportunity to maintain the goodwill developed in the Cincinnati, Ohio market area under the Proprietary Marks, all in an amount to be determined at the time of trial.

## COUNT IV
### (Trademark Infringement)
### All Defendants

82.     The allegations of the foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

83.     A1 owns and commercially uses the Proprietary Marks on goods and services sold and offered in North Carolina, Kentucky, Ohio, and around the United States including in design and installation services for kitchen, bath, and closet projects in new construction and renovation

of both residential and commercial buildings.

84.     The use in commerce of the Proprietary Marks by Defendants outside the scope of the Franchise Agreements and without the consent of A1 is likely to cause confusion, or cause mistake, or to deceive the relevant public, into believing, contrary to fact, that the unauthorized activities of Defendants are licensed, franchised, sponsored, authorized, or otherwise approved by A1. Such unauthorized use of the Proprietary Marks constitutes trademark and/or service mark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114, and the common law.

85.     The trademark infringement by Defendants is willful and malicious and done with an intent to cause confusion, or to cause mistake, or to deceive.

86.     As a direct and proximate result of Defendants' actions, A1 has suffered and is continuing to suffer irreparable injury and has incurred and is continuing to incur monetary damages in an amount that has yet to be determined, plus costs, disbursements, interests, and attorneys' fees.

### COUNT V
### (Unfair Competition)
### All Defendants

87.     The allegations of the foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

88.     The use in commerce of A1's Proprietary Marks by Defendants outside the scope of the Franchise Agreements and without the consent of A1 is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of their goods, services, or commercial activities by another person. Such unauthorized use of A1's trademarks and trade names violates Section 43 of the Lanham Act, 15 U.S.C. § 1125(a) and applicable state law.

89.     The acts of Defendants were and are being done knowingly and intentionally to

cause confusion, or to cause mistake, or to deceive.

90.    As a result of the actions of Defendants, A1 has suffered and is continuing to suffer irreparable injury, and has incurred and is continuing to incur monetary damage in an amount that has yet to be determined, plus costs, disbursements, interests, and attorneys' fees.

## COUNT VI
### (Breach of Contract—Declaratory Relief)
### Franchisee Defendants

91.    The allegations of the foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

92.    The Franchise Agreements are valid, enforceable contracts in writing.

93.    As described above, a dispute exists between the parties as to their rights and obligations under the Franchise Agreements.

94.    Franchisee Defendants violated the Franchise Agreements by failing to pay Royalty Fees and Technology Fees (Franchise Agreements §§ 3.2 and 3.7), failing to meet the Local Advertising Requirement (Franchise Agreements § 3.6), failing to comply with the obligations of the EFT Program (Franchise Agreements § 3.4), and engaging in a directly competitive business and diverting customers (Franchise Agreements § 17.1).

95.    These breaches were not cured or were not subject to a right to cure.

96.    A1 has performed all of its obligations under the Franchise Agreements.

97.    As a consequence of Franchisee Defendants' breaches of the Franchise Agreements, A1 was entitled to and did give notice that the Franchise Agreements were terminated in accordance with law. Franchisee Defendants have not agreed that the termination was proper and are continuing to operate the franchised business and operate under the Proprietary Marks.

98.    There is an actual and justiciable controversy regarding the termination, and A1 is

entitled to a declaratory judgment under 28 U.S.C. §§ 2201–02 that the termination was proper under the terms of the Franchise Agreements and in accordance with law.

## Prayer for Relief

WHEREFORE, A1 respectfully requests that this Court:

A.      Enter a declaratory judgment holding that A1 properly terminated the Franchise Agreements in accordance with the terms and applicable law;

B.      Enter an injunctive order ratifying and enforcing the termination of the Franchise Agreements as of the effective date of the Notice of Termination;

C.      Enter judgment in favor of A1 and against Franchisee Defendants, jointly and severally, for the damages incurred by A1 as a result of Franchisee Defendants' breaches of the Franchise Agreement, including past due fees, late fees, lost future fees, and interest, in an amount according to proof;

D.      Enjoin Defendants and all those acting in concert with them, by preliminary and permanent injunction, from infringing A1's trademarks and trade names and from otherwise engaging in unfair competition with A1;

E.      Enter a preliminary and permanent injunction enjoining and retraining Defendants from using A1's Proprietary Marks, Confidential Information, or trade secrets;

F.      Enter an injunctive order directing Defendants, and all those acting through, by, or in concert with them, including but not limited to Senger Custom Homes, to comply with all of their post-termination obligations as provided in the Franchise Agreements, including but not limited to complying with the covenants not to compete contained in the Franchise Agreements;

-22-

G.      Enter an order requiring Defendants to file with the Court and serve on A1, within thirty days after the service upon Defendants of the injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

H.      Award A1 judgment against Defendants for the damages it has sustained and the profits they have derived as a result of their unfair competition, assessing such damages in a separate accounting procedure, and then trebling those damages in accordance with Section 35 of the Lanham Act, 15 U.S.C. § 1117;

I.      Award A1 its attorneys' fees, costs, and expenses incurred in connection with this action, as provided in Sections 16.4, 16.1.17, and 22.8 of the Franchise Agreements, and Section 35 of the Lanham Act, 15 U.S.C. § 1117; and

J.      Award A1 such other relief as this Court may deem just and proper.

Dated: April 15, 2025

/s/ Nicholas H. Lee
Nicholas H. Lee (NC Bar No. 47885)
PARKER POE ADAMS & BERNSTEIN LLP
620 South Tryon Street, Suite 800
Charlotte, NC 28202
Telephone: (704) 335-9876
nicholaslee@parkerpoe.com

Michael R. Gray (pro hac vice forthcoming)
LATHROP GPM LLP
3100 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 632-3258
Michael.Gray@lathropgpm.com

Maisa Frank (pro hac vice forthcoming)
LATHROP GPM LLP
The Watergate – Suite 700
600 New Hampshire Ave. NW
Washington, DC 20037
Telephone: (202) 295-2200
Maisa.Frank@lathropgpm.com
*Attorneys for Plaintiff*

-23-