# EXHIBIT 1

DocuSign Envelope ID: B3A3CF6E-8B79-4A16-8EA1-306117754EFF



# THE DESIGNERY

# FRANCHISE AGREEMENT

Franchise #:  TD0023

Franchisee:  Joel Senger

Date:  October 20, 2023

Designated Territory:  See map and list of zip codes on page 2 of the Data Sheet to this Franchise Agreement

© 2023 AL Kitchen & Bath Franchising, LLC
2023 FDD 1 v1F

# TABLE OF CONTENTS

**SECTION**                                                                                          **PAGE**

1.   GRANT OF FRANCHISE ................................................................................................ 2
2.   TERM AND RENEWAL ................................................................................................ 5
3.   FEES AND MANNER OF PAYMENT ............................................................................ 6
4.   PROPRIETARY MARKS .............................................................................................. 11
5.   CONFIDENTIAL INFORMATION ............................................................................... 13
6.   FRANCHISOR'S OBLIGATIONS ................................................................................ 15
7.   FRANCHISEE'S OBLIGATIONS ................................................................................. 17
8.   TRAINING ...................................................................................................................... 26
9.   INSURANCE ................................................................................................................... 27
10.  FINANCIAL RECORDS AND REPORTS .................................................................... 28
11.  BOOKS AND RECORDS ............................................................................................... 29
12.  ADVERTISING ............................................................................................................... 31
13   INDEPENDENTBUSINESS; INDEMNIFICATION ................................................... 35
14   SALE OR TRANSFER ................................................................................................... 36
15   BREACH AND TERMINATION ................................................................................... 40
16   RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION ................................. 44
17   COVENANTS .................................................................................................................. 46
18   DISPUTE RESOLUTION .............................................................................................. 48
19   REPRESENTATIONS ..................................................................................................... 52
20   GUARANTEE OF PRINCIPALS AND THEIR SPOUSES ................................................ 53
21   NOTICES ......................................................................................................................... 54
22   MISCELLANEOUS ........................................................................................................ 55

EXHIBITS:

Exhibit A   Personal Guaranty and Guaranty of Spouses
Exhibit B   Conditional Assignment of Franchisee's Telephone Numbers, Facsimile Numbers and
            Domain Names
Exhibit C   Confidentiality and Restrictive Covenant Agreement for Employees
Exhibit D   Electronic Funds Withdrawal Authorization
Exhibit E   Site Selection Addendum
Exhibit F   Statement of Ownership
Exhibit G   Collateral Assignment of Lease
Exhibit H   Franchisor Directed Advertising Services Agreement



# <u>DATA SHEET</u>

| | |
|---|---|
| Franchisee: | <u>Joel Senger</u> |
| Guarantors: | <u>Joel Senger</u> |
| | <u>Amy Senger</u> |
| Effective Date: | <u>October 20, 2023</u> |
| Approved Location: | <u>241 N Colony Dr., Edgewood, Kentucky 41017</u> |
| Designated Territory: | <u>See Map and list of zip codes on the following page</u> |
| Telephone Number: | <u>(817) 300-8717</u> |
| | <u>(682) 597-4677</u> |
| Email Address: | <u>joel@sengercustomhomes.com</u> |
| | <u>amy@sengercustomhomes.com</u> |
| Initial Franchise Fee: | <u>$94,900.00 (2 Designed Territories Per MUA)</u> |
| Initial Franchisor Directed Advertising Fee: | <u>$9,000.00 (2 Designed Territories Per MUA)</u> |
| Multi-Unit Addendum: | ☒ Yes ☐ No |

Territory Map and Zip Codes – the "Designated Territory"



**Zip Codes: 45034, 45039, 45040, 45111, 45140, 45147, 45208, 45209, 45212, 45213, 45215, 45226, 45227, 45236, 45237, 45241, 45242, 45243 and 45249.**

In the event of a conflict between the map and zip codes, the zip codes control.

**The terms of this Data Sheet are incorporated into the attached Franchise Agreement.**

# A1 KITCHEN & BATH FRANCHISING, LLC
# FRANCHISE AGREEMENT

This FRANCHISE AGREEMENT (the "Agreement" or "Franchise Agreement") is entered into and made effective on October 20, 2023 (the "Effective Date"), by and between: (i) A1 Kitchen & Bath Franchising, LLC, a North Carolina limited liability company, with its principal place of business at 107 Parr Drive, Huntersville, North Carolina 28078 ("Franchisor"); and (ii) Joel Senger, an individual residing in the State of Kentucky, with an address at 241 N Colony Dr., Edgewood, Kentucky 41017, which is identified more fully in the attached Data Sheet ("Franchisee").

## RECITALS

A.      Through the expenditure of a considerable amount of time, effort and money, Franchisor has developed a system for the operation of franchised businesses under its then-current proprietary marks, currently "THE DESIGNERY$^{SM}$" (each, a "Franchised Business(es)") that offer design and installation services for kitchen, bath and closet projects in new construction and renovation of both residential and commercial buildings, and any services that Franchisor may later designate (collectively, the "Approved Services").

B.      Franchised Businesses are established and operated using Franchisor's proprietary operating system, the distinguishing characteristics of which include: (i) valuable know-how, information, trade secrets and methods; (ii) Franchisor's proprietary standards and specifications for certain products and services used in connection with providing Franchisor's Approved Products and Approved Services to customers; (iii) certain proprietary products developed by Franchisor (the "Approved Products"); (iv) Franchisor's standards and specifications for sales techniques, marketing and advertising programs; (v) proprietary initial and ongoing training programs; and (vi) standards and specifications for operating the Franchised Business in the manner set forth in this Agreement and Franchisor's proprietary and confidential Operations Manual (defined in Section 6.1) that franchisees have access to, which may be modified from time to time by Franchisor (collectively, the "System").

C.      The System is identified by Franchisor's proprietary trademarks, service marks, trade dress, logos and other indicia of origin (collectively, the "Proprietary Marks"). The rights to all such Proprietary Marks as are now, or shall hereafter be, designated as part of the System will be owned exclusively by Franchisor or its affiliates and be used for the benefit of Franchisor, its affiliates, and Franchisor's franchisees to identify to the public the source of the products and services marketed thereunder. Franchisor may continue to develop, expand, use, control, and add to the Proprietary Marks and System for the benefit of itself, its affiliates, and its franchisees and licensees in order to identify for the public the source of products and services marketed thereunder and to represent the System's high standards of quality and service.

D.      Franchisor offers franchises for the development and operation of Franchised Businesses to be operated and promoted within a designated geographical territory (the "Designated Territory").

E.      Franchisee desires to establish and operate a Franchised Business within the Designated Territory hereinafter designated, to use in connection therewith, Franchisor's System and the Proprietary Marks and to derive the benefits of Franchisor's information, experience, advice, guidance and customer goodwill.

F.      Franchisor desires to grant Franchisee the right to open and operate a Franchised Business based on Franchisee's representations to Franchisor, including those representations set forth in Franchisee's franchise application, in accordance with the terms and conditions set forth in this Agreement.

G.      Franchisee recognizes the importance to Franchisor, to its other franchisees and to the public of maintaining the integrity, standards, qualities and attributes of products and services associated with the Proprietary Marks and System, and is willing to adhere to certain uniform standards, procedures and policies to maintain such integrity, standards, qualities and attributes.

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual promises, commitments and understandings contained herein, Franchisor and Franchisee hereby agree as follows:

# 1.      GRANT OF FRANCHISE

1.1.    **Grant and Acceptance**.  Franchisor hereby grants to Franchisee, upon the express terms and conditions contained in this Agreement, and Franchisee hereby accepts, a non-exclusive license to establish and operate one (1) Franchised Business, under the System and Proprietary Marks identified below, and the right to use the System and Proprietary Marks in the operation of the Franchised Business. Except as otherwise provided in this Agreement, Franchisee may offer and sell only Franchisor's Approved Products and Approved Services within the Designated Territory set forth in Section 1.2 of this Agreement and the Data Sheet. Franchisee must request permission to provide additional new Products and Approved Services from Franchisor, which permission Franchisor may grant, deny, or condition in its sole discretion. In addition, Franchisee may provide Franchisor's Approved Products and Approved Services in adjacent territories (as those are determined by Franchisor) if permitted by and subject to the terms and conditions set forth in the Operations Manual (defined in Section 6.1). Franchisor has the right to supplement, improve or otherwise modify the System from time to time in Franchisor's discretion, and Franchisee agrees to comply with all changes which may include, without limitation, the offer and sale of new or different products or services as Franchisor may specify. Franchisee acknowledges and agrees that this Agreement does not grant Franchisee the option or right to purchase additional Franchised Businesses and/or additional designated territories.

1.2.    **Designated Territory**.  Except as otherwise provided in this Agreement (and the Operations Manual (defined in Section 6.1)) and for so long as Franchisee is not in default of this Agreement, Franchisor shall not establish and operate, nor license any other third party the right to establish and operate, any Franchised Business under the System and the Proprietary Marks within the protected area identified in the Data Sheet, the terms of which are incorporated herein by reference (the "Designated Territory") during the term of this Agreement. Franchisor and its affiliates retain all other rights, including, without limitation, those rights set forth in Sections 1.4 through 1.8 of this Agreement. Franchisee is permitted to conduct the Franchised Business outside of the Designated Territory in adjacent open territory (i.e., not the Designated Territory of another franchisee) if Franchisee receives Franchisor's prior written consent, and in compliance with our the current Adjacent Territory Policy (described in the Operations Manual). The Adjacent Territory Policy is subject to modification or elimination by a change to the Operations Manual. Franchisee may not operate within another franchisee's Designated Territory, except for certain limited circumstances, if any, that are more fully set forth in the Operations Manual, and other franchisees may operate in Franchisee's Designated Territory, in limited circumstances, if any, as set forth in the Operations Manual. Other than these operations, Franchisee is not permitted to operate or market the Franchised Business outside of the Designated Territory without Franchisor's prior written consent. All sales and other activities conducted within or outside the Designated Territory must be conducted in accordance with the terms of this Agreement and Franchisor's operating methods, standards and specifications as set forth in the Operations Manual (defined in Section 6.1).

1.3.    **Approved Location**.  Franchisee must operate the Franchised Business from a retail showroom that is approved by Franchisor and meets Franchisor's standards and specifications (the "Approved Location"). Franchisee must submit the proposed site of the retail showroom for Franchisor's

approval within thirty (30) days of the Effective Date of this Agreement and secure the Approved Location within sixty days (60) days of the Effective Date of this Agreement. Franchisee must lease approximately 500 to 1,500 square feet of commercial real estate for the retail showroom/office and to securely store equipment/inventory. Franchisor may provide Franchisee with standards and specifications for the design and layout of the premises of the Approved Location, and Franchisor must review and approve any proposed location, as well as any lease associated with the proposed location, prior to Franchisee entering into any lease for the proposed location. If Franchisor has not approved a location from which Franchisee must operate the Franchised Business as of the date Franchisee signs this Agreement, the parties will enter into Franchisor's prescribed form of Site Selection Addendum (in the form attached as <u>Exhibit E</u> to this Agreement), the terms of which will govern the parties' site selection obligations. Franchisee may not relocate the Franchised Business without Franchisor's prior written consent.

1.4. **National Accounts**. Franchisor will have the exclusive right, on behalf of itself, its affiliate(s), Franchisee, and/or other franchisees utilizing the Proprietary Marks, to negotiate and enter into agreements or approve forms of agreement to provide services to "National Accounts" (defined in Section 1.4.1), including National Accounts that Franchisee has solicited or serviced. Franchisee may not solicit any National Accounts outside of the Designated Territory, or solicit any National Accounts within or outside of the Designated Territory who are already under contract with Franchisor.

1.4.1. The term "<u>National Account</u>" means any business or businesses under common control, ownership or branding which operate locations in, or deliver products and services beyond, one designated territory, regardless of the volume of products and/or services to be purchased by the customer. Any dispute as to whether a particular customer is a National Account will be determined by Franchisor, in its sole discretion, and Franchisor's determination will be final and binding.

1.4.2. Franchisee may choose to participate in the National Accounts program ("<u>National Accounts Program</u>") to service National Accounts for which the ultimate client of the National Account is located in the Designated Territory consistent with the then-current National Accounts Program Participation Agreement. Franchisee acknowledges and agrees that Franchisor or a third-party service provider Franchisor designates may begin servicing National Accounts in the Designated Territory if: (i) Franchisor believes that Franchisee is not meeting Franchisor's standards and specifications applicable to the National Accounts Franchisee is servicing or the National Accounts Program generally; (ii) Franchisor believes that Franchisee is in default of this Agreement; (iii) the National Account has requested that Franchisor or a third party it selects service its clients; (iv) Franchisee is not then participating in the National Accounts Program (or is not eligible to participate in the National Accounts Program); (v) Franchisee does not offer or is not authorized by Franchisor or the applicable licensing authority to offer the service to be provided; or (vi) Franchisee refuses to service the National Account.

1.4.3. Franchisee agrees that neither the direct provision by Franchisor or a franchisee, licensee or designee of Franchisor of services to National Account customers as authorized above, nor Franchisor's contracting with another party to provide such services as authorized above, shall constitute a violation of the grant of license contained in this Agreement or any other provision of this Agreement, even if such services are delivered from a location within the Designated Territory. Franchisee disclaims any right to compensation or consideration for work performed by others in the Designated Territory pursuant to this Section.

1.4.4. Franchisor has the right to discontinue or terminate a National Account or the entire National Accounts Program. Franchisor may impose any restrictions and/or requirements as a condition to your acceptance of each National Account. Franchisor reserves the right to charge fees on National Account revenue. These fees, if charged, will be a required condition of participating in our National Accounts Program and these fees are subject to change annually. Franchisor may require

Franchisee to conduct thorough background checks on all employees who will service any National Account and may require proof of compliance with this and other requirements at such intervals as Franchisor and/or the National Account dictates.

1.5. **Reservation of Rights**. Franchisee acknowledges that, except as otherwise provided in this Agreement, Franchisee's right to provide the Approved Products and Approved Services, and otherwise use the Proprietary Marks and System within the Designated Territory is non-exclusive, and Franchisor and its affiliates expressly reserve the right to: (i) open and operate, and license others the right to open and operate, Franchised Businesses that offer products and use the Proprietary Marks and System at any location outside of the Designated Territory; (ii) open and operate, and license others the right to open and operate, businesses that offer similar products and services to those offered by the Franchised Business under any other mark at any location, within or outside the Designated Territory; (iii) acquire, or be acquired by, any company, including a company operating one or more businesses near the Franchised Business that offer products and services that are the same or substantially similar to the Approved Products and Approved Services; (iv) exercise its rights under Section 1.6 of this Agreement in the events of catastrophe(s); (v) designate and service National Accounts; (vi) service, route, and/or assign any and all customer work orders and inquiries received through Franchisor's Call Center (defined in Section 6.6) in accordance with this Agreement; and (vii) use the Proprietary Marks and System, and license others to use the Proprietary Marks and System to engage in any other activities not expressly prohibited in this Agreement.

1.6. **Events of Catastrophe**. Notwithstanding Section 1.4, in the event of a natural disaster or other similar catastrophic situation, as Franchisor determines in its sole discretion, Franchisor, its affiliate(s) and other System franchisees may be permitted to provide support to Franchisee and/or perform work in the Designated Territory, including the provision of labor, materials, equipment, and project management on projects in the Designated Territory, and Franchisee will not be entitled to any proceeds from the provision of these services performed by third parties within the Designated Territory.

1.7. **Alternate Channels of Distribution**. Franchisee acknowledges and agrees that certain of Franchisor's or its affiliates' products and services, whether now existing or developed in the future, may be distributed in Franchisee's Designated Territory by Franchisor, Franchisor's affiliates, or other third parties that Franchisor designates, in such manner and through such channels of distribution as Franchisor, in its sole discretion, shall determine. Such alternate channels of distribution will include, but are not limited to, the sale and distribution of the products and services via the Internet and through joint marketing with partner companies under terms and conditions that Franchisor deems appropriate. Franchisee understands that this Agreement grants Franchisee no rights: (i) to distribute Approved Products and Approved Services as described in this Section; or (ii) to share in any of the proceeds received by any such party therefrom.

1.8. **Right to Service Customers in Designated Territory; Use of Call Center**

1.8.1. If Franchisor establishes a Call Center (defined in Section 6.6), then Franchisee must ensure that all initial calls made to the Franchised Business are forwarded to the Call Center, which is part of Franchisor's proprietary Call Center. Once a customer's call is routed to the Call Center and assigned to the Franchised Business, Franchisor will route that customer's work to Franchisee if the customer's location (where the work is to be performed) is within the Designated Territory, unless: (i) Franchisor determines that the work is in the nature of an emergency and: (a) Franchisee does not respond to the assignment within a time period Franchisor deems reasonable, in its sole discretion, appropriate under the circumstances; or (b) Franchisee is not able to perform the required services for the customer within a time period Franchisor deems reasonably appropriate, in its sole discretion; (ii) the work is of such a large scope, complexity and/or commercial nature that Franchisor determines, in its sole discretion, that Franchisee is not capable of performing the work requested in accordance with System standards and specifications and/or the prevailing standard of care in the industry for the type of work requested (in which case

Franchisor may route the work order to Franchisee and additional franchisees, or other franchisees, or Franchisor's affiliate, for completion); (iii) the work order is mistakenly routed to another franchisee or affiliate-owned business due to either the customer providing incorrect information to a Call Center representative or an inadvertent error on the part of the Call Center representative when taking the information from the customer; (iv) Franchisee is not operating the Franchised Business in compliance with this Agreement; or (v) Franchisor reasonably determines that a portion of the Designated Territory has been subjected to a disaster or catastrophe.

      1.8.2.   Franchisee acknowledges and agrees that Franchisor's rights under this Section are necessary to: (i) maintain uniformity across the System and ensure that all work performed under the Proprietary Marks meets Franchisor's System standards for customer service; and (ii) account for inadvertent mistakes by Franchisor's customers and Franchisor's Call Center. Franchisee further acknowledges that it does not have any right to share in the Gross Revenue generated from customers that are serviced within the Designated Territory unless Franchisee is assigned, and subsequently provides services to, such customers.

## 2.      TERM AND RENEWAL

    2.1.    **Term**.  The initial term of the Franchise is for a period of ten (10) years, which will commence on the date Franchisor executes this Agreement.

    2.2.    **Renewal**.  Franchisee has the right to renew this Agreement for one (1) successive, additional ten (10)-year period, provided Franchisee has met the following conditions:

      2.2.1.    Franchisee has notified Franchisor of Franchisee's intention to renew this Agreement in writing at least twelve (12) months, and no more than eighteen (18) months, prior to expiration of the current term;

      2.2.2.    Franchisee has demonstrated to Franchisor's satisfaction that Franchisee has the right to operate the Franchised Business at the Approved Location for the duration of the renewal term; or, if Franchisee is unable to operate the Franchised Business at the Approved Location, Franchisee has secured a substitute location within the Designated Territory acceptable to Franchisor;

      2.2.3.    Franchisee has completed to Franchisor's satisfaction, prior to the expiration of the then-current term, any updates to all required equipment, supplies, inventory, hardware and software, and vehicles to bring the Franchised Business into full compliance with Franchisor's then-current System standards and specifications, and Franchisee has completed all maintenance, refurbishing, renovating, updating and remodeling of the Franchised Business's Approved Location so that it satisfies Franchisor's then-current standards;

      2.2.4.    Franchisee is not in breach of any provision of this Agreement or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, or Franchisor's approved/designated suppliers and vendors, and Franchisee has substantially complied with all such agreements during their respective terms;

      2.2.5.    Franchisee has satisfied all monetary obligations Franchisee owes Franchisor, Franchisor's affiliates, and Franchisor's approved/designated suppliers and vendors, and has timely met these obligations throughout the term of this Agreement;

      2.2.6.    Franchisee executes Franchisor's then-current form of franchise agreement, the terms of which may vary materially from the terms of this Agreement (which may include, without

limitation, increased royalty and other fees and insurance requirements), at least three (3) months prior to the expiration of this Agreement;

       2.2.7.    Franchisee satisfies Franchisor's then-current training requirements for renewing franchisees at Franchisee's expense, if any, as of the date of such renewal, and Franchisee has otherwise obtained and maintained all licenses, permits and approvals required by federal and state law applicable to providing the Approved Products and Approved Services at any location within the Designated Territory;

       2.2.8.    Franchisee and its principals execute a general release in the form Franchisor prescribes; and

       2.2.9.    Franchisee pays a renewal fee in the amount of five thousand dollars ($5,000).

    2.3.    **Holdover Period**.  If this Agreement expires without Franchisee properly exercising its renewal right and Franchisee continues to accept the benefits of this Agreement thereafter, then, at Franchisor's option, Franchisor may treat this Agreement either as: (i) expired as of the date of expiration, with Franchisee then illegally operating a franchise in violation of Franchisor's rights; or (ii) continued on a month-to-month basis (the "Holdover Period") until both parties agree to enter into Franchisor's then-current form of franchise agreement for a renewal term or until one party provides the other with written notice of termination, in which case the Holdover Period will terminate thirty (30) days after receipt of the notice of termination. In the latter case, all of Franchisee's obligations shall remain in full force and effect during the Holdover Period as if this Agreement had not expired, except that the license fee during the Holdover Period will be increased to ten percent (10%) of Gross Revenue for all types of products/services and without any reductions. All obligations and restrictions imposed on Franchisee upon expiration of this Agreement shall take effect upon termination of the Holdover Period.

**3.    FEES AND MANNER OF PAYMENT**

    3.1    **Initial Franchise Fee**.  In consideration of the franchise granted to Franchisee by Franchisor, Franchisee must pay Franchisor a lump sum initial franchise fee set forth on the Data Sheet that is part of this agreement (the "Initial Franchise Fee"), which is due at the signing of this Agreement and deemed fully earned and non-refundable upon payment, in consideration of administrative and other expenses Franchisor incurs in granting the franchise and for Franchisor's lost or deferred opportunity to franchise to others.

       3.1.1.    *Elevate to Owner Program Discount*.  Franchisor offers a discounted Initial Franchise Fee for the first Franchised Business to qualified employees of a franchisee who: (i) has been recommended by a System franchisee; (ii) has been employed by a System franchisee for at least two (2) years; and (iii) otherwise qualifies to be Franchisor's franchisee. The discount is based upon years of service with one of Franchisor's franchisees and is calculated as follows:

| Discount on Initial Franchise Fee | Years of Consecutive Employment With Franchisee |
|---|---|
| 10% | 2 |
| 15% | 3 |
| 20% | 4 |
| 25% | 5+ |

Discounts under the Elevate to Owner Program will be applied to the Initial Franchise Fee for Franchisee's first Franchised Business only and the discount shall be calculated after any third-party broker fees are deducted, if any.

3.2. **Royalty Fee**. Franchisee must pay Franchisor a monthly royalty fee (the "Royalty Fee") deducted on the tenth (10th) business day of the following month for the prior month in an amount equal to the greater of: (i) the Royalty Fee (as delineated in Section 3.2.1 below); or (ii) the minimum royalty fee ("Minimum Royalty Fee"), as described in Section 3.2.2 below.

3.2.1. *Royalty Fee Structure*. Franchisee's Royalty Fee is calculated as follows:

| Monthly Royalty | Gross Revenue for Prior Month |
|---|---|
| 7.0% | $0.00 - $75,000.00 |
| 6.0% | $75,000.01 - $150,000.00 |
| 5.0% | $150,000.01+ |

3.2.2. *Minimum Monthly Royalty Fee*. Franchisee's Minimum Monthly Royalty Fee for one (1) Designated Territory is based upon the number of months the Franchised Business has been open and operating. Franchisee is considered "open and operating" on the date that Franchisee completes the Initial Training Program (defined in Section 8.1). The Minimum Monthly Royalty Fee is as follows:

| Time of Operation | 1 Designated Territory |
|---|---|
| First 3 Months | The Royalty Fee (5-7% of Gross Revenue) |
| 4 to 12 Months | $250 |
| Second Year | $550 |
| Third Year + | $850 |

However, Franchisee will not be subject to a Minimum Royalty Fee during the first three (3) months of operation on the condition that Franchisee strictly complies with all of its obligations during the first three (3) months of operation.

3.2.3. *Special Programs*. Franchisor reserves the right, but not the obligation, to establish special programs that reward franchisees for meeting certain criteria. In the event Franchisor establishes

any special programs, Franchisor will have the right, in Franchisor's sole discretion, to change, modify or dissolve any special programs upon notice to Franchisee.

3.2.4.  *Conversion Roll-In Discount for Existing Businesses*.  If Franchisee has an existing business that is the same or similar to a Franchised Business with annual gross sales of at least $500,000 and Franchisee agrees to convert the existing business into a Franchised Business, Franchisor will discount Franchisee's Royalty Fee for the initial period of operation. The Royalty Fee will be calculated as follows:

| Months of Operation | Royalty Fee |
|---------------------|-------------|
| Months 1-4 | 25% of then-current Royalty Fee |
| Months 5-8 | 50% of then-current Royalty Fee |
| Months 9-12 | 75% of then-current Royalty Fee |
| Months 12+ | The then-current Royalty Fee |

After the initial 12-month period, Franchisee shall pay the Royalty Fee as set forth in Section 3.2 of this Agreement.

3.3.  **Gross Revenue Definition and Reports**.  For purposes of this Agreement, "Gross Revenue" is defined to include all income of any type or nature and from any source that Franchisee derives or receives directly or indirectly from, through, by, or on account of the operation of the Franchised Business (whether or not the products/services are approved by the Franchisor) at any time after the signing of the Franchise Agreement, in whatever form and from whatever source, including, but not limited to, cash, services in kind from barter and/or exchange, on credit or otherwise, and convenience, credit card user, or other fees charged to a customer, as well as business interruption insurance proceeds, all without deduction for expenses, including marketing expenses and taxes. Exclusions do not include reductions for financing program fees, credit card convenience fees or user fees, or any other fees charged to a customer). However, the definition of Gross Revenue does not include sales tax that is collected from customers and actually transmitted to the appropriate taxing authorities or any bona fide refunds you make to customers in the ordinary course of business. We reserve the right to modify our policies and practices regarding revenue recognition, revenue reporting, and the inclusion or exclusion of certain revenue from Gross Revenue as circumstances, business practices, and technology change.

Franchisee must send Franchisor a signed report ("Gross Revenue Report(s)") on or before the tenth (10th) day of each month for the immediately preceding calendar month, in the manner and form specified by Franchisor. Each Gross Revenue Report must set forth: (i) Franchisee's Gross Revenue generated during the previous calendar month; (ii) Franchisee's calculation of the Royalty Fee and Brand Fund Contribution (defined in Section 3.5); and (iii) any other information Franchisor may require. Franchisor may change the form, content and/or interval of the Gross Revenue Report from time to time and/or require Franchisee to submit Gross Revenue Reports upon notice to Franchisee.

3.4.  **Method of Payment**.  With the exception of the Initial Franchise Fee, Franchisee shall pay all fees and other amounts due to Franchisor and/or its affiliates under this Agreement through an electronic funds transfer program (the "EFT Program"), under which Franchisor automatically deducts all payments owed to Franchisor under this Agreement or any other agreement between Franchisee and Franchisor or its affiliates from the bank account Franchisee provides to Franchisor for use in connection with the EFT Program (the "EFT Account"). Franchisee shall immediately deposit all revenues from operation of the Franchised Business into this bank account within two (2) days upon receipt, including cash, checks and credit card receipts. At least ten (10) days prior to opening the Franchised Business, Franchisee shall provide

Franchisor with: (i) Franchisee's bank's name, address and account number; and (ii) a voided check from such bank account. Contemporaneous with the execution of this Agreement, Franchisee shall sign and provide to Franchisor and Franchisee's bank, all documents, including Franchisor's form of EFT Withdrawal Authorization Form in the form attached as <u>Exhibit D</u> to this Agreement, necessary to effectuate the EFT Program and Franchisor's ability to withdraw funds from such bank account via electronic funds transfer ("<u>EFT</u>"). Franchisee shall immediately notify Franchisor of any change in Franchisee's banking relationship, including any change to the EFT Account. Franchisor reserves the right to require Franchisee to pay any fees due under this Agreement or any other agreement related to the Franchised Business by such other means as Franchisor may specify from time to time, including, but not limited to, a requirement to use a specific payment processor from whom Franchisor or its affiliate may collect fees at the time of such payment. If any Gross Revenue Report has not been received within the required time period, then Franchisor may process an EFT for the subject month based on the most recent Gross Revenue Report provided by Franchisee to Franchisor, provided, that if a Gross Revenue Report for the subject month is subsequently received and reflects: (i) that the actual amount of the fee due was more than the amount of the EFT, then Franchisor may withdraw additional funds through an EFT from Franchisee's designated bank account for the difference; or (ii) that the actual amount of the fee due was less than the amount of the EFT, then Franchisor shall credit the excess amount to the payment of Franchisee's future obligations. If any check or electronic payment is not successful due to insufficient funds, stop payment or any similar event, any excess amounts that Franchisee owes will be payable upon demand, together with a nonsufficient funds fee of the greater of one hundred dollars ($100) per occurrence or the highest amount allowed by law, plus the lesser of: (i) one and one-half percent (1½%) per month (eighteen percent (18%) per annum); or (ii) the maximum interest rate allowed by law from the due date of payment. Franchisee must also pay Franchisor one hundred dollars ($100) for each week that a payment is paid after the due date, which is in addition to interest. If Franchisee makes any payment to Franchisor or Franchisor's affiliate(s) by credit card for any fee required, Franchisor may charge a payment service fee of up to four percent (4%) of the total charge.

3.5. **Brand Fund Contribution**. As set forth more fully in Section 12 of this Agreement, Franchisor has established a brand fund for advertising and brand promotion (the "<u>Brand Fund</u>"). Franchisee shall make monthly Brand Fund Contributions of one percent (1%) of Gross Revenue generated by the Franchised Business for sales made during the immediately preceding calendar month (the "<u>Brand Fund Contribution</u>"). Presently, Brand Fund Contributions are to be paid as directed by Franchisor via the EFT Program on the tenth (10th) business day of each month, or as otherwise required by the Operations Manual (defined in Section 6.1) or in writing by Franchisor. Franchisor will have the right to expend the funds accumulated in the Brand Fund in Franchisor's sole discretion. Notwithstanding the foregoing, Franchisor reserves the right to increase the Brand Fund Contribution at any time upon providing notice to Franchisee, provided that the Brand Fund Contribution will not exceed three percent (3%) of Gross Revenue during the term of this Agreement.

3.6. **Local Advertising Requirement**. Franchisee shall expend the greater of: (i) three percent (3%) of Gross Revenue; or (ii) three thousand dollars ($3,000) per month on local advertising (the "<u>Local Advertising Requirement</u>"). Franchisor reserves the right to increase the Local Advertising Requirement to the greater of: (i) four percent (4%) of Gross Revenue; or (ii) four thousand dollars ($4,000) per month upon ninety (90) days' prior written notice. While the Local Advertising Requirement will typically be paid to third parties that Franchisor designates, Franchisor and its affiliate(s) reserve the right to collect this fee or to designate an Approved Supplier that will collect this fee. All or a portion of the Local Advertising Requirement may be allocated to the Franchisor Directed Advertising Fee described in Section 12.5.3 for Local Advertising Services that we provide to you. We and our affiliates may earn revenue and profits on products or services we provide, and may receive rebates, licensing fees, administrative fees, commissions, or other payments on products and services that third party vendors provide. With respect to all Local Advertising Requirement funds you pay to a third party, you are required to provide us with monthly

DocuSign Envelope ID: B3A3CF6E-8B79-4A16-8EA1-306117754EFF

expense statements (including receipts supporting the reported expenditures) evidencing compliance with the Local Advertising Requirement spending obligations. The Initial Franchisor Directed Advertising Fee in the amount set forth in the Data Sheet must be paid at the signing of this Agreement and deemed fully earned and non-refundable upon payment. The initial Franchisor Directed Advertising Fee (defined in Section 12.5.3) is a credit to that fee for the first two months of the term. The Franchisor Directed Advertising Fee must be paid in the month prior to the month in which the fees will be spent, in an amount up to the greater of \$3,000 or three percent (3%) of the prior month's required spend, whichever is greater. Thereafter, in the second month, the Franchisor Directed Advertising Fee must be paid to Franchisor or its designee on or before the tenth (10th) day of the month. If local advertising directed by Franchisor is paid with a franchisee credit card (or other method of direct payment), all such amounts spent that are directed by Franchisor will be credited to the monthly Franchisor Directed Advertising Fee.

3.7.     **Technology Fee**. In addition to the fees set forth above, Franchisee must pay Franchisor and/or Franchisor's designated vendors the then-current technology fee as set forth in the Operations Manual (defined in Section 6.1) ("Technology Fee") associated with using and maintaining Franchisor's reservation system, intranet, mobile applications, required computer hardware and software, hosting services and solutions, and any other technology used in the operation of the Franchised Business, and such payment shall be made in the manner prescribed by Franchisor or the designated vendor(s), as applicable. Franchisee shall pay the Technology Fee in the same manner as the Royalty Fee and as described in Section 3.4 of this Agreement, or as otherwise set forth in the Operations Manual or in writing by Franchisor. Franchisor reserves the right to change the amount of the fee described in this Section as changes are made to the System's hardware, software and other computer requirements or as required by the third-party service provider(s) or by any regulatory agency upon thirty (30) days' prior written notice to you.

3.8.     **Call Center Fee**. Franchisor reserves the right to establish a Call Center. If established, Franchisee shall pay Franchisor a call center fee deducted on the tenth (10th) business day after the end of each calendar month for the prior calendar month in an amount up to four percent (4%) of Franchisee's Gross Revenue (the "Call Center Fee").

3.9.     **Late and/or Underpayments and Interest**. All fee payments, amounts due for purchases by Franchisee from Franchisor and/or its affiliated company(ies), and other amounts which Franchisee owes to Franchisor and/or its affiliated company not received on or before the due date shall be deemed past due. If any payment or contribution is past due, Franchisee shall pay to Franchisor immediately upon demand, in addition to the past due amount, Franchisor's then-current late fee per incident, plus interest on the past due amount from the date it was due until paid at the rate of one and one-half percent (1½%) per month (eighteen percent (18%) per annum), or the maximum rate permitted by law, whichever is less. Nothing contained in this Section shall prevent Franchisor from exercising, in Franchisor's sole judgment, any other rights or remedies available to Franchisor under this Agreement. In addition to the interest set forth above, Franchisee shall also pay Franchisor one hundred dollars (\$100) for each week that a payment is paid after the due date.

3.10.    **No Right to Offset**. Franchisee shall not be entitled to set off any payments required to be made under this Section 3 against any monetary claim it may have against Franchisor.

3.11.    **Non-Exclusive Remedies**. Franchisor's right to recover interest and late payment fees under this Section shall not prevent Franchisor from obtaining, or otherwise waiving, any other remedy available to Franchisor for Franchisee's breach of this Section as set forth in this Agreement or under applicable law.

Case 3:25-cv-00261-MOC-DCK     Document 1-1     Filed 04/15/25     Page 15 of 169

3.12. **Taxes on Payments**.  In the event any taxing authority, wherever located, imposes any future tax, levy or assessment on any payment Franchisee makes to Franchisor, Franchisee must, in addition to all payments due to Franchisor, pay such tax, levy or assessment.

3.13. **Franchisor's Right of Setoff**.  As to Franchisee and/or any affiliate of Franchisee, Franchisor can:

3.13.1.  apply any payments received to any past due, current, future or other indebtedness of any kind, in Franchisor's Business Judgment (defined in Section 3.14 below), no matter how payment is designated by Franchisee (including any amount due under any Promissory Note), except that the Brand Fund Contributions may only be credited to the Brand Fund;

3.13.2.  set off from any amounts that may be owed by Franchisor, any amount owed to Franchisor or any marketing fund; and

3.13.3.  retain any amounts received for Franchisee's account (and/or that of any affiliate of Franchisee), whether rebates from suppliers, payment for National Account work, or otherwise, as a payment against any amounts owed to Franchisor or any marketing fund.

Franchisor can exercise any of the foregoing rights in connection with amounts owed to or from Franchisor and/or any affiliate. For purposes of this Agreement, "affiliate" means any person or entity which controls, is controlled by, or is under common control with another person or entity, including any person or entity that provides services to Franchisee. In addition, as to the Franchisee, "affiliate" also means any owner of any interest in Franchisee or the Franchised Business, any employee or agent of the Franchisee, and/or any independent contractor performing functions for, or on behalf of, Franchisee, and any entity controlled by any of the foregoing.

3.13.4. **Business Judgment**.  For purposes of this Agreement, the term "Business Judgment" means the exercise of reasonable business judgment in making Franchisor's decision or exercising Franchisor's rights. Franchisor's decisions or actions will be deemed to be the result of reasonable business judgment, even if other reasonable or even arguably preferable alternatives are available, if Franchisor's decision or action is intended, in whole or significant part, to promote or benefit the franchise System generally, even if the decision or action also promotes Franchisor's financial or other individual interest. Examples of items that will promote or benefit the franchise System include, without limitation, enhancing the value of the Proprietary Marks, improving customer service and satisfaction, improving product quality, improving uniformity, enhancing or encouraging modernization, and improving the competitive position of the franchise System. This is a defined term for the purposes of this Agreement and is not intended to incorporate principles related to the application of the business judgment rule in a corporate law context.

## 4. PROPRIETARY MARKS

4.1. **Franchisee's Use of the Proprietary Marks and Other Proprietary Material**

4.1.1.   Franchisee shall use only the Proprietary Marks which Franchisor designates, and shall use them only in the manner Franchisor authorizes and permits.

4.1.2.   Franchisee shall use the Proprietary Marks only for the operation of the Franchised Business and only in the Designated Territory and in sales and marketing for the Franchised Business.

4.1.3.    Franchisee shall use all Proprietary Marks without prefix or suffix and in conjunction with the symbols "TM," "SM," "S," or "®," as applicable. Franchisee may not use the Proprietary Marks in connection with the offer or sale of any products or services which Franchisor has not authorized for use in connection with the System. Franchisee may not use the Proprietary Marks as part of Franchisee's corporate or other legal name. Franchisee's corporate name and all fictitious names under which Franchisee proposes to do business must be approved by Franchisor in writing before use. Franchisee must use Franchisee's corporate or limited liability company name either alone or followed by the initials "D/B/A" and a business name approved in advance by Franchisor. Franchisee must promptly register at the office of the county in which Franchisee's Franchised Business is located, or such other public office as provided for by the laws of the state in which Franchisee's Franchised Business is located, as doing business under such assumed business name.

4.1.4.    Franchisee must identify itself as the owner of the Franchised Business (in the manner Franchisor prescribes) in conjunction with any use of the Proprietary Marks, including, without limitation, on invoices, order forms, receipts, customer forms and questionnaires, business stationery, and advertisements, as well as at such conspicuous locations as Franchisor may designate in writing at the Franchised Business premises.

4.1.5.    Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

4.1.6.    Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on Franchisor's behalf.

4.1.7.    Franchisee shall execute all documents Franchisor deems necessary to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

4.1.8.    Franchisee must promptly notify Franchisor of any suspected unauthorized use of the Proprietary Marks that Franchisor may now or hereafter designate for use in connection with the System, any challenge to the validity of the Proprietary Marks, or any challenge to Franchisor's ownership of, Franchisor's right to use and to license others to use, or Franchisee's right to use, the Proprietary Marks and Operations Manual (defined in Section 6.1) (collectively the "Proprietary Material"). Franchisee acknowledges that Franchisor has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Material, including any settlement thereof. Franchisor has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Franchisor's rights to the Proprietary Material. Franchisor shall defend Franchisee against any third-party claim, suit, or demand arising out of Franchisee's use of the Proprietary Material. If Franchisor, in Franchisor's sole discretion, determines that Franchisee has used the Proprietary Material in accordance with this Agreement, Franchisor shall bear the cost of such defense, including the cost of any judgment or settlement. If Franchisor, in Franchisor's sole discretion, determines that Franchisee has not used the Proprietary Material in accordance with this Agreement, Franchisee shall bear the cost of such defense, including the cost of any judgment or settlement. In the event of any litigation relating to Franchisee's use of the Proprietary Material, Franchisee shall execute any and all documents and do such acts as may, in Franchisor's opinion, be necessary to carry out such defense or prosecution, including, without limitation, becoming a nominal party to any legal action. Except to the extent that such litigation is the result of Franchisee's use of the Proprietary Material in a manner inconsistent with the terms of this Agreement, Franchisor agrees to reimburse Franchisee for Franchisee's out-of-pocket costs in performing such acts.

4.1.9.    Franchisee expressly understands and acknowledges that:

4.1.9.1.    Franchisor or its affiliates or licensors own all right, title and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them, and Franchisor has the right to use, and license others to use, the Proprietary Marks;

4.1.9.2.    The Proprietary Marks are valid and serve to identify the System and those who are authorized to operate under the System;

4.1.9.3.    During the term of this Agreement and after its expiration or termination, Franchisee shall not directly or indirectly contest the validity of, or Franchisor's ownership of, or right to use and to license others to use, the Proprietary Marks or any other Proprietary Material;

4.1.9.4.    Franchisee's use of the Proprietary Material does not give Franchisee any ownership interest or other interest in or to the Proprietary Material;

4.1.9.5.    Any and all goodwill arising from Franchisee's use of the Proprietary Material shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System, the Proprietary Marks, or any other Proprietary Material;

4.1.9.6.    Except as specified in this Agreement, the license of the Proprietary Marks granted to Franchisee hereunder is non-exclusive and Franchisor retains the right, among others, to: (i) use the Proprietary Marks itself in connection with selling products and services; (ii) grant other licenses for the Proprietary Marks; and (iii) develop and establish other systems using the Proprietary Marks, similar proprietary marks, or any other proprietary marks, and to grant licenses thereto without providing any rights therein to Franchisee; and

4.1.9.7.    Franchisor reserves the right, in Franchisor's sole discretion, to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder. Franchisee shall discontinue using all Proprietary Marks which Franchisor has notified Franchisee, in writing, have been modified or discontinued within thirty (30) days of receiving written notice and, at Franchisee's sole cost and expense, shall promptly begin using such additional, modified or substituted Proprietary Marks.

4.2.    **Copyrighted Materials**.  You acknowledge that Franchisor is the owner of certain copyrighted or copyrightable works (the "Works") and that the copyrights in the Works are valuable property. The Works include, but are not limited to, the Operations Manuals, advertisements, promotional materials, signs, Internet sites, mobile applications, vehicle graphics, and facility designs. We authorize you to use the Works on the condition that you comply with all of the terms and conditions of this Section 4. This Agreement does not confer any interest in the Works on you, other than the right to use them in the operation of the Franchised Business in compliance with the terms of this Agreement. If you prepare any adaptation, translation or other work derived from the Works, whether or not authorized by us, you agree that the material will be our property and you hereby assign all your right, title and interest therein to us. You agree to sign any documents we deem necessary to confirm our ownership.

## 5.   CONFIDENTIAL INFORMATION

5.1.    **Nondisclosure**.  During the term of this Agreement, Franchisee will receive information which Franchisor considers its trade secret and confidential information. Franchisee may not, during the term of this Agreement or thereafter, communicate, divulge or use for the benefit of any other person or

entity, any Confidential Information (defined in Section 5.2). Upon termination or expiration of this Agreement, regardless of the reason, Franchisee shall return all copies of such Confidential Information to Franchisor immediately, and Franchisee may not use the Confidential Information for any purpose other than operating the Franchised Business in accordance with Franchisor's standards and specifications.

5.2. **Confidential Information**. Confidential Information hereby includes, without limitation, any and all confidential, proprietary and trade secret information relating to the operation of a Franchised Business, such as: (i) all financial, operational, technical and marketing information; (ii) Operations Manual; (iii) Franchisor's System policies or procedures, and franchising materials, brochures, marketing plans, forecasts, and related information; (iv) cost data; (v) pricing information; (vi) business plans; (vii) financial records and results of Franchisor's operations and other persons or entities operating a Franchised Business; (viii) photographs, devices, samples, models and illustrations; (ix) software developed by or for Franchisor; (x) customer and/or client lists and any information relating to Franchisor's customers or the customers of other System franchisees; (xi) prospect customer/client lists; (xii) patent, trademark, service mark and copyright applications; (xiii) information relating to inventions, discoveries, software, and any other research and development information; (xiv) methods of conducting the business developed by Franchisor or other franchisees, and any forms, memoranda, outlines, protocol, presentations, proposals, software, or other documents or information related to such methods; (xv) any information of a customer not generally known or available to the public; (xvi) any Trade Secrets (defined in Section 5.3), or of a customer of Franchisor, or of any other franchisee; and (xvii) any information about or originating from any Franchisee which, if it was information of Franchisor, is expressly deemed Confidential Information pursuant to the foregoing (collectively, "Confidential Information"). Any and all information, knowledge, know-how, techniques, and other data which Franchisor designates as confidential will be deemed Confidential Information for purposes of this Agreement.

5.3. **Trade Secrets**. Notwithstanding Section 5.2, "trade secret" means information (including, but not limited to, components of the System, product marketing and promotional techniques, confidential business information, technical or non- technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, and lists of actual or potential customers or suppliers) that: (i) derive economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy (collectively, "Trade Secrets"). To the extent that applicable law mandates a definition of "trade secret" inconsistent with the foregoing definition, then the foregoing definition shall be construed in such a manner as to be consistent with the mandated definition under applicable law.

5.4. **Employees / Personnel**. All of Franchisee's employees or other personnel must execute covenants that they will maintain the confidentiality of information they receive in connection with their employment by Franchisee at the Franchised Business. Such covenants shall be in a form satisfactory to Franchisor and substantially similar to the Confidentiality and Restrictive Covenant Agreement in the form attached as Exhibit C to this Agreement. Employee non-compete and restrictive covenant agreements must include, without limitation, specific identification of Franchisor as a third-party beneficiary of such covenants with independent rights to enforce them.

5.5. **New Concepts**. If Franchisee, or Franchisee's employees or principals, develop(s) any new concept, process or improvement in the operation or promotion of the Franchised Business, including, but not limited to, any modifications or additions to the Proprietary Material, Franchisee shall promptly notify Franchisor and provide Franchisor with all necessary related information, without compensation. Any such concept, process or improvement shall become Franchisor's sole property and Franchisor shall be the sole owner of all patents, patent applications, trademarks, copyrights, and other intellectual property

rights related thereto. Franchisee and Franchisee's principals and agents hereby assign to Franchisor any rights they may have or acquire therein, including the right to modify such concept, process or improvement, and otherwise waive and/or release all rights of restraint and moral rights therein and thereto. Franchisee and Franchisee's principals and agents agree to assist Franchisor in obtaining and enforcing the intellectual property rights to any such concept, process or improvement in any and all countries, and further agree to execute and provide Franchisor with all necessary documentation for obtaining and enforcing such rights. Franchisee and Franchisee's principals and agents hereby irrevocably designate and appoint Franchisor as their agent and attorney-in-fact to execute and file any such documentation and to do all other lawful acts to further the prosecution and issuance of patents or other intellectual property rights related to any such concept, process or improvement. In the event that the foregoing provisions of this Section 5.5 are found to be invalid or otherwise unenforceable, Franchisee and Franchisee's principals and agents hereby grant to Franchisor a worldwide, perpetual, non-exclusive, fully-paid license to use and sublicense the use of the concept, process or improvement to the extent such use or sublicense would, absent this Agreement, directly or indirectly infringe Franchisee's rights therein.

5.6.    **Customer Privacy**.  Franchisee agrees to adhere to the terms of Franchisor's customer privacy policies Franchisor may now or in the future develop. Franchisee may not divulge personal information regarding any customers, except as absolutely necessary to operate the Franchised Business.

# 6. FRANCHISOR'S OBLIGATIONS

6.1.    **Operations Manual**.  Prior to commencing operation of the Franchised Business, Franchisor will provide Franchisee with secure access to its operations manual, which contains mandatory and suggested specifications, standards and operating procedures for the System, which may be modified and/or supplemented by Franchisor at any time as Franchisor deems advisable in its sole discretion, including Franchisor's proprietary and confidential operations manual for operating a Franchised Business ("Operations Manual"). The Operations Manual may cover such topics as pre- opening procedures; systems and procedures; personnel policies; specifications for vehicles, supplies, equipment and inventory; marketing; accounting and bookkeeping; and related matters as may be incorporated from time to time. The Operations Manual will remain confidential and the property of Franchisor, constituting a trade secret of Franchisor, and may not be shared, loaned out, duplicated, distributed or copied in whole or in part in any manner. The provisions of the Operations Manual constitute provisions of this Agreement as if fully set forth herein. Franchisor will have the right to add to and otherwise modify the contents of the Operations Manual from time to time in writing in any manner, including through the Operations Manual, email, Franchisor's website, or any other means. Franchisee must always follow the directives in the Operations Manual, as they may be modified by Franchisor from time to time. Such compliance by Franchisee is necessary to protect the integrity and reputation of the System. The Operations Manual may also contain provisions that share recommended best practices, which provisions are not mandatory.

6.2.    **Initial Supplies**.  Franchisor will provide Franchisee with a list of all items and equipment needed to open the Franchised Business, along with the proprietary list of Approved Suppliers for those items (as applicable), with which Franchisee must comply.

6.3.    **Ongoing Assistance**.  Franchisor may provide Franchisee continuing consultation and advice, as Franchisor deems necessary and appropriate in its sole discretion, regarding the management and operation of the Franchised Business. Franchisor will provide such assistance, in Franchisor's discretion, by telephone, facsimile, intranet communication, on-site visits, or other means. If Franchisee requires and requests additional on-site assistance from Franchisor, subject to the availability of Franchisor's personnel, Franchisor may provide Franchisee with such assistance at Franchisor's then-current training fee, plus expenses, including Franchisor's travel and lodging expenses, as Franchisor deems necessary in its sole discretion. Franchisor may also use the Operations Manual to provide self-serve training materials.

6.4.    **Additional Training**.  As set forth more fully in Section 8, Franchisor may, in Franchisor's sole discretion, hold refresher and ongoing training courses, or training courses to provide additional information and/or updates regarding Franchisor's System and/or the operation of the Franchised Business. Except as otherwise provided in this Agreement, Franchisor may require Franchisee's personnel to attend such additional training up to twenty (20) days per year at a location to be selected by Franchisor. All expenses, including Franchisee's and Franchisee's employees' transportation, meal, and lodging expenses to attend such training shall be Franchisee's sole responsibility. If training is conducted at Franchisee's Approved Location or in Franchisee's Designated Territory, Franchisee will be responsible for all of Franchisor's employees' expenses to conduct such training, including transportation, meal and lodging expenses. Franchisor will provide Franchisee with thirty (30) days' notice of any upcoming additional or refresher training that Franchisee is required to attend.

6.5.    **Remedial Training**.  In the event Franchisor determines that Franchisee is not operating the Franchised Business as required under the Franchise Agreement or in compliance with the System standards, Franchisor may require Franchisee to attend up to five (5) days of remedial training a year (in addition to any required training). Franchisor has the right to schedule remedial training at its corporate headquarters or other designated training facility, or Franchisor may provide such training on-site at the Franchised Business. In either case, Franchisor may charge Franchisee its then-current tuition training fee (plus its travel and living expenses) to provide such remedial training.

6.6.    **Call Center**.  Franchisor reserves the right to establish and maintain a centralized call center for the purpose of accepting telephone, Internet and other inquiries from potential customers and forwarding such customer information to the appropriate franchisee (the "Call Center"). If established, Franchisee must comply with Franchisor's procedures for using the Call Center as Franchisor specifies in the Operations Manual or otherwise in writing, including any fees Franchisee must pay in connection with administering and maintaining this service. If established, Franchisor has the absolute right to receive all customer calls to the Franchised Business, and subsequently service, route and/or assign any work orders or inquiries resulting from such calls as it deems advisable in its sole discretion, regardless of whether the customer is located within Franchisee's Designated Territory. If established, all System related phone numbers and Internet lead sources are required to be ported to or directed to Franchisor.

6.7.    **Pricing**.  Franchisor may advise Franchisee from time to time concerning suggested retail prices. Franchisor and Franchisee agree that any list or schedule of prices furnished to Franchisee by Franchisor is a recommendation only and is not to be construed as mandatory upon Franchisee. Nothing contained herein shall be deemed a representation or warranty by Franchisor that the use of Franchisor's suggested prices will result in a profit. If we determine that we may lawfully require you to charge certain prices for products or services, certain minimum prices for products or services, or certain maximum prices for products or services, you must adhere to our pricing policies as set forth in the Manuals or otherwise in writing from time to time. Otherwise, you are solely responsible for determining the prices that you charge customers.  You must provide us with your current price list upon our request.

6.8.    **Annual Conference**.  Franchisor may, in Franchisor's discretion, hold one or multiple annual conferences at a location to be selected by Franchisor (the "Annual Conference"). Franchisor will determine the topics and agenda for such conference to serve the purpose, among other things, of updating franchisees on new developments affecting franchisees, exchanging information between franchisees and Franchisor's personnel regarding operations and programs, and recognizing franchisees for their achievements. Franchisor may require Franchisee to attend the Annual Conference and pay Franchisor's then-current registration fee if Franchisor chooses to charge a registration fee in its sole discretion. Attendance at the Annual Conference is mandatory. Franchisor reserves the right to charge Franchisee a fee to cover Annual Conference expenses in the event the Franchisee chooses not to attend. All expenses,

including Franchisee's and Franchisee's employees' transportation to and from the Annual Conference, as well as lodging, meals and salaries during the Annual Conference are Franchisee's sole responsibility. Franchisor may use Brand Fund Contributions for purposes related to the Annual Conference, including costs related to production, programs and materials.

## 7. FRANCHISEE'S OBLIGATIONS

7.1. **Site Location and Lease Approval**. Franchisee must operate the Franchised Business from an approved retail showroom/office that meets Franchisor's then-current standards and specifications for an Approved Location. Franchisee will need to lease approximately 500 to 1,500 square feet of commercial real estate for Franchisee's retain showroom/office and to securely store all equipment and inventory. Franchisor may provide Franchisee with standards and specifications for the design and layout of the premises of the Approved Location, and Franchisor must review and approve any proposed location, as well as any lease associated with the proposed location, prior to Franchisee entering into any lease for the proposed location. If Franchisor has not approved a location for Franchisee to operate the Franchised Business as of the date Franchisee signs this Agreement, the parties shall enter into Franchisor's prescribed form of Site Selection Addendum, the terms of which shall govern the parties' site selection obligations. Franchisor has the right to review, evaluate and approve Franchisee's proposed lease for the Approved Location ("Lease") prior to execution. Franchisor may condition Franchisor's approval of any proposed Lease on, among other things, Franchisee and Franchisee's landlord's execution of a Collateral Assignment of Lease in the form prescribed by Franchisor and attached to this Agreement as Exhibit G.

7.1.1. *Relocation*. If, for any reason, the Lease term is shorter than the term of this Agreement and the Lease cannot be renewed or extended, or Franchisee cannot continue for any other reason to occupy the Approved Location, Franchisee must relocate Franchisee's Franchised Business to a mutually acceptable site within Franchisee's Designated Territory to complete the unexpired portion of the term of this Agreement. Franchisee must notify Franchisor of Franchisee's intention to relocate, procure a site acceptable to Franchisor within ninety (90) days prior to closing operations at Franchisee's current Approved Location, and open for business at the new Approved Location within thirty (30) days of closing business at Franchisee's existing Approved Location. Franchisor may require Franchisee to reimburse Franchisor for its actual costs and expenses associated with evaluating Franchisee's relocation request and/or any locations proposed by Franchisee for relocation, plus a two hundred fifty dollar ($250) administrative fee. We will provide Franchisee with copies of our invoices for its expenses from any third-party providers upon request.

7.1.2. *Franchised Business Appearance and Construction*. Franchisee agrees that the Franchised Business must conform to Franchisor's standards and specifications for the appearance, layout and design of a Franchised Business. Franchisee is solely responsible for the preparation of architectural and working drawings necessary to complete construction and/or build-out at the Approved Location and must ensure that plans meet with applicable ordinances, building codes, permit requirements, and any other applicable local, state or federal law.

7.1.3. *Use of Premises*. The location of Franchisee's Approved Location approved by Franchisor in accordance with this Agreement shall be used solely for the purpose of operating the Franchised Business, unless otherwise approved in writing by Franchisor. Franchisee must obtain Franchisor's prior written consent to conduct any other business or commercial activity from the Approved Location.

7.2. **Training**. Franchisee (or if Franchisee is an entity, then Franchisee's principals) must attend and successfully complete Franchisor's Initial Training Program (defined in Section 8.1), as set forth

DocuSign Envelope ID: B3A3CF6E-8B79-4A16-8EA1-306117754EFF

more fully in Section 8 of this Agreement. Franchisor has the right to require one (1) individual to attend in addition to Franchisee.

7.3. **Opening Requirements**.  Franchisee shall open and commence operating the Franchised Business within one hundred eighty (180) days of executing this Agreement. Franchisee must obtain Franchisor's approval of the Approved Location within thirty (30) days of executing this Agreement. In addition to any other pre- opening obligations set forth in this Agreement, Franchisee is required to complete the following prior to commencing operations: (i) obtain all required licenses, certifications, permits and other governmental approvals necessary to operate the Franchised Business in the Designated Territory, and provide Franchisor with written proof thereof; (ii) purchase all required vehicles, equipment, supplies and inventory in accordance with Franchisor's standards and specifications and, if appropriate, from Franchisor's Approved Suppliers (defined in Section 7.4.2), that Franchisee is required to purchase prior to opening; (iii) attend and successfully complete Franchisor's Initial Training Program, as defined and described in Section 8.1 of this Agreement, as well as any other pre- opening training Franchisor may prescribe; and (iv) provide Franchisor with any and all documents and information necessary for Franchisor to effectuate the EFT Program to automatically withdraw all payments due and owing Franchisor and its affiliates under the Franchise Agreement. Without limiting the foregoing, if Franchisee or any of Franchisee's owners is not a U.S. national, Franchisee represents that Franchisee and/or such owners have an immigration status that allows Franchisee and/or such owners to live and work in the United States, and Franchisee hereby promises that Franchisee and/or such owners will maintain such status during the term of this Agreement.

7.4. **Purchasing Requirements**

7.4.1. *Compliance with Standards.*  Franchisee acknowledges and agrees that Franchisee's obligations set forth in this Agreement and the Operations Manual are reasonable and necessary for the operation of the Franchised Business and to maintain uniformity throughout the System. Franchisee shall adhere to the standards and specifications set forth in this Agreement and the Operations Manual and any revisions or amendments to same. Franchisee shall use the furnishings, supplies, fixtures, equipment, computer hardware and software, and product samples and promotional materials that comply with Franchisor's then-current standards and specifications, which Franchisor will establish and modify at Franchisor's discretion. Franchisee acknowledges that Franchisee may incur an increased cost to comply with such changes at Franchisee's expense.

7.4.2. *Designated and Approved Suppliers.*  Franchisee must currently use Franchisor's designated suppliers to purchase any items and/or services necessary to operate the Franchised Business. Recognizing that preservation of the System depends upon product and service uniformity and the maintenance of Franchisor's trade dress, Franchisee agrees to purchase product samples and other supplies, services, furnishings, fixtures, computer hardware and software, and other equipment from Franchisor or from approved or designated suppliers as Franchisor shall specify, from time to time, in the Operations Manual and otherwise in writing (each an "Approved Supplier"). Franchisee hereby acknowledges that Franchisor, Franchisor's affiliate(s) and/or a third party may be one of several, or the only, Approved Supplier of any item. Franchisee further acknowledges and agrees that Franchisor and/or Franchisor's affiliates have the right to realize a profit or otherwise derive revenue from any products or services that Franchisor, Franchisor's affiliates, or Franchisor's Approved Suppliers supply and/or provide to Franchisee. Franchisor has the irrevocable right to modify, supplement or otherwise change its lists of Approved Suppliers and any items that must be purchased from such Approved Suppliers at any time, as Franchisor deems advisable in its sole discretion. Franchisor may mandate that Franchisee use a specific payment processor in its Franchised Business, in which Franchisor or an affiliate may (or may not) be an owner, and Franchisor or its affiliate may collect fees owed to it or an affiliate at the time of payment by a

customer using such processor. Franchisor may provide Franchisee with notice of such modifications to these lists via the Operations Manual or any other manner Franchisor deems appropriate.

7.4.3. *Supplier Approval.* In the event Franchisee wishes to purchase any unapproved item, including inventory, and/or acquire approved items from an unapproved supplier, Franchisee must provide Franchisor the name, address and telephone number of the proposed supplier, a description of the item Franchisee wishes to purchase, and the purchase price of the item, if known. At Franchisor's request, Franchisee must provide Franchisor, for testing purposes, a sample of the item Franchisee wishes to purchase. Nothing in the foregoing shall be construed to require Franchisor to approve any particular supplier. Franchisor may base Franchisor's approval of any such proposed item or supplier on considerations relating not only directly to the item or supplier itself, but also indirectly to the uniformity, efficiency and quality of operation Franchisor deems necessary or desirable in Franchisor's System as a whole, as well as the maintenance of Franchisor's Confidential Information. Franchisor has the right to receive payments from suppliers on account of their dealings with Franchisee and other franchisees and to use all amounts Franchisor receives without restriction (unless instructed otherwise by the supplier) for any purposes Franchisor deems appropriate. Nothing herein shall require Franchisor to approve an unreasonable number of suppliers for a given item, which approval might, in Franchisor's reasonable judgment, result in higher costs or prevent the effective or economical supervision of approved suppliers.

7.4.3.1. Franchisee or the proposed supplier must pay Franchisor its then-current alternative supplier or new product review fee, in addition to Franchisor's actual costs that Franchisor estimates it will incur in connection with inspecting the alternate supplier, its facilities, and/or the previously non-approved item(s) proposed by Franchisee. If the costs Franchisor incurs are more than the amount Franchisee or the proposed supplier advanced, then Franchisor may withdraw additional funds through the EFT Program from Franchisee's designated bank account for the difference, or if the actual amount Franchisor incurs is less than the amount of the advancement, then Franchisor shall credit the excess amount to the payment of Franchisee's future obligations.

7.4.3.2. Franchisor will use commercially reasonable efforts to notify Franchisee in writing whether or not Franchisee's request is approved or denied within thirty (30) days of: (i) Franchisor's receipt of all supporting information from Franchisee regarding Franchisee's request under this Section; and (ii) if applicable, Franchisor's completion of any inspection or testing associated with Franchisee's request. If Franchisor does not provide written approval within this time period, then Franchisee's request will be deemed denied.

7.4.3.3. Franchisor may, but is not obligated to, provide Franchisee's proposed supplier or provider with its specifications for the item that Franchisee wishes the third party to supply, provided that third party executes Franchisor's prescribed form of non-disclosure agreement.

7.4.3.4. Each supplier that Franchisor approves of must comply with Franchisor's requirements regarding insurance, indemnification and non-disclosure. If Franchisor approves any supplier, Franchisee may enter into supply contracts with such third party, but under no circumstances will Franchisor guarantee Franchisee's performance of any supply contract.

7.4.3.5. Franchisor may re-inspect and revoke Franchisor's approval of particular products or suppliers when Franchisor determines, in Franchisor's sole discretion, that such products or suppliers no longer meet Franchisor's standards. Upon receipt of written notice of such revocation, Franchisee must cease purchasing products from such supplier.

7.4.4. *System Suppliers.* Franchisor may establish business relationships, from time to time, with suppliers who may produce and/or provide certain products or services that Franchisee is

required to purchase from only that supplier (each a "<u>System Supplier</u>"). These System Suppliers may provide, among other things, supplies, fixtures, technology, software and equipment, all in accordance with Franchisor's proprietary standards and specifications, or private label goods that Franchisor has authorized and prescribed for sale by System franchisees. Franchisee recognizes that such products and services are essential to the operation of the Franchised Business and to the System generally. Franchisee further recognizes that Franchisee's failure to pay System Suppliers may interfere with such suppliers' willingness to supply the System and may result in other System franchisees' inability to obtain product, or ability to obtain product only on less favorable credit terms. Accordingly, Franchisee agrees to pay System Suppliers as and when due. Franchisee must use products purchased from Approved Suppliers solely in connection with the operation of the Franchised Business and not for any competitive business purpose.

7.5. **Approved Products and Services**.  Franchisee shall offer for sale all products and services which Franchisor prescribes and only those products and services which Franchisor prescribes. Franchisee may not offer any other products or services for sale without having received Franchisor's prior written authorization. Franchisee shall at all times maintain sufficient levels of inventory, as specified in the Operations Manual, to adequately satisfy consumer demand. Franchisee must offer, use and sell all private label products which Franchisor may now or in the future designate for sale by System franchisees. In the event Franchisee wishes to offer any Approved Products or Approved Services that Franchisor indicates requires additional training or certification from Franchisor or its designee, then Franchisee must complete such training and/or obtain such certification, at Franchisee's sole expense, prior to providing these specialized Approved Products and Approved Services.

7.6. **Operations**

7.6.1. *Hours of Operation.*  Franchisee must operate the Franchised Business for at least those days and number of hours Franchisor specifies in the Operations Manual.

7.6.2. *Maintenance of Premises and Project Sites.*  Franchisee must maintain the Franchised Business and all project sites in a clean, safe and attractive manner, and in accordance with all applicable requirements of law, including all federal, state and local health laws, as well as this Agreement and the Operations Manual. Franchisee and Franchisee's employees must give prompt, courteous and efficient service to the public and otherwise operate the Franchised Business so as to preserve, maintain and enhance the reputation and goodwill of the System.

7.6.3. *Personnel/Staffing.*  Franchisee must employ a sufficient number of qualified, competent personnel, to offer prompt, courteous and efficient service to the public, and otherwise operate the Franchised Business in compliance with the System so as to preserve, maintain and enhance the reputation and goodwill of the System. All employees engaged in the operation of the Franchised Business during working hours shall dress conforming to Franchisor's standards and shall present a neat and clean appearance in conformance with Franchisor's reasonable standards and shall render competent, efficient service to the customers of the Franchised Business.

7.6.4. *Compliance with Operations Manual and Training of Employees.*  Franchisee agrees to conduct the Franchised Business in accordance with the Operations Manual. Franchisee shall immediately train and instruct Franchisee's employees in accordance with the Operations Manual, and shall continue such training and instruction as long as each employee is employed. The Operations Manual shall set forth the practices, procedures and methods to be utilized in the Franchised Business, and Franchisor may require Franchisee to conform Franchisee's practices to national programs, which Franchisor has designed as part of Franchisor's System.

7.6.5.   *Management Participation.*  Franchisee (or at least one of Franchisee's principals if Franchisee is a corporation or partnership) must devote their personal full-time attention and best efforts to the management and operation of the Franchised Business. Upon Franchisee's written request, Franchisor may permit Franchisee to employ a manager to manage the day- to- day operations of the Franchised Business (the "Designated Manager"), provided the Designated Manager: (i) is approved by Franchisor in writing prior to hiring; and (ii) successfully completes Franchisor's Initial Training Program (defined in Section 8.1) before assuming any managerial responsibility. The Franchised Business must at all times be staffed with at least one (1) individual who has successfully completed Franchisor's Initial Training Program. In the event that Franchisee operates more than one Franchised Business, Franchisor may require Franchisee to have a properly trained Designated Manager who has been approved by Franchisor at each location. Franchisee will keep Franchisor informed at all times of the identity of any employee acting as Designated Manager of the Franchised Business. In the event that a Designated Manager resigns or is otherwise terminated from the Franchised Business, the replacement must be trained pursuant to Franchisor's then-current standards. The new Designated Manager must successfully complete training within thirty (30) days of hiring. Franchisor reserves the right, without the obligation, to train the new Designated Manager directly. Franchisee and any Designated Manager(s) are not permitted to seek or maintain other employment or engage in any other business activities during the term of this Agreement.

7.6.5.1.   If Franchisee's Designated Manager departs the Franchised Business and Franchisee does not have another Designated Manager that satisfies the requirements in Section 7.6.5 above, then Franchisor may, at its option, provide Franchisee with a temporary replacement Designated Manager and Franchise shall be obligated to pay the replacement Designated Manager the then-current fee for each full or partial day.

7.6.6.   *Working Capital.*  Franchisee must at all times maintain such working capital as may be reasonably necessary to enable Franchisee to properly and fully carry out and perform all of Franchisee's duties, obligations and responsibilities hereunder and to operate the business in a businesslike, proper and efficient manner.

7.6.7.   *Inventory.*  Prior to commencement of operations, Franchisee shall adequately supply the Franchised Business with supplies, vehicles, equipment and inventory as prescribed by the Franchisor, and any other items of the type, quantity and quality as specified by Franchisor. Franchisee must, at all times, maintain sufficient levels of inventory, including Franchisor's proprietary products and other equipment and supplies used at project sites, as required by Franchisor to adequately meet consumer demand.

7.6.8.   *Products with Proprietary Marks*.  Franchisee shall in the operation of its Franchised Business, use and display labels, forms, vehicles, supplies, equipment and inventory imprinted with the Proprietary Marks and colors as prescribed by the Franchisor.

7.6.9.   *Market Research*.  Franchisor may, from time to time, conduct market research and testing to determine the viability of new products and services. Franchisee must cooperate by participating in such programs and by purchasing and promoting the sale of such test products and services, if required by the Franchisor.

7.6.10. *Customer Contracts*.  In the operation of the Franchised Business, Franchisee is required to use only the customer contracts, waivers, and/or other forms that are designated by Franchisor from time to time.  Franchisor is not obligated to designate any such items and Franchisee's use obligations do not apply where Franchisor does not designate such items. Franchisor may provide Franchisee with templates or sample forms of such items, but it is Franchisee's responsibility to have all items which are to be used with prospective and/or actual customers reviewed, at Franchisee's expense, by an attorney licensed

to practice law in the state(s) where the Franchised Business is operated, for compliance with all applicable state and local legal requirements. Franchisor makes no warranty or representation that any contracts, waivers and/or other forms and/or materials, whether supplied by Franchisor or otherwise, are in compliance with the laws of any particular state(s) or locality.

7.7.    **Franchised Business Inspection**.  Franchisee agrees that, in order to maintain the high quality and uniform standards associated with the Franchise System and to protect its goodwill and reputation, Franchisee will permit Franchisor, during business hours, to inspect Franchisee's Franchised Business or attend a project site, confer with Franchisee and Franchisee's employees and customers, observe and evaluate Franchisee's sales techniques and operation methods, and perform any other inspection which Franchisor deems necessary to protect the standards of quality and uniformity of the franchise System and Franchisee's performance under this Agreement, the Operations Manual, and other standards and specifications required by Franchisor. Franchisee is obligated to make changes to Franchisee's operations based upon any inspections by Franchisor. Franchisor is not required to provide Franchisee with any notice prior to conducting such an inspection.

7.8.    **Computer Software and Hardware**

7.8.1.    *Business Management and Technology System.*    Franchisor's business management and technology system ("Business Management and Technology System") is a proprietary integrated business management system that includes customized software that facilitates the flow of business-related information between Franchisee, Franchisor and Franchisee's customers. The Business Management and Technology System will be managed and maintained by either Franchisor, a third-party company selected by Franchisor, or a combination of both. The Business Management and Technology System includes software that manages customer / Franchisee / Franchisor interactions from demand generation and lead intake through invoicing and collections, Franchisor's websites, telematics, and the Call Center (if established). If the Call Center is established, Franchisee will be required to forward any and all calls made to the Franchised Business (and all telephone numbers associated therewith) so that Franchisor can receive/route/assign these customer calls through the Business Management and Technology System as more fully set forth in this Agreement. Franchisee will have access to the Business Management and Technology System through a unique login.

7.8.2.    *Computer System.*    Franchisor shall have the right to specify or require that certain brands, types, makes and/or models of communications, computer systems and hardware be used by Franchisee, including, without limitation: (a) a compatible "back office" computer system that complies with Franchisor's standards and specifications and is capable of operating designated and Required Software (as defined below in Section 7.8.3below); (b) Franchisor's Business Management and Technology System; (c) a custom and proprietary point-of-sale system (the "POS System"), if Franchisor makes such a POS System part of its proprietary operating system in the future; (d) accounting software; (e) software applications and programs; (f) printers and other peripheral hardware or devices; (g) archival back-up systems; (h) Internet access mode and speed; and (i) physical, electronic, and other security systems (collectively, the "Computer System"). Franchisee must dedicate its Computer System for use as the Business Management and Technology System only and use the Business Management and Technology System in accordance with Franchisor's policies and operational procedures. Franchisee's employees must complete any and all training programs Franchisor reasonably requires for the proper operation and use of the Business Management and Technology System. Franchisee may not use any other cash registers or computer systems in its Franchised Business.

7.8.3.    *Required Software.*    Franchisor shall have the right, but not the obligation, to develop or designate: (i) computer software programs that Franchisee must use in connection with any component of the Computer System, including Franchisor's Business Management and Technology System

DocuSign Envelope ID: B3A3CF6E-8B79-4A16-8EA1-306117754EFF

software (the "Required Software"), which Franchisee shall install at Franchisee's expense; (ii) updates, supplements, modifications or enhancements to the Required Software, which Franchisee shall install at Franchisee's expense; (iii) the tangible media upon which Franchisee records data; and (iv) the database file structure of the Computer System.

7.8.4.  *Compliance with Requirements.*  At Franchisor's request, Franchisee shall purchase or lease, and thereafter maintain, the Computer System and, if applicable, the Required Software. Franchisee expressly agrees to strictly comply with Franchisor's standards and specifications for all items associated with Franchisee's Computer System and any Required Software. Franchisee agrees, at its own expense, to keep its Computer System in good maintenance and repair and install such additions, changes, modifications, substitutions, and/or replacements to Franchisee's Computer System or Required Software as Franchisor directs from time to time in writing. Franchisee agrees that its compliance with this Section shall be at Franchisee's sole cost and expense.

7.8.5.  *Franchisor's Access.*  Franchisor may require that Franchisee's Computer System be programmed to automatically transmit data and reports about the operation of the Franchised Business to Franchisor. Franchisor shall also have the right to, at any time without notice, electronically connect with Franchisee's Computer System to monitor or retrieve data stored on the Computer System or for any other purpose Franchisor deems necessary. There are no contractual limitations on Franchisor's right to access the information and data on Franchisee's POS system and Computer System. Franchisee shall deliver to Franchisor all access codes, static Internet protocol ("IP") addresses and other information to facilitate Franchisor's access to the data described in this Section within thirty (30) days of opening the Franchised Business.

7.8.6.  *Proprietary Software.*  Franchisor has a proprietary interest in all databases, lists, templates, programs, and any other software components that have been created and/or customized by Franchisor using the Computer System and/or Required Software (the "Proprietary Software"). In the future, Franchisor may further customize the Proprietary Software and create programs that conduct, among other things, scheduling, accounting, inventory and related activities. Franchisee must obtain the computer hardware necessary to implement the Proprietary Software into the Franchised Business, and comply with all specifications and standards prescribed by Franchisor regarding the Proprietary Software as provided in the Operations Manual. This Proprietary Software will be Franchisor's proprietary product and the information collected therefrom will be deemed Franchisor's Confidential Information.

7.8.7.  *Computer Network.*  Franchisee is required to participate in any System-wide computer network, intranet system, extranet system or community portal that Franchisor implements, and that may be required by Franchisor to use such computer network, intranet system, or extranet system to, among other things: (i) submit Franchisee's reports due under this Agreement to Franchisor online; (ii) view and print portions of the Operations Manual, including any updates or modifications thereto; (iii) download approved marketing materials; (iv) communicate with Franchisor and other System franchisees; and (v) complete any initial or ongoing training that Franchisor designates, in the event Franchisor makes such training accessible through this medium. Franchisee agrees to use the facilities of any such computer network, intranet system or extranet system in strict compliance with the standards, protocols and restrictions that Franchisor included in the Operations Manual, including those related to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory or defamatory statements. Franchisee understands and agrees that it is solely responsible for any licensing and/or maintenance fee(s) associated with any intranet or extranet described in this Section.

7.9.  **Personal Conduct**.  Franchisee agrees to refrain from committing any act or pursuing any course of conduct that tends to bring Franchisor's Proprietary Marks into disrepute.

7.10 **Best Efforts**. Franchisee (or Franchisee's principals) must devote their personal full-time attention, skill and best efforts to the management and operation of the Franchised Business and to promote and increase the demand for the Franchisor's products and services within the Designated Territory. In consideration of the grant of the Franchised Business, Franchisee (or Franchisee's principals) agrees that it will not own, maintain, engage in, be employed by, or have any interest in any other business other than the Franchised Business without the prior written consent of Franchisor. Franchisee agrees that Franchisee may not, without the prior written consent of Franchisor, engage in any commercial activity that: (i) is not performed for the sole and direct benefit of the Franchised Business; (ii) may benefit or promote any other business; or (iii) may be injurious to the Franchised Business or the goodwill associated with the Proprietary Marks and the System. Franchisee acknowledges that Franchisee's (or Franchisee's principals') violation of the terms in this Section will be a material breach of this Agreement, and Franchisor may terminate this Agreement with notice and without an opportunity to cure. The foregoing remedy shall be in addition to any other legal or equitable remedies that the Franchisor may possess.

7.11 **Telephone and Email Access**. Franchisor reserves the right to procure and supply all telephone numbers and email accounts associated with the Franchised Business.

7.12 **Payment of Debts**. Franchisee is solely responsible for: (i) selecting, retaining and paying Franchisee's employees; (ii) the payment of all invoices for the purchase of products and services used in connection with operating the Franchised Business; and (iii) determining whether, and on what terms, to obtain any financing or credit which Franchisee deems advisable or necessary for the conduct of the Franchised Business. Franchisee agrees to pay all current obligations and liabilities to suppliers, lessors and creditors on a timely basis. Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for debts owed by Franchisee if Franchisor elects to pay any of Franchisee's obligations in order to preserve the relationship between System Suppliers and System franchisees. Franchisee agrees to make prompt payment of all federal, state and local taxes, including individual and corporate taxes, sales and use taxes, franchise taxes, gross receipts taxes, employee withholding taxes, FICA taxes, personal property, and real estate taxes arising from Franchisee's operation of the Franchised Business. Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for these taxes.

7.13 **Compliance with Applicable Laws**. Franchisee must comply with all applicable federal, state and local laws, ordinances and regulations regarding the operation of the Franchised Business (including, without limitation, all government regulations relating to required licensing; occupational hazards and health; trademark and copyright infringement; fair marketing laws; consumer protection; trade regulation; workers' compensation; unemployment insurance; withholding and payment of Federal and State income taxes and social security taxes; sales, use and property taxes; and the applicable provisions of the Americans with Disabilities Act ("ADA") regarding the construction, design and operation of the Franchised Business). Franchisee will have sole authority and control over the day-to-day operations of the Franchised Business and Franchisee's employees and/or independent contractors. Franchisee is solely responsible for all employment decisions and is solely responsible for compliance with all state, federal and local hiring laws and functions of the Franchised Business, including, without limitation, those related to hiring, firing, training (except for brand standards certification training we offer to you and your Designated Manager), wage and hour requirements, compensation, promotion, recordkeeping, supervision and discipline of employees, paid or unpaid, full or part-time. At no time will Franchisee or Franchisee's employees be deemed to be employees of Franchisor or Franchisor's affiliates. Any information we provide about employment matters, whether voluntarily or in response to your request, and whether directly or by means of any technology tools, is a recommendation only and is not intended to and is not an actual exercise of control over the wages, hours or working conditions of your employees or the means and manner by which they carry out their duties. You are strongly encouraged to seek independent competent labor law counsel in the state/locality where you do business for all employment matters.

You alone will direct and control all employees of the Franchised Business, subject only to the Brand Standards that we prescribe to protect the goodwill associated with the Marks, which may include the requirement of initial and periodic drug testing and background checks. You are required to clearly inform all workers, before hiring and periodically thereafter, that Franchisee, and not Franchisor, is their employer. You agree to indemnify us for any liability, cost, expense, loss or damage, including attorney's fees and costs, arising from (i) any claim or allegation that Franchisor or any affiliate is the employer, co-employer, or joint employer of Franchisee, its Owners, or any workers in the Franchised Business.

7.14 **Trade Secrets and Confidential Information**. Franchisee and all of its employees must maintain the confidentiality of all Confidential Information as set forth in this Agreement.

7.15 **Image**. Franchisee acknowledges that Franchisor has developed the System to offer and sell products and services which will distinguish the Franchised Business from other service businesses that offer similar products and services valued at different prices and with less attention paid to product quality and customer service. Franchisee agrees to offer products and services and to conduct the Franchised Business in such a manner which will serve to emulate and enhance the image Franchisor intended for the System. Franchisee further acknowledges and agrees that each aspect of the System is important not only to Franchisee, but also to Franchisor and to other System franchisees in order to maintain the highest operating standards, achieve System-wide uniformity, and increase the demand for the products sold and services rendered by System franchisees. Franchisee agrees to comply with the standards, specifications and requirements Franchisor set forth in order to uniformly convey the distinctive image of a Franchised Business. Franchisee shall, in the operation of the Franchised Business, use only displays, bags, labels, forms, stationery and other products Franchisor designates that are imprinted with the Proprietary Marks and colors, as prescribed from time to time by Franchisor.

7.16 **Pending Actions**. Franchisee shall notify Franchisor in writing, within five (5) days of the commencement of any action, suit or proceeding, and the issuance of any order, suit or proceeding of any court, agency or other government instrumentality, including the receipt of any notice or citation, which may adversely affect the operation or financial condition of Franchisee or the Franchised Business.

7.17 **Standard Maintenance and System Conformity**. Franchisee agrees to repair, refinish, replace, and/or otherwise refurbish the Franchised Business's Computer System, POS System, Required Software, vehicle(s), trailer(s) (if applicable), equipment, tools, and the Approved Location's furnishings, fixtures, decor, and any other tangible part or property of the Franchised Business at Franchisee's sole expense at such times as Franchisor may reasonably direct. Franchisor has the right to direct Franchisee to remodel, re-equip, and otherwise refurbish the Approved Location in the manner necessary to bring it into conformance with other franchises of the type Franchisor's franchisees are opening at the time of such direction. If at any time, in Franchisor's judgment, the general state of repair or the appearance of the premises of the Approved Location or its vehicles or equipment, does not meet Franchisor's standards, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate within fifteen (15) days after receipt of such notice, Franchisor shall have the right, in addition to all other remedies, to enter upon the premises of the Approved Location and affect such maintenance on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand.

7.18 **Customer Service**. Franchisee must comply with any standards, specifications or methodologies that Franchisor establishes in the Operations Manual or otherwise in writing regarding customer service requirements, a customer or product warranty, or a satisfaction guarantee on any Approved Products or Approved Services offered or sold by the Franchised Business, refund policies and other standards and specifications. If specified in the Operations Manual, you are required to provide the

warranty or satisfaction guarantee to each customer and comply with the requirements of the warranty/guarantee program, as set forth in the Operations Manual.

## 8.    TRAINING

8.1    **Initial Training Program**.  Franchisor will provide Franchisee (or one of Franchisee's principal owners if Franchisee is a business entity) and up to two (2) additional representatives that Franchisee designates with Franchisor's then- current initial training program (the "Initial Training Program") tuition- free, subject to the availability and schedule of Franchisor's training personnel. Franchisee must attend and successfully complete the Initial Training Program to Franchisor's satisfaction at Franchisor's corporate headquarters (the "Home Office"), or other location that Franchisor designates, prior to commencing operations of the Franchised Business. Some or all of the classroom training may now or in the future be provided virtually. If Franchisee is a business entity, each franchise owner must attend and successfully complete the Initial Training Program. The Initial Training Program lasts approximately five (5) days, and Franchisee will be solely responsible for costs and expenses Franchisee and its representative(s) incur in connection with attending the Initial Training Program, including travel, lodging, meals or any wages incurred for Franchisee's employees. In the event Franchisor permits Franchisee to employ a Designated Manager (defined in Section 7.6), such Designated Manager must attend and complete the Initial Training Program to Franchisor's satisfaction prior to commencing any managerial duties of the Franchised Business.

8.1.1    *Timing for Completion.*  Franchisee and its designated trainees must participate in and complete the Initial Training Program to Franchisor's satisfaction seven to thirty (7-30) days prior to opening the Franchised Business and within one hundred fifty (150) days from the Effective Date of this Agreement. Upon completion of the Initial Training Program, the Franchised Business shall be deemed "open and operating." In the event Franchisee does not complete the Initial Training Program to Franchisor's satisfaction within this one hundred fifty (150-day) period, then Franchisor may terminate this Agreement or Franchisor may provide Franchisee with additional time in exchange for a general release.

8.1.2    *Additional Employees.*  In the event Franchisee requests that more than two (2) additional people participate in the Initial Training Program (other than Franchisee or Franchisee's partner or principal shareholder), even if they attend the same training session, Franchisor may provide the Initial Training Program to such additional persons, subject to the availability of Franchisor's personnel, and charge Franchisee its then-current training tuition fee. All training related expenses for Franchisee's additional personnel, including transportation to and from the training site, lodging, meals, and salaries during training are Franchisee's sole responsibility.

8.1.3    *Replacement Personnel*.  In the event Franchisee or Franchisee's employee(s) fail(s) to complete the Initial Training Program to Franchisor's satisfaction, the respective person may repeat the course, or, in the case of an employee, Franchisee may send a replacement (the "Replacement Personnel") to the next available training session. Franchisor may charge its then-current training tuition fee for such Replacement Personnel to attend the Initial Training Program. Franchisor may also charge its then-current training tuition fee for each subsequent operating principal, designated manager or employee who attends the course at a scheduled training class at Franchisor's headquarters or other location designated by Franchisor. Failure by Franchisee, subsequent operating principals, designated managers, an employee or any Replacement Personnel to complete the Initial Training Program to Franchisor's satisfaction within the time period prescribed in this Agreement shall constitute default of this Agreement and Franchisor may terminate the Agreement.

8.1.4    *Employee Training*.  Franchisee must ensure that any and all employees of the Franchised Business that do not attend the Initial Training Program are properly trained to perform their

respective duties in connection with the Franchised Business prior to such employee(s) undertaking the duties.

8.1.5  *Training Materials.*  Franchisor will provide Franchisee with training materials for Franchisee to use in training Franchisee's personnel. Only Franchisor's provided training materials may be used by Franchisee in training Franchisee's personnel. Updated training materials may be available to Franchisee in the Operations Manual or by other means, in Franchisor's sole discretion. All training materials provided to Franchisee by Franchisor shall at all times remain Franchisor's property, and Franchisee agrees not to challenge Franchisor's or Franchisor's affiliates' title or rights in or to the training materials. Franchisee may not make any disclosure, duplication or other unauthorized use of any portion of the training materials.

8.2  **Additional and Remedial Training**.  Franchisor may conduct, and require Franchisee, Franchisee's Designated Manager (if applicable) and other employees to attend, additional and/or refresher training courses that Franchisor develops for the benefit of the System, as Franchisor deems advisable in its sole discretion. Franchisor may charge Franchisee its then- current training tuition fee for Franchisee and any other persons that attend such additional or refresher training, and Franchisee will be solely responsible for any and all expenses associated with such training (including travel, lodging, meals and employee wages incurred). Additional and/or refresher training may take place at Franchisor's Home Office or any other location that Franchisor designates. Franchisor will provide Franchisee with thirty (30) days' notice of any upcoming additional or refresher training that Franchisee is required to attend.

8.3  **Reasonable Training and Assistance Requests**.  Upon Franchisee's written request, Franchisor may provide Franchisee with additional training and/or assistance, as Franchisor deems necessary in its sole discretion, subject to the availability and schedules of Franchisor's personnel. Franchisor may charge Franchisee its then- current tuition fee for any training or assistance that Franchisor provides at Franchisee's request, and Franchisee is solely responsible for any expenses and costs incurred: (i) by Franchisee and its representatives in connection with attending such additional training; and (ii) by Franchisor in connection with providing such training or assistance, whether at the Home Office or on-site at Franchisee's Approved Location or within the Designated Territory. Additional assistance may be provided by Franchisor over the phone, via email or Franchisor's Operations Manual.

9.  **INSURANCE**

9.1  **General**.  Franchisee must maintain, at Franchisee's expense, in full force and effect throughout the term of this Agreement, the types of insurance and the minimum policy limits specified in the Operations Manual. In determining and modifying such requirements, Franchisor agrees to use reasonable business judgment and only require such minimum and minimum policy limits that are reasonable. The insurance policy or policies must be in effect at the earlier of: (i) ninety (90) days after the Effective Date of this Agreement; or (ii) prior to attending the Initial Training Program. The insurance policy or policies must protect Franchisee, Franchisor, and Franchisor's past, present and future officers, directors, owners, managers, members, stockholders, affiliates, employees, consultants, attorneys and agents against any loss, liability, personal injury, death, property damage, or expense whatsoever arising out of or occurring upon or in connection with the condition, operation, use or occupancy of the Franchised Business. Franchisee shall list Franchisor as an additional insured under each policy, except for policies required by statute in Franchisee's jurisdiction, including, but not limited to, workers' compensation and employer's liability insurance policies. Franchisor reserves the right to amend, modify and/or supplement additional types of coverage and/or increase the required minimum amount of coverage upon providing Franchisee reasonable notice through the Operations Manual or otherwise in writing by Franchisor. Franchisee's obligation to obtain coverage is not limited in any way by insurance that Franchisor maintains. Upon Franchisor's request or as specified in the Operations Manual, Franchisee shall provide Franchisor

Case 3:25-cv-00261-MOC-DCK    Document 1-1    Filed 04/15/25    Page 32 of 169

with certificates of insurance evidencing the required coverage and any other documentation in connection therewith.

9.2 **Insurance Rating, Approval, and Certification**. All insurance carriers must be approved by Franchisor in advance and in writing. All insurance policies must be issued by insurance companies with a rating of A-VII or better as reported in the most recent edition of A.M. Best's Insurance Report. Franchisor's acceptance of an insurance carrier does not constitute Franchisor's representation or guarantee that the insurance carrier will be capable of meeting claims during the term of the insurance policy. Franchisee agrees to carry such insurance as may be required by the Lease of the Approved Location or by any of Franchisee's lenders or equipment lessors, and such workers' compensation insurance as may be required by applicable law. Franchisee must deliver a certificate of insurance to Franchisor at least twenty (20) days prior to opening the Franchised Business and ten (10) days prior to any renewal of the required policies, as evidence that all insurance requirements have been met. All insurance policies held by Franchisee will be primary to any policy or policies held by Franchisor or its affiliates.

9.3 **Designees**. All liability policies will list Franchisor as an additional insured except the Employment Practices Liability policy where Franchisor will be named as co-defendant. The Commercial General Liability policy shall contain a waiver of subrogation in favor of Franchisor and any parties Franchisor designates, and will be primary and non-contributory to any insurance Franchisor might carry. Franchisor reserves the right to modify required insurance coverage during the course of Franchisee's Agreement based on changes in risk factors, for which Franchisee will comply with upon written notice from Franchisor.

9.4 **Claims Cancellation**. Franchisee must provide Franchisor with copies of any insurance claims or insurance cancellations within twenty-four (24) hours of Franchisee's receipt of said claims or cancellations. Franchisee has a twenty-four (24)-hour opportunity to cure any lapses in insurance coverage. No insurance policy must be subject to cancellation, termination, non-renewal or material modification, except upon at least thirty (30) calendar days' prior written notice from the insurance carrier to Franchisor. Franchisee must submit a certificate of insurance which demonstrates compliance with this Section 9.

9.5 **Failure to Maintain Insurance**. If Franchisee fails to comply with the minimum insurance requirements set forth herein, Franchisor has the right to obtain such insurance and keep same in force and effect, and Franchisee shall pay Franchisor, on demand, the premium cost thereof and a one hundred dollar ($100) administrative fee for the costs incurred in connection with Franchisor obtaining the insurance.

9.6 **Modification of Requirements**. Franchisor has the right to increase or otherwise modify the minimum insurance requirements upon thirty (30) days' prior written notice to Franchisee, and Franchisee shall comply with any such modification within the time specified in said notice.

## 10. FINANCIAL RECORDS AND REPORTS

10.1 **Reporting**. Franchisee must maintain, for at least ten (10) fiscal years from their preparation, full, complete accurate records of all sales, marketing activities, contracts, estimates, authorizations, receipts, payroll and accounts payable, and any other documents and records used in connection with the Franchised Business, in accordance with the standard accounting system described by the Franchisor in the Operations Manual or otherwise specified in writing. Franchisee must also provide Franchisor with complete financial records for the operation of the Franchised Business as described in this Section in accordance with generally accepted accounting principles.

10.1.1   Franchisee will, at its expense, submit to Franchisor within sixty (60) days of the end of each calendar year of the Franchised Business during the term of this Agreement, a complete financial statement for the said calendar year, including, without limitation, both an income statement and balance sheet, which may be unaudited, together with such other information in such form as the Franchisor may require.

10.1.2   Each financial statement shall be signed by Franchisee or by an individual authorized by Franchisee, attesting that the statement is true and correct and prepared in accordance with Franchisor's requirements.

10.1.3   Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks and Franchisor's software provider(s). Franchisee must, upon Franchisor's request, grant temporary administrative access to any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations (including, but not limited to, QuickBooks or our then-current accounting software) to Franchisor and/or its designee for the limited purpose of integration with franchise systems (i.e., ServiceMinder or similar systems) or collecting financial reporting data as required under the Franchise Agreement.

10.1.4   Franchisee shall provide Franchisor any other data, information and supporting records that Franchisor designates from time to time, including any and all reports set forth in the Operations Manual.

10.2   **Tax Returns**.  In addition to the information and materials set forth in Section 10.1, Franchisee agrees to maintain, and furnish to Franchisor within thirty (30) days of filing: (i) complete copies of all federal, state and local tax returns, including those detailing income, sales, value added, use and service taxes, as well as employee withholding, workers' compensation, and similar reports filed by Franchisee reflecting financial activities of the Franchised Business; and (ii) Franchisee's (or Franchisee's principals') personal federal, state and local tax returns; and Franchisee hereby waives, to the extent not prohibited by applicable law, any right to object to disclosure of any tax returns.

10.3   **Right to Disclose Information**.  Franchisor has the right to use and disclose data derived from the reports Franchisee furnishes to Franchisor.  Franchisee hereby consents to us obtaining, using and disclosing to third parties (including, without limitation, prospective franchisees, financial institutions, legal and financial advisors), for any purpose whatsoever or as may be required by law, any financial or other information contained in or resulting from information, data, materials, statements and reports received by us or our affiliates (or disclosed to us or our affiliates) in accordance with this Agreement. Notwithstanding the foregoing, tax return data will only be disclosed to legal and financial advisors or as may be required by law.

## 11.   BOOKS AND RECORDS

11.1   **Records and Audits**.  Franchisee must establish and maintain, at its own expense, accurate business records, reports, accounts, books and data relating to the operation of the Franchised Business that conforms to the requirements and formats (including a specific chart of accounts) Franchisor prescribes from time to time. We may designate an approved bookkeeping vendor (or one of a list of vendors) that Franchisee must use and Franchisee hereby consent to such vendor providing access to any business records that Franchisor would otherwise be entitled to pursuant to the Franchise Agreement.

Franchisee may be required to use the Computer System to maintain sales data and other information and to generate the reports Franchisor requires. Franchisor may require use of a specific

accounting software and version thereof as set forth in the Operations Manual, and Franchisee will be solely responsible for any associated cost.

Franchisor and Franchisor's designees have the right to inspect and/or audit Franchisee's business records at any time during normal business hours to determine whether Franchisee is current with suppliers and otherwise operating in compliance with the terms of this Agreement and the Operations Manual. Moreover, Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks (or our then-current accounting software, if different) and Franchisor's software provider.

If any audit reveals that Franchisee has understated Franchisee's financial information, including, but not limited to, Royalty Fee or Brand Fund Contribution payments, by more than two percent (2%), or if Franchisee has failed to submit timely reports and/or remittances for any two (2) reporting periods within any twelve (12)-month period, Franchisee must pay our costs and expenses, including the cost of such audit and/or inspection, the cost of outside auditors and attorneys (to the extent Franchisor incurs such costs), together with amounts due for Royalty Fees and other fees as a result of such underreporting and/or failure to submit reports, along with all late fees and interest which may otherwise be due under this Agreement.

    11.2    **Corporate or Limited Liability Company Franchisee Records**.  If Franchisee becomes a corporation, limited liability company or other business entity either prior to executing this Agreement, or at any time during the term of this Agreement, the following requirements, when applicable, shall apply:

    11.2.1    Copies of Franchisee's Articles of Incorporation or Charter, minutes of the annual meeting, by- laws and other governing documents, and any amendments thereto, copies of initial shareholder certificates and Shareholder Agreements, if any, and the Resolutions of the Board of Directors authorizing entry into this Agreement as required by the Franchisor and as set forth in the Operations Manual shall be promptly furnished to Franchisor.

    11.2.2    Franchisee shall maintain a current list of all owners or members of record and all beneficial owners of any class of stock of Franchisee and shall furnish such list to Franchisor annually.

    11.2.3    All members with or shareholders of, Franchisee shall jointly and severally guarantee Franchisee's performance hereunder and shall bind themselves to the terms of a Personal Guaranty in a form approved by Franchisor (see <u>Exhibit A</u> to this Agreement). All members and/or shareholders shall also be individually subject to the non- disclosure and confidentiality provisions set forth in this Agreement, as well as any and all in- term and post- term restrictive covenants. However, the requirements of this subsection shall not apply to any corporation registered under the Securities Exchange Act of 1934 (hereinafter known as a "<u>Publicly-held Corporation</u>").

    11.2.4    The majority equity owner in the entity that becomes the Franchisee must complete the Initial Training Program and all other training required by the Franchisor and work directly in the day-to- day operations of the Franchised Business and devote his or her personal full-time attention, skill and best efforts to the management and operation of the Franchised Business, unless Franchisor agrees otherwise in writing.

    11.2.5    All issued and outstanding stock certificates of such corporation shall bear the following legend:

    *EXAMPLE: "Transfers of these shares is subject to certain restrictions contained in a Franchise Agreement between __and A1 Kitchen & Bath Franchising, LLC, dated ___."*

## 12. ADVERTISING

Recognizing the value of advertising and promotion, and the importance of the standardization of advertising and promotion programs to further the goodwill and public image of the System, the parties agree as follows:

12.1 **Generally**. With regard to advertising generally for the Franchised Business, Franchisee will only use or display the advertising materials Franchisor approves in writing. If Franchisee wishes to use any advertising or promotional materials other than those currently approved for use by System franchisees, then Franchisee must submit Franchisee's proposed materials to Franchisor for approval at least thirty (30) days prior to its intended use. Franchisor will use commercially reasonable efforts to notify Franchisee of Franchisor's approval or disapproval of the proposed materials within fifteen (15) days of the date such materials are received. If Franchisee does not receive Franchisor's written approval within fifteen (15) days, proposed materials shall be deemed disapproved. All advertising must prominently display the Proprietary Marks and will comply with any standards for use of the Proprietary Marks that Franchisor establishes, as set forth in the Operations Manual or otherwise in writing. Franchisor may require Franchisee to discontinue the use of any advertising or marketing material, within time frames prescribed by Franchisor, at Franchisee's sole cost and expense.

12.2 **Internet Website**. Franchisee must obtain and maintain adequate hardware and software in order to access the Internet at the bit speed Franchisor requires from time to time. Franchisee is prohibited, however, from establishing any website or other presence on the Internet, except as provided herein. Franchisor may unilaterally modify the provisions of this Section from time to time in its sole discretion.

12.2.1 Franchisor may, but is not obligated to, establish an Internet website that provides information about the System and the products and services offered by Franchised Businesses. In the event Franchisor exercises its right to create such a website, Franchisor shall have sole discretion and control over the website (including timing, design, content and continuation).

12.2.2 Franchisor may, but is not obligated to, create interior pages on its website(s) that contain information about Franchisee's Franchised Business and other franchised businesses. If Franchisor does create such pages, Franchisor may require Franchisee to prepare all or a portion of the page for Franchisee's Franchised Business, at Franchisee's expense, using a template that Franchisor provides. All such information will be subject to Franchisor's approval prior to posting.

12.2.3 Except as approved in advance in writing by Franchisor, Franchisee must not establish or maintain a separate website, splash page, profile or other presence on the Internet, or otherwise advertise on the Internet or any other public computer network in connection with the Franchised Business, including any profile on Facebook, Twitter, LinkedIn, YouTube, Pinterest, Instagram, Snapchat, or any other social media and/or networking site. If such approval is granted by Franchisor, Franchisee must: (i) establish and operate such site or page in accordance with System standards and any other policies Franchisor designates in the Operations Manual or otherwise in writing from time to time; and (ii) utilize any templates that Franchisor provides to Franchisee to create and/or modify such site(s). Franchisor will retain ownership of any and all social media or referral websites / accounts.

12.2.4 Franchisor may use a portion of the Brand Fund Contribution to pay or reimburse itself for the costs incurred in connection with the development, maintenance and update of its website.

12.2.5 Franchisee acknowledges that Franchisor and/or Franchisor's affiliates are the lawful, rightful and sole owner of the Internet domain name www.thedesignery.com, as well as any other Internet domain names registered by Franchisor and/or Franchisor's affiliates, and unconditionally disclaims any ownership interest in such Internet domain names and any Internet domain names similar thereto. Franchisee agrees not to register any Internet domain name in any class or category that contains words used in or similar to any brand name owned by Franchisor or Franchisor's affiliates or any abbreviation, acronym, phonetic variation or visual variation of those words.

12.3    **Brand Fund**.  Franchisor has established a Brand Fund for the common benefit of System franchisees. Franchisor requires Franchisee to participate in and contribute on a monthly basis, one percent (1%) of the Franchised Business's Gross Revenue to the Brand Fund. Notwithstanding the foregoing, Franchisor reserves the right to increase the Brand Fund Contribution at any time upon providing notice to Franchisee, provided that the Brand Fund Contribution will not exceed three percent (3%) of Gross Revenue during the term of this Agreement. Franchisee must pay the Brand Fund Contribution directly to the Brand Fund via EFT on a monthly basis on or before the tenth (10th) business day of each month based on the Gross Revenue generated during the preceding calendar month. Franchisor reserves the right to modify the frequency, manner or method of payment upon providing reasonable notice to Franchisee.

12.3.1    Franchisor will use the Brand Fund, in Franchisor's sole discretion, to develop, produce and distribute national, regional and/or local advertising and to create advertising materials and public relations programs which promote, in Franchisor's sole judgment, the services offered by System franchisees. Franchisor has the sole right to determine contributions and expenditures from the Brand Fund, or any other advertising program, and sole authority to determine, without limitation, the selection of the advertising materials and programs, provided, however, that Franchisor will make a good faith effort to expend the Brand Fund in the general best interests of the System on a national or regional basis. Franchisor may use the Brand Fund to satisfy any and all costs of maintaining, administering, directing, preparing, and producing advertising, including: (i) the cost of preparing and producing Internet, television, radio, magazine and newspaper advertising campaigns; (ii) the cost of direct mail and outdoor billboard advertising; (iii) the cost of soliciting National Accounts; (iv) the cost of public relations activities and advertising agencies; (v) the cost of developing and maintaining an Internet website; (vi) personnel and other departmental costs for advertising that Franchisor internally administers or prepares; and (vii) the costs of building partnerships with national or regional brands. Nevertheless, Franchisee acknowledges that not all System franchisees will benefit directly or on a pro rata basis from such expenditures. The Brand Fund will not be used for the direct solicitation of franchise sales, but Franchisor reserves the right to include a notation in any advertisement indicating "Franchises Available." Franchisor also reserves the right to use the Brand Fund for public relations or recognition of the brand.

12.3.2    Franchisor may periodically assist franchisees to maintain high quality standards through customer surveys, customer interviews, and other similar initiatives ("Surveys"). The cost of such programs will be borne by the Brand Fund. The cost of these programs may be charged directly to Franchisee if Franchisee's results from a Survey fall below System-established minimum standards for such Surveys.

12.3.3    Franchisor has the right to reimburse itself from the Brand Fund for such costs and overhead, if any, as Franchisor may incur in activities reasonably related to the direction and implementation of the Brand Fund.

12.3.4    In Franchisor's sole discretion, units owned and operated by Franchisor or its affiliates may, but are not obligated to, contribute to the Brand Fund. Franchisee acknowledges that the use of the Brand Fund or other advertising funds or accounts and the expenditures made thereby, may benefit

Franchisor and its units, even though the units operated by Franchisor or its affiliates may or may not contribute to the Brand Fund or other advertising funds or accounts.

12.3.5    Franchisor will prepare on an annual basis, and will have available for Franchisee within one hundred twenty (120) days of the end of the fiscal year, a statement of contributions and expenditures for the Brand Fund. The statement will be presented to Franchisee upon Franchisor's written request. The Brand Fund is not required to be independently audited.

12.3.6    Franchisor has the right to require that an advertising cooperative and/or franchisee advisory council be formed, changed, dissolved or merged.

12.3.7    Franchisor assumes no obligation or liability to Franchisee with respect to the maintenance, direction or administration of the Brand Fund or any other advertising funds or accounts maintained in connection with this Agreement, except as expressly set forth in this Section. Franchisor also has the right to cause the Brand Fund to be incorporated or operated through a separate entity at such time as Franchisor deems appropriate, and such successor entity will have all of the rights and duties specified herein.

12.3.8    Franchisee acknowledges that the Brand Fund is not a trust or an asset of Franchisor and that Franchisor is not a fiduciary to Franchisee with respect to, or a trustee of, the Brand Fund or the monies therein.

12.3.9    Franchisor may suspend or terminate the Brand Fund at any time, and any surplus funds may only be used for marketing and advertising purposes until fully expended.

**12.4    Regional Advertising and Promotional Cooperative**.  Franchisor may, in Franchisor's discretion, designate any geographical area for purposes of establishing a regional advertising and promotional cooperative ("Cooperative"), and to determine whether a Cooperative is applicable to the Franchised Business. If a Cooperative is established applicable to the Franchised Business, Franchisee must participate in the Cooperative. Cooperative contributions will be credited towards the Local Advertising Requirement discussed in Section 12.5 below. The following provisions will apply to each Cooperative:

12.4.1    Each Cooperative will be organized and governed in a form and manner, and will commence operation on a date, approved in advance by Franchisor;

12.4.2    Each Cooperative will be organized for the exclusive purpose of administering regional advertising programs and developing, subject to Franchisor's approval, standardized advertising materials for use by the members in local advertising;

12.4.3    No promotional or advertising plans or materials may be used by a Cooperative or furnished to its members without Franchisor's prior approval. All such plans and materials must be submitted to Franchisor in accordance with the procedure set forth in Section 12.1 hereof;

12.4.4    Each Cooperative will have the right to require its members to make contributions to the Cooperative in such amounts as determined by the Cooperative; however, the Cooperative may, by a two-thirds majority vote of its members, require a Cooperative contribution in excess of the Local Advertising Requirement;

12.4.5    Each member franchisee must submit to the Cooperative its respective contribution together with such other statements or reports as Franchisor may require or as may be required by the Cooperative with Franchisor's approval;

12.4.6   Franchisor may grant to Franchisee, in its sole discretion, an exemption for any length of time from the requirement of membership in a Cooperative, upon written request from Franchisee stating reasons supporting such exemption. Franchisor's decision concerning such request for exemption will be final; and

12.4.7   Franchisor will have the power to require any Cooperative to be formed, changed, dissolved, or merged at any time.

**12.5   Local Advertising**

12.5.1   *Grand Opening Marketing*.   In connection with the opening of the Franchised Business, Franchisee must spend a minimum amount of five thousand dollars ($5,000) in local advertising, and as otherwise required and directed by Franchisor ("Grand Opening Marketing"). Any marketing must be conducted in accordance with Franchisor's standards and specifications, as described in the Operations Manual or this Agreement. Franchisor reserves the right to collect all or a portion of the Grand Opening Marketing. Franchisor reserves the right to increase the required spend to seven thousand dollars ($7,000) as Franchisor deems necessary.

12.5.2   *Local Advertising Requirement*.   In addition to the Brand Fund Contributions described above in Section 12.3, Franchisee will be required to spend the greater of: (i) three percent (3%) of Gross Revenue; or (ii) three thousand dollars ($3,000) per month on local advertising and promotion in accordance with Franchisor's standards and specifications (the "Local Advertising Requirement, as defined in Section 3.6). Franchisor reserves the right to increase the Local Advertising Requirement to the greater of: (i) four percent (4%) of Gross Revenue; or (ii) four thousand dollars ($4,000) per month, upon ninety (90) days' prior written notice. Franchisee must spend the Local Advertising Requirement as Franchisor prescribes in the Operations Manual or otherwise in writing, which may include, without limitation, requirements for placing a certain number and/or type(s) of media advertisements, or engaging certain public figures to assist the Franchisee in promoting its Franchised Business. The Local Advertising Requirement must be expended within Franchisee's Designated Territory. Franchisee acknowledges and agrees that Franchisee's Local Advertising Requirement must be expended regardless of the amount(s) spent by other System franchisees on local advertising. Franchisee may spend any additional sums Franchisee determines on local advertising. Franchisee must use only such advertising and promotional materials as have been previously approved by Franchisor. Franchisee must submit to Franchisor proof of Franchisee's expenditures on local advertising. All phone numbers used in local advertising by the Franchised Business of any form must be forwarded to Franchisor's Call Center.

12.5.3   *Local Advertising Services*.   Franchisee must sign the Franchisor Directed Advertising Services Agreement and purchase all Local Advertising Services (defined in the Franchisor Directed Advertising Services Agreement attached hereto as Exhibit H) from Franchisor unless Franchisor provides written permission otherwise. For Franchisor's Local Advertising Services, Franchisee agrees to pay Franchisor or an affiliate Franchisor designates, a non-refundable fee (the "Franchisor Directed Advertising Fee") in an amount designated in the Franchisor Directed Advertising Services Agreement, as updated in the Operations Manual periodically. The Franchisor Directed Advertising Fee is credited to Franchisee's required monthly Local Advertising Requirement. In no event will the Franchisor Directed Advertising Fee be more than the Local Advertising Requirement.

**12.6   Advisory Council**.   Franchisor reserves the right to establish an Advisory Council ("Advisory Council"). Elected franchisee(s) must participate actively in the Advisory Council as Franchisor designates, and participate in all Advisory Council meetings approved by Franchisor. Franchisor reserves the right to prepare and amend the governing documents for the Advisory Council from time to time, in its

DocuSign Envelope ID: B3A3CF6E-8B79-4A16-8EA1-306117754EFF

sole discretion, at any time. Franchisor, in its sole discretion, will determine the topic areas to be considered by the Advisory Council. The purposes of the Advisory Council shall include, but are not limited to: (i) exchanging ideas and problem- solving methods; (ii) advising Franchisor on expenditures for System-wide advertising; and (iii) coordinating franchisee efforts. Amounts and expenditures may vary from time to time due to variations in Advisory Council participation and costs, as determined by the Advisory Council, and as approved by Franchisor. The Advisory Council shall act in an advisory capacity only. Franchisor will have the right to form, change or dissolve any Advisory Council at any time in its sole discretion.

## 13      INDEPENDENTBUSINESS; INDEMNIFICATION

13.1      **Independent Business Status**. Franchisee is an independent business responsible for full control over the internal management and daily operation of the Franchised Business, and neither party to this Agreement is the agent, principal, partner, employee, employer or joint venture partner of the other party. Franchisee may not act or represent itself, directly or by implication, as Franchisor's agent, partner, employee or joint venture partner, and Franchisee may not incur any obligation on Franchisor's behalf or in Franchisor's name. All stationery, business cards and contractual agreements entered into by Franchisee shall contain Franchisee's corporate or fictitious name and a conspicuously displayed notice, in the place Franchisor designates, that Franchisee operates the Franchised Business as an independently owned and operated business, and that Franchisee independently owns and operates the Franchised Business as a System franchisee. Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name, and Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action, nor shall Franchisor be liable by reason of any of Franchisee's acts or omissions in the operation of the Franchised Business or for any claim or judgment arising therefrom against Franchisee or Franchisor. Neither this Agreement nor Franchisor's course of conduct is intended, nor may anything in this Agreement (nor Franchisor's course of conduct) be construed to state or imply that Franchisor is the employer of Franchisee's employees and/or independent contractors. It is understood and agreed by the parties hereto that this Agreement does not establish any fiduciary relationship between them.

13.2      **Indemnification**. Franchisee and Franchisee's principals agree to indemnify, defend and hold Franchisor, Franchisor's affiliates and their respective shareholders, directors, officers, employees, agents, successors and assignees ("Indemnitees") harmless against and to reimburse them for the actual costs of all claims, obligations, liabilities, fines, losses, damages, costs and expenses (including attorneys' fees, except to the extent such fees are determined by an arbitrator or court of competent jurisdiction to be unreasonable, in which case the fees shall be adjusted to be reasonable by such arbitrator or court) ("Claims"), including any and all taxes, directly or indirectly arising out of, in whole or in part: (i) the operation of the Franchised Business, including the use, condition, or construction, equipping, maintenance or operation of the Franchised Business and Franchisee's advertising; (ii) the unauthorized use of the Proprietary Marks and other Proprietary Material; (iii) the transfer of any interest in this Agreement or the Franchised Business in any manner not in accordance with this Agreement; (iv) the infringement, alleged infringement, or any other violation or alleged violation by Franchisee or any of Franchisee's principals of any patent, trademark or copyright, or other proprietary right owned or controlled by third parties; or (v) libel, slander or any other form of defamation of Franchisor, the System, or any franchisee or developer operating under the System, by Franchisee or by any of Franchisee's principals, except for Claims that are determined by an arbitrator or court of competent jurisdiction to have been caused solely and directly by the indemnified party's gross negligence, willful misconduct, strict liability, or fraud. For purposes of this indemnification, "Claims" shall mean and include all obligations, actual, consequential, punitive, and other damages and costs reasonably incurred in the defense of any action, including attorneys', attorney assistants' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether or not such claims exceed the amount of insurance

coverage available through Franchisee to Franchisor. Franchisor shall have the right to defend any such claim against it in such manner as Franchisor deems appropriate or desirable, in Franchisor's sole discretion. Such an undertaking by Franchisor shall, in no manner or form, diminish Franchisee's and each of Franchisee's principals,' obligations to indemnify the Indemnities and to hold them harmless. This indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## 14   SALE OR TRANSFER

14.1   **Transfer**.  Franchisee's rights under this Agreement are personal, and Franchisee shall not sell, transfer, assign or encumber Franchisee's interest in the Franchised Business without Franchisor's prior written consent. Any sale, transfer, assignment or encumbrance made without Franchisor's prior written consent shall be voidable at Franchisor's option and shall subject this Agreement to termination as specified herein. For purposes of this Agreement, "Transfer" as a verb means to sell, assign, give away, transfer, pledge, mortgage or encumber, voluntarily, involuntarily, or by operation of law (such as through divorce or bankruptcy proceedings), any interest in this Agreement, the Franchised Business, substantially all the assets of the Franchised Business, or in the ownership of the Franchised Business (if you are an entity). "Transfer" as a noun means any sale, assignment, gift, transfer, pledge, mortgage or encumbrance. Franchisor will not unreasonably withhold, condition, or delay a request to transfer by Franchisee. Franchisee acknowledges and agrees that the conditions set forth for transfer in this Section 14 are reasonable.

14.2   **Death or Disability**

14.2.1   *Representative's Right to Continue as Franchisee*.  In the event of Franchisee's death, disability or incapacitation (or the death, disability or incapacitation of Franchisee's partners or personal guarantors), Franchisee's legal representative or Franchisee's partner's or guarantor's respective legal representative, as applicable, will have the right to continue the operation of the Franchised Business as franchisee under this Agreement if: (i) within one hundred eighty (180) days from the date of death, disability or incapacity (the "180-Day Period"), such person: (a) meets Franchisor's then-current standards to become a franchisee, as described in Section 14.3.2.6; and (b) has obtained Franchisor's prior written approval and has executed Franchisor's then-current franchise agreement for the unexpired term of the franchise, or has furnished a personal guaranty of any partnership, corporation or limited liability company guarantying franchisee's obligations to Franchisor and Franchisor's affiliates; and (ii) such person successfully completes Franchisor's training program (which Franchisor will provide at Franchisor's then-current tuition rate). Such assignment by operation of law will not be deemed in violation of this Agreement, provided such heirs or legatees accept the conditions imposed by the Franchise Agreement and are acceptable to Franchisor. However, in the case of a transfer by demise or inheritance, if the heirs or beneficiaries of any deceased person are unable to meet the conditions contained in this Agreement, the personal representative of the deceased Franchisee will have a reasonable time, in Franchisor's sole discretion, which shall not exceed one hundred eighty (180) days from the date or transfer by demise or inheritance, to dispose of the deceased's interest in the Franchised Business and such disposition will be subject to all the terms and conditions for transfer contained in this Agreement. If the interest is not disposed of in the manner and time frame provided in the immediately preceding sentence, then Franchisor may terminate this Agreement.

14.2.2   *Franchised Business Operation During and After 180-Day Period.*  Franchisor is under no obligation to operate the Franchised Business, or incur any obligation on behalf of any incapacitated franchisee during or after the 180-Day Period. If necessary, Franchisee (or Franchisee's legal representative, as applicable) shall appoint a previously approved acting interim manager to operate the Franchised Business during the 180-Day Period. In the event of Franchisee's death, disability, absence or

otherwise, Franchisor may (but is not required to) operate Franchisee's Franchised Business on Franchisee's behalf and at Franchisee's expense for such period of time (and under such terms and conditions) as Franchisor determines, including paying out the assets and/or revenues of the Franchised Business to cover any or all past, current and/or future obligations of the Franchised Business (including any amounts owed to Franchisor and/or any affiliate) in such priorities as Franchisor determines from time to time, in Franchisor's sole and absolute discretion. Franchisor may pay itself its then-current fee to reimburse Franchisor for Franchisor's management services and other costs. Franchisor may obtain approval of a court or arbitrator for any such arrangements, the attorneys' fees and other costs incurred in connection with obtaining such approval to be charged against the assets and/or revenues of the Franchised Business. Franchisee (and/or Franchisee's estate) will indemnify Franchisor against any costs and/or liabilities incurred by it in connection with, or related in any way to, the operation (or otherwise) of the Franchised Business.

14.3    **Ownership Changes**.  A sale, transfer or assignment requiring Franchisor's prior written consent shall be deemed to occur: (i) if Franchisee is a corporation, upon any assignment, sale, pledge or transfer of any fractional portion of Franchisee's voting stock or any increase in the number of outstanding shares of Franchisee's voting stock which results in a change of ownership; (ii) if Franchisee is a partnership, upon the assignment, sale, pledge or transfer of any fractional partnership ownership interest; or (iii) if Franchisee is a limited liability company, upon the assignment, sale, pledge or transfer of any interest in the limited liability company. Any new partner, shareholder, or member or manager will be required to personally guarantee Franchisee's obligations under this Agreement. A transfer pursuant to (i) through (iii) above shall not be subject to Franchisor's right of first refusal as set forth in Section 14.3.1.

14.3.1   *Right of First Refusal.*  If Franchisee proposes to transfer either this Agreement or all, or substantially all, of the assets used in connection with the Franchised Business or any interest in Franchisee's lease to any third party (other than a corporation or limited liability company as set forth herein), Franchisee shall first offer to sell such interest to Franchisor on the same terms and conditions as offered by such third party. Franchisee shall obtain from the third party and provide to Franchisor a statement in writing, signed by the third party and Franchisee, of the terms of the offer ("Letter of Intent"). If Franchisor elects not to accept the offer within a thirty (30)-day period, Franchisee shall have a period not to exceed sixty (60) days to complete the transfer described in the Letter of Intent, subject to the conditions for approval set forth herein. Franchisee shall effect no other sale or transfer as contemplated under the Letter of Intent without first complying with this Section. Any material change in the terms of the offer shall be deemed a new proposal, subject to Franchisor's right of first refusal. So long as Franchisee has obtained Franchisor's prior written consent, which shall not be unreasonably withheld, a transfer to an existing partner, shareholder or member, or a transfer as a result of the death, disability or incapacitation of a shareholder or partner in accordance with the provisions set forth below, is not subject to Franchisor's first right of refusal. In the event the consideration, terms and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms and/or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within thirty (30) days on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by the third party, an independent appraiser shall be designated by Franchisor at Franchisor's expense, and the appraiser's determination shall be binding.

14.3.2   *Conditions for Approval.*  Franchisee shall notify Franchisor in writing of any proposed transfer of this Agreement, any direct or indirect interest in Franchisee, or in all or substantially all of the assets of the Franchised Business at least thirty (30) days before such transfer is proposed to take place. Franchisor may condition Franchisor's approval of any proposed sale or transfer of the Franchised Business or of Franchisee's interest in this Agreement upon satisfaction of the following occurrences:

14.3.2.1	All of Franchisee's accrued monetary obligations to Franchisor, Franchisor's affiliates, and Franchisor's designated/approved suppliers and vendors must be satisfied;

14.3.2.2	Franchisee must cure all existing defaults under this Agreement, or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, and Franchisor's designated/approved suppliers and vendors within the period permitted for cure and have substantially complied with such agreements during their respective terms;

14.3.2.3	Franchisee and Franchisee's principals (if Franchisee is a partnership, corporation or limited liability company), and the transferee (if it has had any previous relationship with Franchisor or Franchisor's affiliates), must execute a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and Franchisor's affiliates and officers, directors, shareholders and employees, in their corporate and individual capacities; provided, however, the general release shall not be inconsistent with any applicable state statute regulating franchising.

14.3.2.4	Transferor and transferee must execute a mutual general release relieving all claims against each other, excluding only such claims relating to any provision or covenant of this Agreement which imposes obligations beyond the expiration of this Agreement;

14.3.2.5	Franchisee or transferee must provide Franchisor a copy of the executed purchase agreement relating to the proposed transfer with all supporting documents and schedules, including transferee's assumption of and agreement to faithfully perform all of Franchisee's obligations under this Agreement;

14.3.2.6	Transferee must demonstrate to Franchisor's satisfaction that he or she: (i)  meets Franchisor's educational, managerial and business standards; (ii) possesses a good moral character, business reputation and credit rating; (iii) has the aptitude and ability to conduct the business to be transferred; and (iv) has adequate financial resources and capital to meet the performance obligations under this Agreement; however, transferee shall not be in the same business as Franchisor either as licensor, franchisor, independent operator or licensee of any other business or chain which is similar in nature or in competition with Franchisor, except that the transferee may be an existing franchisee of ours;

14.3.2.7	At Franchisor's option, transferee (and, if transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) either: (i) enter into a written assignment, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement; or (ii) execute Franchisor's then-current franchise agreement, and will receive a full then-current initial term for a franchisee, which term will commence on the date the transferee executes the then-current Franchise Agreement;

14.3.2.8	Franchisee must pay Franchisor a transfer fee equal to ten thousand dollars ($10,000) per Designated Territory that is being transferred to transferee. A non-refundable deposit of three thousand dollars ($3,000) of the Transfer Fee is due with Franchisee's written notice of proposed transfer and the balance of seven thousand dollars ($7,000) is due upon Franchisor's approval at closing. In the event Franchisee transfers multiple Designated Territories at once, Franchisor reserves the right, but not the obligation, in Franchisor's sole discretion, to reduce the transfer fee for any of the Designated Territories being transferred, by any amount;

14.3.2.9	Transferee shall satisfactorily complete Franchisor's training program at the transferee's expense within the time frame Franchisor sets forth;

14.3.2.10    Franchisee, and Franchisee's principals if Franchisee is a partnership, corporation or limited liability company, and the members of their respective families must comply with the post-termination provisions of this Agreement;

14.3.2.11    Transferee must obtain, within the time limits set by Franchisor, and maintain thereafter, all permits and licenses required for the operation of the Franchised Business;

14.3.2.12    To the extent required by the terms of any leases or other agreements, the lessors or other parties must consent to the proposed transfer;

14.3.2.13    The transfer must be made in compliance with any laws that apply to the transfer, including state and federal laws governing the offer and sale of franchises;

14.3.2.14    Franchisee must ensure that all projects in progress at the time of the transfer will be continued without interruption, and the transferee must promptly notify all current customers of the change in ownership;

14.3.2.15    The purchase price and terms of the proposed transfer must not be so burdensome to the prospective transferee as to impair or materially threaten its future operation of the Franchised Business and performance under its franchise agreement;

14.3.2.16    Franchisee must request that Franchisor provide the prospective transferee with Franchisor's current form of Franchisee Disclosure Document and Franchisor shall not be liable for any representations not included in the Franchisee Disclosure Document;

14.3.2.17    Franchisor's approval of the transfer will not constitute a waiver of any claims Franchisor may have against the transferring party; and

14.3.2.18    Franchisor will have the right to disclose to any prospective transferee such revenue reports and other financial information concerning Franchisee and Franchisee's Franchised Business as Franchisee has supplied Franchisor hereunder.

14.4    **Transfer to a Corporation or Limited Liability Company**.  If Franchisee is an individual and desires to assign its rights under this Agreement to a corporation or limited liability company, and if all of the following conditions are met, Franchisor will consent to the transfer without assessing the transfer fees set forth above, and such assignment will not be subject to Franchisor's right of first refusal in Section 14.3.1:

14.4.1   The corporation or limited liability company is newly organized and its activities are confined to operating the Franchised Business;

14.4.2   Franchisee is, and at all times remains, the owner of at least fifty-one percent (51%) of the outstanding shares of the corporation or a controlling interest in the limited liability company;

14.4.3   The corporation or limited liability company agrees in writing to assume all of Franchisee's obligations hereunder;

14.4.4   All stockholders of the corporation, or members and managers of the limited liability company, as applicable, must execute Franchisor's prescribed form of personal guaranty;

DocuSign Envelope ID: B3A3CF6E-8B79-4A16-8EA1-306117754EFF

14.4.5   At Franchisor's request, Franchisee will furnish true and correct copies of all documents and contracts governing the rights, obligations and powers of Franchisee's owners and agents (such as articles of incorporation or organization and partnership, operating or shareholder agreements and similar documents).

14.4.6   Franchisee and Franchisee's principals (if Franchisee is a partnership, corporation or limited liability company), and transferee (if it has had any previous relationship with Franchisor or Franchisor's affiliates), must execute a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and Franchisor's affiliates and officers, directors, shareholders and employees, in their corporate and individual capacities; provided, however, the general release shall not be inconsistent with any applicable state statute regulating franchising.

14.4.7   *Non-Traditional Ownership Structures*.  Franchisor may, but is not obligated to, approve a Transfer to or allow ownership by an ESOP, trust or private equity firm ("Non-traditional Ownership") and any request to Transfer to an ESOP, trust or private equity firm may be denied in our sole discretion. However, if we do approve a Transfer by an ESOP, trust or private equity firm, we may impose additional requirements that include, but are not limited to, the following: (a) the ownership and related requirements set forth in Section 14.4.7.1; (b) additional financial covenants; (c) additional insurance requirements; (d) an enhanced right to purchase the Franchised Business, and such other conditions that Franchisor deems appropriate in Franchisor's Business Judgment.

14.4.7.1   *Operational Control-Non-Traditional Entities*.  ESOP or other trust ownership of the Franchised Business is permitted only with our prior written permission, which may be granted or withheld in our sole discretion. At all times, the guarantors directly will: (i) control all aspects of Franchisee and the operation of the Franchised Business; and (ii) serve as trustee of the trust and retain sole control over the voting of the trust's equity interest in the Franchisee. The Trustee must at all times be an individual and must meet the then-current requirements of franchise ownership. Any change in trustee is deemed a Transfer and is subject to approval as set forth in this Agreement. Any change in beneficiaries is deemed a Transfer. Any such Transfer is subject to approval conditions and other rights we have as set forth in this Agreement. Franchisee acknowledges and agrees that: (i) if the guarantors do not maintain operational control respecting each of: (a) the Franchised Business; (b) the Franchisee; and (c) the trust, such an event will constitute a Transfer as described in Article 14 of this Agreement and Franchisee must comply with all applicable provisions of such Article; and (ii) if the guarantors desire to turn over operational control respecting the Franchisee, the trust, or the Franchised Business to one or more trust beneficiaries, such beneficiaries must satisfy all conditions to consent as described in Article 20 of this Agreement. The trust must be and remain a revocable trust. If by operation of law or otherwise the trust converts to an irrevocable trust, the trust must divest ownership of the Franchised Business to an approved person or entity pursuant to the terms of Article 14 of this Agreement. The trust must contain a provision equivalent to and granting the trustee the following powers with regard to trust assets: "The trustee may exercise all rights of an absolute owner with respect to stocks, other securities, and closely held business interests. The trustee is hereby authorized to sell, convey, pledge, mortgage, lease or transfer title to any interest in the trust property for a period within or extending beyond the duration of the trust."

14.5   **Franchisor's Right to Transfer**.  Franchisor has the right to sell, transfer, assign and/or encumber all or any part of Franchisor's assets and Franchisor's interest in, and rights and obligations under, this Agreement, in Franchisor's sole discretion.

## 15   BREACH AND TERMINATION

15.1   **Automatic Termination**.  This Agreement shall automatically terminate without notice or an opportunity to cure upon the occurrence of any of the following:

15.1.1 *Voluntary Bankruptcy.*  If Franchisee makes an assignment for the benefit of creditors, files a voluntary petition in bankruptcy, is adjudicated bankrupt or insolvent, files or acquiesces in the filing of a petition seeking reorganization or arrangement under any federal or state bankruptcy or insolvency law, or consents to or acquiesces in the appointment of a trustee or receiver for Franchisee or the Franchised Business.

15.1.2 *Involuntary Bankruptcy.*  If proceedings are commenced to have Franchisee adjudicated bankrupt or to seek Franchisee's reorganization under any state or federal bankruptcy or insolvency law, and such proceedings are not dismissed within sixty (60) days, or a trustee or receiver is appointed for Franchisee or the Franchised Business without Franchisee's consent, and the appointment is not vacated within sixty (60) days.

15.1.3 *Loss of Premises.*  If Franchisee loses the right to occupy the Franchised Business premises or operate the Franchised Business from the Approved Location.

15.2    **With Notice and Without Opportunity to Cure**.  Franchisor has the right to terminate this Agreement upon notice without providing Franchisee an opportunity to cure for any of the following breaches or defaults:

15.2.1    *Criminal Acts.*  If Franchisee or Franchisee's principals are convicted of or plead guilty or no contest to a felony or other offense related to the operation of the Franchised Business or that Franchisor believes, in its sole discretion, is likely to have an adverse effect on the Proprietary Marks or the goodwill associated therewith.

15.2.2    *Fraud.*  If Franchisee or Franchisee's principals commit any fraud or misrepresentation in the operation of the Franchised Business, including but not limited to, any misrepresentation made in Franchisee's franchise application.

15.2.3    *Other Actions.*  If Franchisee or Franchisee's principals, including any shareholder, member, guarantor or agent engages in activity or conduct which materially impairs that goodwill associated with the System or the Proprietary Marks and fails to cease and correct such activities or conduct within twenty-four (24) hours of Franchisee's receipt of written notice of a breach under this Section.

15.2.4    *Misrepresentation.*  If Franchisee or Franchisee's principals make any misrepresentation or omission in connection with Franchisee's franchise application, including but not limited to, any financial misrepresentation.

15.2.5    *Failure to Complete Training.*  If Franchisee (and/or Franchisee's Designated Manager, if applicable) fails to complete the Initial Training Program as provided in Section 8.

15.2.6    *Repeated Breaches.*  If Franchisor sends Franchisee two (2) or more written notices to cure pursuant to Sections 15.3 or 15.4 hereof in any twelve (12)-month period, regardless of whether the defaults set forth in the notices were subsequently cured.

15.2.7    *Breach of Other Agreements.*  If Franchisee or Franchisee's principals materially breach any other agreement with Franchisor or any of Franchisor's affiliates, or threaten any material breach of any such agreement, or any lease for the Approved Location, and fails to cure such breach within any permitted period for cure.

15.2.8    *Misuse of the Proprietary Marks or Confidential Information*.  If Franchisee or Franchisee's principals violate any provision hereof pertaining to Proprietary Marks or Confidential Information or misuse the Proprietary Marks or Confidential Information.

15.2.9    *Disclosure of Confidential Information or Trade Secrets*.  If Franchisee or Franchisee's principals disclose or divulge the contents of the Operations Manual or any other Confidential Information or Trade Secret provided to Franchisee by Franchisor or any of its affiliates to any third party.

15.2.10    *Violation of Law*.  If Franchisee violates any law, ordinance or regulation or operates the Franchised Business in a manner that presents a health or safety hazard to customers, or the general public.

15.2.11    *Violation of In-term Restrictive Covenant*.  If Franchisee violates the in-term restrictive covenant contained in Section 17.1, or any of the other restrictive covenants set forth in this Agreement.

15.2.12    *Liens*.  If a levy of writ of attachment or execution or any other lien is placed against Franchisee or any of Franchisee's principals or any of their assets which is not released or bonded against within thirty (30) days.

15.2.13    *Insolvency*.  If Franchisee or any of Franchisee's principals become insolvent.

15.2.14    *Abandonment*.  If Franchisee voluntarily or otherwise abandons the Franchised Business. The term "abandon" includes any conduct which indicates a desire or intent to discontinue the Franchised Business in accordance with the terms of this Agreement for seven (7) days or more without Franchisor's prior written consent.

15.2.15    *Unauthorized Transfer*.  If Franchisee purports to sell, transfer or otherwise dispose of any interest in the Franchised Business in violation of Section 14 hereof.

15.2.16    *Unauthorized Products or Services*.  If Franchisee offers any unauthorized and unapproved products or services at or from the Franchised Business.

15.2.17    *Unapproved Purchases*.  If Franchisee orders or purchases supplies, signs, furnishings, fixtures, equipment or inventory from an unapproved supplier or which Franchisor has not approved.

15.2.18    *Proprietary Software*.  If Franchisee misuses or makes unauthorized use of any Proprietary Software Franchisor may develop for use in connection with the System.

15.2.19    *Insurance*.  If Franchisee fails to maintain insurance or to repay Franchisor for insurance paid for by it, or otherwise fails to adhere to the requirements of Section 9.

15.2.20    *Government Regulations*.  If Franchisee fails, within fifteen (15) calendar days after notification of non-compliance by federal, state or local government authorities to comply with any law or regulation applicable to the Franchised Business.

15.2.21    *Government Actions*.  If any government action is taken against Franchisee that results in any obligation upon Franchisor which, in Franchisor's sole judgment, is

uneconomical, not in the best interests of Franchisor, or would result in Franchisor having an unintended relationship or obligation.

15.2.22   *Anti-Terrorist Activities.*   If Franchisee fails to comply with the provisions of Section 22.8.

15.2.23   *Personal Use of Franchised Business Property*.   If Franchisee takes for Franchisee's own personal use any assets or property of the Franchised Business, including employee taxes, FICA, insurance or benefits.

15.2.24   *Insufficient Funds.*   If there are insufficient funds in Franchisee's bank account to cover a check or EFT payment to Franchisor two (2) or more times within any twelve (12)-month period.

15.2.25   *Failure to Open.*   If Franchisee fails to commence operations of the Franchised Business within the time prescribed in Section 7.3 of this Agreement.

15.2.26   *Operating Outside of Designated Territory*.   If Franchisee operates the Franchised Business outside of the Designated Territory without Franchisor's prior written consent, as provided in Section 1.2 of this Agreement.

15.2.27   *Violation of Best Efforts.*   If Franchisee or Franchisee's principals violate any of the provisions in Section 7.10 of this Agreement.

15.3   **Upon 15 Days' Notice to Cure**.   Franchisor has the right to terminate this Agreement if any of the following defaults remain uncured after Franchisor provides Franchisee with notice of such default(s) and fifteen (15) days to cure:

15.3.1   *Nonpayment.*   If Franchisee fails to pay Franchisor as and when due any sums owed to Franchisor, any of Franchisor's affiliates, or any of Franchisor's System Suppliers, Approved Suppliers or vendors.

15.3.2   *Endorsement of Checks.*   If Franchisee fails to immediately endorse and deliver to Franchisor any payments due to Franchisor from any third party that is erroneously made to Franchisee.

15.3.3   *Failure to Maintain Sufficient Marketing Materials and Supplies*.   If Franchisee fails to maintain sufficient inventory of marketing materials and other supplies necessary to adequately develop the Designated Territory and meet consumer demand.

15.3.4   *Interruption of Service.*   If Franchisee fails to maintain the prescribed months, days, or hours of operation at the Franchised Business.

15.3.5   *Failure to Personally Supervise Franchised Business Operations or Employ Adequate Personnel.*   If Franchisee or the Designated Manager fails, in Franchisor's sole discretion, to personally supervise day-to-day operation of the Franchised Business or fails to employ a sufficient number of qualified, competent personnel as Franchisor requires from time to time.

15.3.6   *Quality Control.*   If Franchisee fails to maintain the strict quality controls reasonably required by this Agreement and/or the Operations Manual.

15.3.7 *Licenses and Permits.* If Franchisee fails to procure or maintain any licenses, certifications, or permits necessary for the operation of the Franchised Business.

15.4 **Upon 30 Days' Notice to Cure**. Franchisor has the right to terminate this Agreement if Franchisee fails to perform or comply with any other term or condition of this Agreement or any ancillary agreements between Franchisee and Franchisor or Franchisor's affiliates, and Franchisee fails to cure such default(s) within thirty (30) days after being provided with notice thereof.

15.5 **Step In Rights**. In addition to Franchisor's right to terminate this Agreement, and not in lieu of such right or any other rights Franchisor may have against Franchisee, upon a failure to cure any default within the applicable time period (if any), Franchisor has the right, but not the obligation, to enter upon the Franchised Business premises and exercise complete authority with respect to the operation of the Franchised Business until such time as Franchisor determines, in Franchisor's sole discretion that the default has been cured and Franchisee is otherwise in compliance with this Agreement. In the event Franchisor exercises the rights described in this Section, Franchisee must reimburse Franchisor for all costs and overhead, if any, incurred in connection with its operation of the Franchised Business, including, without limitation, costs of personnel for supervising and staffing the Franchised Business and their travel and lodging accommodations. If Franchisor undertakes to operate the Franchised Business pursuant to this Section, Franchisee agrees to indemnify and hold Franchisor (and Franchisor's representative(s) and employees) harmless from and against any fines, claims, suits or proceedings which may arise out of Franchisor's operation of the Franchised Business. Franchisor reserves the right to charge Franchisee up to ten percent (10%) of Franchisee's Gross Revenue generated during the period of time that Franchisor provides temporary management of the Franchised Business.

15.6 **Nonwaiver**. Franchisor's delay in exercising or failing to exercise any right or remedy under this Agreement or Franchisor's acceptance of any late or partial payment due hereunder shall not constitute a waiver of any of Franchisor's rights or remedies against Franchisee.

# 16 RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION

16.1 **Franchisee's Obligations**. Upon termination of this Agreement, or the expiration or termination of any Holdover Period, regardless of the cause, and upon expiration and nonrenewal or transfer of this Agreement, Franchisee must, at Franchisee's cost and expense:

16.1.1 Immediately cease all operations under this Agreement;

16.1.2 Immediately pay Franchisor all unpaid fees and pay Franchisor, Franchisor's affiliates, Franchisor's major suppliers and vendors, all other monies owed;

16.1.3 Discontinue Immediately discontinue the use of the Proprietary Marks;

16.1.4 Immediately cease using the Business Management and Technology System and the Operations Manual, and return all Proprietary Materials and Confidential Information, including, without limitation, all customer lists and data, within ten (10) calendar days, and immediately and permanently cease use of such information and materials;

16.1.5 Immediately cease using all telephone and facsimile numbers and listings, as well as any permitted domain names and/or social media pages used in connection with the operation of the Franchised Business (collectively, the "Assigned Property"), and direct the telephone company and/or domain name registrar to transfer all such Assigned Property to Franchisor or Franchisor's designee pursuant to the Conditional Assignment of Telephone Numbers and Domain Name in the form attached as

DocuSign Envelope ID: B3A3CF6E-8B79-4A16-8EA1-306117754EFF

Exhibit B to this Agreement, and transfer all usernames and passwords for all social media pages to Franchisor;

16.1.6    Immediately vacate the Franchised Business premises, and if Franchisor exercised Franchisor's rights pursuant to Franchisor's prescribed form of Collateral Assignment of Lease, arrange for transfer of the lease to Franchisor within fifteen (15) calendar days of termination or expiration of this Agreement;

16.1.7    Immediately surrender all stationery, printed matter, signs, advertising materials, supplies and other items containing the Proprietary Marks, as Franchisor directs, and all items which are a part of the trade dress of the System no later than ten (10) calendar days after the termination or expiration of this Agreement;

16.1.8    Immediately cease holding itself out as Franchisor's Franchisee;

16.1.9    Immediately cease to communicate with all customers of the Franchised Business;

16.1.10    Take such action as shall be necessary to amend or cancel any assumed name, business name or equivalent registration, which contains any trade name or other Proprietary Mark Franchisor licensed to Franchisee, and furnish Franchisor evidence satisfactory to Franchisor of compliance with this obligation within fifteen (15) calendar days after the termination, expiration or transfer of this Agreement;

16.1.11    Permit Franchisor to make a final inspection of Franchisee's financial records, books, and other accounting records within one (1) month of the effective date of termination, expiration or transfer;

16.1.12    Comply with the post-termination covenants set forth in Section 17 hereof, all of which shall survive the transfer, termination or expiration of this Agreement;

16.1.13    Cease to use in advertising or in any other manner, any methods, procedures or techniques associated with Franchisor or the System;

16.1.14    Immediately remove Franchisor's Proprietary Marks from vehicles used in connection with the Franchised Business, and otherwise de-identify the vehicles from being associated with Franchisor or the System;

16.1.15    Execute from time to time any necessary papers, documents, and assurances to effectuate the intent of this Section 16;

16.1.16    As applicable, provide Franchisor with access and any account information regarding any social media accounts used in connection with the Franchised Business; and

16.1.17    Reimburse Franchisor in connection with any costs Franchisor incurs in connection with enforcing Franchisee's obligations under this Section 16.

16.2    **Option to Purchase Personal Property**.  Upon the termination or expiration of this Agreement or the expiration or termination of any Holdover Period, Franchisor or Franchisor's designee shall have the option, but not the obligation, to purchase any personal property used in connection with operation of the Franchised Business by providing Franchisee written notice of Franchisor's election within

sixty (60) calendar days after such termination or expiration and paying Franchisee the book value for such personal property within sixty (60) calendar days of such notice. For purposes of this paragraph, "book value" means the amount Franchisee actually paid for the personal property less depreciation (calculated by using the straight-line depreciation method on a ten (10)-year depreciation schedule irrespective of the depreciation method or schedule Franchisee uses for accounting purposes). Notwithstanding the foregoing, to the extent that Franchisor exercises Franchisor's right to purchase any personal property that is subject to a lease or finance agreement, the purchase price of such personal property shall equal the amount of Franchisee's remaining obligations under the lease or finance agreement, as applicable, which Franchisor would assume (such assumption of obligations constituting the full purchase price of such personal property). Franchisor shall be entitled to offset the purchase price by the amount of money owed by Franchisee to Franchisor for any payments necessary to acquire clear title to property or for any other debt. If Franchisor exercises Franchisor's option to purchase, pending the closing of such purchase, Franchisor has the right to appoint a manager to maintain operation of the Franchised Business, or Franchisor may require that Franchisee close the Franchised Business during such period without removing any assets. Franchisee is required to maintain in force all insurance policies required under this Agreement until the date of such closing. Franchisor has the unrestricted right to assign this option to purchase the Franchised Business. Franchisor will be entitled to all customary warranties and representations in connection with Franchisor's purchase of Franchisee's property, including, without limitation, representations and warranties as to ownership and condition of and title to the property; liens and encumbrances on the property; validity of contracts and agreements; and liabilities affecting the property, contingent or otherwise.

16.3    **Exclusions**.  Franchisor may exclude from the personal property purchased under Section 16.2, cash or its equivalent and any equipment, signs, inventory, materials and supplies that are not reasonably necessary (in function or quality) to the Franchised Business's operation or that Franchisor has not approved as meeting standards for the Franchised Business.

16.4    **Damages, Costs and Expenses**.  In the event of termination for any default by Franchisee, Franchisee shall promptly pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of Franchisee's personal property, furnishings, equipment, signs, fixtures and inventory related to the operation of the Franchised Business.

## 17   COVENANTS

Franchisee acknowledges that as a participant in Franchisor's System, Franchisee will receive proprietary and Confidential Information and materials, Trade Secrets, and the unique methods, procedures and techniques which Franchisor has developed. Therefore, to protect Franchisor and Franchisor's other franchisees, Franchisee agrees as follows:

17.1    **During the Term of this Agreement**.  During the term of this Agreement, and during any Holdover Period, neither Franchisee, Franchisee's owners, officers, directors, principals, nor any member of the immediate family of Franchisee or Franchisee's owners, officers, directors, or principals will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

17.1.1    Own, maintain, engage in, be employed as an officer, director, or principal of, lend money to, extend credit to, or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers the Approved Products and/or Approved Services or any other products and/or services authorized or offered for sale by System franchisees (a "Competitive Business") within the Designated Territory or the Designated Territory of any other System franchisee, provided that

Case 3:25-cv-00261-MOC-DCK    Document 1-1    Filed 04/15/25    Page 51 of 169

this Section 17.1.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly-traded company providing such services;

       17.1.2  Employ or seek to employ any person who is at that time employed by Franchisor, Franchisor's affiliates, or any other System franchisee, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

       17.1.3  Solicit any current, former or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System, or other franchisees for any competitive purpose.

       17.2   **After the Term of this Agreement**.  For a period of two (2) years after the expiration, transfer or termination of this Agreement, or after the expiration or termination of any Holdover Period, regardless of the cause, neither Franchisee, Franchisee's owners, officers, directors, principals, nor any member of the immediate family of Franchisee or Franchisee's owners, principals, officers or directors will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

       17.2.1  Own, maintain, engage in, be employed as an officer, director, principal of, lend money to, extend credit to, or have any interest in any Competitive Business: (a) within the Designated Territory; (b) within a twenty-five (25)-mile radius of the Designated Territory of any other Franchised Business; or (c) within a twenty-five (25)-mile radius of any System business operated by Franchisor or its affiliate, provided that this Section 17.2.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly-traded company providing services the same as or similar to a Competitive Business;

       17.2.2  Employ or seek to employ any person who is at that time employed by Franchisor, Franchisor's affiliates, or any other System franchisee, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

       17.2.3  Solicit any current, former or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System, or other franchisees for any competitive purpose.

       17.3   **Intent and Enforcement**.  It is the parties' intent that the provisions of this Section 17 be judicially enforced to the fullest extent permissible under applicable law. Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable. In the event of the actual or threatened breach of this Section 17 by Franchisee, any of Franchisee's principals, or any member of the immediate family of Franchisee or Franchisee's principals, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach. Franchisee acknowledges that the covenants contained herein are necessary to protect the goodwill of the Franchised Business, other System franchisees, and the System. Franchisee further acknowledges that covenants contained in this Section 17 are necessary to protect Franchisor's procedures and know-how transmitted during the term of this Agreement. Franchisee agrees that in the event of the actual or threatened breach of this Section 17, Franchisor's harm will be irreparable and that Franchisor has no adequate remedy at law to prevent such harm. Franchisee acknowledges and agrees on Franchisee's own behalf, and on behalf of the persons who are liable under this Section 17, that each has previously worked or been gainfully employed in other careers and that the provisions of this

Section 17 in no way prevent any such person from earning a living. Franchisee further acknowledges and agrees that the time limitations of this Section 17 shall be tolled during any default under this Section.

17.4 **Employees**. Franchisee shall ensure that Franchisee's principals, managers, employees and anyone else who will have access to Franchisor's Confidential Information, execute a Confidentiality and Restrictive Covenant Agreement, in the form attached as Exhibit C to this Agreement, or as Franchisor, in Franchisor's sole discretion, otherwise prescribes. Franchisee must furnish Franchisor a copy of each executed agreement.

17.5 **No Defense**. Franchisee hereby agrees that the existence of any claim Franchisee may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to Franchisor's enforcement of the covenants contained in this Section 17. Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) that Franchisor incurs in connection with the enforcement of this Section 17.

# 18 DISPUTE RESOLUTION

18.1 **Choice of Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without reference to its conflict of laws principals.

18.2 **Internal Dispute Resolution**. Franchisee and Franchisor believe that it is important to resolve any disputes amicably, quickly, cost-effectively and professionally and to return to business as soon as possible. Franchisee and Franchisor have agreed that the provisions of this Section 18 support these mutual objectives and, therefore, agree as follows: Any disagreement, litigation, claim, dispute, suit, action, controversy or proceeding of any type whatsoever, including any claim for equitable relief and/or where Franchisee is acting as a "private attorney general," suing pursuant to a statutory claim or otherwise, between or involving Franchisee and Franchisor on whatever theory and/or facts based, and whether or not arising out of this Agreement (including any dispute or disagreement relating to arbitration, including the arbitrability of this Agreement or any of its provisions), or offer, sale or negotiation of a The Designery Franchise, or the relationship of the parties arising from the Franchise or from entering this Agreement, or any claim that this Agreement or any part of this Agreement is invalid, illegal or otherwise voidable, void or unenforceable ("Dispute") will be processed in the following manner, Franchisee and Franchisor each expressly waiving all rights to any court proceeding, except as expressly provided below in Section 18.3.1. Franchisee must first bring any claim or dispute between Franchisee and Franchisor to Franchisor's management after providing notice as set forth in Section 18.6 below. Franchisee must exhaust this internal dispute resolution procedure before Franchisee may bring Franchisee's dispute before a third party. This agreement to first attempt resolution of disputes internally shall survive termination or expiration of this Agreement. Franchisee and Franchisor agree that the franchise relationship is unique and that as a result, it is important that anyone who serves as a mediator or arbitrator in a Dispute must have a minimum of seven (7) years' substantive experience in franchise law.

18.3 **Mediation/Arbitration**. If Franchisee and Franchisor are unable to resolve a Dispute using the internal dispute resolution procedure, then Disputes which are not first resolved through the internal dispute resolution procedure set forth in Section 18.2 above must be submitted first to non-binding mediation in Mecklenburg County, North Carolina under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect. A link to the AAA Commercial Arbitration Rules and Mediation Procedures can be found at https://www.adr.org/Rules. The mediation will be conducted by one mediator with at least seven (7) years of substantive experience in franchise law who will be appointed under the AAA's Commercial Mediation Rules and who will conduct the mediation in accordance with such rules. Mediation must be conducted on an individual, not a class-wide, basis; only Franchisor (and/or its affiliates and its and their respective owners, officers, directors,

agents and employees) and Franchisee (and/or its owners, guarantors, affiliates, officers, directors, agents and employees, if applicable) may be the parties to any mediation proceeding described in this Section, and no such mediation proceeding may be consolidated with any other mediation proceeding between Franchisor and any other person, corporation, limited liability company or partnership. Franchisor and Franchisee agree that statements made by Franchisor, Franchisee or any other party in any such mediation proceeding will not be admissible in any arbitration or other legal proceeding. If the mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written declaration by Franchisor, then, subject to the exclusions set forth in Section 18.3.1, all Disputes must be submitted to binding arbitration before one arbitrator of the AAA in accordance with its commercial arbitration rules. The arbitration will be conducted by one arbitrator with at least seven (7) years of substantive experience in franchise law who will be appointed under the AAA's Commercial Arbitration Rules and who will conduct the arbitration in accordance with such rules. Except as provided in Section 18.3.1, no party may file litigation involving any Dispute unless it has complied with the mediation and arbitration provisions in this Article regarding that Dispute. "Filing litigation" includes asserting a counterclaim, third-party claim, or other claim relating to a Dispute (irrespective of whether the party asserting the claim filed the legal action in which the claim is asserted). Franchisor's rights to mediation and arbitration, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and arbitration, and Franchisor and Franchisee shall share mediation and arbitration costs equally except as provided in Section 22.8. This agreement to mediate and arbitrate shall survive any termination or expiration of this Agreement.

18.3.1   The parties shall not be required to first attempt to mediate or arbitrate a controversy, dispute or claim through mediation as set forth in this Section 18.3 if such controversy, dispute or claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

18.3.1.1     Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

18.3.1.2     Any claims pertaining to or arising out of any warranty issue;

18.3.1.3     Any of the restrictive covenants contained in this Agreement;

18.3.1.4     Any of Franchisee's payment obligations that are more than forty-five (45) days past due;

18.3.1.5     Any claims arising out of or related to fraud or misrepresentation by Franchisee, or Franchisee's insolvency;

18.3.1.6     Any claims relating to Franchisee's obligations on termination or expiration of this Agreement;

18.3.1.7     Any claims relating to any Transfer of an interest in Franchisee, the Franchised Business or Franchisee's assets; or

18.3.1.8     Any matters involving danger, health or safety.

18.3.2   Interpretation.  The provisions of this Agreement must be construed as independent of any other covenant or provision of this Agreement. However, if a court or arbitrator of competent jurisdiction determines that any provisions are unlawful, that court or arbitrator is to modify or interpret the provisions to the minimum extent necessary to have them comply with the law. Notwithstanding any

provision relating to the state laws by and under which this Agreement must be governed and construed, all issues relating to arbitrability or the enforcement of the agreement to arbitrate in this Agreement must be governed by the United States Arbitration Act (9 U.S.C. § 1 et seq.) and the Federal common law of arbitration. The arbitrator, and not any federal, state or local court, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, unconscionability, arbitrability, enforceability or formation of this Agreement, including any claim of fraud in the inducement or that all or any part of the Agreement is void or voidable. However, the preceding sentence shall not apply to the clause entitled "Class Action Waiver."

18.3.3  **Judgment**.  Judgment on an arbitration award may be entered in any court of competent jurisdiction. This judgment is binding, final and non-appealable.

18.3.4  **Failure to Appear**.  The arbitration and mediation provisions in this Article are self-executing and remain in full force and effect after the expiration or sooner termination of this Agreement. If either party fails to appear at any properly noticed arbitration proceeding, notwithstanding failing to appear, an award may be entered against that party by default or otherwise.

18.3.5  **Class Action Waiver**.  Any proceeding (whether mediation, arbitration, trial to a court or jury, appeal or otherwise) must be brought in the parties' individual capacity and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff or similar proceeding ("Class Action"). Franchisee and Franchisor expressly waive any ability to maintain any Class Action in any forum. Further, an arbitration proceeding between Franchisor and Franchisee (or any of Franchisee's or Franchisor's affiliates and owners and guarantors) may not be consolidated with any other arbitration proceeding between them and any other franchisee, person or entity. Franchisee hereby agrees not to seek joinder of any of its claims with those of any other party. The arbitrator shall not have authority to combine or aggregate similar claims or conduct any Class Action, nor make an award to any person or entity not a party to the arbitration. Any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. FRANCHISEE AND FRANCHISOR UNDERSTAND THAT FRANCHISOR WOULD HAVE HAD A RIGHT TO LITIGATE THROUGH A COURT, TO HAVE A JUDGE OR JURY DECIDE ITS CASE, AND TO BE PARTY TO A CLASS OR REPRESENTATIVE ACTION. HOWEVER, FRANCHISEE AND FRANCHISOR UNDERSTAND AND CHOOSE TO WAIVE THAT RIGHT AND HAVE ANY CLAIMS DECIDED INDIVIDUALLY THROUGH ARBITRATION. It is Franchisee's and Franchisor's joint business judgment that the limitations of this subsection make good business sense, because:

18.3.5.1  the mediation and arbitration procedures contemplated by this Agreement (and which Franchisee and Franchisor agree are the core methods for resolving disputes) function most effectively on an individual case basis;

18.3.5.2  there are significant business and other factors present in each individual franchisee's situation which should be respected; and

18.3.5.3  the economic interests of lawyers on either side in class-wide or multiple plaintiff cases, as well as the tendency to polarize positions, makes accommodation and compromise, as a practical business matter, less easily achieved, which would be a serious detriment to Franchisee's and Franchisor's business interests, as well as those of the entire Franchise System, in quickly, amicably and economically resolving any dispute.

18.4  **Selection of Venue**.  Nothing contained in this Agreement shall prevent Franchisor from applying to and obtaining from any court having jurisdiction, a writ of attachment, a temporary injunction,

preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests. The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Mecklenburg County, North Carolina and the jurisdiction and venue of the United States District Court for the Western District of North Carolina. Franchisee acknowledges that this Agreement has been entered into in the State of North Carolina, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Huntersville, North Carolina, including, but not limited to, training, assistance, support, and the development of the System. In recognition of such services and their origin, Franchisee hereby irrevocably consents to the personal jurisdiction of the state and federal courts of North Carolina as set forth in this Section.

18.5    **Third Party Beneficiaries**.  Franchisor's officers, directors, shareholders, members, agents and/or employees are express third party beneficiaries of the provisions of this Agreement, including the mediation and arbitration provision set forth in this Section 18, each having authority to specifically enforce the right to mediate or arbitrate claims asserted against such person(s) by Franchisee.

18.6    **Prior Notice of Claims**.  As a condition precedent to commencing an action for damages or for violation or breach of this Agreement, Franchisee must notify Franchisor within thirty (30) days after the occurrence of the violation or breach, and failure to timely give such notice shall preclude any claim for damages.

18.7    **No Right to Offset**.  Franchisee shall not withhold all or any part of any payment to Franchisor or any of its affiliates on the grounds of Franchisor's alleged nonperformance or as an offset against any amount Franchisor or any of Franchisor's affiliates allegedly may owe Franchisee under this Agreement or any related agreements.

18.8    **Injunctive Relief**.  The Franchised Business is intended to be one of a large number of businesses identified by the Proprietary Marks selling to the public the Approved Products and Approved Services associated with the Proprietary Marks. Consequently, a single franchisee's failure to comply with the terms of its franchise agreement is likely to cause irreparable damage to Franchisor, and damages at law would therefore be an inadequate remedy. Upon Franchisee's breach or threatened breach of any of the terms concerning any matters referenced in Section 18.3.1, Franchisor may seek an injunction restraining the breach and/or a decree of specific performance (with recovery of reasonable attorneys' fees and costs incurred in obtaining equitable relief). Franchisor may do so without demonstrating or proving any actual damage. These equitable remedies are in addition to all other rights or remedies to which Franchisor may otherwise be entitled due to Franchisee's breach of this Agreement. Franchisor may seek this relief without posting any bond or security; however, if a court of competent jurisdiction requires a bond or security, a bond or security for $1,000 is sufficient. Notwithstanding anything in this Agreement to the contrary, Franchisor may seek injunctive relief in any jurisdiction that has jurisdiction over Franchisee or any other party against whom the relief is sought. If injunctive relief is granted, Franchisee's only remedy will be the court's dissolution of the injunctive relief. If the injunctive relief was wrongfully issued, Franchisee expressly waives all claims for damages Franchisee incurred as a result of the wrongful issuance.

18.9    **Limitation of Action**.  Franchisee further agrees that no cause of action arising out of or under this Agreement may be maintained by Franchisee against Franchisor unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after the Franchisee becomes aware of facts or circumstances reasonably indicating that Franchisee may have a claim against Franchisor hereunder, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense or setoff.

18.9.1    Franchisee hereby waives the right to obtain any remedy based on alleged fraud, misrepresentation or deceit by Franchisor, including, without limitation, rescission of this Agreement, in

any mediation, arbitration, judicial, or other adjudicatory proceeding arising hereunder, except upon a ground expressly provided in this Agreement, or pursuant to any right expressly granted by any applicable statute expressly regulating the sale of franchises, or any regulation or rules promulgated thereunder.

18.9.2 Notwithstanding anything to the contrary contained herein, all actions shall be conducted on an individual, not a class-wide basis, and any proceeding between Franchisee, Franchisee's guarantors, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

18.10 **Waiver of Punitive Damages**. Franchisee hereby waives to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agrees that in the event of a dispute, that Franchisee's recovery is limited to actual damages. If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages. Nothing in this Section shall be construed to prevent Franchisor from claiming and obtaining punitive or consequential damages, including lost future Royalty Fees for the balance of the term of this Agreement.

18.11 **THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT. THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR FRANCHISEE'S PURCHASE FROM FRANCHISOR OF THE FRANCHISE AND/OR ANY PRODUCTS OR SERVICES.**

## 19 REPRESENTATIONS

19.1 **Call Center**. If established, the Call Center will be provided on an "AS IS" and "AS AVAILABLE" basis. Franchisor does not covenant any level, quality, continuity or standard of operation for the Call Center, or covenant that the Call Center will be free from defaults, viruses or other harmful components, operate on a continuous or uninterrupted basis, or provide secure access to the Call Center or services provided thereby. FRANCHISOR MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT, OR WARRANTIES REGARDING THE QUALITY, ACCURACY, TIMELINESS, AVAILABILITY, SUITABILITY, OR RELIABILITY OF ANY SERVICE, OR SECURITY, USEFULNESS, LACK OF VIRUSES OR OTHER HARMFUL COMPONENTS, OR WARRANTIES REGARDING COMPLETENESS OF THE CONTENT OF THE CALL CENTER, OR WARRANTIES WITH RESPECT TO THE USE OR AVAILABILITY OF ANY INFORMATION, DATA, ITEM, APPARATUS, METHOD OR PROCESS INCLUDED IN THE CALL CENTER, OR THAT SUCH WILL MEET THE FRANCHISEE'S REQUIREMENTS, OR BE ERROR FREE OR NOT INFRINGE ON THE RIGHTS OF OTHERS, OR THAT DEFECTS WILL BE CORRECTED.

19.2 **No Authority**. NO SALESPERSON, REPRESENTATIVE OR OTHER PERSON HAS THE AUTHORITY TO BIND OR OBLIGATE FRANCHISOR EXCEPT FRANCHISOR'S AUTHORIZED OFFICER BY A WRITTEN DOCUMENT. FRANCHISEE ACKNOWLEDGES THAT NO REPRESENTATIONS, PROMISES, INDUCEMENTS, GUARANTEES OR WARRANTIES OF ANY KIND WERE MADE BY FRANCHISOR OR ON FRANCHISOR'S BEHALF WHICH HAVE LED

FRANCHISEE TO ENTER INTO THIS AGREEMENT. FRANCHISEE UNDERSTANDS THAT WHETHER FRANCHISEE SUCCEEDS AS A FRANCHISEE IS DEPENDENT UPON FRANCHISEE'S EFFORTS, BUSINESS JUDGMENTS, THE PERFORMANCE OF FRANCHISEE'S EMPLOYEES, MARKET CONDITIONS AND VARIABLE FACTORS BEYOND FRANCHISOR'S CONTROL OR INFLUENCE. FRANCHISEE FURTHER UNDERSTANDS THAT SOME FRANCHISEES ARE MORE OR LESS SUCCESSFUL THAN OTHER FRANCHISEES AND THAT FRANCHISOR HAS MADE NO REPRESENTATION THAT FRANCHISEE WILL DO AS WELL AS ANY OTHER FRANCHISEE.

19.3 **Receipt**. THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THIS AGREEMENT, WITH ALL BLANKS COMPLETED AND WITH ANY AMENDMENTS AND SCHEDULES, AT LEAST SEVEN (7) CALENDAR DAYS PRIOR TO EXECUTION OF THIS AGREEMENT. IN ADDITION, THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT AT LEAST FOURTEEN (14) CALENDAR DAYS PRIOR TO THE EXECUTION OF THIS AGREEMENT OR FRANCHISEE'S PAYMENT OF ANY MONIES TO FRANCHISOR, REFUNDABLE OR OTHERWISE.

19.4 **Opportunity for Review by Franchisee's Advisors**. FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR HAS RECOMMENDED, AND THAT FRANCHISEE HAS HAD THE OPPORTUNITY TO OBTAIN, REVIEW OF THIS AGREEMENT AND FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT BY FRANCHISEE'S LAWYER, ACCOUNTANT OR OTHER BUSINESS ADVISOR PRIOR TO EXECUTION HEREOF.

19.5 **Execution of Agreement**. EACH OF THE UNDERSIGNED PARTIES WARRANTS THAT IT HAS THE FULL AUTHORITY TO SIGN AND EXECUTE THIS AGREEMENT. IF FRANCHISEE IS A PARTNERSHIP OR CORPORATION, THE PERSON EXECUTING THIS AGREEMENT ON BEHALF OF SUCH PARTNERSHIP OR CORPORATION WARRANTS TO FRANCHISOR, BOTH INDIVIDUALLY AND IN HIS/HER CAPACITY AS PARTNER OR OFFICER, THAT ALL OF THE PARTNERS OF THE PARTNERSHIP OR ALL OF THE SHAREHOLDERS OF THE CORPORATION, AS APPLICABLE, HAVE READ AND APPROVED THIS AGREEMENT, INCLUDING ANY RESTRICTIONS WHICH THIS AGREEMENT PLACES UPON RIGHTS TO TRANSFER THEIR INTEREST IN THE PARTNERSHIP OR CORPORATION.

## 20 GUARANTEE OF PRINCIPALS AND THEIR SPOUSES

20.1 Franchisee's spouse and all partners in a limited partnership, shareholders in a corporate franchisee, or members of a limited liability company, as well as all general partners and managing members, and their spouses hereby personally and unconditionally guarantee without notice, demand or presentment, the payment of all of Franchisee's monetary obligations under this Agreement and any other agreement between Franchisee and Franchisor and/or Franchisor's affiliates, as if each were an original party to this or any other agreement in his or her individual capacity. All such personal guarantors further agree to be bound by the restrictions upon Franchisee's activities upon transfer, termination or expiration and nonrenewal of this Agreement as if each were an original party to this Agreement in his or her individual capacity. All such personal guarantors and their spouses must execute a continuing Personal Guaranty in the form attached as <u>Exhibit A</u> to this Agreement.

20.2 **Security Interest**. For valuable consideration, as security for the payment of/for: (a) all amounts owing or to be owed to us and our affiliates by you from time to time under this Agreement or any other agreement between you and us or our affiliates, or otherwise; (b) your performance of all obligations to us and our affiliates; and (c) the costs and expenses that we and/or our affiliates incur to collect or attempt to collect amounts due from you and to enforce this Section (together, the "Obligations"), you hereby grant

us a security interest in all of the assets of the Franchised Business or used by at or in connection with your Franchised Business, including but not limited to: (i) all equipment, furnishings, fixtures, motor vehicles, merchandise, inventory, goods and other tangible personal property; (ii) all accounts, accounts receivable, other receivables, contract rights, leasehold interests, software, chattel paper and general intangibles; (iii) all instruments, documents of title, policies and certificates of insurance, securities, bank deposits, bank accounts and cash; (iv) all books, records and documents; (v) all permits and licenses for the operation of the Franchised Business; and (vi) all accessions, additions and improvements to, and all replacements, substitutions and parts for, and all proceeds and products of, the foregoing, including proceeds of insurance (collectively, the "Collateral"). Franchisee agrees to execute and deliver to Franchisor any other documents reasonably requested by Franchisor to create, maintain, perfect, or assure the priority of the security interest granted above. Franchisee hereby appoints Franchisor as its agent and attorney-in-fact to execute and deliver documents and to take all other actions (to the extent permitted by law) in Franchisee's name and on Franchisee's behalf that Franchisor may deem necessary or advisable to create, maintain, perfect, assure the priority of, or foreclose its security interest in and lien on the Collateral. You must execute and deliver to us financing statements and/or such other documents as we reasonably deem necessary to perfect our interest in the Collateral within 10 days of your receipt of such documents from us.

You will not remove the Collateral or any portion thereof or grant or permit any security interest in (or otherwise encumber) the Collateral, without our prior written consent. You represent and warrant that the security interest granted is prior to all other security interests in the Collateral except for (i) bona fide purchase money security interests and (ii) if consented to by us in writing, the security interest granted to a third party in connection with your original financing for your Franchised Business, if any. In connection with any request for our approval of a security interest, we will exercise our Business Judgment, bearing in mind the interests of the borrower, lender, ourselves and the System. On the occurrence of any event entitling us to terminate this Agreement or any other agreement between the parties, or if we reasonably determine that we are not assured that your (and/or any affiliates') obligations will be timely and fully paid and/or performed, we will have all the rights and remedies of a secured party under the Uniform Commercial Code of the State in which your Franchised Business is located, including, without limitation, the right to take possession of the Collateral. This appointment is coupled with an interest and is irrevocable as long as any of the Obligations remain outstanding.

## 21  NOTICES

All notices and requests to be given under this Agreement are to be in writing and delivered by either hand delivery or overnight mail by a recognized carrier offering a delivery receipt to the following addresses (which may be changed by written notice):

| | |
|---|---|
| Franchisee Name/Address: | Joel Senger |
| | 241 N Colony Dr. |
| | Edgewood, Kentucky 41017 |
| | |
| Franchisor: | A1 Kitchen & Bath Franchising, LLC |
| | 107 Parr Drive |
| | Huntersville, North Carolina 28078 |
| | Attn:  Chief Legal Officer |

Mailing any notice hereunder sent by U.S. certified mail, postage prepaid or when sent via Federal Express or a similar overnight courier shall be presumptive evidence of delivery of the notice or request.

## 22  MISCELLANEOUS

22.1    **Entire Agreement**.  This Agreement contains the entire Agreement of the parties. There are no representations either oral or written, except those contained in this Agreement. This written Agreement includes all representations between the parties. This Agreement may not be modified except by a written document signed by both parties. Nothing in this Agreement or any related agreement is intended to disclaim the representations Franchisor made in the Franchise Disclosure Document furnished to Franchisee.

22.2    **Construction of Language**.  The language of this Agreement shall be construed according to its fair meaning, and not strictly for or against either party. All words in this Agreement refer to whatever number or gender the context requires. If more than one party or person is referred to as Franchisee, their obligations and liabilities shall be joint and several. Headings are for reference purposes and do not control interpretation. Reference to Franchisee's "immediate family" means Franchisee's spouse, parents, children and siblings, and Franchisee's spouse's parents, children and siblings. Reference to Franchisee's "principals" means Franchisee's partners, officers, directors, shareholders, members and managers, as applicable. References to "Franchisor" and "Franchisee" include the party's successors, assigns or transferees. The parties have had a reasonable opportunity to review this Agreement. In the event of an ambiguity or if a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all of the parties, and no presumptions or burdens of proof shall arise in favor of any party by virtue of the authorship of any of the provisions of this Agreement.

22.3    **Severability**.  If any provision of this Agreement is deemed invalid or inoperative for any reason, that provision shall be deemed modified to the extent necessary to make it valid and operative or, if it cannot be so modified, it shall then be severed, and the remainder of that provision shall continue in full force and effect as if this Agreement had been signed with the invalid portion so modified or eliminated; provided, however, that if any part of this Agreement relating to payments to Franchisor or any of its affiliates or protection of the Proprietary Marks or the Confidential Information, including the Operations Manual and Franchisor's other Trade Secrets is declared invalid or unenforceable, then Franchisor, at Franchisor's option, may terminate this Agreement immediately upon written notice to Franchisee.

22.4    **State Law Applies**.  If any provision of this Agreement, including but not limited to its provisions for transfer, renewal, termination, notice of termination, or cure rights, is inconsistent with any valid law or regulation of the state in which the Franchised Business is located, then the valid law or regulation of that state applicable to the Franchised Business shall supersede any provision of this Agreement that is less favorable to Franchisee.

22.5    **Additional Documentation**.  Franchisee must, from time to time, subsequent to the date first set forth above, at Franchisor's request and without further consideration, execute and deliver such other documentation or agreements and take such other actions as Franchisor reasonably may require in order to effectuate the transactions contemplated herein. In the event that Franchisee fails to comply with the provisions of this Section, Franchisee hereby appoints Franchisor as Franchisee's attorney-in-fact to execute any and all documents on Franchisee's behalf, reasonably necessary to effectuate the transactions contemplated herein.

22.6    **Force Majeure**.  Neither Franchisee, Franchisor, nor Franchisor's affiliates will be liable for loss or damage or deemed to be in breach of this Agreement or any related agreement if its failure to perform, its obligations is not the fault, nor within the reasonable control of the person due to perform but results from, without limitation, acts of God or natural disaster (such as, but not limited to, violent storm, cyclone, hurricane, tornado, blizzard, earthquake, volcanic activity, landslide, tidal wave, tsunami,

flood, damage or destruction by lightning, drought); accident, riots, war, terrorist act, epidemic, pandemic, quarantine, civil commotion, breakdown of communication facilities, breakdown of web host, breakdown of Internet service provider, natural catastrophes, national or regional emergencies; governmental acts or omissions, changes in laws or regulations, national or local strikes, fire, explosion, generalized lack of availability of raw materials or energy; or any other cause, whether similar in kind to the foregoing or otherwise. Any delay resulting from any such cause will extend the time of performance for the period of such delay or for such other reasonable period of time as the parties agree in writing or will excuse performance, in whole or in part, as Franchisor deems reasonable. For the avoidance of doubt, this Force Majeure section shall not apply to a party's financial inability to perform its obligations hereunder, nor does this Section apply to negate or delay any payment obligation whether on account of a public health crisis such as COVID-19 or otherwise.

22.7    **Anti-Terrorist Activities**.  Franchisee certifies that neither Franchisee nor Franchisee's owners, principals, employees or anyone associated with Franchisee is listed in the Annex to Executive Order 13224. Franchisee agrees not to hire or have any dealings with a person listed in the Annex. Franchisee certifies that Franchisee has no knowledge or information that, if generally known, would result in Franchisee, Franchisee's owners, principals, employees, or anyone associated with Franchisee being listed in the Annex to Executive Order 13224. Franchisee agrees to comply with and/or assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with the Anti-Terrorism Laws (as defined below). In connection with such compliance, Franchisee certifies, represents, and warrants that none of Franchisee's property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and Franchisee's owners or principals are not otherwise in violation of any of the Anti-Terrorism Laws. Franchisee is solely responsible for ascertaining what actions must be taken by Franchisee to comply with all such Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that Franchisee's indemnification responsibilities as provided in Section 13.2 of this Agreement pertain to Franchisee's obligations under this Section 22.7. Any misrepresentation by Franchisee under this Section or any violation of the Anti-Terrorism Laws by Franchisee, Franchisee's owners, principals or employees shall constitute grounds for immediate termination of this Agreement and any other agreement Franchisee has entered into with Franchisor or one of Franchisor's affiliates in accordance with the terms of Section 15.2.1 of this Agreement. As used herein, "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies lists and any other requirements of any Governmental Authority (including without limitation, the United States Department of Treasury Office of Foreign Assets Control) addressing or in any way relating to terrorist acts and acts of war.

22.8    **Attorneys' Fees**. If Franchisee is in breach or default of any monetary or non-monetary material obligation under this Agreement or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs. If Franchisee institutes any legal action to interpret or enforce the terms of this Agreement, and Franchisee's claim in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

22.9    **Amendment of Prior Agreements**.  In order to enhance consistency and quality of operation, performance, dispute resolution and other matters, we amend our standard Franchise Agreement

from time to time. As a result, this Agreement may be different from other Brand franchise agreements that Franchisee or Franchisee's affiliates may have signed in the past and may contain revised provisions regarding, among other things, modifications to the System, manner of payment of fees and late fees, duties of franchisee, protection of trademarks, status and protection of Manuals and Confidential Information, technology requirements, advertising, insurance, accounting and records, transfers, default and termination, obligations on termination, franchisee covenants, taxes, indemnification, obligations to defend, approvals and waivers, notices, construction of agreement and applicable law. To cooperate with us in the achievement of these goals and as a condition of the grant of an additional franchise, Franchisee agrees that all of Franchisee's or its affiliates' existing Brand franchise agreements with Franchisor or its affiliates are amended to match the provisions of this Agreement (if the existing franchise agreements do not already include these provisions), except with respect to the royalty fee rate, required marketing contributions and spending, other fees for which amounts are specified, territory description, Approved Location, contract term, renewal conditions, and transfer conditions set out in the prior agreements, which will remain unchanged. FRANCHISEE ACKNOWLEDGES THAT THIS SECTION AMENDS ALL OF FRANCHISEE'S EXISTING FRANCHISE AGREEMENTS WITH FRANCHISOR AND THAT THE AMENDMENT WILL SURVIVE THE EXPIRATION OR TERMINATION OF THIS AGREEMENT.

22.10    **No Personal Liability**.  Franchisee agrees that fulfillment of any and all of Franchisor's obligations written in this Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility, and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee for any reason. This is an important part of this Agreement. Franchisee agrees that nothing that Franchisee has been told by Franchisor or Franchisor's representatives shall be binding unless it is written in this Agreement. This is an important part of this Agreement. Do not sign this Agreement if there is any question concerning its contents or any representations made.

22.11    You and we agree that we may conduct due diligence on the franchise sale process and that we rely on your representations of that experience as a material inducement to enter into the franchise relationship, without which we would not enter into this Franchise Agreement with you. Accordingly, you and we agree that any such diligence may be entered into evidence in any dispute resolution proceeding, and the limitations set forth in any state addenda or other amendment to this Agreement will not waive any of our rights, claims or protections under any law or regulation.

*(THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.*
*SIGNATURES APPEAR ON THE FOLLOWING PAGE.)*

IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.

**FRANCHISOR:**                                    **FRANCHISEE:**

**A1 KITCHEN & BATH**
**FRANCHISING, LLC**

DocuSigned by:

_Jeffrey Dudan_
—80D09C8147D34C9...
Jeffrey R. Dudan, President

DocuSigned by:

—6E8E03E0D6E684E4...
Joel Senger, Individually

# EXHIBIT A
# TO
# THE DESIGNERY
# FRANCHISE AGREEMENT

## PERSONAL GUARANTY

NOTE: IF FRANCHISEE IS A CORPORATION, EACH OF FRANCHISEE'S SHAREHOLDERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING. IF FRANCHISEE IS A PARTNERSHIP, EACH OF FRANCHISEE'S GENERAL PARTNERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING. IF FRANCHISEE IS A LIMITED LIABILITY COMPANY, EACH OF FRANCHISEE'S MEMBERS AND MANAGERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING.

Definition of "Franchisee": Joel Senger

| | | |
|---|---|---|
| ☒ Individual | ☐ Sole Proprietorship | ☐ Limited Liability Company |
| ☐ Corporation | ☐ General Partnership | ☐ Limited Partnership |

## ARTICLE I
## PERSONAL GUARANTY

The undersigned persons (individually and collectively "you" or "Personal Guarantors") hereby represent to A1 Kitchen & Bath Franchising, LLC ("Franchisor") that you are all of the owners, shareholders, general partners, or all of the members and managers, or the spouse of any such owner, shareholder, general partner, or member or manager of the Franchisee. In consideration of the grant by Franchisor to Franchisee, as provided in the foregoing franchise agreement (the "Franchise Agreement"), each of you hereby agree, in consideration of benefits received and to be received by each of you, jointly and severally, and for yourselves, your heirs, legal representatives and assigns, to be firmly bound by all of the terms, provisions and conditions of the foregoing Franchise Agreement, and any other agreement between Franchisee and Franchisor and/or its affiliates, and do hereby unconditionally guarantee the full and timely performance by Franchisee of each and every obligation of Franchisee under the aforesaid Franchise Agreement or other agreement between Franchisor and Franchisee, including, without limitation, any indebtedness of Franchisee arising under or by virtue of the aforesaid Franchise Agreement and that you (jointly and individually) will not permit or cause any change in the percentage of Franchisee owned, directly or indirectly, by any person, without first obtaining the written consent of Franchisor prior to said proposed transfer, which consent must not be unreasonably withheld, and without first paying or causing to be paid to Franchisor the transfer fee provided for in said Franchise Agreement, if applicable, and without otherwise complying with the transfer provisions of the foregoing Franchise Agreement. You further agree to be bound by the in-term and post-term non-competition and non-solicitation covenants set forth in Section 17 of the Franchise Agreement, as well as all other covenants set forth in the Franchise Agreement, including, but not limited to, those concerning confidentiality (Section 5 of the Franchise Agreement) and indemnification (Section 13.2 of the Franchise Agreement). You agree that this personal guaranty (the "Guaranty") will be governed by the dispute resolution procedures set forth in Section 18 of the Franchise Agreement.

## ARTICLE II
## CONFIDENTIALITY

During the term of this Guaranty, you will receive information which Franchisor considers a trade secret and confidential information ("Confidential Information"). You shall not, during the term of this Guaranty or thereafter, communicate, divulge, or use for the benefit of any other person, partnership, association, corporation, or limited liability company any Confidential Information, including, without limitation, Franchisor's Operations Manual and its contents; price lists and standards and specifications for the Approved Products and Approved Services; standards and specifications related to Franchisor's integrated bookkeeping system; and other methods, techniques and know-how concerning the operation of a Franchised Business of which you may be apprised by virtue of your role as a Personal Guarantor of Franchisee.

## ARTICLE III
## NON-COMPETITION

1.     **During the Term of the Franchise Agreement**.  During the term of the Franchise Agreement, neither you, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

a.     Own, maintain, engage in, be employed as an officer, director, principal of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers the Approved Products or Approved Services or any other products and/or services authorized or offered for sale by System franchisees (a "Competitive Business") within the Designated Territory or the Designated Territory of any other System franchisee, provided that this Article III(1) does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;

b.     Employ or seek to employ any person who is at that time employed by Franchisor, Franchisor's affiliates or any other System franchisee, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

c.     Solicit any current, former or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

2.     **After the Term of the Franchise Agreement**.  For a period of two (2) years after the expiration and nonrenewal, transfer or termination of the Franchise Agreement, regardless of the cause, neither you, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors, or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

a.     Own, maintain, engage in, be employed as an officer, director, principal of, lend money to, extend credit to, or have any interest in any Competitive Business: (i) within the Designated Territory; (ii) within a twenty-five (25)-mile radius of the Designated Territory of any other Franchised

Business; or (iii) within a twenty-five (25)-mile radius of any System business operated by Franchisor or its affiliate, provided that this Article III(2) does not apply to: (A) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (B) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly-traded company providing services the same as or similar to a Competitive Business;

        b.      Employ or seek to employ any person who is at that time employed by Franchisor, Franchisor's affiliates, or any other System franchisee, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

        c.      Solicit any current, former or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

      3.      **Intent and Enforcement**.  It is the parties' intent that the provisions of this Article III be judicially enforced to the fullest extent permissible under applicable law. Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable. In the event of the actual or threatened breach of this Article III by you, any of your principals, or any members of their immediate family, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach. You agree that in the event of the actual or threatened breach of this Article III, Franchisor's harm will be irreparable, and that Franchisor has no adequate remedy at law to prevent such harm. You acknowledge and agree that each of you has previously worked or been gainfully employed in other careers and that the provisions of this Article III in no way prevent you from earning a living. You further acknowledge and agree that the time limitation of this Article III shall be tolled during any default under this Guaranty.

## ARTICLE IV
## DISPUTE RESOLUTION

      1.      **Acknowledgment**.  You acknowledge that this Guaranty is not a franchise agreement and does not confer upon you any rights to use the Franchisor's Proprietary Marks or its System.

      2.      **Governing Law**.  This Guaranty shall be deemed to have been made in and governed by the laws of the State of North Carolina, without any reference to North Carolina conflict of laws principles.

      3.      **Internal Dispute Resolution**.  Franchisee and Franchisor believe that it is important to resolve any disputes amicably, quickly, cost-effectively and professionally and to return to business as soon as possible. Franchisee and Franchisor have agreed that the provisions of Sections 3 and 4 of this Personal Guaranty support these mutual objectives and, therefore, agree as follows. Any disagreement, litigation, claim, dispute, suit, action, controversy or proceeding of any type whatsoever, including any claim for equitable relief and/or where Franchisee is acting as a "private attorney general" suing pursuant to a statutory claim or otherwise between or involving a Guarantor, Franchisee and/or Franchisor on whatever theory and/or facts based, and whether or not arising out of this Guaranty (including any dispute or disagreement relating to arbitration, including the arbitrability of this Guaranty or any of its provisions), or offer, sale or negotiation of a The Designery Franchise, or the relationship of the parties arising from the Franchise or from entering this Guaranty or the Franchise Agreement, or any claim that this Guaranty or the Franchise Agreement or any part thereof is invalid, illegal or otherwise voidable, void or unenforceable ("Dispute") will be processed in the following manner, Franchisee and Franchisor each

expressly waiving all rights to any court proceeding, except as expressly provided below in Section 4.1. Personal Guarantor must first bring any claim or Dispute between Franchisee and Franchisor or Personal Guarantor and Franchisor to Franchisor's management, after providing notice as set forth in Section 4.8 below. Personal Guarantor must exhaust this internal Dispute resolution procedure before Personal Guarantor may bring Personal Guarantor's Dispute before a third party. This agreement to first attempt resolution of Disputes internally shall survive termination or expiration of this Guaranty. Personal Guarantor and Franchisor agree that the franchise relationship is unique and that as a result, it is important that anyone who serves as a mediator or arbitrator in a Dispute must have a minimum of seven (7) years' substantive experience in franchise law.

4.    **Mediation**.

If Personal Guarantor and Franchisor are unable to resolve a Dispute using the internal Dispute resolution procedure, then Disputes which are not first resolved through the internal Dispute resolution procedure set forth in Section 3 above, must be submitted first to non-binding mediation in Mecklenburg County, North Carolina under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect. The mediation will be conducted by one mediator with at least seven (7) years of substantive experience in franchise law who will be appointed under the AAA's Commercial Mediation Rules and who will conduct the mediation in accordance with such rules. Mediation must be conducted on an individual, not a class-wide, basis; only Franchisor (and/or its affiliates and its and their respective owners, officers, directors, agents and employees) and Franchisee (and/or its Owners, guarantors, affiliates, officers, directors, agents and employees, if applicable) may be the parties to any mediation proceeding described in this Section, and no such mediation proceeding may be consolidated with any other mediation proceeding between Franchisor and any other person, corporation, limited liability company or partnership. Franchisor and Personal Guarantor agree that statements made by Franchisor, Personal Guarantor or any other party in any such mediation proceeding will not be admissible in any arbitration or other legal proceeding. If the mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written declaration by Franchisor, then, subject to the exclusions set forth in Section 4.1, all Disputes must be submitted to binding arbitration before one arbitrator of the AAA in accordance with its commercial arbitration rules. The arbitration will be conducted by one arbitrator with at least seven (7) years of substantive experience in franchise law who will be appointed under the AAA's Commercial Arbitration Rules and who will conduct the arbitration in accordance with such rules. Except as provided in Section 4.1, no party may file litigation involving any Dispute unless it has complied with the mediation and arbitration provisions in this Article regarding that Dispute. "Filing litigation" includes asserting a counterclaim, third-party claim or other claim relating to a Dispute (irrespective of whether the party asserting the claim filed the legal action in which the claim is asserted). Franchisor's rights to mediation and arbitration, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and arbitration, and Franchisor and Personal Guarantor shall share mediation costs equally. This agreement to mediate and arbitrate shall survive any termination or expiration of this Guaranty.

4.1    The parties shall not be required to first attempt to mediate or arbitrate a controversy, Dispute or claim through mediation as set forth in this Section 4.1 if such controversy, Dispute or claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

4.1.1    Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

4.1.2    Any claims pertaining to or arising out of any warranty issue;

4.1.3    Any of the restrictive covenants contained in this Guaranty;

4.1.4    Any of Franchisee's payment obligations that are more than forty- five (45) days past due;

4.1.5    Any claims arising out of or related to fraud or misrepresentation by Personal Guarantor, Franchisee, or Franchisee's insolvency;

4.1.6    Any claims relating to Franchisee's obligations on termination or expiration of this Guaranty;

4.1.7    Any claims relating to any Transfer of an interest in Franchisee, the Franchised Business or Franchisee's assets; or

4.1.8    Any matters involving danger, health or safety.

4.2    **Interpretation**.  The provisions of this Guaranty must be construed as independent of any other covenant or provision of this Guaranty. However, if a court or arbitrator of competent jurisdiction determines that any provisions are unlawful, that court or arbitrator is to modify or interpret the provisions to the minimum extent necessary to have them comply with the law. Notwithstanding any provision relating to the state laws by and under which this Guaranty must be governed and construed, all issues relating to arbitrability or the enforcement of the agreement to arbitrate in this Guaranty must be governed by the United States Arbitration Act (9 U.S.C. § 1 et seq.) and the Federal common law of arbitration. The arbitrator, and not any federal, state or local court, shall have exclusive authority to resolve any Dispute relating to the interpretation, applicability, unconscionability, arbitrability, enforceability or formation of this Guaranty, including any claim of fraud in the inducement or that all or any part of the Guaranty is void or voidable. However, the preceding sentence shall not apply to the clause entitled "Class Action Waiver."

4.3    **Judgment**.  Judgment on an arbitration award may be entered in any court of competent jurisdiction. This judgment is binding, final and non-appealable.

4.4    **Failure to Appear**.  The arbitration and mediation provisions in this Article are self-executing and remain in full force and effect after the expiration or sooner termination of this Guaranty. If either party fails to appear at any properly noticed arbitration proceeding, notwithstanding failing to appear, an award may be entered against that party by default or otherwise.

4.5    **Class Action Waiver**.  Any proceeding (whether mediation, arbitration, trial by a court or jury, appeal or otherwise) must be brought in the parties' individual capacity and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff or similar proceeding ("Class Action"). Personal Guarantor and Franchisor expressly waive any ability to maintain any Class Action in any forum. Further, an arbitration proceeding between Franchisor and Personal Guarantor (or any of Franchisee's or Franchisor's affiliates and owners and guarantors) may not be consolidated with any

other arbitration proceeding between them and any other franchisee, person or entity. Personal Guarantor hereby agrees not to seek joinder of any of its claims with those of any other party. The arbitrator shall not have authority to combine or aggregate similar claims or conduct any Class Action nor make an award to any person or entity not a party to the arbitration. Any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. PERSONAL GUARANTOR AND FRANCHISOR UNDERSTAND THAT FRANCHISOR WOULD HAVE HAD A RIGHT TO LITIGATE THROUGH A COURT, TO HAVE A JUDGE OR JURY DECIDE ITS CASE, AND TO BE PARTY TO A CLASS OR REPRESENTATIVE ACTION. HOWEVER, PERSONAL GUARANTOR AND FRANCHISOR UNDERSTAND AND CHOOSE TO WAIVE THAT RIGHT AND HAVE ANY CLAIMS DECIDED INDIVIDUALLY THROUGH ARBITRATION. It is Personal Guarantor's and Franchisor's joint business judgment that the limitations of this subsection make good business sense, because:

4.5.1    the mediation and arbitration procedures contemplated by this Guaranty (and which Personal Guarantor and Franchisor agree are the core methods for resolving Disputes) function most effectively on an individual case basis;

4.5.2    there are significant business and other factors present in each individual Personal Guarantor's situation which should be respected; and

4.5.3    the economic interests of lawyers on either side in class-wide or multiple plaintiff disputes, as well as the tendency to polarize positions makes accommodation and compromise, as a practical business matter, less easily achieved, which would be a serious detriment to Personal Guarantor's and Franchisor's business interests, as well as those of the entire Franchise System, in quickly, amicably and economically resolving any Dispute.

4.6    **Selection of Venue**.  Nothing contained in this Guaranty shall prevent Franchisor from applying to and obtaining from any court having jurisdiction, a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests. The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Mecklenburg County, North Carolina and the jurisdiction and venue of the United States District Court for the Western District of North Carolina. Personal Guarantor acknowledges that this Guaranty has been entered into in the State of North Carolina, and that Franchisee, whose obligations Personal Guarantor is guaranteeing, is to receive valuable and continuing services emanating from Franchisor's headquarters in Huntersville, North Carolina, including, but not limited to, training, assistance, support and the development of the System. In recognition of such services and their origin, Personal Guarantor hereby irrevocably consents to the personal jurisdiction of the state and federal courts of North Carolina as set forth in this Section.

4.7    **Third Party Beneficiaries**.  Franchisor's officers, directors, shareholders, members, agents and/or employees are express third-party beneficiaries of the provisions of this Guaranty, including the mediation provision set forth in this Section 4, each having authority to specifically enforce the right to mediate and arbitrate claims asserted against such person(s) by Personal Guarantor.

4.8    **Prior Notice of Claims**.  As a condition precedent to commencing an action for damages or for violation or breach of this Guaranty, Personal Guarantor must notify Franchisor within thirty (30) days after the occurrence of the violation or breach, and failure to timely give such notice shall preclude any claim for damages.

4.9     **No Right to Offset**.  Personal Guarantor shall not withhold all or any part of any payment to Franchisor or any of its affiliates on the grounds of Franchisor's alleged nonperformance or as an offset against any amount Franchisor or any of Franchisor's affiliates allegedly may owe Franchisee under this Guaranty or any related agreements.

4.10    **Injunctive Relief**.  The Franchised Business is intended to be one of a large number of businesses identified by the Proprietary Marks selling to the public the Approved Products and Approved Services associated with the Proprietary Marks. Consequently, a single Personal Guarantor's failure to comply with the terms of its franchise agreement is likely to cause irreparable damage to us, and damages at law would therefore be an inadequate remedy. On Personal Guarantor's breach or threatened breach of any of the terms concerning any matters referenced in Section 4.1, we may seek an injunction restraining the breach and/or a decree of specific performance (with recovery of reasonable attorneys' fees and costs incurred in obtaining equitable relief). We may do so without demonstrating or proving any actual damage. These equitable remedies are in addition to all other rights or remedies to which we may otherwise be entitled because of Personal Guarantor's breach of this Guaranty. We may seek this relief without posting any bond or security. However, if a court of competent jurisdiction requires a bond or security, a bond or security for $1,000 is sufficient. Notwithstanding anything in this Guaranty to the contrary, Franchisor may seek injunctive relief in any jurisdiction that has jurisdiction over Personal Guarantor or any other party against whom the relief is sought. If injunctive relief is granted, Personal Guarantor's only remedy will be the court's dissolution of the injunctive relief. If the injunctive relief was wrongfully issued, Personal Guarantor expressly waives all claims for damages Personal Guarantor incurred as a result of the wrongful issuance.

5.      **Jurisdiction and Venue**.  Nothing contained in this Guaranty shall prevent Franchisor from applying to and obtaining from any court having jurisdiction, a writ of attachment, a temporary injunction, preliminary injunction, and/or other emergency relief available to safeguard and protect Franchisor's interests. The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Mecklenburg County, North Carolina and the jurisdiction and venue of the United States District Court for the Western District of North Carolina. The parties acknowledge and agree that this Guaranty has been entered into in the State of North Carolina, and that Franchisee, whose obligations Personal Guarantor is guaranteeing, is to receive valuable and continuing services emanating from Franchisor's headquarters in Huntersville, North Carolina, including, but not limited to, training, assistance, support and the development of the System. In recognition of such services and their origin, you hereby irrevocably consent to the personal jurisdiction of the state and federal courts of North Carolina as set forth herein.

6.      **Jury Trial Waiver**.  **THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT. THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS PERSONAL GUARANTY OR THE FRANCHISE AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR YOUR PURCHASE FROM FRANCHISOR OF THE FRANCHISE, OPTION AND/OR ANY PRODUCTS OR SERVICES.**

7.      **Waiver of Punitive Damages**.  You waive, to the fullest extent permitted by law, any right to, or claim for, any punitive, exemplary, incidental, indirect, special or consequential damages (including,

without limitation, lost profits) which you may have against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agree that in the event of a Dispute, your recovery shall be limited to actual damages. If any other term of this Guaranty is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.

8.     **Limitation on Action**.  You agree that no cause of action arising out of or under this Guaranty or the Franchise Agreement may be maintained by you unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after you become aware of facts or circumstances reasonably indicating that you may have a claim against the Franchisor, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense or set-off. Notwithstanding anything to the contrary contained herein, all actions will be conducted on an individual, not a class-wide, basis and any proceeding between you, Franchisee, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

9.     **Attorneys' Fees**.  If the undersigned is in breach or default of any monetary or non-monetary material obligation under the Franchise Agreement or this Guaranty, or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs. If the undersigned or Franchisee institutes any legal action to interpret or enforce the terms of this Guaranty or the Franchise Agreement, and the claim(s) in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

10.     **Nonwaiver**.  Franchisor's failure to insist upon strict compliance with any provision of this Guaranty and the Franchise Agreement shall not be a waiver of Franchisor's right to do so, any law, custom, usage or rule to the contrary notwithstanding. Delay or omission by Franchisor respecting any breach or default shall not affect Franchisor's rights respecting any subsequent breaches or defaults. All rights and remedies granted in this Guaranty shall be cumulative. Franchisor's election to exercise any remedy available by law or contract shall not be deemed a waiver or preclude exercise of any other remedy.

11.     **Severability**.  The parties agree that if any provisions of this Guaranty may be construed in two ways, one of which would render the provision illegal or otherwise voidable or unenforceable and the other which would render it valid and enforceable, such provision shall have the meaning that renders it valid and enforceable. The language of all provisions of this Guaranty shall be construed according to fair meaning and not strictly construed for or against either party. The provisions of this Guaranty are severable, and this Guaranty shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein, and partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable. If any material provision of this Guaranty shall be stricken or declared invalid, the parties agree to negotiate mutually acceptable substitute provisions. In the event that the parties are unable to agree upon such provisions, Franchisor reserves the right to terminate this Guaranty.

12.     **Construction of Language**.  Any term defined in the Franchise Agreement that is not defined in this Guaranty will be ascribed the meaning given to it in the Franchise Agreement. The language

of this Guaranty will be construed according to its fair meaning, and not strictly for or against either party. All words in this Guaranty refer to whatever number or gender the context requires. If more than one party or person is referred to as you, their obligations and liabilities must be joint and several. Headings are for reference purposes and do not control interpretation.

13.    **Successors**.   References to "Franchisor" or "the undersigned," or "you" include the respective parties' successors, assigns or transferees.

14.    **No Personal Liability**.   You agree that fulfillment of any and all of Franchisor's obligations written in this Guaranty or in the Franchise Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee or you for any reason.

IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS GUARANTY TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.

**PERSONAL GUARANTOR:**          **SPOUSE:**

_____          _____
Joel Senger, Individually          Amy Senger, Individually

**EXHIBIT B**
**TO**
**A1 KITCHEN & BATH FRANCHISING, LLC**
**FRANCHISE AGREEMENT**

## CONDITIONAL ASSIGNMENT OF FRANCHISEE'S TELEPHONE NUMBERS, FACSIMILE NUMBERS AND DOMAIN NAMES

1.        Joel Senger                                                           , doing business as a A1 Kitchen & Bath Franchising, LLC franchisee ("Assignor"), in exchange for valuable consideration provided by A1 Kitchen & Bath Franchising, LLC ("Assignee"), receipt of which is hereby acknowledged, hereby conditionally assigns to Assignee all telephone numbers, facsimile numbers, domain names, as well as any listings associated therewith, utilized by Assignor in the operation of its Franchised Business at Assignor's above-referenced address (the "Assigned Property"). The Assigned Property includes the following:

Telephone Number(s): _____

Facsimile Number(s): _____

Domain/Social Media Name(s) (as permitted by Franchisor under the Franchise Agreement): _____

2.        This Conditional  Assignment of Franchisee's Telephone Numbers and Domain Names ("Assignment") will become effective automatically upon termination or expiration of Assignor's franchise. Upon the occurrence of that condition, Assignor must do all things required by the telephone company and/or domain name registrar to assure the effectiveness of the assignment of Assigned Property as if the Assignee had been originally issued such Assigned Property and the usage thereof.

3.        Assignor agrees to pay the telephone company and/or domain name registrar, on or before the effective date of assignment, all amounts owed for the use of the Assigned Property up to the date this Assignment becomes effective. Assignor further agrees to indemnify Assignee for any sums Assignee must pay the telephone company to effectuate this Assignment and agrees to fully cooperate with the telephone company and/or domain name registrar, as well as Assignee, in effectuating this Assignment.

**ASSIGNOR:**                                         **ASSIGNEE:**

                                                            **A1 KITCHEN & BATH FRANCHISING, LLC**


_____        _____
                                                            Jeffrey R. Dudan, President

Date: _____        Date: _____

Case 3:25-cv-00261-MOC-DCK     Document 1-1     Filed 04/15/25     Page 73 of 169

**EXHIBIT C**
**TO**
**A1 KITCHEN & BATH FRANCHISING, LLC**
**FRANCHISE AGREEMENT**

**CONFIDENTIALITY AND RESTRICTIVE COVENANT AGREEMENT**
*(for trained employees, shareholders, officers, directors, general partners, members and managers of Franchisee)*

In consideration of my being a _____ of _____ (the "Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I hereby acknowledge and agree that Franchisee, has acquired the right and franchise from A1 Kitchen & Bath Franchising, LLC (the "Company") to establish and operate a franchised business (the "Franchised Business") and the right to use, in the operation of the Franchised Business, the Company's trade names, trademarks and service marks (the "Proprietary Marks") and the Company's unique and distinctive format and system relating to the establishment and operation of Franchised Businesses (the "System"), as they may be changed, improved and further developed from time to time in the Company's sole discretion, only at the following authorized and approved location: _____ _____ (the "Franchised Business Premises").

1.      The Company possesses certain proprietary and confidential information and trade secrets relating to the operation of the System and the Franchised Business, including the Company's Manuals; price lists and standards and specifications for the Approved Products and Approved Services; standards and specifications related to the Company's integrated bookkeeping system, and other methods, techniques and know-how concerning the of operation of the Franchised Business which may be communicated to Franchisee or of which I may be apprised by virtue of my employment with Franchisee ("Confidential Information").

2.      Any and all information, knowledge, know-how and techniques which the Company specifically designates as confidential shall be deemed to be Confidential Information for purposes of this Confidentiality and Restrictive Covenant Agreement ("Agreement").

3.      In my position with the Franchisee, the Company and Franchisee will disclose the Confidential Information to me in furnishing to me the training program and subsequent ongoing training, the Company's Operations Manual (the "Operations Manual"), and other general assistance during the term of this Agreement.

4.      I will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Franchised Business during the term hereof, and the use or duplication of the Confidential Information for any use outside the System would constitute an unfair method of competition.

5.      The Confidential Information is proprietary, involves trade secrets of the Company, and is disclosed to me solely on the condition that I agree, and I do hereby agree, that I shall hold in strict confidence all Confidential Information and all other information designated by the Company as confidential. Unless the Company otherwise agrees in writing, I will disclose and/or use the Confidential Information only in connection with my duties with the Franchisee, and will continue to not disclose any such information even after I cease to be in that position and will not use any such information even after I cease to be in that position unless I can demonstrate that such information has become generally known or easily accessible other than by the breach of an obligation of Franchisee under the Franchise Agreement.

6.      Except as otherwise approved in writing by the Company, I shall not, while in my position with the Franchisee, for myself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company, own, maintain, engage in, be employed by, or have any interest in any other business which operates or licenses any other competing business(es), except for a Franchised Business operating under the System and Proprietary Marks.

7.      I agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an un-appealed final decision to which the Company is a party, I expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

8.      I understand and acknowledge that the Company shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without my consent, effective immediately upon receipt by me of written notice thereof, and I agree to comply forthwith with any covenant as so modified.

9.      The Company is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with the Franchisee. I am aware that my violation of this Agreement will cause the Company and the Franchisee irreparable harm; therefore, I acknowledge and agree that the Franchisee and/or the Company may apply for the issuance of an injunction preventing me from violating this Agreement, and I agree to pay the Franchisee and the Company all the costs it/they incur(s), including, without limitation, legal fees and expenses, if this Agreement is enforced against me. Due to the importance of this Agreement to the Franchisee and the Company, any claim I have against the Franchisee or the Company is a separate matter and does not entitle me to violate, or justify any violation of this Agreement.

10.      This Agreement shall be construed under the laws of the State of North Carolina. The only way this Agreement can be changed is in writing signed by both the Franchisee and me.

_____
Employee

Date: _____

**ACKNOWLEDGED BY FRANCHISEE:**

By: _____

Name: _____

**EXHIBIT D**
**TO**
**A1 KITCHEN & BATH FRANCHISING, LLC**
**FRANCHISE AGREEMENT**

**ELECTRONIC FUNDS WITHDRAWAL AUTHORIZATION**

Bank Name:

ABA#:

Acct. No.:

Acct. Name:

   Effective as of the date of the signature below, _____ ("Franchisee"), hereby authorizes A1 Kitchen & Bath Franchising, LLC ("Company") or its designee to withdraw funds from the above-referenced bank account, electronically or otherwise, and to make the following payments to Company under the Franchise Agreement for the Franchised Business located at: _____: (i) all Royalty Fees; (ii) all Brand Fund Contributions, Technology Fees, Call Center Fees or other recurring fees; and (iii) any other fees due and owing under the Franchise Agreement. Franchisee acknowledges that Royalty Fees and all other fees may be collected by Franchisor in the manner provided for in the Franchise Agreement. Such withdrawals shall occur on a monthly basis, or on such other schedule as Company shall specify in writing. Company is also authorized to deposit the Gross Revenue of Franchisee's Franchised Business, less all amounts due under the Franchise Agreement, into the above-referenced account, electronically or otherwise. Such deposits shall occur on a monthly basis, or on such other schedule as Company shall specify in writing.

   This authorization shall remain in full force and effect until terminated in writing by Company. Franchisee shall provide Company, in conjunction with this authorization, a voided check from the above-referenced account.

**AGREED:**

**FRANCHISEE:**

Date: _____

**EXHIBIT E**
**TO**
**A1 KITCHEN & BATH FRANCHISING, LLC**
**FRANCHISE AGREEMENT**

## SITE SELECTION ADDENDUM

A1 Kitchen & Bath Franchising, LLC, a North Carolina limited liability company with a principal business address at 107 Parr Drive, Huntersville, North Carolina 28078 ("Franchisor") and Joel Senger ("Franchisee"), have on October 20, 2023 (the "Effective Date"), entered into the foregoing Franchise Agreement for the operation of a franchised business using Franchisor's Proprietary Marks and System (the "Franchised Business") and desire to supplement its terms, as set forth below. The parties therefore agree as follows:

1.      Within sixty (60) days after the Effective Date of the Franchise Agreement, Franchisee must obtain a site, at Franchisee's expense, for the Franchised Business, which Franchisor will approve as hereinafter provided. The site must be within the Designated Territory set forth in the Data Sheet of the Franchise Agreement.

2.      Franchisee's failure to obtain a site for the Franchised Business within the time required in Paragraph 1 will constitute a default under the Franchise Agreement and this Site Selection Addendum ("Addendum"). Time is of the essence.

3.      Prior to Franchisee's acquisition by lease or purchase of a site for the Franchised Business, Franchisee must submit to Franchisor, in the form Franchisor specifies, a completed site review form, such other information or materials as Franchisor may reasonably require, and a letter of intent or other evidence satisfactory to Franchisor that confirms Franchisee's favorable prospects for obtaining the proposed site. Recognizing that time is of the essence, Franchisee must submit a proposed site, together with the information and materials required by this Paragraph 3, to Franchisor for Franchisor's approval within thirty (30) days after execution of the Franchise Agreement. Franchisor will have thirty (30) days after receipt of such information and materials from Franchisee to approve or disapprove, in Franchisor's sole discretion, the site as a location for the Franchised Business. No proposed site will be deemed approved unless Franchisor has expressly approved it in writing.

4.      Franchisor will furnish to Franchisee such site selection guidelines, consultation and on-site evaluation as Franchisor deems advisable as part of Franchisor's evaluation of Franchisee's request for site approval. Franchisor will not, however, provide on-site evaluation for any proposed site prior to Franchisor's receipt of the information and materials required by Paragraph 3 hereof. If Franchisor deems on-site evaluation necessary and appropriate, Franchisor will conduct one (1) on-site evaluation at Franchisor's cost. For each additional on-site evaluation (if any), Franchisee will reimburse Franchisor for Franchisor's expenses, including, without limitation, the costs of travel, lodging and meals.

5.      If Franchisee will be occupying the Franchised Business premises under a lease, Franchisee shall, upon Franchisor's request, prior to the execution of the lease, submit the lease to Franchisor for Franchisor's approval. Franchisor's approval of the lease may be conditioned upon Franchisee's execution of a Collateral Assignment of Lease in the form Franchisor prescribes, as well as the inclusion or exclusion of certain required provisions. Franchisee must furnish Franchisor with a copy of any executed lease within ten (10) days after execution thereof.

© 2023 A1 Kitchen & Bath Franchising, LLC
2023 FDD 1 v1F

6.      After Franchisor has approved a site for the Franchised Business in writing and Franchisee has acquired the site, the site will constitute the Approved Location referred to in Section 1.3 of the Franchise Agreement.

7.      Franchisee hereby acknowledges and agrees that Franchisor's approval of a site does not constitute an assurance, representation or warranty of any kind, express or implied, as to the suitability of the site for the Franchised Business or for any other purpose. Franchisor's approval of the site indicates only that Franchisor believes the site complies with acceptable minimum criteria established by Franchisor solely for Franchisor's purposes as of the time of the evaluation. Both parties to this Agreement acknowledge the application of criteria that have been effective with respect to other sites and premises may not be predictive of potential for all sites and that, subsequent to Franchisor's approval of a site, demographic and/or economic factors such as competition from other similar businesses included in or excluded from Franchisor's criteria could change, thereby altering the potential of a site. Such factors are unpredictable and are beyond Franchisor's control. Franchisor will not be responsible for the failure of a site approved by Franchisor to meet Franchisee's expectations as to revenue or operational criteria. Franchisee further acknowledges and agrees that Franchisee's acceptance of a franchise for the operation of the Franchised Business at the site is based on Franchisee's own independent investigation of the suitability of the site.

8.      This Addendum constitutes an integral part of the Franchise Agreement between the parties hereto, and the terms of this Addendum will be controlling with respect to the subject matter hereof. Except as modified or supplemented by this Addendum, the terms of the Franchise Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum on the day and year first above written.

**FRANCHISOR:**                                    **FRANCHISEE:**

**A1 KITCHEN & BATH FRANCHISING, LLC**

_____         _____
Jeffrey R. Dudan, President                      Joel Senger, Individually

**EXHIBIT F
TO
A1 KITCHEN & BATH FRANCHISING, LLC
FRANCHISE AGREEMENT**

**<u>STATEMENT OF OWNERSHIP</u>**

**Franchisee:**  Joel Senger

**Form of Ownership
(Check One)**

☒  Individual        ☐  Sole Proprietorship        ☐  Limited Liability Company

☐  Corporation      ☐  General Partnership          ☐  Limited Partnership

If a **Partnership**, provide name and address of each partner showing percentage owned, whether active in management, and indicate the state in which the partnership was formed.

If a **Corporation**, provide the state and date of incorporation, the names and addresses of each officer and director, and list the names and addresses of every shareholder showing what percentage of stock is owned by each.

If a **Limited Liability Company**, provide the state and date of formation, the name and address of the manager(s), and list the names and addresses of every member and the percentage of membership interest held by each member.

State and Date of Formation/Incorporation: _____

**Management (managers, officers, board of directors, etc.):**

| Name | Title |
|------|-------|
|      |       |
|      |       |
|      |       |
|      |       |

**Members, Stockholders, Partners:**

| Name | Address | Percentage Owned |
|------|---------|------------------|
|      |         |                  |
|      |         |                  |
|      |         |                  |

DocuSign Envelope ID: B3A3CF6E-8B79-4A16-8EA1-306117754EFF

**Identification of Managing Owner**.  Your managing owner as of the Effective Date is _____ _____.  You  may  not  change  the  managing  owner without prior written approval.

**Identification of Designated Manager**.  Your Designated Manager, if applicable, as of the Effective Date is _____.  You  may  not  change the Designated Manager without prior written approval.

This form is current and complete as of October 20, 2023.

**FRANCHISEE:**

DocuSigned by:

_____
6F8E03E9D8E64E4

Joel Senger, Individually

**EXHIBIT G**
**TO**
**A1 KITCHEN & BATH FRANCHISING, LLC**
**FRANCHISE AGREEMENT**

**COLLATERAL ASSIGNMENT OF LEASE**

Landlord: _____          A1 Kitchen & Bath Franchising, LLC
                                                          Notice Address:  107 Parr Drive
Notice Address: _____          Huntersville, NC 28078

_____

_____

Telephone: _____

Tenant: _____

Leased Premises: _____

      1.    <u>Use</u>. Tenant is a franchisee of Franchisor. The Leased Premises shall be used only for the operation of a The Designery business (or any name authorized by Franchisor).

      2.    <u>Notice of Default and Opportunity To Cure</u>. Landlord shall provide Franchisor with copies of any written notice of default ("<u>Default</u>") given to Tenant under the Lease, and Landlord grants to Franchisor the option (but not the obligation) to cure any Default under the Lease (should Tenant fail to do so) within ten (10) days after the expiration of the period in which Tenant may cure the Default.

      3.    <u>Termination of Lease</u>. Landlord shall copy Franchisor on any notice of termination of the Lease. If Landlord terminates the Lease for Tenant's Default, Franchisor shall have the option to enter into a new Lease with Landlord on the same terms and conditions as the terminated Lease. To exercise this option, Franchisor must notify Landlord within fifteen (15) days after Franchisor receives notice of the termination of the Lease.

      4.    <u>Termination of Franchise Agreement</u>. If the Franchise Agreement between Franchisor and Tenant is terminated during the term of the Lease, then upon the written request of Franchisor, Tenant shall assign the Lease to Franchisor. Landlord hereby consents to the assignment of the Lease to Franchisor.

      5.    <u>Assignment and Subletting</u>. Notwithstanding any provision of the Lease to the contrary, Tenant shall have the right to assign or sublet the Lease to Franchisor, provided that no such assignment or sublease shall relieve Tenant or any guarantor of liability under the Lease. If Franchisor becomes the lessee of the Leased Premises, then Franchisor shall have the right to assign or sublease its lease to a franchisee of the The Designery brand.

      6.    <u>Authorization</u>. Tenant authorizes Landlord and Franchisor to communicate directly with each other about Tenant and Tenant's business.

7.     <u>Right to Enter</u>. Upon the expiration or termination of the Franchise Agreement or the Lease, or the termination of Tenant's right of possession of the Leased Premises, Franchisor or its designee may, after giving reasonable prior notice to Landlord, enter the Leased Premises to remove signs and other material bearing Franchisor's brand name, trademarks and commercial symbols, provided that Franchisor will be liable to Landlord for any damage Franchisor or its designee causes by such removal.

8.     <u>No Liability</u>. By executing this Collateral Assignment of Lease, Franchisor does not assume any liability with respect to the Leased Premises or any obligation as Tenant under the Lease.

Executed by:

**LANDLORD:**

By: _____

Name: _____

Title: _____

Date: _____

**TENANT:**

By: _____

Name: _____

Title: _____

Date: _____

**FRANCHISOR:**

**A1 KITCHEN & BATH FRANCHISING, LLC**

_____

Jeffrey R. Dudan, President

Date: _____

**EXHIBIT H**
**TO**
**FRANCHISE AGREEMENT**

**FRANCHISOR DIRECTED ADVERTISING SERVICES AGREEMENT**

This Franchisor Directed Advertising Services Agreement ("FDASA") is entered into as of October 20, 2023, by and between A1 Kitchen & Bath Franchising, LLC, a North Carolina limited liability company, with its principal place of business at 107 Parr Drive, Huntersville, North Carolina 28078 ("we," "us," "our" or "Franchisor") and Joel Senger, an individual residing in the State of Kentucky with an address at 241 N Colony Dr., Edgewood, Kentucky 41017 ("you" or "Franchisee").

**RECITALS**

A.     Franchisee and Franchisor are parties to that certain Franchise Agreement dated the date hereof (the "Franchise Agreement").

B.     Pursuant to the terms of the Franchise Agreement, Franchisee is required to pay for Local Advertising Services (defined below) from Franchisor.

**AGREEMENT**

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     Any capitalized terms used, but not defined herein, have the same meaning set forth in the Franchise Agreement.

2.     **Term**.  The FDASA will remain in effect indefinitely and will automatically terminate upon the expiration or termination of the Franchise Agreement.

3.     **Default**.  If you are in default of your obligations under the FDASA or the Franchise Agreement, we may suspend some or all of the Local Advertising Services without terminating either agreement. This remedy is in addition to any other remedies we may have at law or in equity.

4.     **Termination**.  We can terminate the FDASA prior to the end of the Term by written notice if: (i) you are in default under the Franchise Agreement or any other agreement with Franchisor or an affiliate of Franchisor; (ii) you are in default under the FDASA and the default continues for a period of ten (10) days after we deliver written notice of default; or (iii) we discontinue the Local Advertising Services under Section 8 of this FDASA.

5.     **Franchisor Directed Advertising Services**.  You and we agree that as Franchisor we have the right, in light of our marketing expertise and research regarding effective advertising of the System: (a) to formulate and design the Local Advertising Services (defined below), including the service options and vendors made available to franchisees from time to time; (b) to develop and control all content for the Local Advertising Services (the "Advertising"); and (c) to determine the uses and distribution of all such Advertising. We have the right to administer each service, as well as other services we elect to offer in the future, which may include appointment generation platforms, billboards, radio ads, etc. We can change or end a service at any time and add new services at any time.

"Local Advertising Services" means our advertising of the The Designery brand and the Services offered under the Proprietary Marks and the System, as conducted in your Designated Territory in coordination with our similar advertising service in the territories of other franchisees and nationally, and includes the several channels and forms of local marketing activities and services that we (or a designated vendor) offer from time to time and perform pursuant to this FDASA, which activities and services may include, but are not limited to: media management, advertising design, digital marketing for generation of customer leads, digital marketing for generation of customer reviews, tracking of leads, performance analytics, production and printing of marketing pieces, list management, mail management, market studies, strategy and analysis, research and development, shipping and delivery to the United States Postal Service or other carrier, other services we offer in our Business Judgment, and related administrative services.

6. **Franchisor Directed Advertising Fee**. For our Local Advertising Services, you agree to pay us or an affiliate we designate a non-refundable fee (the "Franchisor Directed Advertising Fee") in an amount up to the Local Advertising Requirement (currently, the greater of three thousand dollars ($3,000) per month or three percent (3%) of Gross Revenue per month). We reserve the right to designate the timing of payment and to set other policies relating to the Franchisor Directed Advertising Fee, but the fee will continue to be due monthly by the tenth (10th) of the month. For example, although we have no obligation to do so, we may permit you to: (i) vary the monthly payment, subject to satisfaction of the annual amount required; and/or (ii) allocate the required amount among marketing channels that we offer. If not otherwise designated by us, you must pay the Franchisor Directed Advertising Fee at the same time you pay your Royalty Fee under the Franchise Agreement. You must pay the Franchisor Directed Advertising Fee by electronic funds transfer or such other method as we may designate from time to time. We and our affiliates may earn revenue and profits on products or services we provide and may receive rebates, licensing fees, administrative fees, commissions, or other payments on products and services that third-party vendors provide. The Franchisor Directed Advertising Fee is credited to your required monthly Local Advertising Requirement. If local advertising directed by us is paid with a franchisee credit card (or other method of direct payment), all such amounts spent that are directed by us will be credited to the monthly Franchisor Directed Advertising Fee.

7. **Changes to Franchisor Directed Advertising Fee**. We may periodically increase or decrease the Franchisor Directed Advertising Fee in an amount we deem appropriate in our Business Judgment, but in no event will that increase cause the Franchisor Directed Advertising Fee to be more than the Local Advertising Requirement. Further, we reserve the right to change the Franchisor Directed Advertising Fee from a dollar amount to a percentage of sales or to any other formula we designate. We will give you thirty (30) days' advance notice by email or other means if we intend to change the Franchisor Directed Advertising Fee pursuant to this Section.

8. **No Guaranteed Results**. We do not represent or warrant that the Local Advertising Services or any individual service will reach a minimum number of persons in your Designated Territory, will reach any specific persons in the Designated Territory, or will produce any particular results for your Franchised Business. We obtain distribution lists and other data from third-party data compilation and demographic information service provider(s) that we and/or our affiliates select. We make no representation or warranty regarding the accuracy of any such lists or other data we use to conduct the Local Advertising Services.

9. **Ownership**. You acknowledge and agree that, as between Franchisor and Franchisee, Franchisor owns all right, title and interest in and to any Advertising created in or for the Local Advertising Services, including all intellectual property rights therein or appurtenant thereto. Franchisee will not acquire any right, title or interest in the Advertising or any portion thereof pursuant to this FDASA or otherwise, other than the right to access and use the Advertising as expressly granted in the Franchise Agreement, subject to the terms and conditions of the Franchise Agreement and this FDASA.

10.     **<u>Discontinuation or Replacement of Local Advertising Services</u>**.  We have the right, in our sole business judgment, to discontinue the Local Advertising Services, in whole or in part, and to require you to pay all or a portion of the amount of the Franchisor Directed Advertising Fee to one or more other services that we establish to supplement or take the place of the Local Advertising Services. In the event that we discontinue the Local Advertising Services or replace it with an entirely new service, we will seek feedback from franchisees, which feedback will be advisory only.

11.     **<u>Assignment</u>**.  The FDASA is fully assignable by Franchisor. Franchisee may not assign the FDASA without the prior written consent of Franchisor.

12.     **<u>Miscellaneous</u>**.   The choice of law, choice of forum/venue, and dispute resolution provisions set forth in the Franchise Agreement apply to the parties' dealings under the FDASA.

**IN WITNESS WHEREOF**, the parties hereto have executed this FDASA by their duly authorized representatives as indicated below.

FRANCHISOR:                                  FRANCHISEE:

**A1 KITCHEN AND BATH FRANCHISING, LLC**

DocuSigned by:                               DocuSigned by:

*Jeffrey Dudan*                              _____
00D0980D147D34C8...                          8F8E03E0D6E04E4...
Jeffrey R. Dudan, President                  Joel Senger, Individually

.

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327



# THE DESIGNERY

# FRANCHISE AGREEMENT

Franchise #:  TD0024

Franchisee:  Joel Senger

Date:  October 20, 2023

Designated Territory:  See map and list of zip codes on page 2 of the Data Sheet to this Franchise Agreement

© 2023 A1 Kitchen & Bath Franchising, LLC
2023 FDD 1 v1F

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

## TABLE OF CONTENTS

**SECTION**                                                                                              **PAGE**

1.    GRANT OF FRANCHISE ................................................................................................ 2
2.    TERM AND RENEWAL ................................................................................................ 5
3.    FEES AND MANNER OF PAYMENT ........................................................................ 6
4.    PROPRIETARY MARKS ............................................................................................ 11
5.    CONFIDENTIAL INFORMATION ........................................................................... 13
6.    FRANCHISOR'S OBLIGATIONS ............................................................................. 15
7.    FRANCHISEE'S OBLIGATIONS .............................................................................. 17
8.    TRAINING .................................................................................................................... 26
9.    INSURANCE ................................................................................................................. 27
10.   FINANCIAL RECORDS AND REPORTS ................................................................ 28
11.   BOOKS AND RECORDS ............................................................................................ 29
12.   ADVERTISING ............................................................................................................ 31
13    INDEPENDENTBUSINESS; INDEMNIFICATION ............................................... 35
14    SALE OR TRANSFER ................................................................................................ 36
15    BREACH AND TERMINATION ............................................................................... 40
16    RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION ................... 44
17    COVENANTS ............................................................................................................... 46
18    DISPUTE RESOLUTION ........................................................................................... 48
19    REPRESENTATIONS .................................................................................................. 52
20    GUARANTEE OF PRINCIPALS AND THEIR SPOUSES .................................... 53
21    NOTICES ...................................................................................................................... 54
22    MISCELLANEOUS ..................................................................................................... 55

EXHIBITS:

Exhibit A    Personal Guaranty and Guaranty of Spouses
Exhibit B    Conditional Assignment of Franchisee's Telephone Numbers, Facsimile Numbers and
             Domain Names
Exhibit C    Confidentiality and Restrictive Covenant Agreement for Employees
Exhibit D    Electronic Funds Withdrawal Authorization
Exhibit E    Site Selection Addendum
Exhibit F    Statement of Ownership
Exhibit G    Collateral Assignment of Lease
Exhibit H    Franchisor Directed Advertising Services Agreement

© 2023 AJ Kitchen & Bath Franchising, LLC
2023 FDD FMF

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327



# DATA SHEET

| | |
|---|---|
| Franchisee: | Joel Senger |
| Guarantors: | Joel Senger |
| | Amy Senger |
| Effective Date: | October 20, 2023 |
| Approved Location: | 241 N Colony Dr., Edgewood, Kentucky 41017 |
| Designated Territory: | See Map and list of zip codes on the following page |
| Telephone Number: | (817) 300-8717 |
| | (682) 597-4677 |
| Email Address: | joel@sengercustomhomes.com |
| | amy@sengercustomhomes.com |
| Initial Franchise Fee: | $94,900.00 (2 Designed Territories Per MUA) |
| Initial Franchisor Directed Advertising Fee: | $9,000.00 (2 Designed Territories Per MUA) |
| Multi-Unit Addendum: | ☒ Yes      ☐ No |

Territory Map and Zip Codes – the "Designated Territory"



**Zip Codes:** 41011, 41014, 41016, 41017, 41018, 41042, 41071, 41073, 41074, 41075, 41091, 45001, 45202, 45203, 45204, 45205, 45206, 45207, 45211, 45214, 45219, 45220, 45223, 45225, 45229, 45233, 45238, and 45248.

In the event of a conflict between the map and zip codes, the zip codes control.

**The terms of this Data Sheet are incorporated into the attached Franchise Agreement.**

# A1 KITCHEN & BATH FRANCHISING, LLC
## FRANCHISE AGREEMENT

This FRANCHISE AGREEMENT (the "Agreement" or "Franchise Agreement") is entered into and made effective on October 20, 2023 (the "Effective Date"), by and between: (i) A1 Kitchen & Bath Franchising, LLC, a North Carolina limited liability company, with its principal place of business at 107 Parr Drive, Huntersville, North Carolina 28078 ("Franchisor"); and (ii) Joel Senger, an individual residing in the State of Kentucky, with an address at 241 N Colony Dr., Edgewood, Kentucky 41017, which is identified more fully in the attached Data Sheet ("Franchisee").

## RECITALS

A.      Through the expenditure of a considerable amount of time, effort and money, Franchisor has developed a system for the operation of franchised businesses under its then-current proprietary marks, currently "THE DESIGNERY$^{SM}$" (each, a "Franchised Business(es)") that offer design and installation services for kitchen, bath and closet projects in new construction and renovation of both residential and commercial buildings, and any services that Franchisor may later designate (collectively, the "Approved Services").

B.      Franchised Businesses are established and operated using Franchisor's proprietary operating system, the distinguishing characteristics of which include: (i) valuable know-how, information, trade secrets and methods; (ii) Franchisor's proprietary standards and specifications for certain products and services used in connection with providing Franchisor's Approved Products and Approved Services to customers; (iii) certain proprietary products developed by Franchisor (the "Approved Products"); (iv) Franchisor's standards and specifications for sales techniques, marketing and advertising programs; (v) proprietary initial and ongoing training programs; and (vi) standards and specifications for operating the Franchised Business in the manner set forth in this Agreement and Franchisor's proprietary and confidential Operations Manual (defined in Section 6.1) that franchisees have access to, which may be modified from time to time by Franchisor (collectively, the "System").

C.      The System is identified by Franchisor's proprietary trademarks, service marks, trade dress, logos and other indicia of origin (collectively, the "Proprietary Marks"). The rights to all such Proprietary Marks as are now, or shall hereafter be, designated as part of the System will be owned exclusively by Franchisor or its affiliates and be used for the benefit of Franchisor, its affiliates, and Franchisor's franchisees to identify to the public the source of the products and services marketed thereunder. Franchisor may continue to develop, expand, use, control, and add to the Proprietary Marks and System for the benefit of itself, its affiliates, and its franchisees and licensees in order to identify for the public the source of products and services marketed thereunder and to represent the System's high standards of quality and service.

D.      Franchisor offers franchises for the development and operation of Franchised Businesses to be operated and promoted within a designated geographical territory (the "Designated Territory").

E.      Franchisee desires to establish and operate a Franchised Business within the Designated Territory hereinafter designated, to use in connection therewith, Franchisor's System and the Proprietary Marks and to derive the benefits of Franchisor's information, experience, advice, guidance and customer goodwill.

F.      Franchisor desires to grant Franchisee the right to open and operate a Franchised Business based on Franchisee's representations to Franchisor, including those representations set forth in Franchisee's franchise application, in accordance with the terms and conditions set forth in this Agreement.

G.     Franchisee recognizes the importance to Franchisor, to its other franchisees and to the public of maintaining the integrity, standards, qualities and attributes of products and services associated with the Proprietary Marks and System, and is willing to adhere to certain uniform standards, procedures and policies to maintain such integrity, standards, qualities and attributes.

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual promises, commitments and understandings contained herein, Franchisor and Franchisee hereby agree as follows:

## 1.     GRANT OF FRANCHISE

1.1.     **Grant and Acceptance**.  Franchisor hereby grants to Franchisee, upon the express terms and conditions contained in this Agreement, and Franchisee hereby accepts, a non-exclusive license to establish and operate one (1) Franchised Business, under the System and Proprietary Marks identified below, and the right to use the System and Proprietary Marks in the operation of the Franchised Business. Except as otherwise provided in this Agreement, Franchisee may offer and sell only Franchisor's Approved Products and Approved Services within the Designated Territory set forth in Section 1.2 of this Agreement and the Data Sheet. Franchisee must request permission to provide additional new Products and Approved Services from Franchisor, which permission Franchisor may grant, deny, or condition in its sole discretion. In addition, Franchisee may provide Franchisor's Approved Products and Approved Services in adjacent territories (as those are determined by Franchisor) if permitted by and subject to the terms and conditions set forth in the Operations Manual (defined in Section 6.1). Franchisor has the right to supplement, improve or otherwise modify the System from time to time in Franchisor's discretion, and Franchisee agrees to comply with all changes which may include, without limitation, the offer and sale of new or different products or services as Franchisor may specify. Franchisee acknowledges and agrees that this Agreement does not grant Franchisee the option or right to purchase additional Franchised Businesses and/or additional designated territories.

1.2.     **Designated Territory**.  Except as otherwise provided in this Agreement (and the Operations Manual (defined in Section 6.1)) and for so long as Franchisee is not in default of this Agreement, Franchisor shall not establish and operate, nor license any other third party the right to establish and operate, any Franchised Business under the System and the Proprietary Marks within the protected area identified in the Data Sheet, the terms of which are incorporated herein by reference (the "Designated Territory") during the term of this Agreement. Franchisor and its affiliates retain all other rights, including, without limitation, those rights set forth in Sections 1.4 through 1.8 of this Agreement. Franchisee is permitted to conduct the Franchised Business outside of the Designated Territory in adjacent open territory (i.e., not the Designated Territory of another franchisee) if Franchisee receives Franchisor's prior written consent, and in compliance with our the current Adjacent Territory Policy (described in the Operations Manual). The Adjacent Territory Policy is subject to modification or elimination by a change to the Operations Manual. Franchisee may not operate within another franchisee's Designated Territory, except for certain limited circumstances, if any, that are more fully set forth in the Operations Manual, and other franchisees may operate in Franchisee's Designated Territory, in limited circumstances, if any, as set forth in the Operations Manual. Other than these operations, Franchisee is not permitted to operate or market the Franchised Business outside of the Designated Territory without Franchisor's prior written consent. All sales and other activities conducted within or outside the Designated Territory must be conducted in accordance with the terms of this Agreement and Franchisor's operating methods, standards and specifications as set forth in the Operations Manual (defined in Section 6.1).

1.3.     **Approved Location**.  Franchisee must operate the Franchised Business from a retail showroom that is approved by Franchisor and meets Franchisor's standards and specifications (the "Approved Location"). Franchisee must submit the proposed site of the retail showroom for Franchisor's

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

approval within thirty (30) days of the Effective Date of this Agreement and secure the Approved Location within sixty days (60) days of the Effective Date of this Agreement. Franchisee must lease approximately 500 to 1,500 square feet of commercial real estate for the retail showroom/office and to securely store equipment/inventory. Franchisor may provide Franchisee with standards and specifications for the design and layout of the premises of the Approved Location, and Franchisor must review and approve any proposed location, as well as any lease associated with the proposed location, prior to Franchisee entering into any lease for the proposed location. If Franchisor has not approved a location from which Franchisee must operate the Franchised Business as of the date Franchisee signs this Agreement, the parties will enter into Franchisor's prescribed form of Site Selection Addendum (in the form attached as <u>Exhibit E</u> to this Agreement), the terms of which will govern the parties' site selection obligations. Franchisee may not relocate the Franchised Business without Franchisor's prior written consent.

1.4.     **National Accounts**.  Franchisor will have the exclusive right, on behalf of itself, its affiliate(s), Franchisee, and/or other franchisees utilizing the Proprietary Marks, to negotiate and enter into agreements or approve forms of agreement to provide services to "National Accounts" (defined in Section 1.4.1), including National Accounts that Franchisee has solicited or serviced. Franchisee may not solicit any National Accounts outside of the Designated Territory, or solicit any National Accounts within or outside of the Designated Territory who are already under contract with Franchisor.

1.4.1.     The term "<u>National Account</u>" means any business or businesses under common control, ownership or branding which operate locations in, or deliver products and services beyond, one designated territory, regardless of the volume of products and/or services to be purchased by the customer. Any dispute as to whether a particular customer is a National Account will be determined by Franchisor, in its sole discretion, and Franchisor's determination will be final and binding.

1.4.2.     Franchisee may choose to participate in the National Accounts program ("<u>National Accounts Program</u>") to service National Accounts for which the ultimate client of the National Account is located in the Designated Territory consistent with the then-current National Accounts Program Participation Agreement. Franchisee acknowledges and agrees that Franchisor or a third-party service provider Franchisor designates may begin servicing National Accounts in the Designated Territory if: (i) Franchisor believes that Franchisee is not meeting Franchisor's standards and specifications applicable to the National Accounts Franchisee is servicing or the National Accounts Program generally; (ii) Franchisor believes that Franchisee is in default of this Agreement; (iii) the National Account has requested that Franchisor or a third party it selects service its clients; (iv) Franchisee is not then participating in the National Accounts Program (or is not eligible to participate in the National Accounts Program); (v) Franchisee does not offer or is not authorized by Franchisor or the applicable licensing authority to offer the service to be provided; or (vi) Franchisee refuses to service the National Account.

1.4.3.     Franchisee agrees that neither the direct provision by Franchisor or a franchisee, licensee or designee of Franchisor of services to National Account customers as authorized above, nor Franchisor's contracting with another party to provide such services as authorized above, shall constitute a violation of the grant of license contained in this Agreement or any other provision of this Agreement, even if such services are delivered from a location within the Designated Territory. Franchisee disclaims any right to compensation or consideration for work performed by others in the Designated Territory pursuant to this Section.

1.4.4.     Franchisor has the right to discontinue or terminate a National Account or the entire National Accounts Program. Franchisor may impose any restrictions and/or requirements as a condition to your acceptance of each National Account. Franchisor reserves the right to charge fees on National Account revenue. These fees, if charged, will be a required condition of participating in our National Accounts Program and these fees are subject to change annually. Franchisor may require

Franchisee to conduct thorough background checks on all employees who will service any National Account and may require proof of compliance with this and other requirements at such intervals as Franchisor and/or the National Account dictates.

1.5.    **Reservation of Rights**.  Franchisee acknowledges that, except as otherwise provided in this Agreement, Franchisee's right to provide the Approved Products and Approved Services, and otherwise use the Proprietary Marks and System within the Designated Territory is non-exclusive, and Franchisor and its affiliates expressly reserve the right to: (i) open and operate, and license others the right to open and operate, Franchised Businesses that offer products and use the Proprietary Marks and System at any location outside of the Designated Territory; (ii) open and operate, and license others the right to open and operate, businesses that offer similar products and services to those offered by the Franchised Business under any other mark at any location, within or outside the Designated Territory; (iii) acquire, or be acquired by, any company, including a company operating one or more businesses near the Franchised Business that offer products and services that are the same or substantially similar to the Approved Products and Approved Services; (iv) exercise its rights under Section 1.6 of this Agreement in the events of catastrophe(s); (v) designate and service National Accounts; (vi) service, route, and/or assign any and all customer work orders and inquiries received through Franchisor's Call Center (defined in Section 6.6) in accordance with this Agreement; and (vii) use the Proprietary Marks and System, and license others to use the Proprietary Marks and System to engage in any other activities not expressly prohibited in this Agreement.

1.6.    **Events of Catastrophe**.  Notwithstanding Section 1.4, in the event of a natural disaster or other similar catastrophic situation, as Franchisor determines in its sole discretion, Franchisor, its affiliate(s) and other System franchisees may be permitted to provide support to Franchisee and/or perform work in the Designated Territory, including the provision of labor, materials, equipment, and project management on projects in the Designated Territory, and Franchisee will not be entitled to any proceeds from the provision of these services performed by third parties within the Designated Territory.

1.7.    **Alternate Channels of Distribution**.  Franchisee acknowledges and agrees that certain of Franchisor's or its affiliates' products and services, whether now existing or developed in the future, may be distributed in Franchisee's Designated Territory by Franchisor, Franchisor's affiliates, or other third parties that Franchisor designates, in such manner and through such channels of distribution as Franchisor, in its sole discretion, shall determine. Such alternate channels of distribution will include, but are not limited to, the sale and distribution of the products and services via the Internet and through joint marketing with partner companies under terms and conditions that Franchisor deems appropriate. Franchisee understands that this Agreement grants Franchisee no rights: (i) to distribute Approved Products and Approved Services as described in this Section; or (ii) to share in any of the proceeds received by any such party therefrom.

1.8.    **Right to Service Customers in Designated Territory; Use of Call Center**

1.8.1.    If Franchisor establishes a Call Center (defined in Section 6.6), then Franchisee must ensure that all initial calls made to the Franchised Business are forwarded to the Call Center, which is part of Franchisor's proprietary Call Center. Once a customer's call is routed to the Call Center and assigned to the Franchised Business, Franchisor will route that customer's work to Franchisee if the customer's location (where the work is to be performed) is within the Designated Territory, unless: (i) Franchisor determines that the work is in the nature of an emergency and: (a) Franchisee does not respond to the assignment within a time period Franchisor deems reasonable, in its sole discretion, appropriate under the circumstances; or (b) Franchisee is not able to perform the required services for the customer within a time period Franchisor deems reasonably appropriate, in its sole discretion; (ii) the work is of such a large scope, complexity and/or commercial nature that Franchisor determines, in its sole discretion, that Franchisee is not capable of performing the work requested in accordance with System standards and specifications and/or the prevailing standard of care in the industry for the type of work requested (in which case

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

Franchisor may route the work order to Franchisee and additional franchisees, or other franchisees, or Franchisor's affiliate, for completion); (iii) the work order is mistakenly routed to another franchisee or affiliate-owned business due to either the customer providing incorrect information to a Call Center representative or an inadvertent error on the part of the Call Center representative when taking the information from the customer; (iv) Franchisee is not operating the Franchised Business in compliance with this Agreement; or (v) Franchisor reasonably determines that a portion of the Designated Territory has been subjected to a disaster or catastrophe.

      1.8.2.    Franchisee acknowledges and agrees that Franchisor's rights under this Section are necessary to: (i) maintain uniformity across the System and ensure that all work performed under the Proprietary Marks meets Franchisor's System standards for customer service; and (ii) account for inadvertent mistakes by Franchisor's customers and Franchisor's Call Center. Franchisee further acknowledges that it does not have any right to share in the Gross Revenue generated from customers that are serviced within the Designated Territory unless Franchisee is assigned, and subsequently provides services to, such customers.

## 2. TERM AND RENEWAL

    2.1.    **Term**.  The initial term of the Franchise is for a period of ten (10) years, which will commence on the date Franchisor executes this Agreement.

    2.2.    **Renewal**.  Franchisee has the right to renew this Agreement for one (1) successive, additional ten (10)-year period, provided Franchisee has met the following conditions:

      2.2.1.    Franchisee has notified Franchisor of Franchisee's intention to renew this Agreement in writing at least twelve (12) months, and no more than eighteen (18) months, prior to expiration of the current term;

      2.2.2.    Franchisee has demonstrated to Franchisor's satisfaction that Franchisee has the right to operate the Franchised Business at the Approved Location for the duration of the renewal term; or, if Franchisee is unable to operate the Franchised Business at the Approved Location, Franchisee has secured a substitute location within the Designated Territory acceptable to Franchisor;

      2.2.3.    Franchisee has completed to Franchisor's satisfaction, prior to the expiration of the then-current term, any updates to all required equipment, supplies, inventory, hardware and software, and vehicles to bring the Franchised Business into full compliance with Franchisor's then-current System standards and specifications, and Franchisee has completed all maintenance, refurbishing, renovating, updating and remodeling of the Franchised Business's Approved Location so that it satisfies Franchisor's then-current standards;

      2.2.4.    Franchisee is not in breach of any provision of this Agreement or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, or Franchisor's approved/designated suppliers and vendors, and Franchisee has substantially complied with all such agreements during their respective terms;

      2.2.5.    Franchisee has satisfied all monetary obligations Franchisee owes Franchisor, Franchisor's affiliates, and Franchisor's approved/designated suppliers and vendors, and has timely met these obligations throughout the term of this Agreement;

      2.2.6.    Franchisee executes Franchisor's then-current form of franchise agreement, the terms of which may vary materially from the terms of this Agreement (which may include, without

limitation, increased royalty and other fees and insurance requirements), at least three (3) months prior to the expiration of this Agreement;

2.2.7.    Franchisee satisfies Franchisor's then-current training requirements for renewing franchisees at Franchisee's expense, if any, as of the date of such renewal, and Franchisee has otherwise obtained and maintained all licenses, permits and approvals required by federal and state law applicable to providing the Approved Products and Approved Services at any location within the Designated Territory;

2.2.8.    Franchisee and its principals execute a general release in the form Franchisor prescribes; and

2.2.9.    Franchisee pays a renewal fee in the amount of five thousand dollars ($5,000).

2.3.    **Holdover Period**.  If this Agreement expires without Franchisee properly exercising its renewal right and Franchisee continues to accept the benefits of this Agreement thereafter, then, at Franchisor's option, Franchisor may treat this Agreement either as: (i) expired as of the date of expiration, with Franchisee then illegally operating a franchise in violation of Franchisor's rights; or (ii) continued on a month-to-month basis (the "Holdover Period") until both parties agree to enter into Franchisor's then-current form of franchise agreement for a renewal term or until one party provides the other with written notice of termination, in which case the Holdover Period will terminate thirty (30) days after receipt of the notice of termination. In the latter case, all of Franchisee's obligations shall remain in full force and effect during the Holdover Period as if this Agreement had not expired, except that the license fee during the Holdover Period will be increased to ten percent (10%) of Gross Revenue for all types of products/services and without any reductions. All obligations and restrictions imposed on Franchisee upon expiration of this Agreement shall take effect upon termination of the Holdover Period.

3.    **FEES AND MANNER OF PAYMENT**

3.1.    **Initial Franchise Fee**.  In consideration of the franchise granted to Franchisee by Franchisor, Franchisee must pay Franchisor a lump sum initial franchise fee set forth on the Data Sheet that is part of this agreement (the "Initial Franchise Fee"), which is due at the signing of this Agreement and deemed fully earned and non-refundable upon payment, in consideration of administrative and other expenses Franchisor incurs in granting the franchise and for Franchisor's lost or deferred opportunity to franchise to others.

3.1.1.    *Elevate to Owner Program Discount*.  Franchisor offers a discounted Initial Franchise Fee for the first Franchised Business to qualified employees of a franchisee who: (i) has been recommended by a System franchisee; (ii) has been employed by a System franchisee for at least two (2) years; and (iii) otherwise qualifies to be Franchisor's franchisee. The discount is based upon years of service with one of Franchisor's franchisees and is calculated as follows:

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

| Discount on Initial Franchise Fee | Years of Consecutive Employment With Franchisee |
|---|---|
| 10% | 2 |
| 15% | 3 |
| 20% | 4 |
| 25% | 5+ |

Discounts under the Elevate to Owner Program will be applied to the Initial Franchise Fee for Franchisee's first Franchised Business only and the discount shall be calculated after any third-party broker fees are deducted, if any.

3.2. **Royalty Fee**. Franchisee must pay Franchisor a monthly royalty fee (the "Royalty Fee") deducted on the tenth (10th) business day of the following month for the prior month in an amount equal to the greater of: (i) the Royalty Fee (as delineated in Section 3.2.1 below); or (ii) the minimum royalty fee ("Minimum Royalty Fee"), as described in Section 3.2.2 below.

3.2.1. *Royalty Fee Structure.* Franchisee's Royalty Fee is calculated as follows:

| Monthly Royalty | Gross Revenue for Prior Month |
|---|---|
| 7.0% | $0.00 - $75,000.00 |
| 6.0% | $75,000.01 - $150,000.00 |
| 5.0% | $150,000.01+ |

3.2.2. *Minimum Monthly Royalty Fee.* Franchisee's Minimum Monthly Royalty Fee for one (1) Designated Territory is based upon the number of months the Franchised Business has been open and operating. Franchisee is considered "open and operating" on the date that Franchisee completes the Initial Training Program (defined in Section 8.1). The Minimum Monthly Royalty Fee is as follows:

| Time of Operation | 1 Designated Territory |
|---|---|
| First 3 Months | The Royalty Fee (5-7% of Gross Revenue) |
| 4 to 12 Months | $250 |
| Second Year | $550 |
| Third Year + | $850 |

However, Franchisee will not be subject to a Minimum Royalty Fee during the first three (3) months of operation on the condition that Franchisee strictly complies with all of its obligations during the first three (3) months of operation.

3.2.3. *Special Programs.* Franchisor reserves the right, but not the obligation, to establish special programs that reward franchisees for meeting certain criteria. In the event Franchisor establishes

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

any special programs, Franchisor will have the right, in Franchisor's sole discretion, to change, modify or dissolve any special programs upon notice to Franchisee.

   3.2.4.   *Conversion Roll-In Discount for Existing Businesses*.  If Franchisee has an existing business that is the same or similar to a Franchised Business with annual gross sales of at least $500,000 and Franchisee agrees to convert the existing business into a Franchised Business, Franchisor will discount Franchisee's Royalty Fee for the initial period of operation. The Royalty Fee will be calculated as follows:

| Months of Operation | Royalty Fee |
| --- | --- |
| Months 1-4 | 25% of then-current Royalty Fee |
| Months 5-8 | 50% of then-current Royalty Fee |
| Months 9-12 | 75% of then-current Royalty Fee |
| Months 12+ | The then-current Royalty Fee |

   After the initial 12-month period, Franchisee shall pay the Royalty Fee as set forth in Section 3.2 of this Agreement.

   3.3.   **Gross Revenue Definition and Reports**.  For purposes of this Agreement, "Gross Revenue" is defined to include all income of any type or nature and from any source that Franchisee derives or receives directly or indirectly from, through, by, or on account of the operation of the Franchised Business (whether or not the products/services are approved by the Franchisor) at any time after the signing of the Franchise Agreement, in whatever form and from whatever source, including, but not limited to, cash, services in kind from barter and/or exchange, on credit or otherwise, and convenience, credit card user, or other fees charged to a customer, as well as business interruption insurance proceeds, all without deduction for expenses, including marketing expenses and taxes. Exclusions do not include reductions for financing program fees, credit card convenience fees or user fees, or any other fees charged to a customer). However, the definition of Gross Revenue does not include sales tax that is collected from customers and actually transmitted to the appropriate taxing authorities or any bona fide refunds you make to customers in the ordinary course of business. We reserve the right to modify our policies and practices regarding revenue recognition, revenue reporting, and the inclusion or exclusion of certain revenue from Gross Revenue as circumstances, business practices, and technology change.

   Franchisee must send Franchisor a signed report ("Gross Revenue Report(s)") on or before the tenth (10th) day of each month for the immediately preceding calendar month, in the manner and form specified by Franchisor. Each Gross Revenue Report must set forth: (i) Franchisee's Gross Revenue generated during the previous calendar month; (ii) Franchisee's calculation of the Royalty Fee and Brand Fund Contribution (defined in Section 3.5); and (iii) any other information Franchisor may require. Franchisor may change the form, content and/or interval of the Gross Revenue Report from time to time and/or require Franchisee to submit Gross Revenue Reports upon notice to Franchisee.

   3.4.   **Method of Payment**.  With the exception of the Initial Franchise Fee, Franchisee shall pay all fees and other amounts due to Franchisor and/or its affiliates under this Agreement through an electronic funds transfer program (the "EFT Program"), under which Franchisor automatically deducts all payments owed to Franchisor under this Agreement or any other agreement between Franchisor and Franchisee or its affiliates from the bank account Franchisee provides to Franchisor for use in connection with the EFT Program (the "EFT Account"). Franchisee shall immediately deposit all revenues from operation of the Franchised Business into this bank account within two (2) days upon receipt, including cash, checks and credit card receipts. At least ten (10) days prior to opening the Franchised Business, Franchisee shall provide

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

Franchisor with: (i) Franchisee's bank's name, address and account number; and (ii) a voided check from such bank account. Contemporaneous with the execution of this Agreement, Franchisee shall sign and provide to Franchisor and Franchisee's bank, all documents, including Franchisor's form of EFT Withdrawal Authorization Form in the form attached as <u>Exhibit D</u> to this Agreement, necessary to effectuate the EFT Program and Franchisor's ability to withdraw funds from such bank account via electronic funds transfer ("<u>EFT</u>"). Franchisee shall immediately notify Franchisor of any change in Franchisee's banking relationship, including any change to the EFT Account. Franchisor reserves the right to require Franchisee to pay any fees due under this Agreement or any other agreement related to the Franchised Business by such other means as Franchisor may specify from time to time, including, but not limited to, a requirement to use a specific payment processor from whom Franchisor or its affiliate may collect fees at the time of such payment. If any Gross Revenue Report has not been received within the required time period, then Franchisor may process an EFT for the subject month based on the most recent Gross Revenue Report provided by Franchisee to Franchisor, provided, that if a Gross Revenue Report for the subject month is subsequently received and reflects: (i) that the actual amount of the fee due was more than the amount of the EFT, then Franchisor may withdraw additional funds through an EFT from Franchisee's designated bank account for the difference; or (ii) that the actual amount of the fee due was less than the amount of the EFT, then Franchisor shall credit the excess amount to the payment of Franchisee's future obligations. If any check or electronic payment is not successful due to insufficient funds, stop payment or any similar event, any excess amounts that Franchisee owes will be payable upon demand, together with a nonsufficient funds fee of the greater of one hundred dollars ($100) per occurrence or the highest amount allowed by law, plus the lesser of: (i) one and one-half percent (1½%) per month (eighteen percent (18%) per annum); or (ii) the maximum interest rate allowed by law from the due date of payment. Franchisee must also pay Franchisor one hundred dollars ($100) for each week that a payment is paid after the due date, which is in addition to interest. If Franchisee makes any payment to Franchisor or Franchisor's affiliate(s) by credit card for any fee required, Franchisor may charge a payment service fee of up to four percent (4%) of the total charge.

3.5.    **Brand Fund Contribution**.  As set forth more fully in Section 12 of this Agreement, Franchisor has established a brand fund for advertising and brand promotion (the "<u>Brand Fund</u>"). Franchisee shall make monthly Brand Fund Contributions of one percent (1%) of Gross Revenue generated by the Franchised Business for sales made during the immediately preceding calendar month (the "<u>Brand Fund Contribution</u>"). Presently, Brand Fund Contributions are to be paid as directed by Franchisor via the EFT Program on the tenth (10th) business day of each month, or as otherwise required by the Operations Manual (defined in Section 6.1) or in writing by Franchisor. Franchisor will have the right to expend the funds accumulated in the Brand Fund in Franchisor's sole discretion. Notwithstanding the foregoing, Franchisor reserves the right to increase the Brand Fund Contribution at any time upon providing notice to Franchisee, provided that the Brand Fund Contribution will not exceed three percent (3%) of Gross Revenue during the term of this Agreement.

3.6.    **Local Advertising Requirement**.  Franchisee shall expend the greater of: (i) three percent (3%) of Gross Revenue; or (ii) three thousand dollars ($3,000) per month on local advertising (the "<u>Local Advertising Requirement</u>"). Franchisor reserves the right to increase the Local Advertising Requirement to the greater of: (i) four percent (4%) of Gross Revenue; or (ii) four thousand dollars ($4,000) per month upon ninety (90) days' prior written notice. While the Local Advertising Requirement will typically be paid to third parties that Franchisor designates, Franchisor and its affiliate(s) reserve the right to collect this fee or to designate an Approved Supplier that will collect this fee. All or a portion of the Local Advertising Requirement may be allocated to the Franchisor Directed Advertising Fee described in Section 12.5.3 for Local Advertising Services that we provide to you. We and our affiliates may earn revenue and profits on products or services we provide, and may receive rebates, licensing fees, administrative fees, commissions, or other payments on products and services that third party vendors provide. With respect to all Local Advertising Requirement funds you pay to a third party, you are required to provide us with monthly

expense statements (including receipts supporting the reported expenditures) evidencing compliance with the Local Advertising Requirement spending obligations. The Initial Franchisor Directed Advertising Fee in the amount set forth in the Data Sheet must be paid at the signing of this Agreement and deemed fully earned and non-refundable upon payment. The initial Franchisor Directed Advertising Fee (defined in Section 12.5.3) is a credit to that fee for the first two months of the term. The Franchisor Directed Advertising Fee must be paid in the month prior to the month in which the fees will be spent, in an amount up to the greater of $3,000 or three percent (3%) of the prior month's required spend, whichever is greater. Thereafter, in the second month, the Franchisor Directed Advertising Fee must be paid to Franchisor or its designee on or before the tenth (10th) day of the month. If local advertising directed by Franchisor is paid with a franchisee credit card (or other method of direct payment), all such amounts spent that are directed by Franchisor will be credited to the monthly Franchisor Directed Advertising Fee.

3.7.    **Technology Fee**.  In addition to the fees set forth above, Franchisee must pay Franchisor and/or Franchisor's designated vendors the then-current technology fee as set forth in the Operations Manual (defined in Section 6.1) ("Technology Fee") associated with using and maintaining Franchisor's reservation system, intranet, mobile applications, required computer hardware and software, hosting services and solutions, and any other technology used in the operation of the Franchised Business, and such payment shall be made in the manner prescribed by Franchisor or the designated vendor(s), as applicable. Franchisee shall pay the Technology Fee in the same manner as the Royalty Fee and as described in Section 3.4 of this Agreement, or as otherwise set forth in the Operations Manual or in writing by Franchisor. Franchisor reserves the right to change the amount of the fee described in this Section as changes are made to the System's hardware, software and other computer requirements or as required by the third-party service provider(s) or by any regulatory agency upon thirty (30) days' prior written notice to you.

3.8.    **Call Center Fee**.  Franchisor reserves the right to establish a Call Center. If established, Franchisee shall pay Franchisor a call center fee deducted on the tenth (10th) business day after the end of each calendar month for the prior calendar month in an amount up to four percent (4%) of Franchisee's Gross Revenue (the "Call Center Fee").

3.9.    **Late and/or Underpayments and Interest**.  All fee payments, amounts due for purchases by Franchisee from Franchisor and/or its affiliated company(ies), and other amounts which Franchisee owes to Franchisor and/or its affiliated company not received on or before the due date shall be deemed past due. If any payment or contribution is past due, Franchisee shall pay to Franchisor immediately upon demand, in addition to the past due amount, Franchisor's then-current late fee per incident, plus interest on the past due amount from the date it was due until paid at the rate of one and one-half percent (1½%) per month (eighteen percent (18%) per annum), or the maximum rate permitted by law, whichever is less. Nothing contained in this Section shall prevent Franchisor from exercising, in Franchisor's sole judgment, any other rights or remedies available to Franchisor under this Agreement. In addition to the interest set forth above, Franchisee shall also pay Franchisor one hundred dollars ($100) for each week that a payment is paid after the due date.

3.10.    **No Right to Offset**.  Franchisee shall not be entitled to set off any payments required to be made under this Section 3 against any monetary claim it may have against Franchisor.

3.11.    **Non-Exclusive Remedies**.  Franchisor's right to recover interest and late payment fees under this Section shall not prevent Franchisor from obtaining, or otherwise waiving, any other remedy available to Franchisor for Franchisee's breach of this Section as set forth in this Agreement or under applicable law.

3.12. **Taxes on Payments**. In the event any taxing authority, wherever located, imposes any future tax, levy or assessment on any payment Franchisee makes to Franchisor, Franchisee must, in addition to all payments due to Franchisor, pay such tax, levy or assessment.

3.13. **Franchisor's Right of Setoff**. As to Franchisee and/or any affiliate of Franchisee, Franchisor can:

3.13.1. apply any payments received to any past due, current, future or other indebtedness of any kind, in Franchisor's Business Judgment (defined in Section 3.14 below), no matter how payment is designated by Franchisee (including any amount due under any Promissory Note), except that the Brand Fund Contributions may only be credited to the Brand Fund;

3.13.2. set off from any amounts that may be owed by Franchisor, any amount owed to Franchisor or any marketing fund; and

3.13.3. retain any amounts received for Franchisee's account (and/or that of any affiliate of Franchisee), whether rebates from suppliers, payment for National Account work, or otherwise, as a payment against any amounts owed to Franchisor or any marketing fund.

Franchisor can exercise any of the foregoing rights in connection with amounts owed to or from Franchisor and/or any affiliate. For purposes of this Agreement, "affiliate" means any person or entity which controls, is controlled by, or is under common control with another person or entity, including any person or entity that provides services to Franchisee. In addition, as to the Franchisee, "affiliate" also means any owner of any interest in Franchisee or the Franchised Business, any employee or agent of the Franchisee, and/or any independent contractor performing functions for, or on behalf of, Franchisee, and any entity controlled by any of the foregoing.

3.13.4. **Business Judgment**. For purposes of this Agreement, the term "Business Judgment" means the exercise of reasonable business judgment in making Franchisor's decision or exercising Franchisor's rights. Franchisor's decisions or actions will be deemed to be the result of reasonable business judgment, even if other reasonable or even arguably preferable alternatives are available, if Franchisor's decision or action is intended, in whole or significant part, to promote or benefit the franchise System generally, even if the decision or action also promotes Franchisor's financial or other individual interest. Examples of items that will promote or benefit the franchise System include, without limitation, enhancing the value of the Proprietary Marks, improving customer service and satisfaction, improving product quality, improving uniformity, enhancing or encouraging modernization, and improving the competitive position of the franchise System. This is a defined term for the purposes of this Agreement and is not intended to incorporate principles related to the application of the business judgment rule in a corporate law context.

## 4. PROPRIETARY MARKS

### 4.1. **Franchisee's Use of the Proprietary Marks and Other Proprietary Material**

4.1.1. Franchisee shall use only the Proprietary Marks which Franchisor designates, and shall use them only in the manner Franchisor authorizes and permits.

4.1.2. Franchisee shall use the Proprietary Marks only for the operation of the Franchised Business and only in the Designated Territory and in sales and marketing for the Franchised Business.

4.1.3.    Franchisee shall use all Proprietary Marks without prefix or suffix and in conjunction with the symbols "TM," "SM," "S," or "®," as applicable. Franchisee may not use the Proprietary Marks in connection with the offer or sale of any products or services which Franchisor has not authorized for use in connection with the System. Franchisee may not use the Proprietary Marks as part of Franchisee's corporate or other legal name. Franchisee's corporate name and all fictitious names under which Franchisee proposes to do business must be approved by Franchisor in writing before use. Franchisee must use Franchisee's corporate or limited liability company name either alone or followed by the initials "D/B/A" and a business name approved in advance by Franchisor. Franchisee must promptly register at the office of the county in which Franchisee's Franchised Business is located, or such other public office as provided for by the laws of the state in which Franchisee's Franchised Business is located, as doing business under such assumed business name.

4.1.4.    Franchisee must identify itself as the owner of the Franchised Business (in the manner Franchisor prescribes) in conjunction with any use of the Proprietary Marks, including, without limitation, on invoices, order forms, receipts, customer forms and questionnaires, business stationery, and advertisements, as well as at such conspicuous locations as Franchisor may designate in writing at the Franchised Business premises.

4.1.5.    Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

4.1.6.    Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on Franchisor's behalf.

4.1.7.    Franchisee shall execute all documents Franchisor deems necessary to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

4.1.8.    Franchisee must promptly notify Franchisor of any suspected unauthorized use of the Proprietary Marks that Franchisor may now or hereafter designate for use in connection with the System, any challenge to the validity of the Proprietary Marks, or any challenge to Franchisor's ownership of, Franchisor's right to use and to license others to use, or Franchisee's right to use, the Proprietary Marks and Operations Manual (defined in Section 6.1) (collectively the "Proprietary Material"). Franchisee acknowledges that Franchisor has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Material, including any settlement thereof. Franchisor has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Franchisor's rights to the Proprietary Material. Franchisor shall defend Franchisee against any third-party claim, suit, or demand arising out of Franchisee's use of the Proprietary Material. If Franchisor, in Franchisor's sole discretion, determines that Franchisee has used the Proprietary Material in accordance with this Agreement, Franchisor shall bear the cost of such defense, including the cost of any judgment or settlement. If Franchisor, in Franchisor's sole discretion, determines that Franchisee has not used the Proprietary Material in accordance with this Agreement, Franchisee shall bear the cost of such defense, including the cost of any judgment or settlement. In the event of any litigation relating to Franchisee's use of the Proprietary Material, Franchisee shall execute any and all documents and do such acts as may, in Franchisor's opinion, be necessary to carry out such defense or prosecution, including, without limitation, becoming a nominal party to any legal action. Except to the extent that such litigation is the result of Franchisee's use of the Proprietary Material in a manner inconsistent with the terms of this Agreement, Franchisor agrees to reimburse Franchisee for Franchisee's out-of-pocket costs in performing such acts.

4.1.9.   Franchisee expressly understands and acknowledges that:

4.1.9.1.   Franchisor or its affiliates or licensors own all right, title and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them, and Franchisor has the right to use, and license others to use, the Proprietary Marks;

4.1.9.2.   The Proprietary Marks are valid and serve to identify the System and those who are authorized to operate under the System;

4.1.9.3.   During the term of this Agreement and after its expiration or termination, Franchisee shall not directly or indirectly contest the validity of, or Franchisor's ownership of, or right to use and to license others to use, the Proprietary Marks or any other Proprietary Material;

4.1.9.4.   Franchisee's use of the Proprietary Material does not give Franchisee any ownership interest or other interest in or to the Proprietary Material;

4.1.9.5.   Any and all goodwill arising from Franchisee's use of the Proprietary Material shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System, the Proprietary Marks, or any other Proprietary Material;

4.1.9.6.   Except as specified in this Agreement, the license of the Proprietary Marks granted to Franchisee hereunder is non-exclusive and Franchisor retains the right, among others, to: (i) use the Proprietary Marks itself in connection with selling products and services; (ii) grant other licenses for the Proprietary Marks; and (iii) develop and establish other systems using the Proprietary Marks, similar proprietary marks, or any other proprietary marks, and to grant licenses thereto without providing any rights therein to Franchisee; and

4.1.9.7.   Franchisor reserves the right, in Franchisor's sole discretion, to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder. Franchisee shall discontinue using all Proprietary Marks which Franchisor has notified Franchisee, in writing, have been modified or discontinued within thirty (30) days of receiving written notice and, at Franchisee's sole cost and expense, shall promptly begin using such additional, modified or substituted Proprietary Marks.

4.2.   **Copyrighted Materials**.   You acknowledge that Franchisor is the owner of certain copyrighted or copyrightable works (the "Works") and that the copyrights in the Works are valuable property. The Works include, but are not limited to, the Operations Manuals, advertisements, promotional materials, signs, Internet sites, mobile applications, vehicle graphics, and facility designs. We authorize you to use the Works on the condition that you comply with all of the terms and conditions of this Section 4. This Agreement does not confer any interest in the Works on you, other than the right to use them in the operation of the Franchised Business in compliance with the terms of this Agreement. If you prepare any adaptation, translation or other work derived from the Works, whether or not authorized by us, you agree that the material will be our property and you hereby assign all your right, title and interest therein to us. You agree to sign any documents we deem necessary to confirm our ownership.

# 5.   CONFIDENTIAL INFORMATION

5.1.   **Nondisclosure**.   During the term of this Agreement, Franchisee will receive information which Franchisor considers its trade secret and confidential information. Franchisee may not, during the term of this Agreement or thereafter, communicate, divulge or use for the benefit of any other person or

entity, any Confidential Information (defined in Section 5.2). Upon termination or expiration of this Agreement, regardless of the reason, Franchisee shall return all copies of such Confidential Information to Franchisor immediately, and Franchisee may not use the Confidential Information for any purpose other than operating the Franchised Business in accordance with Franchisor's standards and specifications.

5.2.     **Confidential Information**.  Confidential Information hereby includes, without limitation, any and all confidential, proprietary and trade secret information relating to the operation of a Franchised Business, such as: (i) all financial, operational, technical and marketing information; (ii) Operations Manual; (iii) Franchisor's System policies or procedures, and franchising materials, brochures, marketing plans, forecasts, and related information; (iv) cost data; (v) pricing information; (vi) business plans; (vii) financial records and results of Franchisor's operations and other persons or entities operating a Franchised Business; (viii) photographs, devices, samples, models and illustrations; (ix) software developed by or for Franchisor; (x) customer and/or client lists and any information relating to Franchisor's customers or the customers of other System franchisees; (xi) prospect customer/client lists; (xii) patent, trademark, service mark and copyright applications; (xiii) information relating to inventions, discoveries, software, and any other research and development information; (xiv) methods of conducting the business developed by Franchisor or other franchisees, and any forms, memoranda, outlines, protocol, presentations, proposals, software, or other documents or information related to such methods; (xv) any information of a customer not generally known or available to the public; (xvi) any Trade Secrets (defined in Section 5.3), or of a customer of Franchisor, or of any other franchisee; and (xvii) any information about or originating from any Franchisee which, if it was information of Franchisor, is expressly deemed Confidential Information pursuant to the foregoing (collectively, "<u>Confidential Information</u>"). Any and all information, knowledge, know-how, techniques, and other data which Franchisor designates as confidential will be deemed Confidential Information for purposes of this Agreement.

5.3.     **Trade Secrets**.  Notwithstanding Section 5.2, "trade secret" means information (including, but not limited to, components of the System, product marketing and promotional techniques, confidential business information, technical or non- technical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, and lists of actual or potential customers or suppliers) that: (i) derive economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy (collectively, "<u>Trade Secrets</u>"). To the extent that applicable law mandates a definition of "trade secret" inconsistent with the foregoing definition, then the foregoing definition shall be construed in such a manner as to be consistent with the mandated definition under applicable law.

5.4.     **Employees / Personnel**.  All of Franchisee's employees or other personnel must execute covenants that they will maintain the confidentiality of information they receive in connection with their employment by Franchisee at the Franchised Business. Such covenants shall be in a form satisfactory to Franchisor and substantially similar to the Confidentiality and Restrictive Covenant Agreement in the form attached as Exhibit C to this Agreement. Employee non-compete and restrictive covenant agreements must include, without limitation, specific identification of Franchisor as a third-party beneficiary of such covenants with independent rights to enforce them.

5.5.     **New Concepts**.  If Franchisee, or Franchisee's employees or principals, develop(s) any new concept, process or improvement in the operation or promotion of the Franchised Business, including, but not limited to, any modifications or additions to the Proprietary Material, Franchisee shall promptly notify Franchisor and provide Franchisor with all necessary related information, without compensation. Any such concept, process or improvement shall become Franchisor's sole property and Franchisor shall be the sole owner of all patents, patent applications, trademarks, copyrights, and other intellectual property

rights related thereto. Franchisee and Franchisee's principals and agents hereby assign to Franchisor any rights they may have or acquire therein, including the right to modify such concept, process or improvement, and otherwise waive and/or release all rights of restraint and moral rights therein and thereto. Franchisee and Franchisee's principals and agents agree to assist Franchisor in obtaining and enforcing the intellectual property rights to any such concept, process or improvement in any and all countries, and further agree to execute and provide Franchisor with all necessary documentation for obtaining and enforcing such rights. Franchisee and Franchisee's principals and agents hereby irrevocably designate and appoint Franchisor as their agent and attorney-in-fact to execute and file any such documentation and to do all other lawful acts to further the prosecution and issuance of patents or other intellectual property rights related to any such concept, process or improvement. In the event that the foregoing provisions of this Section 5.5 are found to be invalid or otherwise unenforceable, Franchisee and Franchisee's principals and agents hereby grant to Franchisor a worldwide, perpetual, non-exclusive, fully-paid license to use and sublicense the use of the concept, process or improvement to the extent such use or sublicense would, absent this Agreement, directly or indirectly infringe Franchisee's rights therein.

     5.6.    **Customer Privacy**.  Franchisee agrees to adhere to the terms of Franchisor's customer privacy policies Franchisor may now or in the future develop. Franchisee may not divulge personal information regarding any customers, except as absolutely necessary to operate the Franchised Business.

# 6. FRANCHISOR'S OBLIGATIONS

     6.1.    **Operations Manual**.  Prior to commencing operation of the Franchised Business, Franchisor will provide Franchisee with secure access to its operations manual, which contains mandatory and suggested specifications, standards and operating procedures for the System, which may be modified and/or supplemented by Franchisor at any time as Franchisor deems advisable in its sole discretion, including Franchisor's proprietary and confidential operations manual for operating a Franchised Business ("Operations Manual"). The Operations Manual may cover such topics as pre- opening procedures; systems and procedures; personnel policies; specifications for vehicles, supplies, equipment and inventory; marketing; accounting and bookkeeping; and related matters as may be incorporated from time to time. The Operations Manual will remain confidential and the property of Franchisor, constituting a trade secret of Franchisor, and may not be shared, loaned out, duplicated, distributed or copied in whole or in part in any manner. The provisions of the Operations Manual constitute provisions of this Agreement as if fully set forth herein. Franchisor will have the right to add to and otherwise modify the contents of the Operations Manual from time to time in writing in any manner, including through the Operations Manual, email, Franchisor's website, or any other means. Franchisee must always follow the directives in the Operations Manual, as they may be modified by Franchisor from time to time. Such compliance by Franchisee is necessary to protect the integrity and reputation of the System. The Operations Manual may also contain provisions that share recommended best practices, which provisions are not mandatory.

     6.2.    **Initial Supplies**.  Franchisor will provide Franchisee with a list of all items and equipment needed to open the Franchised Business, along with the proprietary list of Approved Suppliers for those items (as applicable), with which Franchisee must comply.

     6.3.    **Ongoing Assistance**.  Franchisor may provide Franchisee continuing consultation and advice, as Franchisor deems necessary and appropriate in its sole discretion, regarding the management and operation of the Franchised Business. Franchisor will provide such assistance, in Franchisor's discretion, by telephone, facsimile, intranet communication, on-site visits, or other means. If Franchisee requires and requests additional on-site assistance from Franchisor, subject to the availability of Franchisor's personnel, Franchisor may provide Franchisee with such assistance at Franchisor's then-current training fee, plus expenses, including Franchisor's travel and lodging expenses, as Franchisor deems necessary in its sole discretion. Franchisor may also use the Operations Manual to provide self-serve training materials.

6.4.    **Additional Training**.  As set forth more fully in Section 8, Franchisor may, in Franchisor's sole discretion, hold refresher and ongoing training courses, or training courses to provide additional information and/or updates regarding Franchisor's System and/or the operation of the Franchised Business. Except as otherwise provided in this Agreement, Franchisor may require Franchisee and Franchisee's personnel to attend such additional training up to twenty (20) days per year at a location to be selected by Franchisor. All expenses, including Franchisee's and Franchisee's employees' transportation, meal, and lodging expenses to attend such training shall be Franchisee's sole responsibility. If training is conducted at Franchisee's Approved Location or in Franchisee's Designated Territory, Franchisee will be responsible for all of Franchisor's employees' expenses to conduct such training, including transportation, meal and lodging expenses. Franchisor will provide Franchisee with thirty (30) days' notice of any upcoming additional or refresher training that Franchisee is required to attend.

6.5.    **Remedial Training**.  In the event Franchisor determines that Franchisee is not operating the Franchised Business as required under the Franchise Agreement or in compliance with the System standards, Franchisor may require Franchisee to attend up to five (5) days of remedial training a year (in addition to any required training). Franchisor has the right to schedule remedial training at its corporate headquarters or other designated training facility, or Franchisor may provide such training on-site at the Franchised Business. In either case, Franchisor may charge Franchisee its then-current tuition training fee (plus its travel and living expenses) to provide such remedial training.

6.6.    **Call Center**.  Franchisor reserves the right to establish and maintain a centralized call center for the purpose of accepting telephone, Internet and other inquiries from potential customers and forwarding such customer information to the appropriate franchisee (the "Call Center"). If established, Franchisee must comply with Franchisor's procedures for using the Call Center as Franchisor specifies in the Operations Manual or otherwise in writing, including any fees Franchisee must pay in connection with administering and maintaining this service. If established, Franchisor has the absolute right to receive all customer calls to the Franchised Business, and subsequently service, route and/or assign any work orders or inquiries resulting from such calls as it deems advisable in its sole discretion, regardless of whether the customer is located within Franchisee's Designated Territory. If established, all System related phone numbers and Internet lead sources are required to be ported to or directed to Franchisor.

6.7.    **Pricing**.  Franchisor may advise Franchisee from time to time concerning suggested retail prices. Franchisor and Franchisee agree that any list or schedule of prices furnished to Franchisee by Franchisor is a recommendation only and is not to be construed as mandatory upon Franchisee. Nothing contained herein shall be deemed a representation or warranty by Franchisor that the use of Franchisor's suggested prices will result in a profit. If we determine that we may lawfully require you to charge certain prices for products or services, certain minimum prices for products or services, or certain maximum prices for products or services, you must adhere to our pricing policies as set forth in the Manuals or otherwise in writing from time to time. Otherwise, you are solely responsible for determining the prices that you charge customers.  You must provide us with your current price list upon our request.

6.8.    **Annual Conference**.  Franchisor may, in Franchisor's discretion, hold one or multiple annual conferences at a location to be selected by Franchisor (the "Annual Conference"). Franchisor will determine the topics and agenda for such conference to serve the purpose, among other things, of updating franchisees on new developments affecting franchisees, exchanging information between franchisees and Franchisor's personnel regarding operations and programs, and recognizing franchisees for their achievements. Franchisor may require Franchisee to attend the Annual Conference and pay Franchisor's then-current registration fee if Franchisor chooses to charge a registration fee in its sole discretion. Attendance at the Annual Conference is mandatory. Franchisor reserves the right to charge Franchisee a fee to cover Annual Conference expenses in the event the Franchisee chooses not to attend. All expenses,

including Franchisee's and Franchisee's employees' transportation to and from the Annual Conference, as well as lodging, meals and salaries during the Annual Conference are Franchisee's sole responsibility. Franchisor may use Brand Fund Contributions for purposes related to the Annual Conference, including costs related to production, programs and materials.

## 7. FRANCHISEE'S OBLIGATIONS

7.1. **Site Location and Lease Approval**. Franchisee must operate the Franchised Business from an approved retail showroom/office that meets Franchisor's then-current standards and specifications for an Approved Location. Franchisee will need to lease approximately 500 to 1,500 square feet of commercial real estate for Franchisee's retain showroom/office and to securely store all equipment and inventory. Franchisor may provide Franchisee with standards and specifications for the design and layout of the premises of the Approved Location, and Franchisor must review and approve any proposed location, as well as any lease associated with the proposed location, prior to Franchisee entering into any lease for the proposed location. If Franchisor has not approved a location for Franchisee to operate the Franchised Business as of the date Franchisee signs this Agreement, the parties shall enter into Franchisor's prescribed form of Site Selection Addendum, the terms of which shall govern the parties' site selection obligations. Franchisor has the right to review, evaluate and approve Franchisee's proposed lease for the Approved Location ("Lease") prior to execution. Franchisor may condition Franchisor's approval of any proposed Lease on, among other things, Franchisee and Franchisee's landlord's execution of a Collateral Assignment of Lease in the form prescribed by Franchisor and attached to this Agreement as Exhibit G.

7.1.1. *Relocation*. If, for any reason, the Lease term is shorter than the term of this Agreement and the Lease cannot be renewed or extended, or Franchisee cannot continue for any other reason to occupy the Approved Location, Franchisee must relocate Franchisee's Franchised Business to a mutually acceptable site within Franchisee's Designated Territory to complete the unexpired portion of the term of this Agreement. Franchisee must notify Franchisor of Franchisee's intention to relocate, procure a site acceptable to Franchisor within ninety (90) days prior to closing operations at Franchisee's current Approved Location, and open for business at the new Approved Location within thirty (30) days of closing business at Franchisee's existing Approved Location. Franchisor may require Franchisee to reimburse Franchisor for its actual costs and expenses associated with evaluating Franchisee's relocation request and/or any locations proposed by Franchisee for relocation, plus a two hundred fifty dollar ($250) administrative fee. We will provide Franchisee with copies of our invoices for its expenses from any third-party providers upon request.

7.1.2. *Franchised Business Appearance and Construction*. Franchisee agrees that the Franchised Business must conform to Franchisor's standards and specifications for the appearance, layout and design of a Franchised Business. Franchisee is solely responsible for the preparation of architectural and working drawings necessary to complete construction and/or build-out at the Approved Location and must ensure that plans meet with applicable ordinances, building codes, permit requirements, and any other applicable local, state or federal law.

7.1.3. *Use of Premises*. The location of Franchisee's Approved Location approved by Franchisor in accordance with this Agreement shall be used solely for the purpose of operating the Franchised Business, unless otherwise approved in writing by Franchisor. Franchisee must obtain Franchisor's prior written consent to conduct any other business or commercial activity from the Approved Location.

7.2. **Training**. Franchisee (or if Franchisee is an entity, then Franchisee's principals) must attend and successfully complete Franchisor's Initial Training Program (defined in Section 8.1), as set forth

more fully in Section 8 of this Agreement. Franchisor has the right to require one (1) individual to attend in addition to Franchisee.

      7.3.    **Opening Requirements**. Franchisee shall open and commence operating the Franchised Business within one hundred eighty (180) days of executing this Agreement. Franchisee must obtain Franchisor's approval of the Approved Location within thirty (30) days of executing this Agreement. In addition to any other pre- opening obligations set forth in this Agreement, Franchisee is required to complete the following prior to commencing operations: (i) obtain all required licenses, certifications, permits and other governmental approvals necessary to operate the Franchised Business in the Designated Territory, and provide Franchisor with written proof thereof; (ii) purchase all required vehicles, equipment, supplies and inventory in accordance with Franchisor's standards and specifications and, if appropriate, from Franchisor's Approved Suppliers (defined in Section 7.4.2), that Franchisee is required to purchase prior to opening; (iii) attend and successfully complete Franchisor's Initial Training Program, as defined and described in Section 8.1 of this Agreement, as well as any other pre- opening training Franchisor may prescribe; and (iv) provide Franchisor with any and all documents and information necessary for Franchisor to effectuate the EFT Program to automatically withdraw all payments due and owing Franchisor and its affiliates under the Franchise Agreement. Without limiting the foregoing, if Franchisee or any of Franchisee's owners is not a U.S. national, Franchisee represents that Franchisee and/or such owners have an immigration status that allows Franchisee and/or such owners to live and work in the United States, and Franchisee hereby promises that Franchisee and/or such owners will maintain such status during the term of this Agreement.

      7.4.    **Purchasing Requirements**

      7.4.1.   *Compliance with Standards.*  Franchisee acknowledges and agrees that Franchisee's obligations set forth in this Agreement and the Operations Manual are reasonable and necessary for the operation of the Franchised Business and to maintain uniformity throughout the System. Franchisee shall adhere to the standards and specifications set forth in this Agreement and the Operations Manual and any revisions or amendments to same. Franchisee shall use the furnishings, supplies, fixtures, equipment, computer hardware and software, and product samples and promotional materials that comply with Franchisor's then-current standards and specifications, which Franchisor will establish and modify at Franchisor's discretion. Franchisee acknowledges that Franchisee may incur an increased cost to comply with such changes at Franchisee's expense.

      7.4.2.   *Designated and Approved Suppliers.*  Franchisee must currently use Franchisor's designated suppliers to purchase any items and/or services necessary to operate the Franchised Business. Recognizing that preservation of the System depends upon product and service uniformity and the maintenance of Franchisor's trade dress, Franchisee agrees to purchase product samples and other supplies, services, furnishings, fixtures, computer hardware and software, and other equipment from Franchisor or from approved or designated suppliers as Franchisor shall specify, from time to time, in the Operations Manual and otherwise in writing (each an "<u>Approved Supplier</u>"). Franchisee hereby acknowledges that Franchisor, Franchisor's affiliate(s) and/or a third party may be one of several, or the only, Approved Supplier of any item. Franchisee further acknowledges and agrees that Franchisor and/or Franchisor's affiliates have the right to realize a profit or otherwise derive revenue from any products or services that Franchisor, Franchisor's affiliates, or Franchisor's Approved Suppliers supply and/or provide to Franchisee. Franchisor has the irrevocable right to modify, supplement or otherwise change its lists of Approved Suppliers and any items that must be purchased from such Approved Suppliers at any time, as Franchisor deems advisable in its sole discretion. Franchisor may mandate that Franchisee use a specific payment processor in its Franchised Business, in which Franchisor or an affiliate may (or may not) be an owner, and Franchisor or its affiliate may collect fees owed to it or an affiliate at the time of payment by a

customer using such processor. Franchisor may provide Franchisee with notice of such modifications to these lists via the Operations Manual or any other manner Franchisor deems appropriate.

      7.4.3.   *Supplier Approval.*  In the event Franchisee wishes to purchase any unapproved item, including inventory, and/or acquire approved items from an unapproved supplier, Franchisee must provide Franchisor the name, address and telephone number of the proposed supplier, a description of the item Franchisee wishes to purchase, and the purchase price of the item, if known. At Franchisor's request, Franchisee must provide Franchisor, for testing purposes, a sample of the item Franchisee wishes to purchase. Nothing in the foregoing shall be construed to require Franchisor to approve any particular supplier. Franchisor may base Franchisor's approval of any such proposed item or supplier on considerations relating not only directly to the item or supplier itself, but also indirectly to the uniformity, efficiency and quality of operation Franchisor deems necessary or desirable in Franchisor's System as a whole, as well as the maintenance of Franchisor's Confidential Information. Franchisor has the right to receive payments from suppliers on account of their dealings with Franchisee and other franchisees and to use all amounts Franchisor receives without restriction (unless instructed otherwise by the supplier) for any purposes Franchisor deems appropriate. Nothing herein shall require Franchisor to approve an unreasonable number of suppliers for a given item, which approval might, in Franchisor's reasonable judgment, result in higher costs or prevent the effective or economical supervision of approved suppliers.

      7.4.3.1.   Franchisee or the proposed supplier must pay Franchisor its then-current alternative supplier or new product review fee, in addition to Franchisor's actual costs that Franchisor estimates it will incur in connection with inspecting the alternate supplier, its facilities, and/or the previously non-approved item(s) proposed by Franchisee. If the costs Franchisor incurs are more than the amount Franchisee or the proposed supplier advanced, then Franchisor may withdraw additional funds through the EFT Program from Franchisee's designated bank account for the difference, or if the actual amount Franchisor incurs is less than the amount of the advancement, then Franchisor shall credit the excess amount to the payment of Franchisee's future obligations.

      7.4.3.2.   Franchisor will use commercially reasonable efforts to notify Franchisee in writing whether or not Franchisee's request is approved or denied within thirty (30) days of: (i) Franchisor's receipt of all supporting information from Franchisee regarding Franchisee's request under this Section; and (ii) if applicable, Franchisor's completion of any inspection or testing associated with Franchisee's request. If Franchisor does not provide written approval within this time period, then Franchisee's request will be deemed denied.

      7.4.3.3.   Franchisor may, but is not obligated to, provide Franchisee's proposed supplier or provider with its specifications for the item that Franchisee wishes the third party to supply, provided that third party executes Franchisor's prescribed form of non-disclosure agreement.

      7.4.3.4.   Each supplier that Franchisor approves of must comply with Franchisor's requirements regarding insurance, indemnification and non-disclosure. If Franchisor approves any supplier, Franchisee may enter into supply contracts with such third party, but under no circumstances will Franchisor guarantee Franchisee's performance of any supply contract.

      7.4.3.5.   Franchisor may re-inspect and revoke Franchisor's approval of particular products or suppliers when Franchisor determines, in Franchisor's sole discretion, that such products or suppliers no longer meet Franchisor's standards. Upon receipt of written notice of such revocation, Franchisee must cease purchasing products from such supplier.

      7.4.4.   *System Suppliers.*  Franchisor may establish business relationships, from time to time, with suppliers who may produce and/or provide certain products or services that Franchisee is

required to purchase from only that supplier (each a "<u>System Supplier</u>"). These System Suppliers may provide, among other things, supplies, fixtures, technology, software and equipment, all in accordance with Franchisor's proprietary standards and specifications, or private label goods that Franchisor has authorized and prescribed for sale by System franchisees. Franchisee recognizes that such products and services are essential to the operation of the Franchised Business and to the System generally. Franchisee further recognizes that Franchisee's failure to pay System Suppliers may interfere with such suppliers' willingness to supply the System and may result in other System franchisees' inability to obtain product, or ability to obtain product only on less favorable credit terms. Accordingly, Franchisee agrees to pay System Suppliers as and when due. Franchisee must use products purchased from Approved Suppliers solely in connection with the operation of the Franchised Business and not for any competitive business purpose.

7.5. **Approved Products and Services**. Franchisee shall offer for sale all products and services which Franchisor prescribes and only those products and services which Franchisor prescribes. Franchisee may not offer any other products or services for sale without having received Franchisor's prior written authorization. Franchisee shall at all times maintain sufficient levels of inventory, as specified in the Operations Manual, to adequately satisfy consumer demand. Franchisee must offer, use and sell all private label products which Franchisor may now or in the future designate for sale by System franchisees. In the event Franchisee wishes to offer any Approved Products or Approved Services that Franchisor indicates requires additional training or certification from Franchisor or its designee, then Franchisee must complete such training and/or obtain such certification, at Franchisee's sole expense, prior to providing these specialized Approved Products and Approved Services.

7.6. **Operations**

7.6.1. *Hours of Operation.* Franchisee must operate the Franchised Business for at least those days and number of hours Franchisor specifies in the Operations Manual.

7.6.2. *Maintenance of Premises and Project Sites.* Franchisee must maintain the Franchised Business and all project sites in a clean, safe and attractive manner, and in accordance with all applicable requirements of law, including all federal, state and local health laws, as well as this Agreement and the Operations Manual. Franchisee and Franchisee's employees must give prompt, courteous and efficient service to the public and otherwise operate the Franchised Business so as to preserve, maintain and enhance the reputation and goodwill of the System.

7.6.3. *Personnel/Staffing.* Franchisee must employ a sufficient number of qualified, competent personnel, to offer prompt, courteous and efficient service to the public, and otherwise operate the Franchised Business in compliance with the System so as to preserve, maintain and enhance the reputation and goodwill of the System. All employees engaged in the operation of the Franchised Business during working hours shall dress conforming to Franchisor's standards and shall present a neat and clean appearance in conformance with Franchisor's reasonable standards and shall render competent, efficient service to the customers of the Franchised Business.

7.6.4. *Compliance with Operations Manual and Training of Employees.* Franchisee agrees to conduct the Franchised Business in accordance with the Operations Manual. Franchisee shall immediately train and instruct Franchisee's employees in accordance with the Operations Manual, and shall continue such training and instruction as long as each employee is employed. The Operations Manual shall set forth the practices, procedures and methods to be utilized in the Franchised Business, and Franchisor may require Franchisee to conform Franchisee's practices to national programs, which Franchisor has designed as part of Franchisor's System.

7.6.5.  *Management Participation.*  Franchisee (or at least one of Franchisee's principals if Franchisee is a corporation or partnership) must devote their personal full-time attention and best efforts to the management and operation of the Franchised Business. Upon Franchisee's written request, Franchisor may permit Franchisee to employ a manager to manage the day- to- day operations of the Franchised Business (the "Designated Manager"), provided the Designated Manager: (i) is approved by Franchisor in writing prior to hiring; and (ii) successfully completes Franchisor's Initial Training Program (defined in Section 8.1) before assuming any managerial responsibility. The Franchised Business must at all times be staffed with at least one (1) individual who has successfully completed Franchisor's Initial Training Program. In the event that Franchisee operates more than one Franchised Business, Franchisor may require Franchisee to have a properly trained Designated Manager who has been approved by Franchisor at each location. Franchisee will keep Franchisor informed at all times of the identity of any employee acting as Designated Manager of the Franchised Business. In the event that a Designated Manager resigns or is otherwise terminated from the Franchised Business, the replacement must be trained pursuant to Franchisor's then-current standards. The new Designated Manager must successfully complete training within thirty (30) days of hiring. Franchisor reserves the right, without the obligation, to train the new Designated Manager directly. Franchisee and any Designated Manager(s) are not permitted to seek or maintain other employment or engage in any other business activities during the term of this Agreement.

7.6.5.1.  If Franchisee's Designated Manager departs the Franchised Business and Franchisee does not have another Designated Manager that satisfies the requirements in Section 7.6.5 above, then Franchisor may, at its option, provide Franchisee with a temporary replacement Designated Manager and Franchise shall be obligated to pay the replacement Designated Manager the then-current fee for each full or partial day.

7.6.6.  *Working Capital.*  Franchisee must at all times maintain such working capital as may be reasonably necessary to enable Franchisee to properly and fully carry out and perform all of Franchisee's duties, obligations and responsibilities hereunder and to operate the business in a businesslike, proper and efficient manner.

7.6.7.  *Inventory.*  Prior to commencement of operations, Franchisee shall adequately supply the Franchised Business with supplies, vehicles, equipment and inventory as prescribed by the Franchisor, and any other items of the type, quantity and quality as specified by Franchisor. Franchisee must, at all times, maintain sufficient levels of inventory, including Franchisor's proprietary products and other equipment and supplies used at project sites, as required by Franchisor to adequately meet consumer demand.

7.6.8.  *Products with Proprietary Marks*.  Franchisee shall in the operation of its Franchised Business, use and display labels, forms, vehicles, supplies, equipment and inventory imprinted with the Proprietary Marks and colors as prescribed by the Franchisor.

7.6.9.  *Market Research*.  Franchisor may, from time to time, conduct market research and testing to determine the viability of new products and services. Franchisee must cooperate by participating in such programs and by purchasing and promoting the sale of such test products and services, if required by the Franchisor.

7.6.10.  *Customer Contracts*.  In the operation of the Franchised Business, Franchisee is required to use only the customer contracts, waivers, and/or other forms that are designated by Franchisor from time to time.  Franchisor is not obligated to designate any such items and Franchisee's use obligations do not apply where Franchisor does not designate such items. Franchisor may provide Franchisee with templates or sample forms of such items, but it is Franchisee's responsibility to have all items which are to be used with prospective and/or actual customers reviewed, at Franchisee's expense, by an attorney licensed

to practice law in the state(s) where the Franchised Business is operated, for compliance with all applicable state and local legal requirements. Franchisor makes no warranty or representation that any contracts, waivers and/or other forms and/or materials, whether supplied by Franchisor or otherwise, are in compliance with the laws of any particular state(s) or locality.

7.7.    **Franchised Business Inspection**.  Franchisee agrees that, in order to maintain the high quality and uniform standards associated with the Franchise System and to protect its goodwill and reputation, Franchisee will permit Franchisor, during business hours, to inspect Franchisee's Franchised Business or attend a project site, confer with Franchisee and Franchisee's employees and customers, observe and evaluate Franchisee's sales techniques and operation methods, and perform any other inspection which Franchisor deems necessary to protect the standards of quality and uniformity of the franchise System and Franchisee's performance under this Agreement, the Operations Manual, and other standards and specifications required by Franchisor. Franchisee is obligated to make changes to Franchisee's operations based upon any inspections by Franchisor. Franchisor is not required to provide Franchisee with any notice prior to conducting such an inspection.

7.8.    **Computer Software and Hardware**

7.8.1.    *Business Management and Technology System.*    Franchisor's business management and technology system ("Business Management and Technology System") is a proprietary integrated business management system that includes customized software that facilitates the flow of business-related information between Franchisee, Franchisor and Franchisee's customers. The Business Management and Technology System will be managed and maintained by either Franchisor, a third-party company selected by Franchisor, or a combination of both. The Business Management and Technology System includes software that manages customer / Franchisee / Franchisor interactions from demand generation and lead intake through invoicing and collections, Franchisor's websites, telematics, and the Call Center (if established). If the Call Center is established, Franchisee will be required to forward any and all calls made to the Franchised Business (and all telephone numbers associated therewith) so that Franchisor can receive/route/assign these customer calls through the Business Management and Technology System as more fully set forth in this Agreement. Franchisee will have access to the Business Management and Technology System through a unique login.

7.8.2.    *Computer System.*  Franchisor shall have the right to specify or require that certain brands, types, makes and/or models of communications, computer systems and hardware be used by Franchisee, including, without limitation: (a) a compatible "back office" computer system that complies with Franchisor's standards and specifications and is capable of operating designated and Required Software (as defined below in Section 7.8.3below); (b) Franchisor's Business Management and Technology System; (c) a custom and proprietary point-of-sale system (the "POS System"), if Franchisor makes such a POS System part of its proprietary operating system in the future; (d) accounting software; (e) software applications and programs; (f) printers and other peripheral hardware or devices; (g) archival back-up systems; (h) Internet access mode and speed; and (i) physical, electronic, and other security systems (collectively, the "Computer System"). Franchisee must dedicate its Computer System for use as the Business Management and Technology System only and use the Business Management and Technology System in accordance with Franchisor's policies and operational procedures. Franchisee's employees must complete any and all training programs Franchisor reasonably requires for the proper operation and use of the Business Management and Technology System. Franchisee may not use any other cash registers or computer systems in its Franchised Business.

7.8.3.    *Required Software.*  Franchisor shall have the right, but not the obligation, to develop or designate: (i) computer software programs that Franchisee must use in connection with any component of the Computer System, including Franchisor's Business Management and Technology System

software (the "Required Software"), which Franchisee shall install at Franchisee's expense; (ii) updates, supplements, modifications or enhancements to the Required Software, which Franchisee shall install at Franchisee's expense; (iii) the tangible media upon which Franchisee records data; and (iv) the database file structure of the Computer System.

      7.8.4. *Compliance with Requirements.* At Franchisor's request, Franchisee shall purchase or lease, and thereafter maintain, the Computer System and, if applicable, the Required Software. Franchisee expressly agrees to strictly comply with Franchisor's standards and specifications for all items associated with Franchisee's Computer System and any Required Software. Franchisee agrees, at its own expense, to keep its Computer System in good maintenance and repair and install such additions, changes, modifications, substitutions, and/or replacements to Franchisee's Computer System or Required Software as Franchisor directs from time to time in writing. Franchisee agrees that its compliance with this Section shall be at Franchisee's sole cost and expense.

      7.8.5. *Franchisor's Access.* Franchisor may require that Franchisee's Computer System be programmed to automatically transmit data and reports about the operation of the Franchised Business to Franchisor. Franchisor shall also have the right to, at any time without notice, electronically connect with Franchisee's Computer System to monitor or retrieve data stored on the Computer System or for any other purpose Franchisor deems necessary. There are no contractual limitations on Franchisor's right to access the information and data on Franchisee's POS system and Computer System. Franchisee shall deliver to Franchisor all access codes, static Internet protocol ("IP") addresses and other information to facilitate Franchisor's access to the data described in this Section within thirty (30) days of opening the Franchised Business.

      7.8.6. *Proprietary Software.* Franchisor has a proprietary interest in all databases, lists, templates, programs, and any other software components that have been created and/or customized by Franchisor using the Computer System and/or Required Software (the "Proprietary Software"). In the future, Franchisor may further customize the Proprietary Software and create programs that conduct, among other things, scheduling, accounting, inventory and related activities. Franchisee must obtain the computer hardware necessary to implement the Proprietary Software into the Franchised Business, and comply with all specifications and standards prescribed by Franchisor regarding the Proprietary Software as provided in the Operations Manual. This Proprietary Software will be Franchisor's proprietary product and the information collected therefrom will be deemed Franchisor's Confidential Information.

      7.8.7. *Computer Network.* Franchisee is required to participate in any System-wide computer network, intranet system, extranet system or community portal that Franchisor implements, and that may be required by Franchisor to use such computer network, intranet system, or extranet system to, among other things: (i) submit Franchisee's reports due under this Agreement to Franchisor online; (ii) view and print portions of the Operations Manual, including any updates or modifications thereto; (iii) download approved marketing materials; (iv) communicate with Franchisor and other System franchisees; and (v) complete any initial or ongoing training that Franchisor designates, in the event Franchisor makes such training accessible through this medium. Franchisee agrees to use the facilities of any such computer network, intranet system or extranet system in strict compliance with the standards, protocols and restrictions that Franchisor included in the Operations Manual, including those related to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory or defamatory statements. Franchisee understands and agrees that it is solely responsible for any licensing and/or maintenance fee(s) associated with any intranet or extranet described in this Section.

    7.9. **Personal Conduct**. Franchisee agrees to refrain from committing any act or pursuing any course of conduct that tends to bring Franchisor's Proprietary Marks into disrepute.

7.10　**Best Efforts**.　Franchisee (or Franchisee's principals) must devote their personal full-time attention, skill and best efforts to the management and operation of the Franchised Business and to promote and increase the demand for the Franchisor's products and services within the Designated Territory. In consideration of the grant of the Franchised Business, Franchisee (or Franchisee's principals) agrees that it will not own, maintain, engage in, be employed by, or have any interest in any other business other than the Franchised Business without the prior written consent of Franchisor. Franchisee agrees that Franchisee may not, without the prior written consent of Franchisor, engage in any commercial activity that: (i) is not performed for the sole and direct benefit of the Franchised Business; (ii) may benefit or promote any other business; or (iii) may be injurious to the Franchised Business or the goodwill associated with the Proprietary Marks and the System. Franchisee acknowledges that Franchisee's (or Franchisee's principals') violation of the terms in this Section will be a material breach of this Agreement, and Franchisor may terminate this Agreement with notice and without an opportunity to cure. The foregoing remedy shall be in addition to any other legal or equitable remedies that the Franchisor may possess.

7.11　**Telephone and Email Access**.　Franchisor reserves the right to procure and supply all telephone numbers and email accounts associated with the Franchised Business.

7.12　**Payment of Debts**.　Franchisee is solely responsible for: (i) selecting, retaining and paying Franchisee's employees; (ii) the payment of all invoices for the purchase of products and services used in connection with operating the Franchised Business; and (iii) determining whether, and on what terms, to obtain any financing or credit which Franchisee deems advisable or necessary for the conduct of the Franchised Business. Franchisee agrees to pay all current obligations and liabilities to suppliers, lessors and creditors on a timely basis. Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for debts owed by Franchisee if Franchisor elects to pay any of Franchisee's obligations in order to preserve the relationship between System Suppliers and System franchisees. Franchisee agrees to make prompt payment of all federal, state and local taxes, including individual and corporate taxes, sales and use taxes, franchise taxes, gross receipts taxes, employee withholding taxes, FICA taxes, personal property, and real estate taxes arising from Franchisee's operation of the Franchised Business. Franchisee agrees to indemnify Franchisor in the event that Franchisor is held responsible for these taxes.

7.13　**Compliance with Applicable Laws**.　Franchisee must comply with all applicable federal, state and local laws, ordinances and regulations regarding the operation of the Franchised Business (including, without limitation, all government regulations relating to required licensing; occupational hazards and health; trademark and copyright infringement; fair marketing laws; consumer protection; trade regulation; workers' compensation; unemployment insurance; withholding and payment of Federal and State income taxes and social security taxes; sales, use and property taxes; and the applicable provisions of the Americans with Disabilities Act ("ADA") regarding the construction, design and operation of the Franchised Business). Franchisee will have sole authority and control over the day-to-day operations of the Franchised Business and Franchisee's employees and/or independent contractors. Franchisee is solely responsible for all employment decisions and is solely responsible for compliance with all state, federal and local hiring laws and functions of the Franchised Business, including, without limitation, those related to hiring, firing, training (except for brand standards certification training we offer to you and your Designated Manager), wage and hour requirements, compensation, promotion, recordkeeping, supervision and discipline of employees, paid or unpaid, full or part-time. At no time will Franchisee or Franchisee's employees be deemed to be employees of Franchisor or Franchisor's affiliates. Any information we provide about employment matters, whether voluntarily or in response to your request, and whether directly or by means of any technology tools, is a recommendation only and is not intended to and is not an actual exercise of control over the wages, hours or working conditions of your employees or the means and manner by which they carry out their duties. You are strongly encouraged to seek independent competent labor law counsel in the state/locality where you do business for all employment matters.

You alone will direct and control all employees of the Franchised Business, subject only to the Brand Standards that we prescribe to protect the goodwill associated with the Marks, which may include the requirement of initial and periodic drug testing and background checks. You are required to clearly inform all workers, before hiring and periodically thereafter, that Franchisee, and not Franchisor, is their employer. You agree to indemnify us for any liability, cost, expense, loss or damage, including attorney's fees and costs, arising from (i) any claim or allegation that Franchisor or any affiliate is the employer, co-employer, or joint employer of Franchisee, its Owners, or any workers in the Franchised Business.

7.14    **Trade Secrets and Confidential Information**.  Franchisee and all of its employees must maintain the confidentiality of all Confidential Information as set forth in this Agreement.

7.15    **Image**.  Franchisee acknowledges that Franchisor has developed the System to offer and sell products and services which will distinguish the Franchised Business from other service businesses that offer similar products and services valued at different prices and with less attention paid to product quality and customer service. Franchisee agrees to offer products and services and to conduct the Franchised Business in such a manner which will serve to emulate and enhance the image Franchisor intended for the System. Franchisee further acknowledges and agrees that each aspect of the System is important not only to Franchisee, but also to Franchisor and to other System franchisees in order to maintain the highest operating standards, achieve System-wide uniformity, and increase the demand for the products sold and services rendered by System franchisees. Franchisee agrees to comply with the standards, specifications and requirements Franchisor set forth in order to uniformly convey the distinctive image of a Franchised Business. Franchisee shall, in the operation of the Franchised Business, use only displays, bags, labels, forms, stationery and other products Franchisor designates that are imprinted with the Proprietary Marks and colors, as prescribed from time to time by Franchisor.

7.16    **Pending Actions**.  Franchisee shall notify Franchisor in writing, within five (5) days of the commencement of any action, suit or proceeding, and the issuance of any order, suit or proceeding of any court, agency or other government instrumentality, including the receipt of any notice or citation, which may adversely affect the operation or financial condition of Franchisee or the Franchised Business.

7.17    **Standard Maintenance and System Conformity**.  Franchisee agrees to repair, refinish, replace, and/or otherwise refurbish the Franchised Business's Computer System, POS System, Required Software, vehicle(s), trailer(s) (if applicable), equipment, tools, and the Approved Location's furnishings, fixtures, decor, and any other tangible part or property of the Franchised Business at Franchisee's sole expense at such times as Franchisor may reasonably direct. Franchisor has the right to direct Franchisee to remodel, re-equip, and otherwise refurbish the Approved Location in the manner necessary to bring it into conformance with other franchises of the type Franchisor's franchisees are opening at the time of such direction. If at any time, in Franchisor's judgment, the general state of repair or the appearance of the premises of the Approved Location or its vehicles or equipment, does not meet Franchisor's standards, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate within fifteen (15) days after receipt of such notice, Franchisor shall have the right, in addition to all other remedies, to enter upon the premises of the Approved Location and affect such maintenance on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand.

7.18    **Customer Service**.  Franchisee must comply with any standards, specifications or methodologies that Franchisor establishes in the Operations Manual or otherwise in writing regarding customer service requirements, a customer or product warranty, or a satisfaction guarantee on any Approved Products or Approved Services offered or sold by the Franchised Business, refund policies and other standards and specifications.  If specified in the Operations Manual, you are required to provide the

warranty or satisfaction guarantee to each customer and comply with the requirements of the warranty/guarantee program, as set forth in the Operations Manual.

## 8.   TRAINING

8.1     **Initial Training Program**.  Franchisor will provide Franchisee (or one of Franchisee's principal owners if Franchisee is a business entity) and up to two (2) additional representatives that Franchisee designates with Franchisor's then- current initial training program (the "Initial Training Program") tuition- free, subject to the availability and schedule of Franchisor's training personnel. Franchisee must attend and successfully complete the Initial Training Program to Franchisor's satisfaction at Franchisor's corporate headquarters (the "Home Office"), or other location that Franchisor designates, prior to commencing operations of the Franchised Business. Some or all of the classroom training may now or in the future be provided virtually. If Franchisee is a business entity, each franchise owner must attend and successfully complete the Initial Training Program. The Initial Training Program lasts approximately five (5) days, and Franchisee will be solely responsible for costs and expenses Franchisee and its representative(s) incur in connection with attending the Initial Training Program, including travel, lodging, meals or any wages incurred for Franchisee's employees. In the event Franchisor permits Franchisee to employ a Designated Manager (defined in Section 7.6), such Designated Manager must attend and complete the Initial Training Program to Franchisor's satisfaction prior to commencing any managerial duties of the Franchised Business.

8.1.1     *Timing for Completion.*  Franchisee and its designated trainees must participate in and complete the Initial Training Program to Franchisor's satisfaction seven to thirty (7-30) days prior to opening the Franchised Business and within one hundred fifty (150) days from the Effective Date of this Agreement. Upon completion of the Initial Training Program, the Franchised Business shall be deemed "open and operating." In the event Franchisee does not complete the Initial Training Program to Franchisor's satisfaction within this one hundred fifty (150-day) period, then Franchisor may terminate this Agreement or Franchisor may provide Franchisee with additional time in exchange for a general release.

8.1.2     *Additional Employees.*  In the event Franchisee requests that more than two (2) additional people participate in the Initial Training Program (other than Franchisee or Franchisee's partner or principal shareholder), even if they attend the same training session, Franchisor may provide the Initial Training Program to such additional persons, subject to the availability of Franchisor's personnel, and charge Franchisee its then-current training tuition fee. All training related expenses for Franchisee's additional personnel, including transportation to and from the training site, lodging, meals, and salaries during training are Franchisee's sole responsibility.

8.1.3     *Replacement Personnel*.  In the event Franchisee or Franchisee's employee(s) fail(s) to complete the Initial Training Program to Franchisor's satisfaction, the respective person may repeat the course, or, in the case of an employee, Franchisee may send a replacement (the "Replacement Personnel") to the next available training session. Franchisor may charge its then-current training tuition fee for such Replacement Personnel to attend the Initial Training Program. Franchisor may also charge its then-current training tuition fee for each subsequent operating principal, designated manager or employee who attends the course at a scheduled training class at Franchisor's headquarters or other location designated by Franchisor. Failure by Franchisee, subsequent operating principals, designated managers, an employee or any Replacement Personnel to complete the Initial Training Program to Franchisor's satisfaction within the time period prescribed in this Agreement shall constitute default of this Agreement and Franchisor may terminate the Agreement.

8.1.4     *Employee Training*.  Franchisee must ensure that any and all employees of the Franchised Business that do not attend the Initial Training Program are properly trained to perform their

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

respective duties in connection with the Franchised Business prior to such employee(s) undertaking the duties.

        8.1.5   *Training Materials.*  Franchisor will provide Franchisee with training materials for Franchisee to use in training Franchisee's personnel. Only Franchisor's provided training materials may be used by Franchisee in training Franchisee's personnel. Updated training materials may be available to Franchisee in the Operations Manual or by other means, in Franchisor's sole discretion. All training materials provided to Franchisee by Franchisor shall at all times remain Franchisor's property, and Franchisee agrees not to challenge Franchisor's or Franchisor's affiliates' title or rights in or to the training materials. Franchisee may not make any disclosure, duplication or other unauthorized use of any portion of the training materials.

    8.2   **Additional and Remedial Training**.  Franchisor may conduct, and require Franchisee, Franchisee's Designated Manager (if applicable) and other employees to attend, additional and/or refresher training courses that Franchisor develops for the benefit of the System, as Franchisor deems advisable in its sole discretion. Franchisor may charge Franchisee its then- current training tuition fee for Franchisee and any other persons that attend such additional or refresher training, and Franchisee will be solely responsible for any and all expenses associated with such training (including travel, lodging, meals and employee wages incurred). Additional and/or refresher training may take place at Franchisor's Home Office or any other location that Franchisor designates. Franchisor will provide Franchisee with thirty (30) days' notice of any upcoming additional or refresher training that Franchisee is required to attend.

    8.3   **Reasonable Training and Assistance Requests**.  Upon Franchisee's written request, Franchisor may provide Franchisee with additional training and/or assistance, as Franchisor deems necessary in its sole discretion, subject to the availability and schedules of Franchisor's personnel. Franchisor may charge Franchisee its then- current tuition fee for any training or assistance that Franchisor provides at Franchisee's request, and Franchisee is solely responsible for any expenses and costs incurred: (i) by Franchisee and its representatives in connection with attending such additional training; and (ii) by Franchisor in connection with providing such training or assistance, whether at the Home Office or on-site at Franchisee's Approved Location or within the Designated Territory. Additional assistance may be provided by Franchisor over the phone, via email or Franchisor's Operations Manual.

9.   **INSURANCE**

    9.1   **General**.  Franchisee must maintain, at Franchisee's expense, in full force and effect throughout the term of this Agreement, the types of insurance and the minimum policy limits specified in the Operations Manual. In determining and modifying such requirements, Franchisor agrees to use reasonable business judgment and only require such insurance and minimum policy limits that are reasonable. The insurance policy or policies must be in effect at the earlier of: (i) ninety (90) days after the Effective Date of this Agreement; or (ii) prior to attending the Initial Training Program. The insurance policy or policies must protect Franchisee, Franchisor, and Franchisor's past, present and future officers, directors, owners, managers, members, stockholders, affiliates, employees, consultants, attorneys and agents against any loss, liability, personal injury, death, property damage, or expense whatsoever arising out of or occurring upon or in connection with the condition, operation, use or occupancy of the Franchised Business. Franchisee shall list Franchisor as an additional insured under each policy, except for policies required by statute in Franchisee's jurisdiction, including, but not limited to, workers' compensation and employer's liability insurance policies. Franchisor reserves the right to amend, modify and/or supplement additional types of coverage and/or increase the required minimum amount of coverage upon providing Franchisee reasonable notice through the Operations Manual or otherwise in writing by Franchisor. Franchisee's obligation to obtain coverage is not limited in any way by insurance that Franchisor maintains. Upon Franchisor's request or as specified in the Operations Manual, Franchisee shall provide Franchisor

with certificates of insurance evidencing the required coverage and any other documentation in connection therewith.

9.2     **Insurance Rating, Approval, and Certification**.  All insurance carriers must be approved by Franchisor in advance and in writing. All insurance policies must be issued by insurance companies with a rating of A-VII or better as reported in the most recent edition of A.M. Best's Insurance Report. Franchisor's acceptance of an insurance carrier does not constitute Franchisor's representation or guarantee that the insurance carrier will be capable of meeting claims during the term of the insurance policy. Franchisee agrees to carry such insurance as may be required by the Lease of the Approved Location or by any of Franchisee's lenders or equipment lessors, and such workers' compensation insurance as may be required by applicable law. Franchisee must deliver a certificate of insurance to Franchisor at least twenty (20) days prior to opening the Franchised Business and ten (10) days prior to any renewal of the required policies, as evidence that all insurance requirements have been met. All insurance policies held by Franchisee will be primary to any policy or policies held by Franchisor or its affiliates.

9.3     **Designees**.  All liability policies will list Franchisor as an additional insured except the Employment Practices Liability policy where Franchisor will be named as co-defendant. The Commercial General Liability policy shall contain a waiver of subrogation in favor of Franchisor and any parties Franchisor designates, and will be primary and non-contributory to any insurance Franchisor might carry. Franchisor reserves the right to modify required insurance coverage during the course of Franchisee's Agreement based on changes in risk factors, for which Franchisee will comply with upon written notice from Franchisor.

9.4     **Claims Cancellation**.  Franchisee must provide Franchisor with copies of any insurance claims or insurance cancellations within twenty-four (24) hours of Franchisee's receipt of said claims or cancellations. Franchisee has a twenty-four (24)-hour opportunity to cure any lapses in insurance coverage. No insurance policy must be subject to cancellation, termination, non-renewal or material modification, except upon at least thirty (30) calendar days' prior written notice from the insurance carrier to Franchisor. Franchisee must submit a certificate of insurance which demonstrates compliance with this Section 9.

9.5     **Failure to Maintain Insurance**.  If Franchisee fails to comply with the minimum insurance requirements set forth herein, Franchisor has the right to obtain such insurance and keep same in force and effect, and Franchisee shall pay Franchisor, on demand, the premium cost thereof and a one hundred dollar ($100) administrative fee for the costs incurred in connection with Franchisor obtaining the insurance.

9.6     **Modification of Requirements**.  Franchisor has the right to increase or otherwise modify the minimum insurance requirements upon thirty (30) days' prior written notice to Franchisee, and Franchisee shall comply with any such modification within the time specified in said notice.

## 10.     FINANCIAL RECORDS AND REPORTS

10.1     **Reporting**.  Franchisee must maintain, for at least ten (10) fiscal years from their preparation, full, complete accurate records of all sales, marketing activities, contracts, estimates, authorizations, receipts, payroll and accounts payable, and any other documents and records used in connection with the Franchised Business, in accordance with the standard accounting system described by the Franchisor in the Operations Manual or otherwise specified in writing. Franchisee must also provide Franchisor with complete financial records for the operation of the Franchised Business as described in this Section in accordance with generally accepted accounting principles.

10.1.1 Franchisee will, at its expense, submit to Franchisor within sixty (60) days of the end of each calendar year of the Franchised Business during the term of this Agreement, a complete financial statement for the said calendar year, including, without limitation, both an income statement and balance sheet, which may be unaudited, together with such other information in such form as the Franchisor may require.

10.1.2 Each financial statement shall be signed by Franchisee or by an individual authorized by Franchisee, attesting that the statement is true and correct and prepared in accordance with Franchisor's requirements.

10.1.3 Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks and Franchisor's software provider(s). Franchisee must, upon Franchisor's request, grant temporary administrative access to any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations (including, but not limited to, QuickBooks or our then-current accounting software) to Franchisor and/or its designee for the limited purpose of integration with franchise systems (i.e., ServiceMinder or similar systems) or collecting financial reporting data as required under the Franchise Agreement.

10.1.4 Franchisee shall provide Franchisor any other data, information and supporting records that Franchisor designates from time to time, including any and all reports set forth in the Operations Manual.

10.2 **Tax Returns**. In addition to the information and materials set forth in Section 10.1, Franchisee agrees to maintain, and furnish to Franchisor within thirty (30) days of filing: (i) complete copies of all federal, state and local tax returns, including those detailing income, sales, value added, use and service taxes, as well as employee withholding, workers' compensation, and similar reports filed by Franchisee reflecting financial activities of the Franchised Business; and (ii) Franchisee's (or Franchisee's principals') personal federal, state and local tax returns; and Franchisee hereby waives, to the extent not prohibited by applicable law, any right to object to disclosure of any tax returns.

10.3 **Right to Disclose Information**. Franchisor has the right to use and disclose data derived from the reports Franchisee furnishes to Franchisor. Franchisee hereby consents to us obtaining, using and disclosing to third parties (including, without limitation, prospective franchisees, financial institutions, legal and financial advisors), for any purpose whatsoever or as may be required by law, any financial or other information contained in or resulting from information, data, materials, statements and reports received by us or our affiliates (or disclosed to us or our affiliates) in accordance with this Agreement. Notwithstanding the foregoing, tax return data will only be disclosed to legal and financial advisors or as may be required by law.

## 11. BOOKS AND RECORDS

11.1 **Records and Audits**. Franchisee must establish and maintain, at its own expense, accurate business records, reports, accounts, books and data relating to the operation of the Franchised Business that conforms to the requirements and formats (including a specific chart of accounts) Franchisor prescribes from time to time. We may designate an approved bookkeeping vendor (or one of a list of vendors) that Franchisee must use and Franchisee hereby consent to such vendor providing access to any business records that Franchisor would otherwise be entitled to pursuant to the Franchise Agreement.

Franchisee may be required to use the Computer System to maintain sales data and other information and to generate the reports Franchisor requires. Franchisor may require use of a specific

accounting software and version thereof as set forth in the Operations Manual, and Franchisee will be solely responsible for any associated cost.

Franchisor and Franchisor's designees have the right to inspect and/or audit Franchisee's business records at any time during normal business hours to determine whether Franchisee is current with suppliers and otherwise operating in compliance with the terms of this Agreement and the Operations Manual. Moreover, Franchisee must also provide Franchisor with access to the information generated by any software Franchisor requires Franchisee to use in connection with its bookkeeping and other accounting obligations under this Agreement, including QuickBooks (or our then-current accounting software, if different) and Franchisor's software provider.

If any audit reveals that Franchisee has understated Franchisee's financial information, including, but not limited to, Royalty Fee or Brand Fund Contribution payments, by more than two percent (2%), or if Franchisee has failed to submit timely reports and/or remittances for any two (2) reporting periods within any twelve (12)-month period, Franchisee must pay our costs and expenses, including the cost of such audit and/or inspection, the cost of outside auditors and attorneys (to the extent Franchisor incurs such costs), together with amounts due for Royalty Fees and other fees as a result of such underreporting and/or failure to submit reports, along with all late fees and interest which may otherwise be due under this Agreement.

11.2    **Corporate or Limited Liability Company Franchisee Records**.  If Franchisee becomes a corporation, limited liability company or other business entity either prior to executing this Agreement, or at any time during the term of this Agreement, the following requirements, when applicable, shall apply:

11.2.1   Copies of Franchisee's Articles of Incorporation or Charter, minutes of the annual meeting, by- laws and other governing documents, and any amendments thereto, copies of initial shareholder certificates and Shareholder Agreements, if any, and the Resolutions of the Board of Directors authorizing entry into this Agreement as required by the Franchisor and as set forth in the Operations Manual shall be promptly furnished to Franchisor.

11.2.2   Franchisee shall maintain a current list of all owners or members of record and all beneficial owners of any class of stock of Franchisee and shall furnish such list to Franchisor annually.

11.2.3   All members with or shareholders of, Franchisee shall jointly and severally guarantee Franchisee's performance hereunder and shall bind themselves to the terms of a Personal Guaranty in a form approved by Franchisor (see <u>Exhibit A</u> to this Agreement). All members and/or shareholders shall also be individually subject to the non- disclosure and confidentiality provisions set forth in this Agreement, as well as any and all in- term and post- term restrictive covenants. However, the requirements of this subsection shall not apply to any corporation registered under the Securities Exchange Act of 1934 (hereinafter known as a "<u>Publicly-held Corporation</u>").

11.2.4   The majority equity owner in the entity that becomes the Franchisee must complete the Initial Training Program and all other training required by the Franchisor and work directly in the day-to- day operations of the Franchised Business and devote his or her personal full-time attention, skill and best efforts to the management and operation of the Franchised Business, unless Franchisor agrees otherwise in writing.

11.2.5   All issued and outstanding stock certificates of such corporation shall bear the following legend:

*EXAMPLE: "Transfers of these shares is subject to certain restrictions contained in a Franchise Agreement between __and A1 Kitchen & Bath Franchising, LLC, dated ___."*

## 12. ADVERTISING

Recognizing the value of advertising and promotion, and the importance of the standardization of advertising and promotion programs to further the goodwill and public image of the System, the parties agree as follows:

12.1 **Generally**. With regard to advertising generally for the Franchised Business, Franchisee will only use or display the advertising materials Franchisor approves in writing. If Franchisee wishes to use any advertising or promotional materials other than those currently approved for use by System franchisees, then Franchisee must submit Franchisee's proposed materials to Franchisor for approval at least thirty (30) days prior to its intended use. Franchisor will use commercially reasonable efforts to notify Franchisee of Franchisor's approval or disapproval of the proposed materials within fifteen (15) days of the date such materials are received. If Franchisee does not receive Franchisor's written approval within fifteen (15) days, proposed materials shall be deemed disapproved. All advertising must prominently display the Proprietary Marks and will comply with any standards for use of the Proprietary Marks that Franchisor establishes, as set forth in the Operations Manual or otherwise in writing. Franchisor may require Franchisee to discontinue the use of any advertising or marketing material, within time frames prescribed by Franchisor, at Franchisee's sole cost and expense.

12.2 **Internet Website**. Franchisee must obtain and maintain adequate hardware and software in order to access the Internet at the bit speed Franchisor requires from time to time. Franchisee is prohibited, however, from establishing any website or other presence on the Internet, except as provided herein. Franchisor may unilaterally modify the provisions of this Section from time to time in its sole discretion.

12.2.1 Franchisor may, but is not obligated to, establish an Internet website that provides information about the System and the products and services offered by Franchised Businesses. In the event Franchisor exercises its right to create such a website, Franchisor shall have sole discretion and control over the website (including timing, design, content and continuation).

12.2.2 Franchisor may, but is not obligated to, create interior pages on its website(s) that contain information about Franchisee's Franchised Business and other franchised businesses. If Franchisor does create such pages, Franchisor may require Franchisee to prepare all or a portion of the page for Franchisee's Franchised Business, at Franchisee's expense, using a template that Franchisor provides. All such information will be subject to Franchisor's approval prior to posting.

12.2.3 Except as approved in advance in writing by Franchisor, Franchisee must not establish or maintain a separate website, splash page, profile or other presence on the Internet, or otherwise advertise on the Internet or any other public computer network in connection with the Franchised Business, including any profile on Facebook, Twitter, LinkedIn, YouTube, Pinterest, Instagram, Snapchat, or any other social media and/or networking site. If such approval is granted by Franchisor, Franchisee must: (i) establish and operate such site or page in accordance with System standards and any other policies Franchisor designates in the Operations Manual or otherwise in writing from time to time; and (ii) utilize any templates that Franchisor provides to Franchisee to create and/or modify such site(s). Franchisor will retain ownership of any and all social media or referral websites / accounts.

12.2.4 Franchisor may use a portion of the Brand Fund Contribution to pay or reimburse itself for the costs incurred in connection with the development, maintenance and update of its website.

12.2.5  Franchisee acknowledges that Franchisor and/or Franchisor's affiliates are the lawful, rightful and sole owner of the Internet domain name www.thedesignery.com, as well as any other Internet domain names registered by Franchisor and/or Franchisor's affiliates, and unconditionally disclaims any ownership interest in such Internet domain names and any Internet domain names similar thereto. Franchisee agrees not to register any Internet domain name in any class or category that contains words used in or similar to any brand name owned by Franchisor or Franchisor's affiliates or any abbreviation, acronym, phonetic variation or visual variation of those words.

12.3  **Brand Fund**.  Franchisor has established a Brand Fund for the common benefit of System franchisees. Franchisor requires Franchisee to participate in and contribute on a monthly basis, one percent (1%) of the Franchised Business's Gross Revenue to the Brand Fund. Notwithstanding the foregoing, Franchisor reserves the right to increase the Brand Fund Contribution at any time upon providing notice to Franchisee, provided that the Brand Fund Contribution will not exceed three percent (3%) of Gross Revenue during the term of this Agreement. Franchisee must pay the Brand Fund Contribution directly to the Brand Fund via EFT on a monthly basis on or before the tenth (10th) business day of each month based on the Gross Revenue generated during the preceding calendar month. Franchisor reserves the right to modify the frequency, manner or method of payment upon providing reasonable notice to Franchisee.

12.3.1  Franchisor will use the Brand Fund, in Franchisor's sole discretion, to develop, produce and distribute national, regional and/or local advertising and to create advertising materials and public relations programs which promote, in Franchisor's sole judgment, the services offered by System franchisees. Franchisor has the sole right to determine contributions and expenditures from the Brand Fund, or any other advertising program, and sole authority to determine, without limitation, the selection of the advertising materials and programs, provided, however, that Franchisor will make a good faith effort to expend the Brand Fund in the general best interests of the System on a national or regional basis. Franchisor may use the Brand Fund to satisfy any and all costs of maintaining, administering, directing, preparing, and producing advertising, including: (i) the cost of preparing and producing Internet, television, radio, magazine and newspaper advertising campaigns; (ii) the cost of direct mail and outdoor billboard advertising; (iii) the cost of soliciting National Accounts; (iv) the cost of public relations activities and advertising agencies; (v) the cost of developing and maintaining an Internet website; (vi) personnel and other departmental costs for advertising that Franchisor internally administers or prepares; and (vii) the costs of building partnerships with national or regional brands. Nevertheless, Franchisee acknowledges that not all System franchisees will benefit directly or on a pro rata basis from such expenditures. The Brand Fund will not be used for the direct solicitation of franchise sales, but Franchisor reserves the right to include a notation in any advertisement indicating "Franchises Available." Franchisor also reserves the right to use the Brand Fund for public relations or recognition of the brand.

12.3.2  Franchisor may periodically assist franchisees to maintain high quality standards through customer surveys, customer interviews, and other similar initiatives ("Surveys"). The cost of such programs will be borne by the Brand Fund. The cost of these programs may be charged directly to Franchisee if Franchisee's results from a Survey fall below System-established minimum standards for such Surveys.

12.3.3  Franchisor has the right to reimburse itself from the Brand Fund for such costs and overhead, if any, as Franchisor may incur in activities reasonably related to the direction and implementation of the Brand Fund.

12.3.4  In Franchisor's sole discretion, units owned and operated by Franchisor or its affiliates may, but are not obligated to, contribute to the Brand Fund. Franchisee acknowledges that the use of the Brand Fund or other advertising funds or accounts and the expenditures made thereby, may benefit

Franchisor and its units, even though the units operated by Franchisor or its affiliates may or may not contribute to the Brand Fund or other advertising funds or accounts.

12.3.5   Franchisor will prepare on an annual basis, and will have available for Franchisee within one hundred twenty (120) days of the end of the fiscal year, a statement of contributions and expenditures for the Brand Fund. The statement will be presented to Franchisee upon Franchisor's written request. The Brand Fund is not required to be independently audited.

12.3.6   Franchisor has the right to require that an advertising cooperative and/or franchisee advisory council be formed, changed, dissolved or merged.

12.3.7   Franchisor assumes no obligation or liability to Franchisee with respect to the maintenance, direction or administration of the Brand Fund or any other advertising funds or accounts maintained in connection with this Agreement, except as expressly set forth in this Section. Franchisor also has the right to cause the Brand Fund to be incorporated or operated through a separate entity at such time as Franchisor deems appropriate, and such successor entity will have all of the rights and duties specified herein.

12.3.8   Franchisee acknowledges that the Brand Fund is not a trust or an asset of Franchisor and that Franchisor is not a fiduciary to Franchisee with respect to, or a trustee of, the Brand Fund or the monies therein.

12.3.9   Franchisor may suspend or terminate the Brand Fund at any time, and any surplus funds may only be used for marketing and advertising purposes until fully expended.

**12.4**     **Regional Advertising and Promotional Cooperative**.  Franchisor may, in Franchisor's discretion, designate any geographical area for purposes of establishing a regional advertising and promotional cooperative ("Cooperative"), and to determine whether a Cooperative is applicable to the Franchised Business. If a Cooperative is established applicable to the Franchised Business, Franchisee must participate in the Cooperative. Cooperative contributions will be credited towards the Local Advertising Requirement discussed in Section 12.5 below. The following provisions will apply to each Cooperative:

12.4.1   Each Cooperative will be organized and governed in a form and manner, and will commence operation on a date, approved in advance by Franchisor;

12.4.2   Each Cooperative will be organized for the exclusive purpose of administering regional advertising programs and developing, subject to Franchisor's approval, standardized advertising materials for use by the members in local advertising;

12.4.3   No promotional or advertising plans or materials may be used by a Cooperative or furnished to its members without Franchisor's prior approval. All such plans and materials must be submitted to Franchisor in accordance with the procedure set forth in Section 12.1 hereof;

12.4.4   Each Cooperative will have the right to require its members to make contributions to the Cooperative in such amounts as determined by the Cooperative; however, the Cooperative may, by a two-thirds majority vote of its members, require a Cooperative contribution in excess of the Local Advertising Requirement;

12.4.5   Each member franchisee must submit to the Cooperative its respective contribution together with such other statements or reports as Franchisor may require or as may be required by the Cooperative with Franchisor's approval;

12.4.6   Franchisor may grant to Franchisee, in its sole discretion, an exemption for any length of time from the requirement of membership in a Cooperative, upon written request from Franchisee stating reasons supporting such exemption. Franchisor's decision concerning such request for exemption will be final; and

12.4.7   Franchisor will have the power to require any Cooperative to be formed, changed, dissolved, or merged at any time.

## 12.5    Local Advertising

12.5.1   *Grand Opening Marketing*.   In connection with the opening of the Franchised Business, Franchisee must spend a minimum amount of five thousand dollars ($5,000) in local advertising, and as otherwise required and directed by Franchisor ("Grand Opening Marketing"). Any marketing must be conducted in accordance with Franchisor's standards and specifications, as described in the Operations Manual or this Agreement. Franchisor reserves the right to collect all or a portion of the Grand Opening Marketing. Franchisor reserves the right to increase the required spend to seven thousand dollars ($7,000) as Franchisor deems necessary.

12.5.2   *Local Advertising Requirement*.   In addition to the Brand Fund Contributions described above in Section 12.3, Franchisee will be required to spend the greater of: (i) three percent (3%) of Gross Revenue; or (ii) three thousand dollars ($3,000) per month on local advertising and promotion in accordance with Franchisor's standards and specifications (the "Local Advertising Requirement, as defined in Section 3.6). Franchisor reserves the right to increase the Local Advertising Requirement to the greater of: (i) four percent (4%) of Gross Revenue; or (ii) four thousand dollars ($4,000) per month, upon ninety (90) days' prior written notice. Franchisee must spend the Local Advertising Requirement as Franchisor prescribes in the Operations Manual or otherwise in writing, which may include, without limitation, requirements for placing a certain number and/or type(s) of media advertisements, or engaging certain public figures to assist the Franchisee in promoting its Franchised Business. The Local Advertising Requirement must be expended within Franchisee's Designated Territory. Franchisee acknowledges and agrees that Franchisee's Local Advertising Requirement must be expended regardless of the amount(s) spent by other System franchisees on local advertising. Franchisee may spend any additional sums Franchisee determines on local advertising. Franchisee must use only such advertising and promotional materials as have been previously approved by Franchisor. Franchisee must submit to Franchisor proof of Franchisee's expenditures on local advertising. All phone numbers used in local advertising by the Franchised Business of any form must be forwarded to Franchisor's Call Center.

12.5.3   *Local Advertising Services*.   Franchisee must sign the Franchisor Directed Advertising Services Agreement and purchase all Local Advertising Services (defined in the Franchisor Directed Advertising Services Agreement attached hereto as Exhibit H) from Franchisor unless Franchisor provides written permission otherwise. For Franchisor's Local Advertising Services, Franchisee agrees to pay Franchisor or an affiliate Franchisor designates, a non-refundable fee (the "Franchisor Directed Advertising Fee") in an amount designated in the Franchisor Directed Advertising Services Agreement, as updated in the Operations Manual periodically. The Franchisor Directed Advertising Fee is credited to Franchisee's required monthly Local Advertising Requirement. In no event will the Franchisor Directed Advertising Fee be more than the Local Advertising Requirement.

## 12.6    Advisory Council.   Franchisor reserves the right to establish an Advisory Council ("Advisory Council"). Elected franchisee(s) must participate actively in the Advisory Council as Franchisor designates, and participate in all Advisory Council meetings approved by Franchisor. Franchisor reserves the right to prepare and amend the governing documents for the Advisory Council from time to time, in its

sole discretion, at any time. Franchisor, in its sole discretion, will determine the topic areas to be considered by the Advisory Council. The purposes of the Advisory Council shall include, but are not limited to: (i) exchanging ideas and problem- solving methods; (ii) advising Franchisor on expenditures for System-wide advertising; and (iii) coordinating franchisee efforts. Amounts and expenditures may vary from time to time due to variations in Advisory Council participation and costs, as determined by the Advisory Council, and as approved by Franchisor. The Advisory Council shall act in an advisory capacity only. Franchisor will have the right to form, change or dissolve any Advisory Council at any time in its sole discretion.

## 13      INDEPENDENTBUSINESS; INDEMNIFICATION

13.1      **Independent Business Status**.  Franchisee is an independent business responsible for full control over the internal management and daily operation of the Franchised Business, and neither party to this Agreement is the agent, principal, partner, employee, employer or joint venture partner of the other party. Franchisee may not act or represent itself, directly or by implication, as Franchisor's agent, partner, employee or joint venture partner, and Franchisee may not incur any obligation on Franchisor's behalf or in Franchisor's name. All stationery, business cards and contractual agreements entered into by Franchisee shall contain Franchisee's corporate or fictitious name and a conspicuously displayed notice, in the place Franchisor designates, that Franchisee operates the Franchised Business as an independently owned and operated business, and that Franchisee independently owns and operates the Franchised Business as a System franchisee. Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name, and Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action, nor shall Franchisor be liable by reason of any of Franchisee's acts or omissions in the operation of the Franchised Business or for any claim or judgment arising therefrom against Franchisee or Franchisor. Neither this Agreement nor Franchisor's course of conduct is intended, nor may anything in this Agreement (nor Franchisor's course of conduct) be construed to state or imply that Franchisor is the employer of Franchisee's employees and/or independent contractors. It is understood and agreed by the parties hereto that this Agreement does not establish any fiduciary relationship between them.

13.2      **Indemnification**.  Franchisee and Franchisee's principals agree to indemnify, defend and hold Franchisor, Franchisor's affiliates and their respective shareholders, directors, officers, employees, agents, successors and assignees ("Indemnitees") harmless against and to reimburse them for the actual costs of all claims, obligations, liabilities, fines, losses, damages, costs and expenses (including attorneys' fees, except to the extent such fees are determined by an arbitrator or court of competent jurisdiction to be unreasonable, in which case the fees shall be adjusted to be reasonable by such arbitrator or court) ("Claims"), including any and all taxes, directly or indirectly arising out of, in whole or in part: (i) the operation of the Franchised Business, including the use, condition, or construction, equipping, maintenance or operation of the Franchised Business and Franchisee's advertising; (ii) the unauthorized use of the Proprietary Marks and other Proprietary Material; (iii) the transfer of any interest in this Agreement or the Franchised Business in any manner not in accordance with this Agreement; (iv) the infringement, alleged infringement, or any other violation or alleged violation by Franchisee or any of Franchisee's principals of any patent, trademark or copyright, or other proprietary right owned or controlled by third parties; or (v) libel, slander or any other form of defamation of Franchisor, the System, or any franchisee or developer operating under the System, by Franchisee or by any of Franchisee's principals, except for Claims that are determined by an arbitrator or court of competent jurisdiction to have been caused solely and directly by the indemnified party's gross negligence, willful misconduct, strict liability, or fraud. For purposes of this indemnification, "Claims" shall mean and include all obligations, actual, consequential, punitive, and other damages and costs reasonably incurred in the defense of any action, including attorneys', attorney assistants' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether or not such claims exceed the amount of insurance

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

coverage available through Franchisee to Franchisor. Franchisor shall have the right to defend any such claim against it in such manner as Franchisor deems appropriate or desirable, in Franchisor's sole discretion. Such an undertaking by Franchisor shall, in no manner or form, diminish Franchisee's and each of Franchisee's principals,' obligations to indemnify the Indemnities and to hold them harmless. This indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## 14     SALE OR TRANSFER

14.1     **Transfer**.  Franchisee's rights under this Agreement are personal, and Franchisee shall not sell, transfer, assign or encumber Franchisee's interest in the Franchised Business without Franchisor's prior written consent. Any sale, transfer, assignment or encumbrance made without Franchisor's prior written consent shall be voidable at Franchisor's option and shall subject this Agreement to termination as specified herein. For purposes of this Agreement, "Transfer" as a verb means to sell, assign, give away, transfer, pledge, mortgage or encumber, voluntarily, involuntarily, or by operation of law (such as through divorce or bankruptcy proceedings), any interest in this Agreement, the Franchised Business, substantially all the assets of the Franchised Business, or in the ownership of the Franchised Business (if you are an entity). "Transfer" as a noun means any sale, assignment, gift, transfer, pledge, mortgage or encumbrance. Franchisor will not unreasonably withhold, condition, or delay a request to transfer by Franchisee. Franchisee acknowledges and agrees that the conditions set forth for transfer in this Section 14 are reasonable.

14.2     **Death or Disability**

14.2.1     *Representative's Right to Continue as Franchisee*.   In the event of Franchisee's death, disability or incapacitation (or the death, disability or incapacitation of Franchisee's partners or personal guarantors), Franchisee's legal representative or Franchisee's partner's or guarantor's respective legal representative, as applicable, will have the right to continue the operation of the Franchised Business as franchisee under this Agreement if: (i) within one hundred eighty (180) days from the date of death, disability or incapacity (the "180-Day Period"), such person: (a) meets Franchisor's then-current standards to become a franchisee, as described in Section 14.3.2.6; and (b) has obtained Franchisor's prior written approval and has executed Franchisor's then-current franchise agreement for the unexpired term of the franchise, or has furnished a personal guaranty of any partnership, corporation or limited liability company guarantying franchisee's obligations to Franchisor and Franchisor's affiliates; and (ii) such person successfully completes Franchisor's training program (which Franchisor will provide at Franchisor's then-current tuition rate). Such assignment by operation of law will not be deemed in violation of this Agreement, provided such heirs or legatees accept the conditions imposed by the Franchise Agreement and are acceptable to Franchisor. However, in the case of a transfer by demise or inheritance, if the heirs or beneficiaries of any deceased person are unable to meet the conditions contained in this Agreement, the personal representative of the deceased Franchisee will have a reasonable time, in Franchisor's sole discretion, which shall not exceed one hundred eighty (180) days from the date or transfer by demise or inheritance, to dispose of the deceased's interest in the Franchised Business and such disposition will be subject to all the terms and conditions for transfer contained in this Agreement. If the interest is not disposed of in the manner and time frame provided in the immediately preceding sentence, then Franchisor may terminate this Agreement.

14.2.2     *Franchised Business Operation During and After 180-Day Period*.  Franchisor is under no obligation to operate the Franchised Business, or incur any obligation on behalf of any incapacitated franchisee during or after the 180-Day Period. If necessary, Franchisee (or Franchisee's legal representative, as applicable) shall appoint a previously approved acting interim manager to operate the Franchised Business during the 180-Day Period. In the event of Franchisee's death, disability, absence or

otherwise, Franchisor may (but is not required to) operate Franchisee's Franchised Business on Franchisee's behalf and at Franchisee's expense for such period of time (and under such terms and conditions) as Franchisor determines, including paying out the assets and/or revenues of the Franchised Business to cover any or all past, current and/or future obligations of the Franchised Business (including any amounts owed to Franchisor and/or any affiliate) in such priorities as Franchisor determines from time to time, in Franchisor's sole and absolute discretion. Franchisor may pay itself its then-current fee to reimburse Franchisor for Franchisor's management services and other costs. Franchisor may obtain approval of a court or arbitrator for any such arrangements, the attorneys' fees and other costs incurred in connection with obtaining such approval to be charged against the assets and/or revenues of the Franchised Business. Franchisee (and/or Franchisee's estate) will indemnify Franchisor against any costs and/or liabilities incurred by it in connection with, or related in any way to, the operation (or otherwise) of the Franchised Business.

14.3 **Ownership Changes**. A sale, transfer or assignment requiring Franchisor's prior written consent shall be deemed to occur: (i) if Franchisee is a corporation, upon any assignment, sale, pledge or transfer of any fractional portion of Franchisee's voting stock or any increase in the number of outstanding shares of Franchisee's voting stock which results in a change of ownership; (ii) if Franchisee is a partnership, upon the assignment, sale, pledge or transfer of any fractional partnership ownership interest; or (iii) if Franchisee is a limited liability company, upon the assignment, sale, pledge or transfer of any interest in the limited liability company. Any new partner, shareholder, or member or manager will be required to personally guarantee Franchisee's obligations under this Agreement. A transfer pursuant to (i) through (iii) above shall not be subject to Franchisor's right of first refusal as set forth in Section 14.3.1.

14.3.1 *Right of First Refusal.* If Franchisee proposes to transfer either this Agreement or all, or substantially all, of the assets used in connection with the Franchised Business or any interest in Franchisee's lease to any third party (other than a corporation or limited liability company as set forth herein), Franchisee shall first offer to sell such interest to Franchisor on the same terms and conditions as offered by such third party. Franchisee shall obtain from the third party and provide to Franchisor a statement in writing, signed by the third party and Franchisee, of the terms of the offer ("Letter of Intent"). If Franchisor elects not to accept the offer within a thirty (30)-day period, Franchisee shall have a period not to exceed sixty (60) days to complete the transfer described in the Letter of Intent, subject to the conditions for approval set forth herein. Franchisee shall effect no other sale or transfer as contemplated under the Letter of Intent without first complying with this Section. Any material change in the terms of the offer shall be deemed a new proposal, subject to Franchisor's right of first refusal. So long as Franchisee has obtained Franchisor's prior written consent, which shall not be unreasonably withheld, a transfer to an existing partner, shareholder or member, or a transfer as a result of the death, disability or incapacitation of a shareholder or partner in accordance with the provisions set forth below, is not subject to Franchisor's first right of refusal. In the event the consideration, terms and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms and/or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within thirty (30) days on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by the third party, an independent appraiser shall be designated by Franchisor at Franchisor's expense, and the appraiser's determination shall be binding.

14.3.2 *Conditions for Approval.* Franchisee shall notify Franchisor in writing of any proposed transfer of this Agreement, any direct or indirect interest in Franchisee, or in all or substantially all of the assets of the Franchised Business at least thirty (30) days before such transfer is proposed to take place. Franchisor may condition Franchisor's approval of any proposed sale or transfer of the Franchised Business or of Franchisee's interest in this Agreement upon satisfaction of the following occurrences:

14.3.2.1    All of Franchisee's accrued monetary obligations to Franchisor, Franchisor's affiliates, and Franchisor's designated/approved suppliers and vendors must be satisfied;

14.3.2.2    Franchisee must cure all existing defaults under this Agreement, or any other agreement between Franchisee and Franchisor, Franchisor's affiliates, and Franchisor's designated/approved suppliers and vendors within the period permitted for cure and have substantially complied with such agreements during their respective terms;

14.3.2.3    Franchisee and Franchisee's principals (if Franchisee is a partnership, corporation or limited liability company), and the transferee (if it has had any previous relationship with Franchisor or Franchisor's affiliates), must execute a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and Franchisor's affiliates and officers, directors, shareholders and employees, in their corporate and individual capacities; provided, however, the general release shall not be inconsistent with any applicable state statute regulating franchising.

14.3.2.4    Transferor and transferee must execute a mutual general release relieving all claims against each other, excluding only such claims relating to any provision or covenant of this Agreement which imposes obligations beyond the expiration of this Agreement;

14.3.2.5    Franchisee or transferee must provide Franchisor a copy of the executed purchase agreement relating to the proposed transfer with all supporting documents and schedules, including transferee's assumption of and agreement to faithfully perform all of Franchisee's obligations under this Agreement;

14.3.2.6    Transferee must demonstrate to Franchisor's satisfaction that he or she: (i) meets Franchisor's educational, managerial and business standards; (ii) possesses a good moral character, business reputation and credit rating; (iii) has the aptitude and ability to conduct the business to be transferred; and (iv) has adequate financial resources and capital to meet the performance obligations under this Agreement; however, transferee shall not be in the same business as Franchisor either as licensor, franchisor, independent operator or licensee of any other business or chain which is similar in nature or in competition with Franchisor, except that the transferee may be an existing franchisee of ours;

14.3.2.7    At Franchisor's option, transferee (and, if transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) either: (i) enter into a written assignment, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement; or (ii) execute Franchisor's then-current franchise agreement, and will receive a full then-current initial term for a franchisee, which term will commence on the date the transferee executes the then-current Franchise Agreement;

14.3.2.8    Franchisee must pay Franchisor a transfer fee equal to ten thousand dollars ($10,000) per Designated Territory that is being transferred to transferee. A non-refundable deposit of three thousand dollars ($3,000) of the Transfer Fee is due with Franchisee's written notice of proposed transfer and the balance of seven thousand dollars ($7,000) is due upon Franchisor's approval at closing. In the event Franchisee transfers multiple Designated Territories at once, Franchisor reserves the right, but not the obligation, in Franchisor's sole discretion, to reduce the transfer fee for any of the Designated Territories being transferred, by any amount;

14.3.2.9    Transferee shall satisfactorily complete Franchisor's training program at the transferee's expense within the time frame Franchisor sets forth;

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

14.3.2.10    Franchisee, and Franchisee's principals if Franchisee is a partnership, corporation or limited liability company, and the members of their respective families must comply with the post-termination provisions of this Agreement;

14.3.2.11    Transferee must obtain, within the time limits set by Franchisor, and maintain thereafter, all permits and licenses required for the operation of the Franchised Business;

14.3.2.12    To the extent required by the terms of any leases or other agreements, the lessors or other parties must consent to the proposed transfer;

14.3.2.13    The transfer must be made in compliance with any laws that apply to the transfer, including state and federal laws governing the offer and sale of franchises;

14.3.2.14    Franchisee must ensure that all projects in progress at the time of the transfer will be continued without interruption, and the transferee must promptly notify all current customers of the change in ownership;

14.3.2.15    The purchase price and terms of the proposed transfer must not be so burdensome to the prospective transferee as to impair or materially threaten its future operation of the Franchised Business and performance under its franchise agreement;

14.3.2.16    Franchisee must request that Franchisor provide the prospective transferee with Franchisor's current form of Franchisee Disclosure Document and Franchisor shall not be liable for any representations not included in the Franchisee Disclosure Document;

14.3.2.17    Franchisor's approval of the transfer will not constitute a waiver of any claims Franchisor may have against the transferring party; and

14.3.2.18    Franchisor will have the right to disclose to any prospective transferee such revenue reports and other financial information concerning Franchisee and Franchisee's Franchised Business as Franchisee has supplied Franchisor hereunder.

14.4    **Transfer to a Corporation or Limited Liability Company**.  If Franchisee is an individual and desires to assign its rights under this Agreement to a corporation or limited liability company, and if all of the following conditions are met, Franchisor will consent to the transfer without assessing the transfer fees set forth above, and such assignment will not be subject to Franchisor's right of first refusal in Section 14.3.1:

14.4.1   The corporation or limited liability company is newly organized and its activities are confined to operating the Franchised Business;

14.4.2   Franchisee is, and at all times remains, the owner of at least fifty-one percent (51%) of the outstanding shares of the corporation or a controlling interest in the limited liability company;

14.4.3   The corporation or limited liability company agrees in writing to assume all of Franchisee's obligations hereunder;

14.4.4   All stockholders of the corporation, or members and managers of the limited liability company, as applicable, must execute Franchisor's prescribed form of personal guaranty;

Case 3:25-cv-00261-MOC-DCK    Document 1-1    Filed 04/15/25    Page 128 of 169

14.4.5 At Franchisor's request, Franchisee will furnish true and correct copies of all documents and contracts governing the rights, obligations and powers of Franchisee's owners and agents (such as articles of incorporation or organization and partnership, operating or shareholder agreements and similar documents).

14.4.6 Franchisee and Franchisee's principals (if Franchisee is a partnership, corporation or limited liability company), and transferee (if it has had any previous relationship with Franchisor or Franchisor's affiliates), must execute a general release under seal, in a form satisfactory to Franchisor, of any and all claims against Franchisor and Franchisor's affiliates and officers, directors, shareholders and employees, in their corporate and individual capacities; provided, however, the general release shall not be inconsistent with any applicable state statute regulating franchising.

14.4.7 *Non-Traditional Ownership Structures*. Franchisor may, but is not obligated to, approve a Transfer to or allow ownership by an ESOP, trust or private equity firm ("Non-traditional Ownership") and any request to Transfer to an ESOP, trust or private equity firm may be denied in our sole discretion. However, if we do approve a Transfer by an ESOP, trust or private equity firm, we may impose additional requirements that include, but are not limited to, the following: (a) the ownership and related requirements set forth in Section 14.4.7.1; (b) additional financial covenants; (c) additional insurance requirements; (d) an enhanced right to purchase the Franchised Business, and such other conditions that Franchisor deems appropriate in Franchisor's Business Judgment.

14.4.7.1 *Operational Control-Non-Traditional Entities*. ESOP or other trust ownership of the Franchised Business is permitted only with our prior written permission, which may be granted or withheld in our sole discretion. At all times, the guarantors directly will: (i) control all aspects of Franchisee and the operation of the Franchised Business; and (ii) serve as trustee of the trust and retain sole control over the voting of the trust's equity interest in the Franchisee. The Trustee must at all times be an individual and must meet the then-current requirements of franchise ownership. Any change in trustee is deemed a Transfer and is subject to approval as set forth in this Agreement. Any change in beneficiaries is deemed a Transfer. Any such Transfer is subject to approval conditions and other rights we have as set forth in this Agreement. Franchisee acknowledges and agrees that: (i) if the guarantors do not maintain operational control respecting each of: (a) the Franchised Business; (b) the Franchisee; and (c) the trust, such an event will constitute a Transfer as described in Article 14 of this Agreement and Franchisee must comply with all applicable provisions of such Article; and (ii) if the guarantors desire to turn over operational control respecting the Franchisee, the trust, or the Franchised Business to one or more trust beneficiaries, such beneficiaries must satisfy all conditions to consent as described in Article 20 of this Agreement. The trust must be and remain a revocable trust. If by operation of law or otherwise the trust converts to an irrevocable trust, the trust must divest ownership of the Franchised Business to an approved person or entity pursuant to the terms of Article 14 of this Agreement. The trust must contain a provision equivalent to and granting the trustee the following powers with regard to trust assets: "The trustee may exercise all rights of an absolute owner with respect to stocks, other securities, and closely held business interests. The trustee is hereby authorized to sell, convey, pledge, mortgage, lease or transfer title to any interest in the trust property for a period within or extending beyond the duration of the trust."

14.5 **Franchisor's Right to Transfer**. Franchisor has the right to sell, transfer, assign and/or encumber all or any part of Franchisor's assets and Franchisor's interest in, and rights and obligations under, this Agreement, in Franchisor's sole discretion.

## 15 BREACH AND TERMINATION

15.1 **Automatic Termination**. This Agreement shall automatically terminate without notice or an opportunity to cure upon the occurrence of any of the following:

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

15.1.1 *Voluntary Bankruptcy.* If Franchisee makes an assignment for the benefit of creditors, files a voluntary petition in bankruptcy, is adjudicated bankrupt or insolvent, files or acquiesces in the filing of a petition seeking reorganization or arrangement under any federal or state bankruptcy or insolvency law, or consents to or acquiesces in the appointment of a trustee or receiver for Franchisee or the Franchised Business.

15.1.2 *Involuntary Bankruptcy.* If proceedings are commenced to have Franchisee adjudicated bankrupt or to seek Franchisee's reorganization under any state or federal bankruptcy or insolvency law, and such proceedings are not dismissed within sixty (60) days, or a trustee or receiver is appointed for Franchisee or the Franchised Business without Franchisee's consent, and the appointment is not vacated within sixty (60) days.

15.1.3 *Loss of Premises.* If Franchisee loses the right to occupy the Franchised Business premises or operate the Franchised Business from the Approved Location.

15.2 **With Notice and Without Opportunity to Cure.** Franchisor has the right to terminate this Agreement upon notice without providing Franchisee an opportunity to cure for any of the following breaches or defaults:

15.2.1 *Criminal Acts.* If Franchisee or Franchisee's principals are convicted of or plead guilty or no contest to a felony or other offense related to the operation of the Franchised Business or that Franchisor believes, in its sole discretion, is likely to have an adverse effect on the Proprietary Marks or the goodwill associated therewith.

15.2.2 *Fraud.* If Franchisee or Franchisee's principals commit any fraud or misrepresentation in the operation of the Franchised Business, including but not limited to, any misrepresentation made in Franchisee's franchise application.

15.2.3 *Other Actions.* If Franchisee or Franchisee's principals, including any shareholder, member, guarantor or agent engages in activity or conduct which materially impairs that goodwill associated with the System or the Proprietary Marks and fails to cease and correct such activities or conduct within twenty-four (24) hours of Franchisee's receipt of written notice of a breach under this Section.

15.2.4 *Misrepresentation.* If Franchisee or Franchisee's principals make any misrepresentation or omission in connection with Franchisee's franchise application, including but not limited to, any financial misrepresentation.

15.2.5 *Failure to Complete Training.* If Franchisee (and/or Franchisee's Designated Manager, if applicable) fails to complete the Initial Training Program as provided in Section 8.

15.2.6 *Repeated Breaches.* If Franchisor sends Franchisee two (2) or more written notices to cure pursuant to Sections 15.3 or 15.4 hereof in any twelve (12)-month period, regardless of whether the defaults set forth in the notices were subsequently cured.

15.2.7 *Breach of Other Agreements.* If Franchisee or Franchisee's principals materially breach any other agreement with Franchisor or any of Franchisor's affiliates, or threaten any material breach of any such agreement, or any lease for the Approved Location, and fails to cure such breach within any permitted period for cure.

15.2.8 *Misuse of the Proprietary Marks or Confidential Information*. If Franchisee or Franchisee's principals violate any provision hereof pertaining to Proprietary Marks or Confidential Information or misuse the Proprietary Marks or Confidential Information.

15.2.9 *Disclosure of Confidential Information or Trade Secrets*. If Franchisee or Franchisee's principals disclose or divulge the contents of the Operations Manual or any other Confidential Information or Trade Secret provided to Franchisee by Franchisor or any of its affiliates to any third party.

15.2.10 *Violation of Law.* If Franchisee violates any law, ordinance or regulation or operates the Franchised Business in a manner that presents a health or safety hazard to customers, or the general public.

15.2.11 *Violation of In-term Restrictive Covenant.* If Franchisee violates the in-term restrictive covenant contained in Section 17.1, or any of the other restrictive covenants set forth in this Agreement.

15.2.12 *Liens.* If a levy of writ of attachment or execution or any other lien is placed against Franchisee or any of Franchisee's principals or any of their assets which is not released or bonded against within thirty (30) days.

15.2.13 *Insolvency.* If Franchisee or any of Franchisee's principals become insolvent.

15.2.14 *Abandonment.* If Franchisee voluntarily or otherwise abandons the Franchised Business. The term "abandon" includes any conduct which indicates a desire or intent to discontinue the Franchised Business in accordance with the terms of this Agreement for seven (7) days or more without Franchisor's prior written consent.

15.2.15 *Unauthorized Transfer*. If Franchisee purports to sell, transfer or otherwise dispose of any interest in the Franchised Business in violation of Section 14 hereof.

15.2.16 *Unauthorized Products or Services.* If Franchisee offers any unauthorized and unapproved products or services at or from the Franchised Business.

15.2.17 *Unapproved Purchases.* If Franchisee orders or purchases supplies, signs, furnishings, fixtures, equipment or inventory from an unapproved supplier or which Franchisor has not approved.

15.2.18 *Proprietary Software.* If Franchisee misuses or makes unauthorized use of any Proprietary Software Franchisor may develop for use in connection with the System.

15.2.19 *Insurance.* If Franchisee fails to maintain insurance or to repay Franchisor for insurance paid for by it, or otherwise fails to adhere to the requirements of Section 9.

15.2.20 *Government Regulations.* If Franchisee fails, within fifteen (15) calendar days after notification of non-compliance by federal, state or local government authorities to comply with any law or regulation applicable to the Franchised Business.

15.2.21 *Government Actions.* If any government action is taken against Franchisee that results in any obligation upon Franchisor which, in Franchisor's sole judgment, is

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

uneconomical, not in the best interests of Franchisor, or would result in Franchisor having an unintended relationship or obligation.

15.2.22 *Anti-Terrorist Activities.* If Franchisee fails to comply with the provisions of Section 22.8.

15.2.23 *Personal Use of Franchised Business Property*. If Franchisee takes for Franchisee's own personal use any assets or property of the Franchised Business, including employee taxes, FICA, insurance or benefits.

15.2.24 *Insufficient Funds.* If there are insufficient funds in Franchisee's bank account to cover a check or EFT payment to Franchisor two (2) or more times within any twelve (12)-month period.

15.2.25 *Failure to Open.* If Franchisee fails to commence operations of the Franchised Business within the time prescribed in Section 7.3 of this Agreement.

15.2.26 *Operating Outside of Designated Territory*. If Franchisee operates the Franchised Business outside of the Designated Territory without Franchisor's prior written consent, as provided in Section 1.2 of this Agreement.

15.2.27 *Violation of Best Efforts.* If Franchisee or Franchisee's principals violate any of the provisions in Section 7.10 of this Agreement.

15.3 **Upon 15 Days' Notice to Cure**. Franchisor has the right to terminate this Agreement if any of the following defaults remain uncured after Franchisor provides Franchisee with notice of such default(s) and fifteen (15) days to cure:

15.3.1 *Nonpayment.* If Franchisee fails to pay Franchisor as and when due any sums owed to Franchisor, any of Franchisor's affiliates, or any of Franchisor's System Suppliers, Approved Suppliers or vendors.

15.3.2 *Endorsement of Checks.* If Franchisee fails to immediately endorse and deliver to Franchisor any payments due to Franchisor from any third party that is erroneously made to Franchisee.

15.3.3 *Failure to Maintain Sufficient Marketing Materials and Supplies*. If Franchisee fails to maintain sufficient inventory of marketing materials and other supplies necessary to adequately develop the Designated Territory and meet consumer demand.

15.3.4 *Interruption of Service.* If Franchisee fails to maintain the prescribed months, days, or hours of operation at the Franchised Business.

15.3.5 *Failure to Personally Supervise Franchised Business Operations or Employ Adequate Personnel.* If Franchisee or the Designated Manager fails, in Franchisor's sole discretion, to personally supervise day-to-day operation of the Franchised Business or fails to employ a sufficient number of qualified, competent personnel as Franchisor requires from time to time.

15.3.6 *Quality Control.* If Franchisee fails to maintain the strict quality controls reasonably required by this Agreement and/or the Operations Manual.

Case 3:25-cv-00261-MOC-DCK    Document 1-1    Filed 04/15/25    Page 132 of 169

15.3.7 *Licenses and Permits.* If Franchisee fails to procure or maintain any licenses, certifications, or permits necessary for the operation of the Franchised Business.

15.4 **Upon 30 Days' Notice to Cure**. Franchisor has the right to terminate this Agreement if Franchisee fails to perform or comply with any other term or condition of this Agreement or any ancillary agreements between Franchisee and Franchisor or Franchisor's affiliates, and Franchisee fails to cure such default(s) within thirty (30) days after being provided with notice thereof.

15.5 **Step In Rights**. In addition to Franchisor's right to terminate this Agreement, and not in lieu of such right or any other rights Franchisor may have against Franchisee, upon a failure to cure any default within the applicable time period (if any), Franchisor has the right, but not the obligation, to enter upon the Franchised Business premises and exercise complete authority with respect to the operation of the Franchised Business until such time as Franchisor determines, in Franchisor's sole discretion that the default has been cured and Franchisee is otherwise in compliance with this Agreement. In the event Franchisor exercises the rights described in this Section, Franchisee must reimburse Franchisor for all costs and overhead, if any, incurred in connection with its operation of the Franchised Business, including, without limitation, costs of personnel for supervising and staffing the Franchised Business and their travel and lodging accommodations. If Franchisor undertakes to operate the Franchised Business pursuant to this Section, Franchisee agrees to indemnify and hold Franchisor (and Franchisor's representative(s) and employees) harmless from and against any fines, claims, suits or proceedings which may arise out of Franchisor's operation of the Franchised Business. Franchisor reserves the right to charge Franchisee up to ten percent (10%) of Franchisee's Gross Revenue generated during the period of time that Franchisor provides temporary management of the Franchised Business.

15.6 **Nonwaiver**. Franchisor's delay in exercising or failing to exercise any right or remedy under this Agreement or Franchisor's acceptance of any late or partial payment due hereunder shall not constitute a waiver of any of Franchisor's rights or remedies against Franchisee.

# 16 RIGHTS AND DUTIES UPON TERMINATION OR EXPIRATION

16.1 **Franchisee's Obligations**. Upon termination of this Agreement, or the expiration or termination of any Holdover Period, regardless of the cause, and upon expiration and nonrenewal or transfer of this Agreement, Franchisee must, at Franchisee's cost and expense:

16.1.1 Immediately cease all operations under this Agreement;

16.1.2 Immediately pay Franchisor all unpaid fees and pay Franchisor, Franchisor's affiliates, Franchisor's major suppliers and vendors, all other monies owed;

16.1.3 Discontinue Immediately discontinue the use of the Proprietary Marks;

16.1.4 Immediately cease using the Business Management and Technology System and the Operations Manual, and return all Proprietary Materials and Confidential Information, including, without limitation, all customer lists and data, within ten (10) calendar days, and immediately and permanently cease use of such information and materials;

16.1.5 Immediately cease using all telephone and facsimile numbers and listings, as well as any permitted domain names and/or social media pages used in connection with the operation of the Franchised Business (collectively, the "Assigned Property"), and direct the telephone company and/or domain name registrar to transfer all such Assigned Property to Franchisor or Franchisor's designee pursuant to the Conditional Assignment of Telephone Numbers and Domain Name in the form attached as

Exhibit B to this Agreement, and transfer all usernames and passwords for all social media pages to Franchisor;

16.1.6    Immediately vacate the Franchised Business premises, and if Franchisor exercised Franchisor's rights pursuant to Franchisor's prescribed form of Collateral Assignment of Lease, arrange for transfer of the lease to Franchisor within fifteen (15) calendar days of termination or expiration of this Agreement;

16.1.7    Immediately surrender all stationery, printed matter, signs, advertising materials, supplies and other items containing the Proprietary Marks, as Franchisor directs, and all items which are a part of the trade dress of the System no later than ten (10) calendar days after the termination or expiration of this Agreement;

16.1.8    Immediately cease holding itself out as Franchisor's Franchisee;

16.1.9    Immediately cease to communicate with all customers of the Franchised Business;

16.1.10    Take such action as shall be necessary to amend or cancel any assumed name, business name or equivalent registration, which contains any trade name or other Proprietary Mark Franchisor licensed to Franchisee, and furnish Franchisor evidence satisfactory to Franchisor of compliance with this obligation within fifteen (15) calendar days after the termination, expiration or transfer of this Agreement;

16.1.11    Permit Franchisor to make a final inspection of Franchisee's financial records, books, and other accounting records within one (1) month of the effective date of termination, expiration or transfer;

16.1.12    Comply with the post-termination covenants set forth in Section 17 hereof, all of which shall survive the transfer, termination or expiration of this Agreement;

16.1.13    Cease to use in advertising or in any other manner, any methods, procedures or techniques associated with Franchisor or the System;

16.1.14    Immediately remove Franchisor's Proprietary Marks from vehicles used in connection with the Franchised Business, and otherwise de-identify the vehicles from being associated with Franchisor or the System;

16.1.15    Execute from time to time any necessary papers, documents, and assurances to effectuate the intent of this Section 16;

16.1.16    As applicable, provide Franchisor with access and any account information regarding any social media accounts used in connection with the Franchised Business; and

16.1.17    Reimburse Franchisor in connection with any costs Franchisor incurs in connection with enforcing Franchisee's obligations under this Section 16.

16.2    **Option to Purchase Personal Property**.  Upon the termination or expiration of this Agreement or the expiration or termination of any Holdover Period, Franchisor or Franchisor's designee shall have the option, but not the obligation, to purchase any personal property used in connection with operation of the Franchised Business by providing Franchisee written notice of Franchisor's election within

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

sixty (60) calendar days after such termination or expiration and paying Franchisee the book value for such personal property within sixty (60) calendar days of such notice. For purposes of this paragraph, "book value" means the amount Franchisee actually paid for the personal property less depreciation (calculated by using the straight-line depreciation method on a ten (10)-year depreciation schedule irrespective of the depreciation method or schedule Franchisee uses for accounting purposes). Notwithstanding the foregoing, to the extent that Franchisor exercises Franchisor's right to purchase any personal property that is subject to a lease or finance agreement, the purchase price of such personal property shall equal the amount of Franchisee's remaining obligations under the lease or finance agreement, as applicable, which Franchisor would assume (such assumption of obligations constituting the full purchase price of such personal property). Franchisor shall be entitled to offset the purchase price by the amount of money owed by Franchisee to Franchisor for any payments necessary to acquire clear title to property or for any other debt. If Franchisor exercises Franchisor's option to purchase, pending the closing of such purchase, Franchisor has the right to appoint a manager to maintain operation of the Franchised Business, or Franchisor may require that Franchisee close the Franchised Business during such period without removing any assets. Franchisee is required to maintain in force all insurance policies required under this Agreement until the date of such closing. Franchisor has the unrestricted right to assign this option to purchase the Franchised Business. Franchisor will be entitled to all customary warranties and representations in connection with Franchisor's purchase of Franchisee's property, including, without limitation, representations and warranties as to ownership and condition of and title to the property; liens and encumbrances on the property; validity of contracts and agreements; and liabilities affecting the property, contingent or otherwise.

16.3    **Exclusions**.    Franchisor may exclude from the personal property purchased under Section 16.2, cash or its equivalent and any equipment, signs, inventory, materials and supplies that are not reasonably necessary (in function or quality) to the Franchised Business's operation or that Franchisor has not approved as meeting standards for the Franchised Business.

16.4    **Damages, Costs and Expenses**.    In the event of termination for any default by Franchisee, Franchisee shall promptly pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of Franchisee's personal property, furnishings, equipment, signs, fixtures and inventory related to the operation of the Franchised Business.

## 17   COVENANTS

Franchisee acknowledges that as a participant in Franchisor's System, Franchisee will receive proprietary and Confidential Information and materials, Trade Secrets, and the unique methods, procedures and techniques which Franchisor has developed. Therefore, to protect Franchisor and Franchisor's other franchisees, Franchisee agrees as follows:

17.1    **During the Term of this Agreement**.    During the term of this Agreement, and during any Holdover Period, neither Franchisee, Franchisee's owners, officers, directors, principals, nor any member of the immediate family of Franchisee or Franchisee's owners, officers, directors, or principals will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

17.1.1    Own, maintain, engage in, be employed as an officer, director, or principal of, lend money to, extend credit to, or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers the Approved Products and/or Approved Services or any other products and/or services authorized or offered for sale by System franchisees (a "Competitive Business") within the Designated Territory or the Designated Territory of any other System franchisee, provided that

this Section 17.1.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly-traded company providing such services;

17.1.2 Employ or seek to employ any person who is at that time employed by Franchisor, Franchisor's affiliates, or any other System franchisee, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

17.1.3 Solicit any current, former or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System, or other franchisees for any competitive purpose.

17.2 **After the Term of this Agreement**. For a period of two (2) years after the expiration, transfer or termination of this Agreement, or after the expiration or termination of any Holdover Period, regardless of the cause, neither Franchisee, Franchisee's owners, officers, directors, principals, nor any member of the immediate family of Franchisee or Franchisee's owners, principals, officers or directors will, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person, partnership or corporation:

17.2.1 Own, maintain, engage in, be employed as an officer, director, principal of, lend money to, extend credit to, or have any interest in any Competitive Business: (a) within the Designated Territory; (b) within a twenty-five (25)-mile radius of the Designated Territory of any other Franchised Business; or (c) within a twenty-five (25)-mile radius of any System business operated by Franchisor or its affiliate, provided that this Section 17.2.1 does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly-traded company providing services the same as or similar to a Competitive Business;

17.2.2 Employ or seek to employ any person who is at that time employed by Franchisor, Franchisor's affiliates, or any other System franchisee, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

17.2.3 Solicit any current, former or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System, or other franchisees for any competitive purpose.

17.3 **Intent and Enforcement**. It is the parties' intent that the provisions of this Section 17 be judicially enforced to the fullest extent permissible under applicable law. Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable. In the event of the actual or threatened breach of this Section 17 by Franchisee, any of Franchisee's principals, or any member of the immediate family of Franchisee or Franchisee's principals, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach. Franchisee acknowledges that the covenants contained herein are necessary to protect the goodwill of the Franchised Business, other System franchisees, and the System. Franchisee further acknowledges that covenants contained in this Section 17 are necessary to protect Franchisor's procedures and know-how transmitted during the term of this Agreement. Franchisee agrees that in the event of the actual or threatened breach of this Section 17, Franchisor's harm will be irreparable and that Franchisor has no adequate remedy at law to prevent such harm. Franchisee acknowledges and agrees on Franchisee's own behalf, and on behalf of the persons who are liable under this Section 17, that each has previously worked or been gainfully employed in other careers and that the provisions of this

Section 17 in no way prevent any such person from earning a living. Franchisee further acknowledges and agrees that the time limitations of this Section 17 shall be tolled during any default under this Section.

17.4    **Employees**.  Franchisee shall ensure that Franchisee's principals, managers, employees and anyone else who will have access to Franchisor's Confidential Information, execute a Confidentiality and Restrictive Covenant Agreement, in the form attached as <u>Exhibit C</u> to this Agreement, or as Franchisor, in Franchisor's sole discretion, otherwise prescribes. Franchisee must furnish Franchisor a copy of each executed agreement.

17.5    **No Defense**.  Franchisee hereby agrees that the existence of any claim Franchisee may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to Franchisor's enforcement of the covenants contained in this Section 17. Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) that Franchisor incurs in connection with the enforcement of this Section 17.

## 18   DISPUTE RESOLUTION

18.1    **Choice of Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, without reference to its conflict of laws principals.

18.2    **Internal Dispute Resolution**.  Franchisee and Franchisor believe that it is important to resolve any disputes amicably, quickly, cost-effectively and professionally and to return to business as soon as possible. Franchisee and Franchisor have agreed that the provisions of this Section 18 support these mutual objectives and, therefore, agree as follows: Any disagreement, litigation, claim, dispute, suit, action, controversy or proceeding of any type whatsoever, including any claim for equitable relief and/or where Franchisee is acting as a "private attorney general," suing pursuant to a statutory claim or otherwise, between or involving Franchisee and Franchisor on whatever theory and/or facts based, and whether or not arising out of this Agreement (including any dispute or disagreement relating to arbitration, including the arbitrability of this Agreement or any of its provisions), or offer, sale or negotiation of a The Designery Franchise, or the relationship of the parties arising from the Franchise or from entering this Agreement, or any claim that this Agreement or any part of this Agreement is invalid, illegal or otherwise voidable, void or unenforceable ("<u>Dispute</u>") will be processed in the following manner, Franchisee and Franchisor each expressly waiving all rights to any court proceeding, except as expressly provided below in Section 18.3.1. Franchisee must first bring any claim or dispute between Franchisee and Franchisor to Franchisor's management after providing notice as set forth in Section 18.6 below. Franchisee must exhaust this internal dispute resolution procedure before Franchisee may bring Franchisee's dispute before a third party. This agreement to first attempt resolution of disputes internally shall survive termination or expiration of this Agreement. Franchisee and Franchisor agree that the franchise relationship is unique and that as a result, it is important that anyone who serves as a mediator or arbitrator in a Dispute must have a minimum of seven (7) years' substantive experience in franchise law.

18.3    **Mediation/Arbitration**.  If Franchisee and Franchisor are unable to resolve a Dispute using the internal dispute resolution procedure, then Disputes which are not first resolved through the internal dispute resolution procedure set forth in Section 18.2 above must be submitted first to non-binding mediation in Mecklenburg County, North Carolina under the auspices of the American Arbitration Association ("<u>AAA</u>"), in accordance with AAA's Commercial Mediation Rules then in effect. A link to the AAA Commercial Arbitration Rules and Mediation Procedures can be found at https://www.adr.org/Rules. The mediation will be conducted by one mediator with at least seven (7) years of substantive experience in franchise law who will be appointed under the AAA's Commercial Mediation Rules and who will conduct the mediation in accordance with such rules. Mediation must be conducted on an individual, not a class-wide, basis; only Franchisor (and/or its affiliates and its and their respective owners, officers, directors,

agents and employees) and Franchisee (and/or its owners, guarantors, affiliates, officers, directors, agents and employees, if applicable) may be the parties to any mediation proceeding described in this Section, and no such mediation proceeding may be consolidated with any other mediation proceeding between Franchisor and any other person, corporation, limited liability company or partnership. Franchisor and Franchisee agree that statements made by Franchisor, Franchisee or any other party in any such mediation proceeding will not be admissible in any arbitration or other legal proceeding. If the mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written declaration by Franchisor, then, subject to the exclusions set forth in Section 18.3.1, all Disputes must be submitted to binding arbitration before one arbitrator of the AAA in accordance with its commercial arbitration rules. The arbitration will be conducted by one arbitrator with at least seven (7) years of substantive experience in franchise law who will be appointed under the AAA's Commercial Arbitration Rules and who will conduct the arbitration in accordance with such rules. Except as provided in Section 18.3.1, no party may file litigation involving any Dispute unless it has complied with the mediation and arbitration provisions in this Article regarding that Dispute. "Filing litigation" includes asserting a counterclaim, third-party claim, or other claim relating to a Dispute (irrespective of whether the party asserting the claim filed the legal action in which the claim is asserted). Franchisor's rights to mediation and arbitration, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and arbitration, and Franchisor and Franchisee shall share mediation and arbitration costs equally except as provided in Section 22.8. This agreement to mediate and arbitrate shall survive any termination or expiration of this Agreement.

18.3.1   The parties shall not be required to first attempt to mediate or arbitrate a controversy, dispute or claim through mediation as set forth in this Section 18.3 if such controversy, dispute or claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

18.3.1.1     Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

18.3.1.2     Any claims pertaining to or arising out of any warranty issue;

18.3.1.3     Any of the restrictive covenants contained in this Agreement;

18.3.1.4     Any of Franchisee's payment obligations that are more than forty-five (45) days past due;

18.3.1.5     Any claims arising out of or related to fraud or misrepresentation by Franchisee, or Franchisee's insolvency;

18.3.1.6     Any claims relating to Franchisee's obligations on termination or expiration of this Agreement;

18.3.1.7     Any claims relating to any Transfer of an interest in Franchisee, the Franchised Business or Franchisee's assets; or

18.3.1.8     Any matters involving danger, health or safety.

18.3.2   Interpretation.  The provisions of this Agreement must be construed as independent of any other covenant or provision of this Agreement. However, if a court or arbitrator of competent jurisdiction determines that any provisions are unlawful, that court or arbitrator is to modify or interpret the provisions to the minimum extent necessary to have them comply with the law. Notwithstanding any

provision relating to the state laws by and under which this Agreement must be governed and construed, all issues relating to arbitrability or the enforcement of the agreement to arbitrate in this Agreement must be governed by the United States Arbitration Act (9 U.S.C. § 1 et seq.) and the Federal common law of arbitration. The arbitrator, and not any federal, state or local court, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, unconscionability, arbitrability, enforceability or formation of this Agreement, including any claim of fraud in the inducement or that all or any part of the Agreement is void or voidable. However, the preceding sentence shall not apply to the clause entitled "Class Action Waiver."

18.3.3 **Judgment**. Judgment on an arbitration award may be entered in any court of competent jurisdiction. This judgment is binding, final and non-appealable.

18.3.4 **Failure to Appear**. The arbitration and mediation provisions in this Article are self-executing and remain in full force and effect after the expiration or sooner termination of this Agreement. If either party fails to appear at any properly noticed arbitration proceeding, notwithstanding failing to appear, an award may be entered against that party by default or otherwise.

18.3.5 **Class Action Waiver**. Any proceeding (whether mediation, arbitration, trial to a court or jury, appeal or otherwise) must be brought in the parties' individual capacity and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff or similar proceeding ("Class Action"). Franchisee and Franchisor expressly waive any ability to maintain any Class Action in any forum. Further, an arbitration proceeding between Franchisor and Franchisee (or any of Franchisee's or Franchisor's affiliates and owners and guarantors) may not be consolidated with any other arbitration proceeding between them and any other franchisee, person or entity. Franchisee hereby agrees not to seek joinder of any of its claims with those of any other party. The arbitrator shall not have authority to combine or aggregate similar claims or conduct any Class Action, nor make an award to any person or entity not a party to the arbitration. Any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. FRANCHISEE AND FRANCHISOR UNDERSTAND THAT FRANCHISOR WOULD HAVE HAD A RIGHT TO LITIGATE THROUGH A COURT, TO HAVE A JUDGE OR JURY DECIDE ITS CASE, AND TO BE PARTY TO A CLASS OR REPRESENTATIVE ACTION. HOWEVER, FRANCHISEE AND FRANCHISOR UNDERSTAND AND CHOOSE TO WAIVE THAT RIGHT AND HAVE ANY CLAIMS DECIDED INDIVIDUALLY THROUGH ARBITRATION. It is Franchisee's and Franchisor's joint business judgment that the limitations of this subsection make good business sense, because:

18.3.5.1 the mediation and arbitration procedures contemplated by this Agreement (and which Franchisee and Franchisor agree are the core methods for resolving disputes) function most effectively on an individual case basis;

18.3.5.2 there are significant business and other factors present in each individual franchisee's situation which should be respected; and

18.3.5.3 the economic interests of lawyers on either side in class-wide or multiple plaintiff actions, as well as the tendency to polarize positions, makes accommodation and compromise, as a practical business matter, less easily achieved, which would be a serious detriment to Franchisee's and Franchisor's business interests, as well as those of the entire Franchise System, in quickly, amicably and economically resolving any dispute.

18.4 **Selection of Venue**. Nothing contained in this Agreement shall prevent Franchisor from applying to and obtaining from any court having jurisdiction, a writ of attachment, a temporary injunction,

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests. The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Mecklenburg County, North Carolina and the jurisdiction and venue of the United States District Court for the Western District of North Carolina. Franchisee acknowledges that this Agreement has been entered into in the State of North Carolina, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Huntersville, North Carolina, including, but not limited to, training, assistance, support, and the development of the System. In recognition of such services and their origin, Franchisee hereby irrevocably consents to the personal jurisdiction of the state and federal courts of North Carolina as set forth in this Section.

18.5  **Third Party Beneficiaries**.  Franchisor's officers, directors, shareholders, members, agents and/or employees are express third party beneficiaries of the provisions of this Agreement, including the mediation and arbitration provision set forth in this Section 18, each having authority to specifically enforce the right to mediate or arbitrate claims asserted against such person(s) by Franchisee.

18.6  **Prior Notice of Claims**.  As a condition precedent to commencing an action for damages or for violation or breach of this Agreement, Franchisee must notify Franchisor within thirty (30) days after the occurrence of the violation or breach, and failure to timely give such notice shall preclude any claim for damages.

18.7  **No Right to Offset**.  Franchisee shall not withhold all or any part of any payment to Franchisor or any of its affiliates on the grounds of Franchisor's alleged nonperformance or as an offset against any amount Franchisor or any of Franchisor's affiliates allegedly may owe Franchisee under this Agreement or any related agreements.

18.8  **Injunctive Relief**.  The Franchised Business is intended to be one of a large number of businesses identified by the Proprietary Marks selling to the public the Approved Products and Approved Services associated with the Proprietary Marks. Consequently, a single franchisee's failure to comply with the terms of its franchise agreement is likely to cause irreparable damage to Franchisor, and damages at law would therefore be an inadequate remedy. Upon Franchisee's breach or threatened breach of any of the terms concerning any matters referenced in Section 18.3.1, Franchisor may seek an injunction restraining the breach and/or a decree of specific performance (with recovery of reasonable attorneys' fees and costs incurred in obtaining equitable relief). Franchisor may do so without demonstrating or proving any actual damage. These equitable remedies are in addition to all other rights or remedies to which Franchisor may otherwise be entitled due to Franchisee's breach of this Agreement. Franchisor may seek this relief without posting any bond or security; however, if a court of competent jurisdiction requires a bond or security, a bond or security for $1,000 is sufficient. Notwithstanding anything in this Agreement to the contrary, Franchisor may seek injunctive relief in any jurisdiction that has jurisdiction over Franchisee or any other party against whom the relief is sought. If injunctive relief is granted, Franchisee's only remedy will be the court's dissolution of the injunctive relief. If the injunctive relief was wrongfully issued, Franchisee expressly waives all claims for damages Franchisee incurred as a result of the wrongful issuance.

18.9  **Limitation of Action**.  Franchisee further agrees that no cause of action arising out of or under this Agreement may be maintained by Franchisee against Franchisor unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after the Franchisee becomes aware of facts or circumstances reasonably indicating that Franchisee may have a claim against Franchisor hereunder, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense or setoff.

18.9.1  Franchisee hereby waives the right to obtain any remedy based on alleged fraud, misrepresentation or deceit by Franchisor, including, without limitation, rescission of this Agreement, in

any mediation, arbitration, judicial, or other adjudicatory proceeding arising hereunder, except upon a ground expressly provided in this Agreement, or pursuant to any right expressly granted by any applicable statute expressly regulating the sale of franchises, or any regulation or rules promulgated thereunder.

18.9.2 Notwithstanding anything to the contrary contained herein, all actions shall be conducted on an individual, not a class-wide basis, and any proceeding between Franchisee, Franchisee's guarantors, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

18.10 **Waiver of Punitive Damages**. Franchisee hereby waives to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agrees that in the event of a dispute, that Franchisee's recovery is limited to actual damages. If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages. Nothing in this Section shall be construed to prevent Franchisor from claiming and obtaining punitive or consequential damages, including lost future Royalty Fees for the balance of the term of this Agreement.

18.11 **THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT. THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR FRANCHISEE'S PURCHASE FROM FRANCHISOR OF THE FRANCHISE AND/OR ANY PRODUCTS OR SERVICES.**

## 19 REPRESENTATIONS

19.1 **Call Center**. If established, the Call Center will be provided on an "AS IS" and "AS AVAILABLE" basis. Franchisor does not covenant any level, quality, continuity or standard of operation for the Call Center, or covenant that the Call Center will be free from defaults, viruses or other harmful components, operate on a continuous or uninterrupted basis, or provide secure access to the Call Center or services provided thereby. FRANCHISOR MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT, OR WARRANTIES REGARDING THE QUALITY, ACCURACY, TIMELINESS, AVAILABILITY, SUITABILITY, OR RELIABILITY OF ANY SERVICE, OR SECURITY, USEFULNESS, LACK OF VIRUSES OR OTHER HARMFUL COMPONENTS, OR WARRANTIES REGARDING COMPLETENESS OF THE CONTENT OF THE CALL CENTER, OR WARRANTIES WITH RESPECT TO THE USE OR AVAILABILITY OF ANY INFORMATION, DATA, ITEM, APPARATUS, METHOD OR PROCESS INCLUDED IN THE CALL CENTER, OR THAT SUCH WILL MEET THE FRANCHISEE'S REQUIREMENTS, OR BE ERROR FREE OR NOT INFRINGE ON THE RIGHTS OF OTHERS, OR THAT DEFECTS WILL BE CORRECTED.

19.2 **No Authority**. NO SALESPERSON, REPRESENTATIVE OR OTHER PERSON HAS THE AUTHORITY TO BIND OR OBLIGATE FRANCHISOR EXCEPT FRANCHISOR'S AUTHORIZED OFFICER BY A WRITTEN DOCUMENT. FRANCHISEE ACKNOWLEDGES THAT NO REPRESENTATIONS, PROMISES, INDUCEMENTS, GUARANTEES OR WARRANTIES OF ANY KIND WERE MADE BY FRANCHISOR OR ON FRANCHISOR'S BEHALF WHICH HAVE LED

FRANCHISEE TO ENTER INTO THIS AGREEMENT. FRANCHISEE UNDERSTANDS THAT WHETHER FRANCHISEE SUCCEEDS AS A FRANCHISEE IS DEPENDENT UPON FRANCHISEE'S EFFORTS, BUSINESS JUDGMENTS, THE PERFORMANCE OF FRANCHISEE'S EMPLOYEES, MARKET CONDITIONS AND VARIABLE FACTORS BEYOND FRANCHISOR'S CONTROL OR INFLUENCE. FRANCHISEE FURTHER UNDERSTANDS THAT SOME FRANCHISEES ARE MORE OR LESS SUCCESSFUL THAN OTHER FRANCHISEES AND THAT FRANCHISOR HAS MADE NO REPRESENTATION THAT FRANCHISEE WILL DO AS WELL AS ANY OTHER FRANCHISEE.

19.3 **Receipt**. THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF THIS AGREEMENT, WITH ALL BLANKS COMPLETED AND WITH ANY AMENDMENTS AND SCHEDULES, AT LEAST SEVEN (7) CALENDAR DAYS PRIOR TO EXECUTION OF THIS AGREEMENT. IN ADDITION, THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT AT LEAST FOURTEEN (14) CALENDAR DAYS PRIOR TO THE EXECUTION OF THIS AGREEMENT OR FRANCHISEE'S PAYMENT OF ANY MONIES TO FRANCHISOR, REFUNDABLE OR OTHERWISE.

19.4 **Opportunity for Review by Franchisee's Advisors**. FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR HAS RECOMMENDED, AND THAT FRANCHISEE HAS HAD THE OPPORTUNITY TO OBTAIN, REVIEW OF THIS AGREEMENT AND FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT BY FRANCHISEE'S LAWYER, ACCOUNTANT OR OTHER BUSINESS ADVISOR PRIOR TO EXECUTION HEREOF.

19.5 **Execution of Agreement**. EACH OF THE UNDERSIGNED PARTIES WARRANTS THAT IT HAS THE FULL AUTHORITY TO SIGN AND EXECUTE THIS AGREEMENT. IF FRANCHISEE IS A PARTNERSHIP OR CORPORATION, THE PERSON EXECUTING THIS AGREEMENT ON BEHALF OF SUCH PARTNERSHIP OR CORPORATION WARRANTS TO FRANCHISOR, BOTH INDIVIDUALLY AND IN HIS/HER CAPACITY AS PARTNER OR OFFICER, THAT ALL OF THE PARTNERS OF THE PARTNERSHIP OR ALL OF THE SHAREHOLDERS OF THE CORPORATION, AS APPLICABLE, HAVE READ AND APPROVED THIS AGREEMENT, INCLUDING ANY RESTRICTIONS WHICH THIS AGREEMENT PLACES UPON RIGHTS TO TRANSFER THEIR INTEREST IN THE PARTNERSHIP OR CORPORATION.

## 20 GUARANTEE OF PRINCIPALS AND THEIR SPOUSES

20.1 Franchisee's spouse and all partners in a limited partnership, shareholders in a corporate franchisee, or members of a limited liability company, as well as all general partners and managing members, and their spouses hereby personally and unconditionally guarantee without notice, demand or presentment, the payment of all of Franchisee's monetary obligations under this Agreement and any other agreement between Franchisee and Franchisor and/or Franchisor's affiliates, as if each were an original party to this or any other agreement in his or her individual capacity. All such personal guarantors further agree to be bound by the restrictions upon Franchisee's activities upon transfer, termination or expiration and nonrenewal of this Agreement as if each were an original party to this Agreement in his or her individual capacity. All such personal guarantors and their spouses must execute a continuing Personal Guaranty in the form attached as Exhibit A to this Agreement.

20.2 **Security Interest**. For valuable consideration, as security for the payment of/for: (a) all amounts owing or to be owed to us and our affiliates by you from time to time under this Agreement or any other agreement between you and us or our affiliates, or otherwise; (b) your performance of all obligations to us and our affiliates; and (c) the costs and expenses that we and/or our affiliates incur to collect or attempt to collect amounts due from you and to enforce this Section (together, the "Obligations"), you hereby grant

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

us a security interest in all of the assets of the Franchised Business or used by at or in connection with your Franchised Business, including but not limited to: (i) all equipment, furnishings, fixtures, motor vehicles, merchandise, inventory, goods and other tangible personal property; (ii) all accounts, accounts receivable, other receivables, contract rights, leasehold interests, software, chattel paper and general intangibles; (iii) all instruments, documents of title, policies and certificates of insurance, securities, bank deposits, bank accounts and cash; (iv) all books, records and documents; (v) all permits and licenses for the operation of the Franchised Business; and (vi) all accessions, additions and improvements to, and all replacements, substitutions and parts for, and all proceeds and products of, the foregoing, including proceeds of insurance (collectively, the "Collateral"). Franchisee agrees to execute and deliver to Franchisor any other documents reasonably requested by Franchisor to create, maintain, perfect, or assure the priority of the security interest granted above. Franchisee hereby appoints Franchisor as its agent and attorney-in-fact to execute and deliver documents and to take all other actions (to the extent permitted by law) in Franchisee's name and on Franchisee's behalf that Franchisor may deem necessary or advisable to create, maintain, perfect, assure the priority of, or foreclose its security interest in and lien on the Collateral. You must execute and deliver to us financing statements and/or such other documents as we reasonably deem necessary to perfect our interest in the Collateral within 10 days of your receipt of such documents from us.

You will not remove the Collateral or any portion thereof or grant or permit any security interest in (or otherwise encumber) the Collateral, without our prior written consent. You represent and warrant that the security interest granted is prior to all other security interests in the Collateral except for (i) bona fide purchase money security interests and (ii) if consented to by us in writing, the security interest granted to a third party in connection with your original financing for your Franchised Business, if any. In connection with any request for our approval of a security interest, we will exercise our Business Judgment, bearing in mind the interests of the borrower, lender, ourselves and the System. On the occurrence of any event entitling us to terminate this Agreement or any other agreement between the parties, or if we reasonably determine that we are not assured that your (and/or any affiliates') obligations will be timely and fully paid and/or performed, we will have all the rights and remedies of a secured party under the Uniform Commercial Code of the State in which your Franchised Business is located, including, without limitation, the right to take possession of the Collateral. This appointment is coupled with an interest and is irrevocable as long as any of the Obligations remain outstanding.

## 21  NOTICES

All notices and requests to be given under this Agreement are to be in writing and delivered by either hand delivery or overnight mail by a recognized carrier offering a delivery receipt to the following addresses (which may be changed by written notice):

| | |
|---|---|
| Franchisee Name/Address: | Joel Senger<br>241 N Colony Dr.<br>Edgewood, Kentucky 41017 |
| Franchisor: | A1 Kitchen & Bath Franchising, LLC<br>107 Parr Drive<br>Huntersville, North Carolina 28078<br>Attn:  Chief Legal Officer |

Mailing any notice hereunder sent by U.S. certified mail, postage prepaid or when sent via Federal Express or a similar overnight courier shall be presumptive evidence of delivery of the notice or request.

## 22  MISCELLANEOUS

**22.1  Entire Agreement**.  This Agreement contains the entire Agreement of the parties. There are no representations either oral or written, except those contained in this Agreement. This written Agreement includes all representations between the parties. This Agreement may not be modified except by a written document signed by both parties. Nothing in this Agreement or any related agreement is intended to disclaim the representations Franchisor made in the Franchise Disclosure Document furnished to Franchisee.

**22.2  Construction of Language**.  The language of this Agreement shall be construed according to its fair meaning, and not strictly for or against either party. All words in this Agreement refer to whatever number or gender the context requires. If more than one party or person is referred to as Franchisee, their obligations and liabilities shall be joint and several. Headings are for reference purposes and do not control interpretation. Reference to Franchisee's "immediate family" means Franchisee's spouse, parents, children and siblings, and Franchisee's spouse's parents, children and siblings. Reference to Franchisee's "principals" means Franchisee's partners, officers, directors, shareholders, members and managers, as applicable. References to "Franchisor" and "Franchisee" include the party's successors, assigns or transferees. The parties have had a reasonable opportunity to review this Agreement. In the event of an ambiguity or if a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by all of the parties, and no presumptions or burdens of proof shall arise in favor of any party by virtue of the authorship of any of the provisions of this Agreement.

**22.3  Severability**.  If any provision of this Agreement is deemed invalid or inoperative for any reason, that provision shall be deemed modified to the extent necessary to make it valid and operative or, if it cannot be so modified, it shall then be severed, and the remainder of that provision shall continue in full force and effect as if this Agreement had been signed with the invalid portion so modified or eliminated; provided, however, that if any part of this Agreement relating to payments to Franchisor or any of its affiliates or protection of the Proprietary Marks or the Confidential Information, including the Operations Manual and Franchisor's other Trade Secrets is declared invalid or unenforceable, then Franchisor, at Franchisor's option, may terminate this Agreement immediately upon written notice to Franchisee.

**22.4  State Law Applies**.  If any provision of this Agreement, including but not limited to its provisions for transfer, renewal, termination, notice of termination, or cure rights, is inconsistent with any valid law or regulation of the state in which the Franchised Business is located, then the valid law or regulation of that state applicable to the Franchised Business shall supersede any provision of this Agreement that is less favorable to Franchisee.

**22.5  Additional Documentation**.  Franchisee must, from time to time, subsequent to the date first set forth above, at Franchisor's request and without further consideration, execute and deliver such other documentation or agreements and take such other actions as Franchisor reasonably may require in order to effectuate the transactions contemplated herein. In the event that Franchisee fails to comply with the provisions of this Section, Franchisee hereby appoints Franchisor as Franchisee's attorney-in-fact to execute any and all documents on Franchisee's behalf, reasonably necessary to effectuate the transactions contemplated herein.

**22.6  Force Majeure**.  Neither Franchisee, Franchisor, nor Franchisor's affiliates will be liable for loss or damage or deemed to be in breach of this Agreement or any related agreement if its failure to perform, its obligations is not the fault, nor within the reasonable control of the person due to perform but results from, without limitation, acts of God or natural disaster (such as, but not limited to, violent storm, cyclone, hurricane, tornado, blizzard, earthquake, volcanic activity, landslide, tidal wave, tsunami,

flood, damage or destruction by lightning, drought); accident, riots, war, terrorist act, epidemic, pandemic, quarantine, civil commotion, breakdown of communication facilities, breakdown of web host, breakdown of Internet service provider, natural catastrophes, national or regional emergencies; governmental acts or omissions, changes in laws or regulations, national or local strikes, fire, explosion, generalized lack of availability of raw materials or energy; or any other cause, whether similar in kind to the foregoing or otherwise. Any delay resulting from any such cause will extend the time of performance for the period of such delay or for such other reasonable period of time as the parties agree in writing or will excuse performance, in whole or in part, as Franchisor deems reasonable. For the avoidance of doubt, this Force Majeure section shall not apply to a party's financial inability to perform its obligations hereunder, nor does this Section apply to negate or delay any payment obligation whether on account of a public health crisis such as COVID-19 or otherwise.

22.7    **Anti-Terrorist Activities**.  Franchisee certifies that neither Franchisee nor Franchisee's owners, principals, employees or anyone associated with Franchisee is listed in the Annex to Executive Order 13224. Franchisee agrees not to hire or have any dealings with a person listed in the Annex. Franchisee certifies that Franchisee has no knowledge or information that, if generally known, would result in Franchisee, Franchisee's owners, principals, employees, or anyone associated with Franchisee being listed in the Annex to Executive Order 13224. Franchisee agrees to comply with and/or assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with the Anti-Terrorism Laws (as defined below). In connection with such compliance, Franchisee certifies, represents, and warrants that none of Franchisee's property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and Franchisee's owners or principals are not otherwise in violation of any of the Anti-Terrorism Laws. Franchisee is solely responsible for ascertaining what actions must be taken by Franchisee to comply with all such Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that Franchisee's indemnification responsibilities as provided in Section 13.2 of this Agreement pertain to Franchisee's obligations under this Section 22.7. Any misrepresentation by Franchisee under this Section or any violation of the Anti-Terrorism Laws by Franchisee, Franchisee's owners, principals or employees shall constitute grounds for immediate termination of this Agreement and any other agreement Franchisee has entered into with Franchisor or one of Franchisor's affiliates in accordance with the terms of Section 15.2.1 of this Agreement. As used herein, "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies lists and any other requirements of any Governmental Authority (including without limitation, the United States Department of Treasury Office of Foreign Assets Control) addressing or in any way relating to terrorist acts and acts of war.

22.8    **Attorneys' Fees**. If Franchisee is in breach or default of any monetary or non-monetary material obligation under this Agreement or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs. If Franchisee institutes any legal action to interpret or enforce the terms of this Agreement, and Franchisee's claim in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

22.9    **Amendment of Prior Agreements**.  In order to enhance consistency and quality of operation, performance, dispute resolution and other matters, we amend our standard Franchise Agreement

from time to time. As a result, this Agreement may be different from other Brand franchise agreements that Franchisee or Franchisee's affiliates may have signed in the past and may contain revised provisions regarding, among other things, modifications to the System, manner of payment of fees and late fees, duties of franchisee, protection of trademarks, status and protection of Manuals and Confidential Information, technology requirements, advertising, insurance, accounting and records, transfers, default and termination, obligations on termination, franchisee covenants, taxes, indemnification, obligations to defend, approvals and waivers, notices, construction of agreement and applicable law. To cooperate with us in the achievement of these goals and as a condition of the grant of an additional franchise, Franchisee agrees that all of Franchisee's or its affiliates' existing Brand franchise agreements with Franchisor or its affiliates are amended to match the provisions of this Agreement (if the existing franchise agreements do not already include these provisions), except with respect to the royalty fee rate, required marketing contributions and spending, other fees for which amounts are specified, territory description, Approved Location, contract term, renewal conditions, and transfer conditions set out in the prior agreements, which will remain unchanged. FRANCHISEE ACKNOWLEDGES THAT THIS SECTION AMENDS ALL OF FRANCHISEE'S EXISTING FRANCHISE AGREEMENTS WITH FRANCHISOR AND THAT THE AMENDMENT WILL SURVIVE THE EXPIRATION OR TERMINATION OF THIS AGREEMENT.

22.10 **No Personal Liability**. Franchisee agrees that fulfillment of any and all of Franchisor's obligations written in this Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility, and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee for any reason. This is an important part of this Agreement. Franchisee agrees that nothing that Franchisee has been told by Franchisor or Franchisor's representatives shall be binding unless it is written in this Agreement. This is an important part of this Agreement. Do not sign this Agreement if there is any question concerning its contents or any representations made.

22.11 You and we agree that we may conduct due diligence on the franchise sale process and that we rely on your representations of that experience as a material inducement to enter into the franchise relationship, without which we would not enter into this Franchise Agreement with you. Accordingly, you and we agree that any such diligence may be entered into evidence in any dispute resolution proceeding, and the limitations set forth in any state addenda or other amendment to this Agreement will not waive any of our rights, claims or protections under any law or regulation.

*(THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK. SIGNATURES APPEAR ON THE FOLLOWING PAGE.)*

Case 3:25-cv-00261-MOC-DCK     Document 1-1     Filed 04/15/25     Page 146 of 169

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.

**FRANCHISOR:**                                    **FRANCHISEE:**

**A1 KITCHEN & BATH**
**FRANCHISING, LLC**

_____        _____
Jeffrey R. Dudan, President                    Joel Senger, Individually

# EXHIBIT A
# TO
# THE DESIGNERY
# FRANCHISE AGREEMENT

## PERSONAL GUARANTY

NOTE: IF FRANCHISEE IS A CORPORATION, EACH OF FRANCHISEE'S SHAREHOLDERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING. IF FRANCHISEE IS A PARTNERSHIP, EACH OF FRANCHISEE'S GENERAL PARTNERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING. IF FRANCHISEE IS A LIMITED LIABILITY COMPANY, EACH OF FRANCHISEE'S MEMBERS AND MANAGERS AND THEIR SPOUSES MUST EXECUTE THE FOLLOWING UNDERTAKING.

Definition of "Franchisee": Joel Senger

☒ Individual       ☐ Sole Proprietorship       ☐ Limited Liability Company

☐ Corporation      ☐ General Partnership        ☐ Limited Partnership

# ARTICLE I
# PERSONAL GUARANTY

The undersigned persons (individually and collectively "you" or "Personal Guarantors") hereby represent to A1 Kitchen & Bath Franchising, LLC ("Franchisor") that you are all of the owners, shareholders, general partners, or all of the members and managers, or the spouse of any such owner, shareholder, general partner, or member or manager of the Franchisee. In consideration of the grant by Franchisor to Franchisee, as provided in the foregoing franchise agreement (the "Franchise Agreement"), each of you hereby agree, in consideration of benefits received and to be received by each of you, jointly and severally, and for yourselves, your heirs, legal representatives and assigns, to be firmly bound by all of the terms, provisions and conditions of the foregoing Franchise Agreement, and any other agreement between Franchisee and Franchisor and/or its affiliates, and do hereby unconditionally guarantee the full and timely performance by Franchisee of each and every obligation of Franchisee under the aforesaid Franchise Agreement or other agreement between Franchisor and Franchisee, including, without limitation, any indebtedness of Franchisee arising under or by virtue of the aforesaid Franchise Agreement and that you (jointly and individually) will not permit or cause any change in the percentage of Franchisee owned, directly or indirectly, by any person, without first obtaining the written consent of Franchisor prior to said proposed transfer, which consent must not be unreasonably withheld, and without first paying or causing to be paid to Franchisor the transfer fee provided for in said Franchise Agreement, if applicable, and without otherwise complying with the transfer provisions of the foregoing Franchise Agreement. You further agree to be bound by the in-term and post-term non-competition and non-solicitation covenants set forth in Section 17 of the Franchise Agreement, as well as all other covenants set forth in the Franchise Agreement, including, but not limited to, those concerning confidentiality (Section 5 of the Franchise Agreement) and indemnification (Section 13.2 of the Franchise Agreement). You agree that this personal guaranty (the "Guaranty") will be governed by the dispute resolution procedures set forth in Section 18 of the Franchise Agreement.

## ARTICLE II
## CONFIDENTIALITY

During the term of this Guaranty, you will receive information which Franchisor considers a trade secret and confidential information ("Confidential Information"). You shall not, during the term of this Guaranty or thereafter, communicate, divulge, or use for the benefit of any other person, partnership, association, corporation, or limited liability company any Confidential Information, including, without limitation, Franchisor's Operations Manual and its contents; price lists and standards and specifications for the Approved Products and Approved Services; standards and specifications related to Franchisor's integrated bookkeeping system; and other methods, techniques and know-how concerning the operation of a Franchised Business of which you may be apprised by virtue of your role as a Personal Guarantor of Franchisee.

## ARTICLE III
## NON-COMPETITION

1. **During the Term of the Franchise Agreement**. During the term of the Franchise Agreement, neither you, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

a. Own, maintain, engage in, be employed as an officer, director, principal of, lend money to, extend credit to or have any interest in any other business that, directly or indirectly, by itself or through licensees or franchisees, offers the Approved Products or Approved Services or any other products and/or services authorized or offered for sale by System franchisees (a "Competitive Business") within the Designated Territory or the Designated Territory of any other System franchisee, provided that this Article III(1) does not apply to: (i) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (ii) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly traded company providing such services;

b. Employ or seek to employ any person who is at that time employed by Franchisor, Franchisor's affiliates or any other System franchisee, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

c. Solicit any current, former or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

2. **After the Term of the Franchise Agreement**. For a period of two (2) years after the expiration and nonrenewal, transfer or termination of the Franchise Agreement, regardless of the cause, neither you, nor your owners, principals, officers, directors, nor any members of your family or the family of your owners, officers, directors, or principals may, directly or indirectly, for themselves or through, on behalf of, or in conjunction with any other person or entity:

a. Own, maintain, engage in, be employed as an officer, director, principal of, lend money to, extend credit to, or have any interest in any Competitive Business: (i) within the Designated Territory; (ii) within a twenty-five (25)-mile radius of the Designated Territory of any other Franchised

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

Business; or (iii) within a twenty-five (25)-mile radius of any System business operated by Franchisor or its affiliate, provided that this Article III(2) does not apply to: (A) such person's ownership of a Franchised Business under a Franchise Agreement with Franchisor; or (B) such person's ownership of a less than five percent (5%) legal or beneficial interest in any publicly-traded company providing services the same as or similar to a Competitive Business;

b.      Employ or seek to employ any person who is at that time employed by Franchisor, Franchisor's affiliates, or any other System franchisee, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat; or

c.      Solicit any current, former or prospective customer solicited by Franchisee's Franchised Business or any other customer of whom Franchisee has become aware as a result of access to Franchisor's System or other franchisees for any competitive purpose.

3.      **Intent and Enforcement**.  It is the parties' intent that the provisions of this Article III be judicially enforced to the fullest extent permissible under applicable law. Accordingly, the parties agree that any reduction in scope or modification of any part of the noncompetition provisions contained herein shall not render any other part unenforceable. In the event of the actual or threatened breach of this Article III by you, any of your principals, or any members of their immediate family, Franchisor shall be entitled to an injunction restraining such person from any such actual or threatened breach. You agree that in the event of the actual or threatened breach of this Article III, Franchisor's harm will be irreparable, and that Franchisor has no adequate remedy at law to prevent such harm. You acknowledge and agree that each of you has previously worked or been gainfully employed in other careers and that the provisions of this Article III in no way prevent you from earning a living. You further acknowledge and agree that the time limitation of this Article III shall be tolled during any default under this Guaranty.

## ARTICLE IV
## DISPUTE RESOLUTION

1.      **Acknowledgment**.  You acknowledge that this Guaranty is not a franchise agreement and does not confer upon you any rights to use the Franchisor's Proprietary Marks or its System.

2.      **Governing Law**.  This Guaranty shall be deemed to have been made in and governed by the laws of the State of North Carolina, without any reference to North Carolina conflict of laws principles.

3.      **Internal Dispute Resolution**.  Franchisee and Franchisor believe that it is important to resolve any disputes amicably, quickly, cost-effectively and professionally and to return to business as soon as possible. Franchisee and Franchisor have agreed that the provisions of Sections 3 and 4 of this Personal Guaranty support these mutual objectives and, therefore, agree as follows. Any disagreement, litigation, claim, dispute, suit, action, controversy or proceeding of any type whatsoever, including any claim for equitable relief and/or where Franchisee is acting as a "private attorney general" suing pursuant to a statutory claim or otherwise between or involving a Guarantor, Franchisee and/or Franchisor on whatever theory and/or facts based, and whether or not arising out of this Guaranty (including any dispute or disagreement relating to arbitration, including the arbitrability of this Guaranty or any of its provisions), or offer, sale or negotiation of a The Designery Franchise, or the relationship of the parties arising from the Franchise or from entering this Guaranty or the Franchise Agreement, or any claim that this Guaranty or the Franchise Agreement or any part thereof is invalid, illegal or otherwise voidable, void or unenforceable ("Dispute") will be processed in the following manner, Franchisee and Franchisor each

expressly waiving all rights to any court proceeding, except as expressly provided below in Section 4.1. Personal Guarantor must first bring any claim or Dispute between Franchisee and Franchisor or Personal Guarantor and Franchisor to Franchisor's management, after providing notice as set forth in Section 4.8 below. Personal Guarantor must exhaust this internal Dispute resolution procedure before Personal Guarantor may bring Personal Guarantor's Dispute before a third party. This agreement to first attempt resolution of Disputes internally shall survive termination or expiration of this Guaranty. Personal Guarantor and Franchisor agree that the franchise relationship is unique and that as a result, it is important that anyone who serves as a mediator or arbitrator in a Dispute must have a minimum of seven (7) years' substantive experience in franchise law.

    4.   **Mediation**.

    If Personal Guarantor and Franchisor are unable to resolve a Dispute using the internal Dispute resolution procedure, then Disputes which are not first resolved through the internal Dispute resolution procedure set forth in Section 3 above, must be submitted first to non-binding mediation in Mecklenburg County, North Carolina under the auspices of the American Arbitration Association ("AAA"), in accordance with AAA's Commercial Mediation Rules then in effect. The mediation will be conducted by one mediator with at least seven (7) years of substantive experience in franchise law who will be appointed under the AAA's Commercial Mediation Rules and who will conduct the mediation in accordance with such rules. Mediation must be conducted on an individual, not a class-wide, basis; only Franchisor (and/or its affiliates and its and their respective owners, officers, directors, agents and employees) and Franchisee (and/or its Owners, guarantors, affiliates, officers, directors, agents and employees, if applicable) may be the parties to any mediation proceeding described in this Section, and no such mediation proceeding may be consolidated with any other mediation proceeding between Franchisor and any other person, corporation, limited liability company or partnership. Franchisor and Personal Guarantor agree that statements made by Franchisor, Personal Guarantor or any other party in any such mediation proceeding will not be admissible in any arbitration or other legal proceeding. If the mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written declaration by Franchisor, then, subject to the exclusions set forth in Section 4.1, all Disputes must be submitted to binding arbitration before one arbitrator of the AAA in accordance with its commercial arbitration rules. The arbitration will be conducted by one arbitrator with at least seven (7) years of substantive experience in franchise law who will be appointed under the AAA's Commercial Arbitration Rules and who will conduct the arbitration in accordance with such rules. Except as provided in Section 4.1, no party may file litigation involving any Dispute unless it has complied with the mediation and arbitration provisions in this Article regarding that Dispute. "Filing litigation" includes asserting a counterclaim, third-party claim or other claim relating to a Dispute (irrespective of whether the party asserting the claim filed the legal action in which the claim is asserted). Franchisor's rights to mediation and arbitration, as set forth herein, may be specifically enforced by Franchisor. Each party shall bear its own cost of mediation and arbitration, and Franchisor and Personal Guarantor shall share mediation costs equally. This agreement to mediate and arbitrate shall survive any termination or expiration of this Guaranty.

    4.1   The parties shall not be required to first attempt to mediate or arbitrate a controversy, Dispute or claim through mediation as set forth in this Section 4.1 if such controversy, Dispute or claim concerns an allegation that a party has violated (or threatens to violate, or poses an imminent risk of violating):

4.1.1    Any federally protected intellectual property rights in the Proprietary Marks, the System, or in any Confidential Information;

4.1.2    Any claims pertaining to or arising out of any warranty issue;

4.1.3    Any of the restrictive covenants contained in this Guaranty;

4.1.4    Any of Franchisee's payment obligations that are more than forty- five (45) days past due;

4.1.5    Any claims arising out of or related to fraud or misrepresentation by Personal Guarantor, Franchisee, or Franchisee's insolvency;

4.1.6    Any claims relating to Franchisee's obligations on termination or expiration of this Guaranty;

4.1.7    Any claims relating to any Transfer of an interest in Franchisee, the Franchised Business or Franchisee's assets; or

4.1.8    Any matters involving danger, health or safety.

4.2    **Interpretation**.  The provisions of this Guaranty must be construed as independent of any other covenant or provision of this Guaranty. However, if a court or arbitrator of competent jurisdiction determines that any provisions are unlawful, that court or arbitrator is to modify or interpret the provisions to the minimum extent necessary to have them comply with the law. Notwithstanding any provision relating to the state laws by and under which this Guaranty must be governed and construed, all issues relating to arbitrability or the enforcement of the agreement to arbitrate in this Guaranty must be governed by the United States Arbitration Act (9 U.S.C. § 1 et seq.) and the Federal common law of arbitration. The arbitrator, and not any federal, state or local court, shall have exclusive authority to resolve any Dispute relating to the interpretation, applicability, unconscionability, arbitrability, enforceability or formation of this Guaranty, including any claim of fraud in the inducement or that all or any part of the Guaranty is void or voidable. However, the preceding sentence shall not apply to the clause entitled "Class Action Waiver."

4.3    **Judgment**.  Judgment on an arbitration award may be entered in any court of competent jurisdiction. This judgment is binding, final and non-appealable.

4.4    **Failure to Appear**.  The arbitration and mediation provisions in this Article are self-executing and remain in full force and effect after the expiration or sooner termination of this Guaranty. If either party fails to appear at any properly noticed arbitration proceeding, notwithstanding failing to appear, an award may be entered against that party by default or otherwise.

4.5    **Class Action Waiver**.  Any proceeding (whether mediation, arbitration, trial by a court or jury, appeal or otherwise) must be brought in the parties' individual capacity and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiff or similar proceeding ("Class Action"). Personal Guarantor and Franchisor expressly waive any ability to maintain any Class Action in any forum. Further, an arbitration proceeding between Franchisor and Personal Guarantor (or any of Franchisee's or Franchisor's affiliates and owners and guarantors) may not be consolidated with any

other arbitration proceeding between them and any other franchisee, person or entity. Personal Guarantor hereby agrees not to seek joinder of any of its claims with those of any other party. The arbitrator shall not have authority to combine or aggregate similar claims or conduct any Class Action nor make an award to any person or entity not a party to the arbitration. Any claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined only by a court of competent jurisdiction and not by an arbitrator. PERSONAL GUARANTOR AND FRANCHISOR UNDERSTAND THAT FRANCHISOR WOULD HAVE HAD A RIGHT TO LITIGATE THROUGH A COURT, TO HAVE A JUDGE OR JURY DECIDE ITS CASE, AND TO BE PARTY TO A CLASS OR REPRESENTATIVE ACTION. HOWEVER, PERSONAL GUARANTOR AND FRANCHISOR UNDERSTAND AND CHOOSE TO WAIVE THAT RIGHT AND HAVE ANY CLAIMS DECIDED INDIVIDUALLY THROUGH ARBITRATION. It is Personal Guarantor's and Franchisor's joint business judgment that the limitations of this subsection make good business sense, because:

       4.5.1    the mediation and arbitration procedures contemplated by this Guaranty (and which Personal Guarantor and Franchisor agree are the core methods for resolving Disputes) function most effectively on an individual case basis;

       4.5.2    there are significant business and other factors present in each individual Personal Guarantor's situation which should be respected; and

       4.5.3    the economic interests of lawyers on either side in class-wide or multiple plaintiff disputes, as well as the tendency to polarize positions makes accommodation and compromise, as a practical business matter, less easily achieved, which would be a serious detriment to Personal Guarantor's and Franchisor's business interests, as well as those of the entire Franchise System, in quickly, amicably and economically resolving any Dispute.

       4.6    **Selection of Venue**.  Nothing contained in this Guaranty shall prevent Franchisor from applying to and obtaining from any court having jurisdiction, a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect Franchisor's interests. The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Mecklenburg County, North Carolina and the jurisdiction and venue of the United States District Court for the Western District of North Carolina. Personal Guarantor acknowledges that this Guaranty has been entered into in the State of North Carolina, and that Franchisee, whose obligations Personal Guarantor is guaranteeing, is to receive valuable and continuing services emanating from Franchisor's headquarters in Huntersville, North Carolina, including, but not limited to, training, assistance, support and the development of the System. In recognition of such services and their origin, Personal Guarantor hereby irrevocably consents to the personal jurisdiction of the state and federal courts of North Carolina as set forth in this Section.

       4.7    **Third Party Beneficiaries**.  Franchisor's officers, directors, shareholders, members, agents and/or employees are express third-party beneficiaries of the provisions of this Guaranty, including the mediation provision set forth in this Section 4, each having authority to specifically enforce the right to mediate and arbitrate claims asserted against such person(s) by Personal Guarantor.

       4.8    **Prior Notice of Claims**.  As a condition precedent to commencing an action for damages or for violation or breach of this Guaranty, Personal Guarantor must notify Franchisor within thirty (30) days after the occurrence of the violation or breach, and failure to timely give such notice shall preclude any claim for damages.

4.9 **No Right to Offset**. Personal Guarantor shall not withhold all or any part of any payment to Franchisor or any of its affiliates on the grounds of Franchisor's alleged nonperformance or as an offset against any amount Franchisor or any of Franchisor's affiliates allegedly may owe Franchisee under this Guaranty or any related agreements.

4.10 **Injunctive Relief**. The Franchised Business is intended to be one of a large number of businesses identified by the Proprietary Marks selling to the public the Approved Products and Approved Services associated with the Proprietary Marks. Consequently, a single Personal Guarantor's failure to comply with the terms of its franchise agreement is likely to cause irreparable damage to us, and damages at law would therefore be an inadequate remedy. On Personal Guarantor's breach or threatened breach of any of the terms concerning any matters referenced in Section 4.1, we may seek an injunction restraining the breach and/or a decree of specific performance (with recovery of reasonable attorneys' fees and costs incurred in obtaining equitable relief). We may do so without demonstrating or proving any actual damage. These equitable remedies are in addition to all other rights or remedies to which we may otherwise be entitled because of Personal Guarantor's breach of this Guaranty. We may seek this relief without posting any bond or security. However, if a court of competent jurisdiction requires a bond or security, a bond or security for $1,000 is sufficient. Notwithstanding anything in this Guaranty to the contrary, Franchisor may seek injunctive relief in any jurisdiction that has jurisdiction over Personal Guarantor or any other party against whom the relief is sought. If injunctive relief is granted, Personal Guarantor's only remedy will be the court's dissolution of the injunctive relief. If the injunctive relief was wrongfully issued, Personal Guarantor expressly waives all claims for damages Personal Guarantor incurred as a result of the wrongful issuance.

5. **Jurisdiction and Venue**. Nothing contained in this Guaranty shall prevent Franchisor from applying to and obtaining from any court having jurisdiction, a writ of attachment, a temporary injunction, preliminary injunction, and/or other emergency relief available to safeguard and protect Franchisor's interests. The parties expressly agree to the jurisdiction and venue of any court of general jurisdiction in Mecklenburg County, North Carolina and the jurisdiction and venue of the United States District Court for the Western District of North Carolina. The parties acknowledge and agree that this Guaranty has been entered into in the State of North Carolina, and that Franchisee, whose obligations Personal Guarantor is guaranteeing, is to receive valuable and continuing services emanating from Franchisor's headquarters in Huntersville, North Carolina, including, but not limited to, training, assistance, support and the development of the System. In recognition of such services and their origin, you hereby irrevocably consent to the personal jurisdiction of the state and federal courts of North Carolina as set forth herein.

6. **Jury Trial Waiver**. **THE PARTIES HEREBY AGREE TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR EQUITY, REGARDLESS OF WHICH PARTY BRINGS SUIT. THIS WAIVER SHALL APPLY TO ANY MATTER WHATSOEVER BETWEEN THE PARTIES HERETO WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS PERSONAL GUARANTY OR THE FRANCHISE AGREEMENT, THE PERFORMANCE OF EITHER PARTY, AND/OR YOUR PURCHASE FROM FRANCHISOR OF THE FRANCHISE, OPTION AND/OR ANY PRODUCTS OR SERVICES.**

7. **Waiver of Punitive Damages**. You waive, to the fullest extent permitted by law, any right to, or claim for, any punitive, exemplary, incidental, indirect, special or consequential damages (including,

without limitation, lost profits) which you may have against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agree that in the event of a Dispute, your recovery shall be limited to actual damages. If any other term of this Guaranty is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions shall continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.

8. **Limitation on Action**.  You agree that no cause of action arising out of or under this Guaranty or the Franchise Agreement may be maintained by you unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after you become aware of facts or circumstances reasonably indicating that you may have a claim against the Franchisor, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense or set-off. Notwithstanding anything to the contrary contained herein, all actions will be conducted on an individual, not a class-wide, basis and any proceeding between you, Franchisee, and Franchisor or its affiliates or employees may not be consolidated with any other proceeding between Franchisor and any other person or entity.

9. **Attorneys' Fees**.  If the undersigned is in breach or default of any monetary or non-monetary material obligation under the Franchise Agreement or this Guaranty, or any related agreement between Franchisee and Franchisor and/or Franchisor's affiliates, and Franchisor engages an attorney to enforce Franchisor's rights (whether or not formal judicial proceedings are initiated), Franchisee must pay all reasonable attorneys' fees, court costs and litigation expenses Franchisor incurs. If the undersigned or Franchisee institutes any legal action to interpret or enforce the terms of this Guaranty or the Franchise Agreement, and the claim(s) in such action is denied or the action is dismissed, Franchisor is entitled to recover Franchisor's reasonable attorneys' fees, and all other reasonable costs and expenses incurred in defending against same, and to have such an amount awarded as part of the judgment in the proceeding.

10. **Nonwaiver**.  Franchisor's failure to insist upon strict compliance with any provision of this Guaranty and the Franchise Agreement shall not be a waiver of Franchisor's right to do so, any law, custom, usage or rule to the contrary notwithstanding. Delay or omission by Franchisor respecting any breach or default shall not affect Franchisor's rights respecting any subsequent breaches or defaults. All rights and remedies granted in this Guaranty shall be cumulative. Franchisor's election to exercise any remedy available by law or contract shall not be deemed a waiver or preclude exercise of any other remedy.

11. **Severability**.  The parties agree that if any provisions of this Guaranty may be construed in two ways, one of which would render the provision illegal or otherwise voidable or unenforceable and the other which would render it valid and enforceable, such provision shall have the meaning that renders it valid and enforceable. The language of all provisions of this Guaranty shall be construed according to fair meaning and not strictly construed for or against either party. The provisions of this Guaranty are severable, and this Guaranty shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein, and partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable. If any material provision of this Guaranty shall be stricken or declared invalid, the parties agree to negotiate mutually acceptable substitute provisions. In the event that the parties are unable to agree upon such provisions, Franchisor reserves the right to terminate this Guaranty.

12. **Construction of Language**.  Any term defined in the Franchise Agreement that is not defined in this Guaranty will be ascribed the meaning given to it in the Franchise Agreement. The language

of this Guaranty will be construed according to its fair meaning, and not strictly for or against either party. All words in this Guaranty refer to whatever number or gender the context requires. If more than one party or person is referred to as you, their obligations and liabilities must be joint and several. Headings are for reference purposes and do not control interpretation.

13. **Successors**. References to "Franchisor" or "the undersigned," or "you" include the respective parties' successors, assigns or transferees.

14. **No Personal Liability**. You agree that fulfillment of any and all of Franchisor's obligations written in this Guaranty or in the Franchise Agreement or based on any oral communications which may be ruled to be binding in a Court of Law shall be Franchisor's sole responsibility and none of Franchisor's agents, representatives, nor any individuals associated with Franchisor's franchise company shall be personally liable to Franchisee or you for any reason.

IN WITNESS WHEREOF, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES HERETO HAVE CAUSED THIS GUARANTY TO BE EXECUTED EFFECTIVE THE DATE FIRST SET FORTH ABOVE.

**PERSONAL GUARANTORS:**                    **SPOUSES:**

_____            _____
6F8E03E0D6E54E4...                          C07FEFD931B5470...
Joel Senger, Individually                   Amy Senger, Individually

**EXHIBIT B**
**TO**
**A1 KITCHEN & BATH FRANCHISING, LLC**
**FRANCHISE AGREEMENT**

**CONDITIONAL ASSIGNMENT OF FRANCHISEE'S TELEPHONE NUMBERS,**
**FACSIMILE NUMBERS AND DOMAIN NAMES**

1.      Joel Senger                                                                      , doing business as a A1 Kitchen & Bath Franchising, LLC franchisee ("Assignor"), in exchange for valuable consideration provided by A1 Kitchen & Bath Franchising, LLC ("Assignee"), receipt of which is hereby acknowledged, hereby conditionally assigns to Assignee all telephone numbers, facsimile numbers, domain names, as well as any listings associated therewith, utilized by Assignor in the operation of its Franchised Business at Assignor's above-referenced address (the "Assigned Property"). The Assigned Property includes the following:

Telephone Number(s): _____

Facsimile Number(s): _____

Domain/Social Media Name(s) (as permitted by Franchisor under the Franchise Agreement):
_____

2.      This Conditional  Assignment of Franchisee's Telephone Numbers and Domain Names ("Assignment") will become effective automatically upon termination or expiration of Assignor's franchise. Upon the occurrence of that condition, Assignor must do all things required by the telephone company and/or domain name registrar to assure the effectiveness of the assignment of Assigned Property as if the Assignee had been originally issued such Assigned Property and the usage thereof.

3.      Assignor agrees to pay the telephone company and/or domain name registrar, on or before the effective date of assignment, all amounts owed for the use of the Assigned Property up to the date this Assignment becomes effective. Assignor further agrees to indemnify Assignee for any sums Assignee must pay the telephone company to effectuate this Assignment and agrees to fully cooperate with the telephone company and/or domain name registrar, as well as Assignee, in effectuating this Assignment.

**ASSIGNOR:**                                              **ASSIGNEE:**

                                                         **A1 KITCHEN & BATH FRANCHISING, LLC**

_____        _____
                                                         Jeffrey R. Dudan, President

Date: _____        Date: _____

**EXHIBIT C**
**TO**
**A1 KITCHEN & BATH FRANCHISING, LLC**
**FRANCHISE AGREEMENT**

**CONFIDENTIALITY AND RESTRICTIVE COVENANT AGREEMENT**
*(for trained employees, shareholders, officers, directors, general partners, members and managers of Franchisee)*

In consideration of my being a _____ of _____ (the "Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I hereby acknowledge and agree that Franchisee, has acquired the right and franchise from A1 Kitchen & Bath Franchising, LLC (the "Company") to establish and operate a franchised business (the "Franchised Business") and the right to use, in the operation of the Franchised Business, the Company's trade names, trademarks and service marks (the "Proprietary Marks") and the Company's unique and distinctive format and system relating to the establishment and operation of Franchised Businesses (the "System"), as they may be changed, improved and further developed from time to time in the Company's sole discretion, only at the following authorized and approved location: _____ _____ (the "Franchised Business Premises").

1.    The Company possesses certain proprietary and confidential information and trade secrets relating to the operation of the System and the Franchised Business, including the Company's Manuals; price lists and standards and specifications for the Approved Products and Approved Services; standards and specifications related to the Company's integrated bookkeeping system, and other methods, techniques and know-how concerning the of operation of the Franchised Business which may be communicated to Franchisee or of which I may be apprised by virtue of my employment with Franchisee ("Confidential Information").

2.    Any and all information, knowledge, know-how and techniques which the Company specifically designates as confidential shall be deemed to be Confidential Information for purposes of this Confidentiality and Restrictive Covenant Agreement ("Agreement").

3.    In my position with the Franchisee, the Company and Franchisee will disclose the Confidential Information to me in furnishing to me the training program and subsequent ongoing training, the Company's Operations Manual (the "Operations Manual"), and other general assistance during the term of this Agreement.

4.    I will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Franchised Business during the term hereof, and the use or duplication of the Confidential Information for any use outside the System would constitute an unfair method of competition.

5.    The Confidential Information is proprietary, involves trade secrets of the Company, and is disclosed to me solely on the condition that I agree, and I do hereby agree, that I shall hold in strict confidence all Confidential Information and all other information designated by the Company as confidential. Unless the Company otherwise agrees in writing, I will disclose and/or use the Confidential Information only in connection with my duties with the Franchisee, and will continue to not disclose any such information even after I cease to be in that position and will not use any such information even after I cease to be in that position unless I can demonstrate that such information has become generally known or easily accessible other than by the breach of an obligation of Franchisee under the Franchise Agreement.

6.      Except as otherwise approved in writing by the Company, I shall not, while in my position with the Franchisee, for myself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company, own, maintain, engage in, be employed by, or have any interest in any other business which operates or licenses any other competing business(es), except for a Franchised Business operating under the System and Proprietary Marks.

7.      I agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an un-appealed final decision to which the Company is a party, I expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

8.      I understand and acknowledge that the Company shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without my consent, effective immediately upon receipt by me of written notice thereof, and I agree to comply forthwith with any covenant as so modified.

9.      The Company is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with the Franchisee. I am aware that my violation of this Agreement will cause the Company and the Franchisee irreparable harm; therefore, I acknowledge and agree that the Franchisee and/or the Company may apply for the issuance of an injunction preventing me from violating this Agreement, and I agree to pay the Franchisee and the Company all the costs it/they incur(s), including, without limitation, legal fees and expenses, if this Agreement is enforced against me. Due to the importance of this Agreement to the Franchisee and the Company, any claim I have against the Franchisee or the Company is a separate matter and does not entitle me to violate, or justify any violation of this Agreement.

10.     This Agreement shall be construed under the laws of the State of North Carolina. The only way this Agreement can be changed is in writing signed by both the Franchisee and me.

_____
Employee

Date: _____

**ACKNOWLEDGED BY FRANCHISEE:**

By: _____

Name: _____

**EXHIBIT D**
**TO**
**A1 KITCHEN & BATH FRANCHISING, LLC**
**FRANCHISE AGREEMENT**

**ELECTRONIC FUNDS WITHDRAWAL AUTHORIZATION**

Bank Name:

ABA#:

Acct. No.:

Acct. Name:

      Effective as of the date of the signature below, _____ ("Franchisee"), hereby authorizes A1 Kitchen & Bath Franchising, LLC ("Company") or its designee to withdraw funds from the above-referenced bank account, electronically or otherwise, and to make the following payments to Company under the Franchise Agreement for the Franchised Business located at: _____: (i) all Royalty Fees; (ii) all Brand Fund Contributions, Technology Fees, Call Center Fees or other recurring fees; and (iii) any other fees due and owing under the Franchise Agreement. Franchisee acknowledges that Royalty Fees and all other fees may be collected by Franchisor in the manner provided for in the Franchise Agreement. Such withdrawals shall occur on a monthly basis, or on such other schedule as Company shall specify in writing. Company is also authorized to deposit the Gross Revenue of Franchisee's Franchised Business, less all amounts due under the Franchise Agreement, into the above-referenced account, electronically or otherwise. Such deposits shall occur on a monthly basis, or on such other schedule as Company shall specify in writing.

      This authorization shall remain in full force and effect until terminated in writing by Company. Franchisee shall provide Company, in conjunction with this authorization, a voided check from the above-referenced account.

**AGREED:**

**FRANCHISEE:**

Date: _____

# EXHIBIT E
## TO
## A1 KITCHEN & BATH FRANCHISING, LLC
## FRANCHISE AGREEMENT

## SITE SELECTION ADDENDUM

A1 Kitchen & Bath Franchising, LLC, a North Carolina limited liability company with a principal business address at 107 Parr Drive, Huntersville, North Carolina 28078 ("Franchisor") and Joel Senger ("Franchisee"), have on October 20, 2023 (the "Effective Date"), entered into the foregoing Franchise Agreement for the operation of a franchised business using Franchisor's Proprietary Marks and System (the "Franchised Business") and desire to supplement its terms, as set forth below. The parties therefore agree as follows:

1.      Within sixty (60) days after the Effective Date of the Franchise Agreement, Franchisee must obtain a site, at Franchisee's expense, for the Franchised Business, which Franchisor will approve as hereinafter provided. The site must be within the Designated Territory set forth in the Data Sheet of the Franchise Agreement.

2.      Franchisee's failure to obtain a site for the Franchised Business within the time required in Paragraph 1 will constitute a default under the Franchise Agreement and this Site Selection Addendum ("Addendum"). Time is of the essence.

3.      Prior to Franchisee's acquisition by lease or purchase of a site for the Franchised Business, Franchisee must submit to Franchisor, in the form Franchisor specifies, a completed site review form, such other information or materials as Franchisor may reasonably require, and a letter of intent or other evidence satisfactory to Franchisor that confirms Franchisee's favorable prospects for obtaining the proposed site. Recognizing that time is of the essence, Franchisee must submit a proposed site, together with the information and materials required by this Paragraph 3, to Franchisor for Franchisor's approval within thirty (30) days after execution of the Franchise Agreement. Franchisor will have thirty (30) days after receipt of such information and materials from Franchisee to approve or disapprove, in Franchisor's sole discretion, the site as a location for the Franchised Business. No proposed site will be deemed approved unless Franchisor has expressly approved it in writing.

4.      Franchisor will furnish to Franchisee such site selection guidelines, consultation and on-site evaluation as Franchisor deems advisable as part of Franchisor's evaluation of Franchisee's request for site approval. Franchisor will not, however, provide on-site evaluation for any proposed site prior to Franchisor's receipt of the information and materials required by Paragraph 3 hereof. If Franchisor deems on-site evaluation necessary and appropriate, Franchisor will conduct one (1) on-site evaluation at Franchisor's cost. For each additional on-site evaluation (if any), Franchisee will reimburse Franchisor for Franchisor's expenses, including, without limitation, the costs of travel, lodging and meals.

5.      If Franchisee will be occupying the Franchised Business premises under a lease, Franchisee shall, upon Franchisor's request, prior to the execution of the lease, submit the lease to Franchisor for Franchisor's approval. Franchisor's approval of the lease may be conditioned upon Franchisee's execution of a Collateral Assignment of Lease in the form Franchisor prescribes, as well as the inclusion or exclusion of certain required provisions. Franchisee must furnish Franchisor with a copy of any executed lease within ten (10) days after execution thereof.

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

6.     After Franchisor has approved a site for the Franchised Business in writing and Franchisee has acquired the site, the site will constitute the Approved Location referred to in Section 1.3 of the Franchise Agreement.

7.     Franchisee hereby acknowledges and agrees that Franchisor's approval of a site does not constitute an assurance, representation or warranty of any kind, express or implied, as to the suitability of the site for the Franchised Business or for any other purpose. Franchisor's approval of the site indicates only that Franchisor believes the site complies with acceptable minimum criteria established by Franchisor solely for Franchisor's purposes as of the time of the evaluation. Both parties to this Agreement acknowledge the application of criteria that have been effective with respect to other sites and premises may not be predictive of potential for all sites and that, subsequent to Franchisor's approval of a site, demographic and/or economic factors such as competition from other similar businesses included in or excluded from Franchisor's criteria could change, thereby altering the potential of a site. Such factors are unpredictable and are beyond Franchisor's control. Franchisor will not be responsible for the failure of a site approved by Franchisor to meet Franchisee's expectations as to revenue or operational criteria. Franchisee further acknowledges and agrees that Franchisee's acceptance of a franchise for the operation of the Franchised Business at the site is based on Franchisee's own independent investigation of the suitability of the site.

8.     This Addendum constitutes an integral part of the Franchise Agreement between the parties hereto, and the terms of this Addendum will be controlling with respect to the subject matter hereof. Except as modified or supplemented by this Addendum, the terms of the Franchise Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum on the day and year first above written.

**FRANCHISOR:**                                        **FRANCHISEE:**

**A1 KITCHEN & BATH FRANCHISING, LLC**

DocuSigned by:                                          DocuSigned by:

*Jeffrey Dudan*                                         _____
—80D096B147D34C9—                                       —8F8E03E0D6E84E4—

Jeffrey R. Dudan, President                             Joel Senger, Individually

**EXHIBIT F**
**TO**
**A1 KITCHEN & BATH FRANCHISING, LLC**
**FRANCHISE AGREEMENT**

**STATEMENT OF OWNERSHIP**

**Franchisee:** Joel Senger

**Form of Ownership**
**(Check One)**

☒ Individual ☐ Sole Proprietorship ☐ Limited Liability Company

☐ Corporation ☐ General Partnership ☐ Limited Partnership

If a **Partnership**, provide name and address of each partner showing percentage owned, whether active in management, and indicate the state in which the partnership was formed.

If a **Corporation**, provide the state and date of incorporation, the names and addresses of each officer and director, and list the names and addresses of every shareholder showing what percentage of stock is owned by each.

If a **Limited Liability Company**, provide the state and date of formation, the name and address of the manager(s), and list the names and addresses of every member and the percentage of membership interest held by each member.

State and Date of Formation/Incorporation: _____

**Management (managers, officers, board of directors, etc.):**

| Name | Title |
| --- | --- |
|  |  |
|  |  |
|  |  |
|  |  |

**Members, Stockholders, Partners:**

| Name | Address | Percentage Owned |
| --- | --- | --- |
|  |  |  |
|  |  |  |
|  |  |  |

TD0024

**Identification of Managing Owner**.  Your managing owner as of the Effective Date is _____ _____.  You may not change the managing owner without prior written approval.


**Identification of Designated Manager**.  Your Designated Manager, if applicable, as of the Effective Date is _____.  You may not change the Designated Manager without prior written approval.

      This form is current and complete as of October 20, 2023.


                        **FRANCHISEE:**


DocuSigned by:

8E8E03E0D8E64E4

_____

Joel Senger, Individually

**EXHIBIT G
TO
A1 KITCHEN & BATH FRANCHISING, LLC
FRANCHISE AGREEMENT**

**<u>COLLATERAL ASSIGNMENT OF LEASE</u>**

Landlord: _____          A1 Kitchen & Bath Franchising, LLC
                                                                        Notice Address:   107 Parr Drive
Notice Address: _____                         Huntersville, NC 28078
                        _____
                        _____

Telephone: _____

Tenant: _____

Leased Premises: _____

       1.    <u>Use</u>. Tenant is a franchisee of Franchisor. The Leased Premises shall be used only for the operation of a The Designery business (or any name authorized by Franchisor).

       2.    <u>Notice of Default and Opportunity To Cure</u>. Landlord shall provide Franchisor with copies of any written notice of default ("<u>Default</u>") given to Tenant under the Lease, and Landlord grants to Franchisor the option (but not the obligation) to cure any Default under the Lease (should Tenant fail to do so) within ten (10) days after the expiration of the period in which Tenant may cure the Default.

       3.    <u>Termination of Lease</u>. Landlord shall copy Franchisor on any notice of termination of the Lease. If Landlord terminates the Lease for Tenant's Default, Franchisor shall have the option to enter into a new Lease with Landlord on the same terms and conditions as the terminated Lease. To exercise this option, Franchisor must notify Landlord within fifteen (15) days after Franchisor receives notice of the termination of the Lease.

       4.    <u>Termination of Franchise Agreement</u>. If the Franchise Agreement between Franchisor and Tenant is terminated during the term of the Lease, then upon the written request of Franchisor, Tenant shall assign the Lease to Franchisor. Landlord hereby consents to the assignment of the Lease to Franchisor.

       5.    <u>Assignment and Subletting</u>. Notwithstanding any provision of the Lease to the contrary, Tenant shall have the right to assign or sublet the Lease to Franchisor, provided that no such assignment or sublease shall relieve Tenant or any guarantor of liability under the Lease. If Franchisor becomes the lessee of the Leased Premises, then Franchisor shall have the right to assign or sublease its lease to a franchisee of the The Designery brand.

       6.    <u>Authorization</u>. Tenant authorizes Landlord and Franchisor to communicate directly with each other about Tenant and Tenant's business.

7. <u>Right to Enter</u>. Upon the expiration or termination of the Franchise Agreement or the Lease, or the termination of Tenant's right of possession of the Leased Premises, Franchisor or its designee may, after giving reasonable prior notice to Landlord, enter the Leased Premises to remove signs and other material bearing Franchisor's brand name, trademarks and commercial symbols, provided that Franchisor will be liable to Landlord for any damage Franchisor or its designee causes by such removal.

8. <u>No Liability</u>. By executing this Collateral Assignment of Lease, Franchisor does not assume any liability with respect to the Leased Premises or any obligation as Tenant under the Lease.

Executed by:

**LANDLORD:**

By: _____

Name: _____

Title: _____

Date: _____

**TENANT:**

By: _____

Name: _____

Title: _____

Date: _____

**FRANCHISOR:**

**A1 KITCHEN & BATH FRANCHISING, LLC**

_____
Jeffrey R. Dudan, President

Date: _____

DocuSign Envelope ID: 461565C3-13F2-46A0-81E9-A29C72066327

**EXHIBIT H**
**TO**
**FRANCHISE AGREEMENT**

**FRANCHISOR DIRECTED ADVERTISING SERVICES AGREEMENT**

This Franchisor Directed Advertising Services Agreement ("FDASA") is entered into as of October 20, 2023, by and between A1 Kitchen & Bath Franchising, LLC, a North Carolina limited liability company, with its principal place of business at 107 Parr Drive, Huntersville, North Carolina 28078 ("we," "us," "our" or "Franchisor") and Joel Senger, an individual residing in the State of Kentucky with an address at 241 N Colony Dr., Edgewood, Kentucky 41017 ("you" or "Franchisee").

**RECITALS**

A.      Franchisee and Franchisor are parties to that certain Franchise Agreement dated the date hereof (the "Franchise Agreement").

B.      Pursuant to the terms of the Franchise Agreement, Franchisee is required to pay for Local Advertising Services (defined below) from Franchisor.

**AGREEMENT**

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Any capitalized terms used, but not defined herein, have the same meaning set forth in the Franchise Agreement.

2.      **Term**.  The FDASA will remain in effect indefinitely and will automatically terminate upon the expiration or termination of the Franchise Agreement.

3.      **Default**.  If you are in default of your obligations under the FDASA or the Franchise Agreement, we may suspend some or all of the Local Advertising Services without terminating either agreement. This remedy is in addition to any other remedies we may have at law or in equity.

4.      **Termination**.  We can terminate the FDASA prior to the end of the Term by written notice if: (i) you are in default under the Franchise Agreement or any other agreement with Franchisor or an affiliate of Franchisor; (ii) you are in default under the FDASA and the default continues for a period of ten (10) days after we deliver written notice of default; or (iii) we discontinue the Local Advertising Services under Section 8 of this FDASA.

5.      **Franchisor Directed Advertising Services**.  You and we agree that as Franchisor we have the right, in light of our marketing expertise and research regarding effective advertising of the System: (a) to formulate and design the Local Advertising Services (defined below), including the service options and vendors made available to franchisees from time to time; (b) to develop and control all content for the Local Advertising Services (the "Advertising"); and (c) to determine the uses and distribution of all such Advertising. We have the right to administer each service, as well as other services we elect to offer in the future, which may include appointment generation platforms, billboards, radio ads, etc. We can change or end a service at any time and add new services at any time.

"<u>Local Advertising Services</u>" means our advertising of the The Designery brand and the Services offered under the Proprietary Marks and the System, as conducted in your Designated Territory in coordination with our similar advertising service in the territories of other franchisees and nationally, and includes the several channels and forms of local marketing activities and services that we (or a designated vendor) offer from time to time and perform pursuant to this FDASA, which activities and services may include, but are not limited to: media management, advertising design, digital marketing for generation of customer leads, digital marketing for generation of customer reviews, tracking of leads, performance analytics, production and printing of marketing pieces, list management, mail management, market studies, strategy and analysis, research and development, shipping and delivery to the United States Postal Service or other carrier, other services we offer in our Business Judgment, and related administrative services.

6.  **Franchisor Directed Advertising Fee**.  For our Local Advertising Services, you agree to pay us or an affiliate we designate a non-refundable fee (the "<u>Franchisor Directed Advertising Fee</u>") in an amount up to the Local Advertising Requirement (currently, the greater of three thousand dollars ($3,000) per month or three percent (3%) of Gross Revenue per month). We reserve the right to designate the timing of payment and to set other policies relating to the Franchisor Directed Advertising Fee, but the fee will continue to be due monthly by the tenth (10th) of the month. For example, although we have no obligation to do so, we may permit you to: (i) vary the monthly payment, subject to satisfaction of the annual amount required; and/or (ii) allocate the required amount among marketing channels that we offer. If not otherwise designated by us, you must pay the Franchisor Directed Advertising Fee at the same time you pay your Royalty Fee under the Franchise Agreement. You must pay the Franchisor Directed Advertising Fee by electronic funds transfer or such other method as we may designate from time to time. We and our affiliates may earn revenue and profits on products or services we provide and may receive rebates, licensing fees, administrative fees, commissions, or other payments on products and services that third-party vendors provide. The Franchisor Directed Advertising Fee is credited to your required monthly Local Advertising Requirement. If local advertising directed by us is paid with a franchisee credit card (or other method of direct payment), all such amounts spent that are directed by us will be credited to the monthly Franchisor Directed Advertising Fee.

7.  **Changes to Franchisor Directed Advertising Fee**.  We may periodically increase or decrease the Franchisor Directed Advertising Fee in an amount we deem appropriate in our Business Judgment, but in no event will that increase cause the Franchisor Directed Advertising Fee to be more than the Local Advertising Requirement. Further, we reserve the right to change the Franchisor Directed Advertising Fee from a dollar amount to a percentage of sales or to any other formula we designate. We will give you thirty (30) days' advance notice by email or other means if we intend to change the Franchisor Directed Advertising Fee pursuant to this Section.

8.  **No Guaranteed Results**.  We do not represent or warrant that the Local Advertising Services or any individual service will reach a minimum number of persons in your Designated Territory, will reach any specific persons in the Designated Territory, or will produce any particular results for your Franchised Business. We obtain distribution lists and other data from third-party data compilation and demographic information service provider(s) that we and/or our affiliates select. We make no representation or warranty regarding the accuracy of any such lists or other data we use to conduct the Local Advertising Services.

9.  **Ownership**.  You acknowledge and agree that, as between Franchisor and Franchisee, Franchisor owns all right, title and interest in and to any Advertising created in or for the Local Advertising Services, including all intellectual property rights therein or appurtenant thereto. Franchisee will not acquire any right, title or interest in the Advertising or any portion thereof pursuant to this FDASA or otherwise, other than the right to access and use the Advertising as expressly granted in the Franchise Agreement, subject to the terms and conditions of the Franchise Agreement and this FDASA.

10. **Discontinuation or Replacement of Local Advertising Services**.  We have the right, in our sole business judgment, to discontinue the Local Advertising Services, in whole or in part, and to require you to pay all or a portion of the amount of the Franchisor Directed Advertising Fee to one or more other services that we establish to supplement or take the place of the Local Advertising Services. In the event that we discontinue the Local Advertising Services or replace it with an entirely new service, we will seek feedback from franchisees, which feedback will be advisory only.

11. **Assignment**.  The FDASA is fully assignable by Franchisor. Franchisee may not assign the FDASA without the prior written consent of Franchisor.

12. **Miscellaneous**.  The choice of law, choice of forum/venue, and dispute resolution provisions set forth in the Franchise Agreement apply to the parties' dealings under the FDASA.

**IN WITNESS WHEREOF**, the parties hereto have executed this FDASA by their duly authorized representatives as indicated below.

FRANCHISOR:                                     FRANCHISEE:

**A1 KITCHEN AND BATH FRANCHISING, LLC**

_Jeffrey Dudan_                                 _Joel_
—————————————————               —————————————————
80D0093B142D34C9                                6F8E03E0D0E94E4
Jeffrey R. Dudan, President                     Joel Senger, Individually

.