# EXHIBIT 3



*John G. Haraldson*
*Chief Legal Officer*
*(859) 948-2393*

107 Parr Drive
Huntersville, North Carolina 28078
(980) 443-2700
www.thedesignery.com

February 6, 2025

<u>By Overnight Mail</u>
Proverbs 163 Ventures, Inc.
241 N. Coloby Dr.
Edgewood, Kentucky 41017
Attn: Joel Senger, President and CEO

and

Joel Senger
241 N. Coloby Dr.
Edgewood, Kentucky 41017

With a copy via E-mail to: DAPerry@woodlamping.com
Daniel A. Perry
600 Vine Street, Suite 2500
Cincinnati, OH 45202-2491

Re: Request for Meeting and Notice of Default, Proverbs 163 Ventures, Inc. ("Franchisee")

Dear Mr. Senger:

It is our hope that we can continue our dialogue from December and work to an amicable resolution of the issues between us as we had reached a tentative agreement on a path forward subject to a review of terms offered. We have reached out several times since we met and have not received a response. Accordingly, we request a meeting (Teams/Zoom) with you and/or your counsel to discuss and confirm Franchisee's intentions on or before February 13, 2025.

Proverbs 163 Ventures, Inc., a Kentucky corporation located at 241 N. Coloby Dr., Edgewood, Kentucky 41017, and Joel Senger, owner and guarantor ("Owner"), and Amy Senger, guarantor (together with Joel Senger, the "Guarantors") entered into those certain franchise agreements with A1 Kitchen & Bath Franchising, LLC, a North Carolina limited liability company located at 107 Parr Dr., Huntersville, NC 28078 ("Franchisor") on October 20, 2023 (later assigned to Franchisee on April 4, 2024) for operation of the Franchised Businesses TD0023-0025, ("Franchise Agreements") under which you operated a The Designery™ franchise in the Cincinnati, Ohio market area. Franchisor, Franchisee, Owner, each guarantor (and together the Guarantors) are each sometimes referred to individually as a "Party" and collectively as the "Parties". Terms not defined in this letter have the meaning ascribed to them in the Franchise Agreements.

The Parties met to resolve certain issues on December 2, 2024, in Cincinnati, OH. During that meeting, the parties discussed each of their respective concerns. The parties discussed whether the

Franchisee wanted to continue to operate the business and/or sell the business. In order to help franchisee to continue to operate the business, Franchisor extended an offer of additional coaching in the form of operational and marketing assistance, including in market training at no cost to franchisee and the waiver of certain fees. Franchisor also offered franchisee participation in a resale program to sell the franchise to a new operator. At the end of the meeting, the Parties agreed that the Franchisee would detail any questions about the above options and come to a conclusion on a path forward by December 6, 2024. As of the date of this letter, despite several requests from Franchisor, no further communication regarding a path forward has been communicated to Franchisor.

In addition, on January 6, 2025, Franchisee sent a revocation of ACH authorization to Franchisor. While the Franchisor honored this revocation, Franchisor provided notice to Franchisee that the Franchise Agreement requires an active ACH account (see Section 3.4 of the Franchise Agreements) and that the failure to provide a replacement ACH account would constitute a default. As of the date of this letter, no replacement account has been set up or identified and Franchisee is in default of its obligation to provide an ACH account.

In addition, the Monthly Minimum Royalties and Technology Fee due January 10, 2025, have not been paid and are past due, which constitutes a second and third default of the Franchise Agreements (see Section 3.2.2 and Section 3.7 of the Franchise Agreements). In total, you have failed to pay us $1,599.00 which includes amounts for Minimum Monthly Royalties and Technology Fe es. An itmeized list of amounts included is attached as Exhibit B.This is a default pursuant to Franchise Agreement section 15.3.1.

Further, we believe that Franchisee has failed to meet its Local Advertising Requirement for at least the last several months, which constitutes a fourth default of the Franchise Agreements (see Section 3.6 of the Franchise Agreements). With regard to the Local Advertising Requirement, amounts not spent pursuant to your obligations in the Franchise Agreements must be paid to the Franchisor. We are not able to determine the exact amount due at this time, but any amount due constitutes a default of you obligations pursuant to Franchise Agreement section 15.3.1.

Pursuant to Section 15.3 if the Franchise Agreements, you have 15 days after the date you receive this notice to cure the noticed defaults (February 23, 2025) by completing the following actions:

1. Providing an active ACH account from which we can withdraw amounts due.
2. Pay all past due amounts and remain current with additional amounts coming due during the cure period.
3. Reporting to us your local advertising spend amounts for each month of 2024, and curing any shortfall in required spending. We are willing to work with you on timing and marketing channels these funds are directed to so that we can ensure efficient use of advertising money.
4. As an alternative to the above actions, you may pursue a cure through by working with the Franchisor to agree on a path forward with one or more of the options discussed in our December meeting (potentially subject to some updates regarding changed circumstances since our December meeting).

Notwithstanding these defaults, it is our preference to resolve this matter amicably and to that end we have continued to provide franchisor support of Franchisee's business and we have regularly inquired as to Franchisee's intention with regard to Franchisor's offer of assistance and/or use of the resale program.

However, in the event that we are unable to come to an agreement to resolve the above defaults, we may pursue termination of the Franchise Agreements. Please be aware that, upon termination, you must

comply with those obligations set forth in Section 16 RIGHTS AND DUTIES UPON TERMINATION OF EXPIRATION of the Franchise Agreement, a summary of those obligations is attached as Exhibit A for your convenience, but please refer to the Franchise Agreement for the full obligations.

If you fail to satisfy any of your post-termination obligations described in the Franchise Agreement, the Franchisor may initiate legal action against you to enforce its contractual rights. As part of any such action, Franchisor will seek all available relief against you, which may include, but is not limited to:

1. An injunction compelling you to comply with all of the post-termination obligations in the Franchise Agreement, including the non-compete;

2. Damages related to your violations of the Franchise Agreement, including any violations of your post-termination obligations; and

3. Payment of outstanding past due fees, minimum monthly fees through the end of the term, damages for early termination of the Franchise Agreement, and any other amounts that may be due and owing to Franchisor or any affiliate thereof.

Be advised, this letter serves as notice that despite any action Franchisor may take, Franchisor reserves all rights and causes of action it may have against you under the Franchise Agreement and applicable law, and nothing herein shall constitute a waiver of any such rights.

This letter is being delivered to you by via overnight delivery. As a consequence, if we receive the letter after it has been "refused" or "unclaimed," this notice will nevertheless be deemed effective. Not claiming or refusing to accept this letter will not toll the cure period or prevent termination.

Thank you for your immediate attention to this matter. If you have any questions regarding the content of this letter, please do not hesitate to contact us.

Sincerely,

*[signature]*

John G. Haraldson
General Counsel

Exhibit A – Obligations on Termination

| SECTION | FRANCHISEE OBLIGATION |
|---|---|
| 16.1.1 | Immediately cease all operations under this Agreement; |
| 16.1.2 | Immediately pay Franchisor all unpaid fees, and pay Franchisor, Franchisor's affiliates, Franchisor's major suppliers and vendors, all other monies owed; |
| 16.1.3 | Discontinue immediately the use of the Proprietary Marks; |
| 16.1.4 | Immediately cease using the Technology System and the Operations Manual, and return all Proprietary Materials and Confidential Information, including, without limitation, all customer lists and data, within ten (10) calendar days and immediately and permanently cease use of such information and materials; |
| 16.1.5 | Immediately cease using all telephone and facsimile numbers and listings, as well as any permitted domain names and/or Social Media Pages used in connection with the operation of the Franchised Business (collectively, the "Assigned Property"), and direct the telephone company and/or domain name registrar to transfer all such Assigned Property to Franchisor or Franchisor's designee pursuant to the Conditional Assignment of Telephone Numbers and Domain Name attached hereto as Exhibit B, and transfer all usernames and passwords for all Social Media Pages to Franchisor; |
| 16.1.6 | Immediately vacate the Franchised Business premises, and if Franchisor exercised Franchisor's rights pursuant to Franchisor's prescribed form of Collateral Assignment of Lease, arrange for transfer of the lease to Franchisor within fifteen (15) calendar days of termination or expiration of this Agreement; |
| 16.1.7 | Immediately surrender all stationery, printed matter, signs, advertising materials, supplies and other items containing the Proprietary Marks as Franchisor directs and all items which are a part of the trade dress of the System-immediately, no later than ten (10) calendar days after the termination or expiration of this Agreement; |
| 16.1.8 | Immediately cease holding itself out as Franchisor's Franchisee; |
| 16.1.9 | Immediately cease to communicate with all customers of the Franchised Business; |
| 16.1.10 | Take such action as shall be necessary to amend or cancel any assumed name, business name or equivalent registration, which contains any trade name or other Proprietary Mark Franchisor licensed to Franchisee, and furnish Franchisor evidence satisfactory to Franchisor of compliance with this obligation within fifteen (15) calendar days after the termination, expiration or transfer of this Agreement; |
| 16.1.11 | Permit Franchisor to make final inspection of Franchisee's financial records, books, and other accounting records within one (1) month of the effective date of termination, expiration, or transfer; |
| 16.1.12 | Comply with the post-termination covenants set forth in Section 17 hereof, all of which shall survive the transfer, termination or expiration of this Agreement; |
| 16.1.13 | Cease to use in advertising or in any other manner, any methods, procedures or techniques associated with Franchisor or the System; |
| 16.1.14 | Immediately remove Franchisor's Proprietary Marks from vehicles used in connection with the Franchised Business, and otherwise de-identify the vehicles from being associated with Franchisor or the System; |
| 16.1.15 | Execute from time to time any necessary papers, documents, and assurances to effectuate the intent of this Section 16; and |
| 16.1.16 | Reimburse Franchisor in connection with any costs Franchisor incurs in connection with enforcing Franchisee's obligations under this Section 16. |
| 16.2 | Option to Purchase Personal Property. Upon the termination or expiration of this Agreement, Franchisor, or Franchisor's designee shall have the option, but not the obligation, to purchase any personal property used in connection with operation of the Franchised Business by providing Franchisee written notice of Franchisor's election within sixty (60) calendar days after such termination or expiration and paying Franchisee the book value for such personal property within sixty (60) calendar days of such notice. For purposes of this paragraph, "book value" |

means the amount Franchisee actually paid for the personal property less depreciation (calculated by using the straight-line depreciation method on a ten (10) year depreciation schedule irrespective of the depreciation method or schedule Franchisee uses for accounting purposes). Notwithstanding the foregoing, to the extent that Franchisor exercises Franchisor's right to purchase any personal property that is subject to a lease or finance agreement, the purchase price of such personal property shall equal the amount of Franchisee's remaining obligations under the lease or finance agreement, as applicable. Franchisor shall be entitled to offset the purchase price by the amount of money owed by Franchisee to Franchisor for any payments necessary to acquire clear title to property or for any other debt. If Franchisor exercises Franchisor's option to purchase, pending the closing of such purchase, Franchisor has the right to appoint a manager to maintain operation of the Franchised Business, or Franchisor may require that Franchisee close the Franchised Business during such period without removing any assets. Franchisee is required to maintain in force all insurance policies required under this Agreement until the date of such closing. Franchisor has the unrestricted right to assign this option to purchase the Franchised Business. Franchisor will be entitled to all customary warranties and representations in connection with Franchisor's purchase of Franchisee's property, including, without limitation, representations and warranties as to ownership and condition of and title to the property; liens and encumbrances on the property; validity of contracts and agreements; and liabilities affecting the property, contingent or otherwise.

16.3 Exclusions. Franchisor may exclude from the personal property purchased under Section 16.2 cash or its equivalent and any equipment, signs, inventory, materials and supplies that are not reasonably necessary (in function or quality) to the Franchised Business's operation or that Franchisor has not approved as meeting standards for the Franchised Business.

16.4 Damages, Costs, and Expenses. In the event of termination for any default by Franchisee, Franchisee shall promptly pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of Franchisee's personal property, furnishings, equipment, signs, fixtures and inventory related to the operation of the Franchised Business

Exhibit B – Itemized List of Amounts Past Due

| Date | Transaction Type | Num | Customer | Due Date | Amount | Open Balance | |
|---|---|---|---|---|---|---|---|
| 12/31/2024 | Invoice | 2053 | The Designery Cincinnati Metro | 01/10/2025 | 500.00 | 500.00 | Royalties-December 2024 Revenue Fees-Minimum Applied |
| 01/01/2025 | Invoice | 2082 | The Designery Cincinnati Metro | 01/10/2025 | 599.00 | 599.00 | Technology Fee-January 2025 Fixed Fees |
| 1/31/2024 | Invoice | | The Designery Cincinnati Metro | 2/10/2025 | 500.00 | 500.00 | Royalties-January 2025 Revenue Fees-Minimum Applied |
| | | | | | $ 1,599.00 | $ 1,599.00 | |